EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CV   05   1384

EDWARD J. HUNEKE, Derivatively On
Behalf of VEECO INSTRUMENTS, INC.,

            Plaintiff,

    vs.

EDWARD H. BRAUN, PETER J. SIMONE,
RICHARD A. D'AMORE, JOEL A.
ELFTMANN, HEINS K. FRIDRICH,
DOUGLAS A. KINGSLEY, DR. PAUL R.
LOW, ROGER D. McDANIEL, IRWIN H.
PFISTER, and WALTER J. SCHERR,
inclusive,

            Defendants,

  - and -

VEECO INSTRUMENTS, INC.. a Delaware
corporation,

            Nominal Defendant.

Civil Action No.

VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT

MAR 1 5 2005

BROOKLYN OFFICE

TOWNES, J.

MATSUMOTO, M.J.

———————————————————x

Edward J. Huneke, ("Plaintiff") is a shareholder of Veeco Instruments, Inc.

("Veeco" or the "Company"), and files this Verified Shareholder Derivative Complaint

(the "Complaint") on behalf of the Company against certain of its officers and directors

seeking to remedy defendants' violations of the law, including breaches of fiduciary

duties that occurred between November 3, 2003 and February 10, 2005, inclusive (the

"Relevant Period") and that have caused substantial losses to Veeco and other damages,

such as to its reputation and goodwill.  Plaintiff hereby alleges upon personal knowledge

as to its own acts and upon information and belief as to all other matters, based upon, *inter alia*, an investigation conducted by its counsel, which included, among other things, the review of documents filed with the United States Securities and Exchange Commission ("SEC"), press releases, and other publicly disseminated statements, as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. 1332(a)(2). Diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) insofar as many of the acts and practices complained of herein occurred in this District and the securities at issue were traded on exchanges located in this District.

## THE PARTIES

3.      Plaintiff, Edward J. Huneke, is, and was at times relevant hereto, an owner and holder of Veeco common stock. Plaintiff is a resident of the state of Illinois.

4.      Nominal defendant Veeco is a corporation organized and existing under the laws of the state of Delaware with its headquarters located in this District at 100 Sunnyside Blvd., Woodbury, New York.

2

5.    Defendant Edward H. Braun ("Braun") is Chairman and Chief Executive Officer ("CEO") of Veeco and has been since January, 1990. Defendant Braun is, and at all times relevant hereto was a director of Veeco. Braun was President of Veeco from October 2000 to March 2003 and from January 1990 to May 2000. Prior to 1990, Braun served as Executive Vice President and Chief Operating Officer of Veeco's predecessor. Mr. Braun joined the predecessor in 1966 and held numerous positions with the predecessor, including Director of Marketing, General Manager and Chief Operating Officer. Braun knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' (the "Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Veeco paid defendant Braun millions of dollars in salary, bonus and other compensation, and granted him hundreds of thousands of options to purchase Veeco stock during those years. Defendant Braun is a resident of the state of New York.

6.    Defendant Peter J. Simone ("Simone") joined board of directors in July, 2004, and remains a board member and member of the Audit Committee at this time. Simone currently serves as an independent consultant for North Bridge Venture Partners and Spinner Asset Management, after 20 years of operating responsibility in high technology public and private companies including Speedfam-IPEC, Active Control Experts, Inc., Xionics Document Technologies, Inc. and GCA Corporation. Simone began his career as an auditor with Arthur Young & Company (now Ernst & Young). He is

3

currently a member of the Boards of Directors of Cymer Inc., Newport Corporation,
Sanmina-SCI Corp. and several private companies. Because of Simone's position on the
board, he knew the below-described adverse non-public information about the business of
Veeco, as well as its finances, markets and its internal accounting controls, via access to
internal corporate documents, conversations and connections with other corporate officers
and employees, attendance at Board of Directors' meetings and committees thereof and via
reports and other information provided to him in connection therewith. He is a resident of
the Commonwealth of Massachusetts.

      7.     Throughout the relevant period, Defendant Richard J. D'Amore
("D'Amore") served on the Company's board of directors of directors and on its
Compensation Committee. Because of D'Amore's position on the board, he knew the
below-described adverse non-public information about the business of Veeco, as well as its
finances, markets and its internal accounting controls, via access to internal corporate
documents, conversations and connections with other corporate officers and employees,
attendance at Board of Directors' meetings and committees thereof and via reports and
other information provided to him in connection therewith. He has been a general partner
of North Bridge Venture Partners since 1994. He also serves on the board of directors of
Solectron Corporation. During the relevant period, D'Amore sold 3,333 shares of Veeco
common stock, obtaining $72,378.43 in proceeds from this sale. D'Amore is a resident of
the Commonwealth of Massachusetts.

      8.     Throughout the relevant period Defendant Joel A. Elftmann ("Elftmann")
served on the Company's board of directors and served on its Audit Committee. Because
of Elftmann's position on the board and on the Audit Committee, he knew the below-

4

described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Elftmann is currently the President and a Director of Custom Fab Solutions LLC, a supplier to semiconductor capital equipment manufacturers. Elftmann was a co-founder of FSI International Inc. and served as its Chairman and Chief Executive Officer from May 1991 through December 1999, and thereafter served as its Chairman until January 2002. Mr. Elftman was a co-founder of Metron Technology, N.V., a distributor of semiconductor capital equipment, and serves as a Supervisory Director of Metron. He is also a Director Emeritus of SEMI. Elftmann is a resident of the State of Minnesota.

9.    Throughout the relevant period Defendant Heinz K. Fridrich ("Fridrich") has been a member of Veeco's board of directors and serves on its Audit Committee. Because of Fridrich's position on the board and on the Audit Committee, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. He is associated with and an Industry Professor Emeritus of the University of Florida. He joined the University of Florida in 1993 after 43 years with IBM, including serving as Vice President and General Manager of IBM's largest development and manufacturing site for semiconductors and

electronic packaging, and most recently as IBM's Vice President responsible for worldwide manufacturing and quality. He is also a director of CH Energy Group, Inc. and Solectron Corporation. Fridrich is a resident of the State of Florida.

10.     Throughout the relevant period, Defendant Douglas A. Kingsley ("Kingsley") has served as a member of the Company's board of directors, serving on its Audit Committee and as Chairman of its Nominating and Governance Committee. Because of Kingsley's position on the board and on the Audit Committee, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. He is a Senior Vice President of Advent International Corporation, a venture capital firm, where he has been employed since 1990. From 1985 through 1988, Mr. Kingsley was a sales engineer for Teradyne, Inc., a manufacturer of automatic test equipment for the electronics industry. He is also a director of Aspen Technology Inc.   Kingsley is a resident of the Commonwealth of Massachusetts.

11.     Throughout the relevant period, Defendant Paul R. Low ("Low") has served as a member of Veeco's board of directors and serves on its Compensation, Nominating and Governance committees.  Because of Low's position on the board, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees,

attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Low has been President and Chief Executive Officer of PRL Associates, a technology consulting firm, since founding the firm in 1992. Previously, Low was Vice President-General Manager, Technology Products for IBM from 1989 through 1992 and a member of IBM's Management Board from 1990 to 1992. Low is also a director of Applied Materials, Inc. and Solectron Corporation. Low is a resident of the state of New York.

12.    Throughout the relevant period, Defendant Roger D. McDaniel has served as a member of the Company's board of directors and serves as Chairman of the Compensation Committee and as a member of the Nominating and Governance committee. Because of McDaniel's position on the board, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. McDaniel , currently retired, was President and Chief Executive Officer of IPEC, Inc., which manufactured chemical-mechanical planarization (CMP) equipment for the semiconductor industry, from 1997 to April 1999. Through August 1996, McDaniel was Chief Executive Officer of MEMC Electronic Materials, Inc., a producer of silicon wafers. Mr. McDaniel is a past Chairman of SEMI and a director of Entegris, Inc. McDaniel is a resident of the state of Arizona

13.    Throughout the relevant period, Defendant Irwin H. Pfister ("Pfister") has served on Veeco's board of directors and serves as Chairman of the Audit Committee.

When Veeco's board meets in Executive Session, without the presence of Veeco employees, Pfister presides over these sessions. Because of Pfister's position on the board, the Audit Committee, and as the director who presides over the board when it meets in Executive Session, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Pfister is Executive Vice President of Schlumberger Ltd. and was formerly Chief Executive Officer of SchlumbergerSema, a leading information technology services provider. Pfister joined Schlumberger in May 1986 and has held several management positions, including Executive Vice President of Schlumberger Test and Transactions. From January 1990 to June 1997, Mr. Pfister was President of the Semiconductor Solutions Group. Pfister was formerly Chairman of the Board of SEMI. Pfister is a resident of the State of Nevada.

14.     Throughout the relevant period, Defendant Walter J. Scherr ("Scherr") has served as a member of the Company's board of directors. Because of Scherr's position on the board, he knew the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Scherr has been employed by Veeco as a consultant since December 1995. From December 1993 through December 1995, he was Executive Vice President of Veeco. From January 1990 through

8

December 1993, he was the Chief Financial Officer of Veeco. Scherr joined Veeco's predecessor in 1986 as General Manager of its UPA Technology Division. Prior thereto, Scherr was the principal and founder of Visual Sciences, Inc./Panafax (the first publicly traded facsimile company). Prior to that, he held a variety of other financial and operating management positions with Litton Industries and Sperry Gyroscope Co. Veeco is party to an agreement with Scherr, pursuant to which he is employed as a consultant to Veeco with respect to acquisitions and new business opportunities, as well as certain other matters. Mr. Scherr received $104,200 for his services in such advisory capacity as well as $27,000 in directors fees in 2003. On April 1, 2003, Mr. Scherr also received options to purchase 10,000 shares of Common Stock at an exercise price of $15.48 per share. Scherr is a resident of the State of Texas.

15.    Defendants Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, Pfister, and Scherr are referred to herein as the "Individual Defendants." Defendant Braun is both a director and officer of the Company.

16.    By reason of their positions as officers, directors and/or fiduciaries of Veeco, the Individual Defendants owed Veeco and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control Veeco in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Veeco and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

17.    Each director and officer of the Company owes to Veeco and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of

9

the affairs of the Company, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial condition, and more specifically the plethora of accounting improprieties at the Company's subsidiary, TurboDisc, as described below.

18.    To discharge their duties, the officers and directors of Veeco were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Veeco were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the finances at its newly acquired subsidiary, TurboDisc, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

10

(e)    remain informed as to how Veeco conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

19.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company.  The conduct of the Individual Defendants complained of herein involves a negligently and/or knowing and culpable violation of their obligations as directors and officers of Veeco, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of Defendant Braun, who was both an officer and director of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Veeco's Board during the Relevant Period.

20.    The Individual Defendants breached their duties of loyalty and good faith by allowing the Company to misrepresent the financial condition of its TurboDisc division, as detailed below, and by failing to prevent such illegal actions.  In addition, as a result of certain illegal actions and course of conduct during the Relevant Period, the Company is

11

now the subject of several class action law suits that allege violations of the federal securities laws. As a result, Veeco has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

> (a)  Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

> (b)  Costs incurred in investigating and defending Veeco and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

21.  Moreover, these actions have irreparably damaged Veeco's corporate image and goodwill. For at least the foreseeable future, Veeco will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Veeco's ability to raise equity capital or debt on favorable terms in the future is now impaired.

22.  During all times relevant hereto, the Individual Defendants breached their fiduciary duties to Veeco's shareholders by failing to conduct adequate due diligence in connection with the Company's purchase of Emcore Corporations's TurboDisc Metal Organic Cemical Vapor Deposition business; permitting financial statements to be issued which misrepresented to the investing public, including shareholders of Veeco, the Company's actual financial results.

## BACKGROUND

23.  Defendant Veeco is a Delaware corporation and maintains its principal executive offices in Woodbury, New York. Veeco designs, manufactures, markets and services a line of equipment primarily used by manufacturers in the data storage,

semiconductor, compound semiconductor/wireless and high-brightness light emitting diode industries.

<u>**VEECO'S PUBLIC STATEMENTS**</u>

24.    On November 3, 2003, Veeco announced it would acquire TurboDisc, "creat[ing] a Global Leader in Compound Semiconductor Deposition Technologies." The Company stated:

> Woodbury, NY, November 3, 2003—Veeco Instruments Inc. (Nasdaq: VECO) today announced that it has purchased Emcore Corporation's (Nasdaq: EMKR) TurboDisc Metal Organic Chemical Vapor Deposition (MOCVD) business. Combined with Veeco's molecular beam epitaxy (MBE) business, *the acquisition makes Veeco the only company that provides both key compound semiconductor epitaxial deposition technologies.* Emcore's MOCVD revenue was $51.1 million for the trailing twelve months ended June 30, 2003.
>
> *The ability to provide complementary MBE and MOCVD technologies will enable Veeco to address the full range of applications requiring the high performance aspects of compound semiconductor technologies,* including lower power, higher frequency operation, and light-emitting characteristics. MOCVD tools are particularly well-suited for the critical first step in the growth of high speed electronic, wireless and optoelectronic compound semiconductor materials employed in advanced wireless telecommunications and rapidly growing high brightness light-emitting diode (LED) lighting applications.
>
> \*    \*    \*    \*
>
> *About Emcore's MOCVD Business:*
> Emcore is a recognized industry leader in MOCVD production systems, with over 500 TurboDisc reactors shipped worldwide. TurboDisc reactors are used in the growth of III-V compounds for numerous compound semiconductor applications, including data and telecommunications modules, cellular telephones and solar cells. Emcore's GaNzilla production systems are the recognized leader in growing gallium nitride-based devices, most notably green, blue and white high brightness LEDs used in backlighting wireless mobile devices, and automotive applications. Emcore's patented TurboDisc technology is known for its unique, high-speed rotating disc deposition technique ideal for high production rates. TurboDisc reactors are capable of depositing a wide variety of materials—GaAs, AlGaAs, InP, InGaAlP, InGaN, AlGaN, SiC and GaN—onto a substrate to grow compound semiconductor materials on the atomic scale.

*Management Commentary:*

Edward H. Braun, Chairman and CEO of Veeco, commented, "This acquisition strengthens Veeco's position in the compound semiconductor market, as we are now uniquely able to provide "one-stop" shopping for epitaxial deposition solutions—both MOCVD and MBE. The MOCVD market is twice the size of the MBE available market. Emcore's MOCVD business is a good fit with Veeco's acquisition criteria: history of technology leadership and innovation, complementary technology for an existing Veeco market, leading market position, strong R&D and high market growth potential. We believe that Emcore's MOCVD business will be accretive to Veeco on a cash basis by the second quarter of 2004."

Mr. Braun added, "The addition of MOCVD strengthens our existing compound semiconductor and wireless/telecommunications position and permits penetration of the rapidly emerging LED market opportunity." Strategies Unlimited projects the GaN LED market to exceed $1.9B in 2003, growing at 24% CAGR to reach over $4B by 2007.

25.    On November 10, 2003, the Company issued its quarterly report on Form 10-Q for the period ended September 30, 2003. The Company reported revenues of $63.1 million for the quarter and a net loss of ($2.1) million. The Company reported inventory assets of $86.1 million and deferred income tax assets of $39.5 million. The Company also reported $14.2 million in accounts payable. The Company reiterated its statements concerning the TurboDisc acquisition referenced above.

26.    On February 6, 2004, Veeco announced its financial results for the quarter and year ended December 31, 2003. The Company announced revenues of $76.9 million for the quarter, up 22% from the previous quarter. The Company reported a net loss of $4.8 million, or $0.16 per share. Defendant Braun stated:

"Veeco's fourth quarter orders revenues in EBITA improved both sequentially and year over year. Order strength reflected a broad industry upturn across all of our markets and in all geographic regions. Capacity and technology drivers were evident in semiconductor data storage, wireless, compound semiconductor and scientific research. Fourth quarter orders of $96.8 million (up 51% sequentially) were Veeco's strongest overall orders in 10 quarters. Fourth quarter revenue of $76.9 million was up 22% sequentially.

14

\*   \*   \*   \*

*The November 2003 acquisitions of TurboDisc MOCVD and Advanced Imaging Inc.'s precision lapping technologies allowed us to significantly broaden our product and technology offerings to Veeco's core markets in 2004."*

For the full year, Veeco announced its sales were $279.3 million. The Company further stated:

> Veeco incurred an operating loss of $9.3 million in 2003 compared to an operating loss of $137.9 million in 2002. Included in the 2003 operating loss was a $1.5 million charge for the write-off of in-process R&D, a $1.7 million reduction in gross profit from purchase accounting adjustments due to the required capitalization of profit in inventory and permanent elimination of certain deferred revenue, and $5.4 million of merger and restructuring costs. Exclusive of these charges Veeco's 2003 EBIDTA was $13.0 million compared to $1.3 million in 2002 which also excludes restructuring charges. Veeco's net loss for 2003 was $9.7 million ($0.33) per share compared to a net loss of $123.7 million ($4.25 per share in 2002). Excluding certain charges, 2003 earnings were $0.11 per diluted share compared to the loss of $.010 per share in 2002. Mr. Braun commented, "Industry market conditions improved dramatically in the fourth quarter and we appear to be at the start of a sustainable recovery cycle after two years of historically low capex investment by our customers. Veeco's diversification strategy should serve us well as multiple Veeco markets are forecasted to experience 2004 growth.

27.     On March 12, 2004, the Company filed its annual report on Form 10-K with the S.E.C. for the period ended December 31, 2003. The Form 10-K was signed by Defendants Braun, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, Pfister and Scherr. The Company confirmed its previously announced results, and reported year-end inventories of $97.6 million and deferred income tax assets of $18.1 million. The Company also reported accounts payable of $19.6 million. The annual report was signed by Braun. Braun also certified in connection with the annual report:

> Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such

statements were made, not misleading with respect to the period covered by this annual report.

Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report.

The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

28.    The March 12, 2004 Form 10-K, included the following representations regarding the Company's internal control system and disclosure procedures:

**Item 9a. Controls and Procedures.**

The Company's senior management is responsible for establishing and maintaining a system of disclosure controls and procedures (as defined in Rule 13a-14 and 15d-14 under the Securities Exchange Act of 1934 (the "Exchange Act")) designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

The Company has evaluated the effectiveness of the design and operation of its disclosure controls and procedures under the supervision of and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, within 90 days prior to the filing date of this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in timely alerting them to material information required to be included in our periodic Securities and Exchange Commission filings.

Subsequent to that evaluation there have been no significant changes in our internal controls or other factors that could significantly affect these controls after such evaluation.

29.    Defendant Braun also submitted an additional certification pursuant to 18 U.S.C. § 1350, which states, in relevant part:  [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

30.    On April 26, 2004, Veeco announced its financial results for the quarter ended March 31, 2004. The Company reported first-quarter 2004 revenues of $94.5 million, up 23% sequentially from the prior quarter, and a net loss of $0.7 million, or ($0.02) per share. Defendant Braun stated:

> *"We are pleased to report the first quarter revenue's earnings and bookings all exceeded our quarterly guidance. . . . Veeco received several multiple system orders for our TurboDisc MOCVD products from worldwide customers who are increasing their manufacturing capacity of green, blue and white light emitting diodes (LEDs). The growth of this newly acquired product line has surpassed our initial expectations and we see the LED market as an exciting growth opportunity for Veeco in 2004 and 2005. . . .* First quarter 2004 orders were the strongest in 13 quarters and are indicative of the first growth opportunities available to Veeco through our multi-market strategy."

31.    On May 3, 2004, the Company issued its quarterly report on Form 10-Q for the period ended March 31, 2004, in which it confirmed the above-referenced results. The Company also reported inventory assets of $104.4 million, deferred income tax assets of $9.7 million, and accounts payable of $25.1 million. The Company also stated:

> By region, there continues to be a shift in sales from the U.S. to the Asia Pacific region, although all regional sales have increased due to the TurboDisc business and Aii acquisitions, particularly the Asia Pacific region, which saw a $10.2 million increase in sales in the first quarter of 2004 due to the acquired companies. The Company believes that there will continue to be quarter-to-quarter variations in the geographic distribution of sales.

32.    The May 3, 2004 Form 10-Q, included the same representations regarding the Company's internal control system and disclosure procedures set forth in the March 12, 2004 Form 10-K.

33.    On July 26, 2004, the Company announced its financial results for the quarter ended June 30, 2004. The release was entitled "Results Were Above Prior Quarter

and Prior Year and at High-End of Guidance." The Company reported second quarter 2004 sales of $102.9 million with net income of $1.6 million or earnings per diluted share of $0.05 per share. Defendant Braun stated:

> "We are pleased to report that Veeco's second quarter 2004 orders, revenue and earnings all exceeded the prior year and prior quarter, and met or exceeded our guidance as we continue to experience a multi-market recovery in our core semiconductor, compound semiconductor/wireless and data storage markets.

> \*   \*   \*   \*

> We are pleased to report that Veeco's second quarter 2004 orders, revenue and earnings all exceeded the prior year and prior quarter, and met or exceeded our guidance as we continue to experience a multi-market recovery in our core semiconductor, compound semiconductor/wireless and data storage markets."

34.     On August 3, 2004, the Company issued its quarterly report on Form 10-Q for the period ended June 30, 2004, in which it confirmed the above-stated results. The Company also reported inventory assets of $108.1 million, deferred income-tax assets of $16.1 million, and accounts payable of $46.5 million. The report was signed by Defendant Braun. Braun also signed certification that confirmed that these results for the period ended June 30, 2004, did not contain any untrue statements of material facts or omit material facts necessary to make them, in light of the circumstances under which the statements were made, not misleading. Those certifications were essentially identical to those referenced in above paragraphs 27-28. The August 3, 2004 Form 10-Q repeated the disclosures regarding Controls and Procedures contained in the May 3, 2004 Form 10-Q.

35.     The August 3, 2004 Form 10-Q, included the same representations regarding the Company's internal control system and disclosure procedures set forth in the march 12, 2004 Form 10-K.

19

36.    On October 12, 2004, Veeco announced its financial results for the quarter ended September 30, 2004.  The Company stated:

> Veeco Instruments Inc. (Nasdaq:  VECO) today announced that weak industry-wide capital equipment conditions, particularly in compound semiconductor adversely impacted its results for the quarter ended September 30, 2004.
>
> As a result Veeco's orders for the third quarter of 2004 are expected to be approximately $80 million, compared to $64 million in the third quarter of 2003 and $125 million in the second quarter of 2004.  (Veeco's order guidance provided on 7/26/04 was $125-130 million).
>
> Veeco expects third quarter 2004 revenues to be approximately $93 million, compared to $63 million in the third quarter of 2003, and $103 million in the second quarter of 2004.  (Revenue guidance was $105-110 million).
>
> Veeco's third quarter 2004 GAAP loss is expected to be between ($0.06) and ($0.04) per share compared to third quarter 2003 GAAP loss of ($0.07 per share and GAAP earnings of $0.05 per diluted share in the second quarter of 2004. (Veeco's third quarter guidance was GAAP earnings between $0.06 and $0.09 per diluted share on a GAAP basis).

*    *    *    *

37.    On November 9, 2004, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2004.  The Company confirmed the above results - net sales for the quarter of $92.4 million and net loss of ($0.6 million).  The Company also reported inventory assets of $123.9 million, deferred income tax assets of $15.3 million and accounts payable of $47.1 million.  The Company further reported that:

> "the improvement in epitaxial process equipment is primarily due to $21.3 million in sales from the TurboDisc business, partially offset by a $0.2 million net decrease in other business. . . .  Compared to the second quarter orders to HB-LED/Wireless customers decreased 71.4% due to a $30.3 million decrease in TurboDisc orders.  This decrease in business resulted from spending freezes initiated by many Asian customers at the end of the quarter as they paused to absorb the significant amount of Veeco account purchases in the first half of 2004."

The Company further stated, "Epitaxial process equipment margins improved from 37.0% to 39.5%, due to the favorable mix of TurboDisc MOCDD sales which are higher in margin than the MBE products." The quarterly report was signed by Defendant Braun and certified as stated above in Paragraphs 27-28. The November 9, 2004 Form 10-Q repeated the disclosures regarding Controls and Procedures contained in the August 3, 2004 and May 3, 2004 Forms 10-Q.

### The Truth Begins to Emerge

38.     On February 11, 2005, Veeco announced that it was postponing the release of its financial results for the fourth quarter and full year 2004 pending completion of an internal investigation of improper accounting transactions at its TurboDisc division. The Company further revealed:

> Veeco is conducting an internal investigation of improper accounting transactions recorded at its TurboDisc division, causing a postponement in the release of Veeco's earnings. The investigation focuses principally on the value of inventory, accounts payable and certain revenue items carried on the books of TurboDisc. Veeco acquired the assets of TurboDisc in November 2003. The investigation was commenced after Veeco's internal audit staff and corporate financial management discovered improper accounting transactions in the course of a Veeco internal audit and transitioning the division to Veeco's SAP accounting system during the fourth quarter of 2004.

39.     In a press release dated February 17, 2005, Emcore's Chief Financial Officer, Thomas G. Werthan, stated: ""This transaction was an asset deal that closed over fifteen months ago. Any potential changes to Veeco's 2004 financial results relate to events after the sale to Veeco. The revenue recognition and other accounting issues at Veeco's TurboDisc division are a purely internal matter for Veeco."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

40.    Plaintiff brings this action derivatively in the right and for the benefit of Veeco to redress injuries suffered, and to be suffered, by Veeco as a direct result of the breaches of fiduciary duty by the Individual Defendants.  Veeco is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

41.    Plaintiff will adequately and fairly represent the interests of Veeco in enforcing and prosecuting its rights.

42.    Plaintiff is and was an owner of the stock of Veeco during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

43.    The current Board of Directors of Veeco consists of the following ten individuals: Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, Pfister, and Scherr.  Plaintiff has not made any demand on the present Board of Directors of Veeco to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

44.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non public information regarding the state of the Company's internal financial controls and the accounting improprieties related to TurboDisc.  While in possession of this material adverse non-public information regarding the Company, defendant D'Amore participated in the illegal insider selling noted herein.  Because he received a personal financial benefit

22

from the challenged insider trading transactions, he is interested and any demand upon him is futile.

45.    The Compensation Committee sets the compensation levels of senior management and administers Veeco's stock option plans and employee stock purchase plan. The Compensation Committee operates under a charter, a copy of which can be found on the Company's website ( *www.veeco.com* ). Under the terms of its Charter, the Compensation Committee is directly responsible for establishing annual and long term performance goals and objectives for the Company's elected officers.  This responsibility includes: (i) reviewing and affirming all contractual employment and compensation arrangements for proxy officers of the Company ; (ii) Reviewing, approving and making recommendations to the Board of Directors regarding matters of succession planning, organizational development, and other major Human Resources planning issues as deemed appropriate by the Compensation Committee; (iii) Establishing annual and long-term performance criteria and goals and maximum individual awards at the beginning of each performance period, and certifying results achieved at the end of each performance period for executive officers of the Company; (iv) Making individual compensation determinations including, but not limited to, salary, annual and long-term incentive awards of cash and stock, stock option grants, and the totals thereof with respect to the Chief Executive Officer and, upon recommendation of the Chief Executive Officer, with respect to other proxy officers, other executive officers, and members of senior management of the Company and, if not included in any of the foregoing groups, the five highest paid employees of the Company; (v) Reviewing the structure and level of the compensation of non-employee members of the Board; when recommended by the Chairman of the Board,

the Committee will review and recommend to the Board compensation arrangements for non-employee members of the Board of Directors; and (vi) Overseeing compliance with respect to compensation disclosure and reporting requirements under applicable laws, rules and regulations; in this context, the Committee shall review and approve the compensation section of the Company's annual proxy statement including the Committee's annual report to stockholders on the compensation of the Chief Executive Officer and other executive officers of the Company. The Compensation Committee is comprised of defendants D'Amore, Low and McDaniel. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants D'Amore, Low and McDaniel. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Braun, Simone, Elftmann, Fridrich, Kingsley, Pfister, and Scherr is futile.

46.    The principal professional occupation of defendant Braun is his employment with Veeco, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, for FY:03, FY:02, FY:01, Veeco paid defendant Braun $ 636,538.00, $555,000.00, and, $925,000.00 respectively, in salary, bonus and other compensation, and granted him 140,000, 200,000 and 200,000 options to purchase Veeco stock, respectively. Accordingly, defendant Braun lacks independence from defendants D'Amore, Low and McDaniel , defendants who are not disinterested and/or independent and who exert influence over defendant Braun's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant Braun incapable of impartially considering a demand to commence and vigorously prosecute this action.

47.    Veeco's directors are not disinterested or independent because they are personally liable for the breach of fiduciary duties for failing to implement proper internal controls and reporting systems, resulting in the Company's misrepresenting its financial condition.. Thus, the Veeco Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Veeco to millions of dollars in liability for possible violations of applicable securities laws.

48.    The Audit Committee reviews the scope and results of the audit and other services provided by Veeco's independent auditors. The Audit Committee operates under a charter, a copy of which can be found on the Company's website ( *www.veeco.com* ). The Audit Committee presently consists of defendants Elftmann, Fridrich, Kingsley, Simone and Pfister. During 2003, the Audit Committee met twelve times.  As set forth in the Charter, the purpose of the Audit Committee is to "assist the Company's Board of Directors with the Board's oversight of the accounting and financial reporting processes of the Company and the audit of the financial statements of the Company."  Specifically, the Committee is responsible to assist the Board's with its responsibility to monitor (i) the integrity of the Company's financial statements; (ii) the independent auditor's qualifications and independence; and (iii) the performance of the Company's internal audit function and internal auditors.

49.    Five of the ten board members, defendants Elftmann, Fridrich, Kingsley, Simone and Pfister are on the Audit Committee, and as Audit Committee members, breached their fiduciary duty to the Company by failing to adequately monitor "the

performance of the Company's internal audit function and internal auditors." Because defendants Elftmann, Fridrich, Kingsley, Simone and Pfister cannot be expected to bring an action against themselves, it would be futile to demand that the other five defendants, Braun, D'Amore, Low, McDaniel and Sherr, as no majority would or could be reached in favor of instituting such action.

50.     Veeco has adopted a Code of Ethics for Senior Officers (the "Code") effective January 21, 2004, which applies to its chief executive officer, president, principal financial officer, principal accounting officer and persons performing similar functions. A copy of the Code can be found on Veeco's website (www.veeco.com). The Code of Ethics is Veeco's guide to Company policies and legal requirements and is designed to deter wrongdoing and to promote: (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by Veeco and in Veeco's public communications; (iii) compliance with applicable governmental laws and regulations; (iv) the prompt internal reporting of violations of this Code of Ethics to an appropriate person or persons identified in this Code of Ethics; and (v) accountability for adherence to this Code of Ethics. The Code of Ethics also sets forth the Company's Ethical standards of Conduct, including the avoidance of any actual or apparent conflict of interest. The Code of Ethics also sets forth the Company's Disclosure Standards, as follows: "The Senior Officers are responsible for upholding Veeco's policy to make full, fair, accurate, timely and understandable disclosure.... **Financial data is to be reported accurately and in accordance with generally accepted**

26

**accounting principles consistently applied....**" [emphasis added]. When a violation of the Code of Ethics is uncovered, it is to be reported to the Audit Committee.

51.    As of March 9, 2004, defendant Braun held 65,019 shares of Veeco common stock and 710,665 options/warrants to purchase additional shares. Thus, defendant Braun had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

52.    As of July 22, 2004, defendant Simone held 10,000 stock options to purchase Veeco common stock, with a strike price of $20.67. Thus, defendant Simone had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

53.    As of March 9, 2004, defendant D'Amore held 43,701 shares of Veeco common stock and 61,999 options/warrants to purchase additional shares of Veeco common stock. Thus, defendant D'Amore had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

54.    As of March 9, 2004, defendant Elftmann held 5,333 shares of Veeco common stock and 58,666 options/warrants to purchase additional shares of Veecom common stock. Thus, defendant Elftmann had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

55.    As of March 9, 2004, defendant Fridrich held 45,000 options/warrants to purchase shares of Veeco common stock. Thus, defendant Fridrich had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

56.    As of March 9, 2004, defendant Kingsley held 31,860 options/warrants to purchase shares of Veeco common stock. Thus, defendant Kingsley had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

57.    As of March 9, 2004, defendant Low owned 45,000 options/warrants to purchase shares of Veeco common stock. Thus, defendant Low had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

58.    As of March 9, 2004 defendant McDaniel held 31,000 options/warrants to purchase shares of Veeco common stock. Thus, defendant McDaniel had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

59.    As of March 9, 2004, defendant Pfister held 45,000 options/warrants to purchase shares of Veeco common stock. Thus, defendant Pfister had every incentive to participate in the issuance of false and misleading statements about the business of Veeco

in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

60.     As of March 9, 2004, defendant Scherr held 780 shares of Veeco common stock and 25,333 options/warrants to purchase shares of Veeco common stock. Veeco is party to an agreement with Scherr, pursuant to which he is employed as a consultant to Veeco with respect to acquisitions and new business opportunities, as well as certain other matters. Scherr received $104,200 for his services in such advisory capacity as well as $27,000 in directors' fees with respect to 2003. On April 1, 2003, Mr. Scherr also received options to purchase 10,000 shares of Common Stock at an exercise price of $15.48 per share pursuant to the 2000 Plan. Thus, defendant Scherr had every incentive to participate in the issuance of false and misleading statements about the business of Veeco in order to effectuate a rise in Veeco's stock price and a commensurate increase in his own net worth.

61.     The Director Defendants, other than Mr. Braun, receive a retainer of $5,000 per quarter ($6,250 for committee chairman), a fee of $2,000 for attending each board meeting held in person, $1,000 for attending each board meeting held by conference call and $1,000 for attending each committee meeting. Pursuant to the 2000 Plan, each non-employee Director who meets the eligibility criteria for such plan receives an automatic annual grant of 7,000 options with an exercise price equal to the fair market value of a share of Common Stock on the date of grant. In 2003, the Company also made an additional discretionary grant to each non-employee director of 3,000 options. A proposed amendment to the 2000 Plan would increase the automatic annual grant to non-employee Directors to 10,000 options. In 2003, each of Messrs. D'Amore, Elftmann, Fridrich,

Kingsley, Low, McDaniel and Pfister received a grant of 10,000 options at an exercise price of $16.43.

62.     The Individual Defendants, because of their inter related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the false and misleading statements surrounding TurboDisc , as detailed herein supra, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(a)     Defendants D'Amore, Fridrich and Low are long time business associates, all of them serving not only on Veeco's board, but also on the board of directors of Solectron, Inc.  Defendants Low and Fridrich also both worked for IBM. Because of their long standing and entangling business and professional relationships, neither defendant D'Amore, Fridrich nor defendant Low will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants;

(b)     Defendants Braun, Elftmann, McDaniel and Pfister are also long time associates as directors, former directors, and past chairmen of the trade association, Semiconductor Equipment Materials International ("SEMI").  Because of their long standing association with SEMI, defendants Braun, Elftmann, McDaniel and Pfister will not take action as requested by plaintiff herein against one another or the remainder of the Individual Defendants; and

(c)     Defendant Simone serves as a consultant to NorthBridge Venture Partners ("Northbridge").  Defendant D'Amore is the general partner of Northbridge.

Because of their affiliations with Northbridge, defendants Simone and D'Amore will not take action as requested by Plaintiff herein against one another or the remained of the Individual Defendants.

63.    In order to bring this suit, all of the directors of Veeco would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

64.    The acts complained of constitute violations of the fiduciary duties owed by Veeco's officers and directors and these acts are incapable of ratification.

65.    Any suit by the current directors of Veeco to remedy these wrongs would likely expose the Individual Defendants and Veeco to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

66.    Veeco has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Veeco any part of the damages Veeco suffered and will suffer thereby.

67.    If Veeco's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Veeco. However, due to certain changes in the

language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Veeco against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Veeco, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Veeco to sue them, since they will face a large uninsured liability.

WHEREFORE, plaintiff demands judgment as follows:

a.    Against each director Defendant and in favor of nominal defendant Veeco for the amount of damages sustained by the Company as a result of the breaches of fiduciary duties alleged herein;

b.    Requiring the director Defendants to return to Veeco all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Veeco;

c.    Ordering the director Defendants, and those under their supervision and control, to implement and enforce policies, practices and procedures on behalf of Veeco and its stockholders that are designed to detect and prevent the misconduct described herein;

d.    Awarding plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees and costs and expenses;

e.       Ordering Veeco to implement remedial measures to ensure the practices and acts as complained of herein are not repeated

f.       Such other and further relief as is just and proper in light of all the circumstances of this case.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 14, 2005

LASKY & RIFKIND, LTD

Leigh Lasky
Marci B. Wilson
100 Park Avenue, 12th Floor
New York, New York  10017
212-907-0700

*Attorneys for Plaintiff*

*Of Counsel:*

GOLDMAN SCARLATO & KARON, P.C.
Mark S. Goldman
Paul J. Scarlato
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
215-545-7200

## VERIFICATION

Ed Huneke hereby declares under penalty of perjury under the laws of the United States of America that he is the derivative shareholder plaintiff in the foregoing Shareholder Derivative Complaint ("Complaint"); has reviewed the Complaint; and knows the contents thereof. The same is true to its own knowledge, except as to those matters alleged upon information and belief, as to which matters, it believes it to be true.

Dated: March _9_, 2005

_Ed Huneke_
Ed Huneke
Full Name
_Edward J Huneke_
Edward J. Huneke