# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ------------------------------x | | |
| EDWARD J. HUNEKE, derivatively on behalf of VEECO INSTRUMENTS, INC., | : : : | CV-05-1384 (LDW) (ETB) |
| Plaintiff(s), | : : | **CONSOLIDATED AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | : : | |
| EDWARD H. BRAUN, et al., | : : : | |
| Defendant(s), | : | |
| ------------------------------x | | |
| ------------------------------x | | |
| AUGUST SCHUPP, III, derivatively on behalf of VEECO INSTRUMENTS, INC., | : : | CV-05-1624 (LDW) (ETB) |
| Plaintiff(s), | : : | |
| vs. | : : | |
| EDWARD H. BRAUN, et al., | : : | |
| Defendant(s), | : | |
| ------------------------------x | | |
| DAVID ALTMAN, derivatively on behalf of VEECO INSTRUMENTS, INC., | : : | CV-05-1986 (LDW) (ETB) |
| Plaintiff(s), | : : | |
| vs. | : : | |
| EDWARD H. BRAUN, et al., | : : | |
| Defendant(s) | : | |
| ------------------------------x | | |

Edward J. Huneke, August Schupp, III and David Altman ("Plaintiffs") are shareholders

of Veeco Instruments, Inc. ("Veeco" or the "Company"), and file this Amended Verified

Shareholder Derivative Complaint (the "Complaint") on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of the law, including breaches of fiduciary duties relating to events that occurred between November 3, 2003 and February 10, 2005, inclusive (the "Relevant Period") and that have caused substantial financial losses to Veeco and other damages, including, but not limited to, its reputation and goodwill. Plaintiffs hereby allege upon personal knowledge as to their own acts and upon information and belief as to all other matters, based upon, *inter alia*, an investigation conducted by their counsel, which included, among other things, the review of publicly available documents filed with the United States Securities and Exchange Commission ("SEC"), press releases and other media reports, as well as documents obtained by counsel through their proprietary investigation.

## INTRODUCTION

1.      On November 3, 2003, Veeco purchased the TurboDisc division from Emcore Corporation.  Veeco touted the deal as a key acquisition that would purportedly allow it to significantly broaden its product and technical offerings to its key customers.

2.      TurboDisc was a substantial acquisition for Veeco.  It added 120 new employees to its then workforce of approximately 1,100, as well as assets necessary to the engineering, design and manufacturing of MOCVD products, including a physical plant in New Jersey.

3.      Throughout the relevant period, the TurboDisc division had a substantial and material impact on Veeco's financial results.  According to Veeco's third quarter report for 2004, within less than a year of the acquisition, the contribution from TurboDisc had increased the Company's net sales by more than 25%, and increased its total orders by 43%.

4.      After the acquisition, TurboDisc became one of the largest and most important divisions in the Company. Despite its prominence, however, Veeco's Board of Directors failed to

2

ensure that the Company implemented an internal reporting system sufficient to ensure that it was accurately reporting TurboDisc's financial results. Moreover, Defendants failed to implement an adequate system of corporate checks and balances in order to safeguard the TurboDisc division from financial fraud. It took more than a year for the Board to react to these shortcomings, which included permitting total control over the TurboDisc accounting system to rest in the hands of only one employee. During that period, the foreseeable dire consequences of those inadequacies – namely that the lone employee would fraudulently inflate TurboDisc's financial statements – came to fruition. Defendants' delayed response to Veeco's insufficient oversight, controls and corporate checks was too little, too late and came after the substantial harm to the Company was already done.

5.     Ultimately, the Board's failure to act as a proper steward of the Company was revealed and Defendants were forced to admit that:

- There were material deficiencies in Veeco's internal controls;

- The financial reporting system in place was wholly inadequate to ensure that Veeco's financial results were accurately reported, and the legacy accounting system utilized by TurboDisc to report its financial results was outdated and outmoded; and

- By permitting one employee to have total control over TurboDisc's accounting entries, Veeco's accounting system lacked appropriate checks to ensure that such fraud would not take place.

6.     As a result of the Board's failure to ensure that a proper system of internal controls was in place, Veeco was forced to restate its reported financial results for the three quarters subsequent to the TurboDisc acquisition, significantly reducing its previously reported earnings. The restated financial results revealed that the Company was not nearly as profitable as it had previously reported to investors. Whereas the Company had initially announced results

for the first three quarters of 2004 that significantly beat the prior years' numbers, the restated results showed the Company actually performed *worse* than it did in the prior year.

7.      Veeco's restatements eroded market confidence in the Company and led to the filing of numerous securities fraud class action lawsuits, potentially exposing the Company to debilitating judgments or settlements.

8.      In addition to the above-mentioned allegations, counsel's investigation has revealed that the inadequacies in Veeco's internal control system are more wide-spread than disclosed in Veeco's public statements. Specifically, a former Veeco employee has alleged that Veeco repeatedly committed serious violations of export laws in connection with its overseas sales, which constitute a material portion of Veeco's total sales. If proved, such violations could lead to fines and/or a suspension of the Company's export licenses, which could threaten the Company's future viability.

9.      Defendants' reckless stewardship of Veeco, particularly their failure to institute appropriate controls and oversight of all areas of the Company's business, has exposed the Company to potentially significant fines and legal liability, has substantially impaired the Company's market capitalization, has eroded the Company's goodwill and trust in the market place, and has threatened the Company's overseas sales.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2). Diversity exists between the plaintiffs and each Defendant, and the amount in controversy exceeds $75,000. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in

the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) insofar as many of the acts and practices complained of herein occurred in this District and the nominal Defendant Veeco is headquartered in this District.

## THE PARTIES

12.    Plaintiff Edward J. Huneke, is, and was at times relevant hereto, an owner and holder of Veeco common stock. Plaintiff Huneke is a citizen of the state of Illinois.

13.    Plaintiff August Schupp, III, is, and was at times relevant hereto, an owner and holder of Veeco common stock. Plaintiff Schupp is a citizen of California.

14.    Plaintiff David Altman, is, and was at times relevant hereto, an owner and holder of Veeco common stock. Plaintiff Altman is a citizen of New Jersey.

15.    Nominal Defendant Veeco is a corporation organized and existing under the laws of Delaware, with its headquarters located in this District at 100 Sunnyside Blvd., Woodbury, New York.

16.    Defendant Edward H. Braun ("Braun") is, and has been since January, 1990, Chairman and Chief Executive Officer ("CEO") of Veeco. Braun is, and at all times relevant hereto has been, a director of Veeco. Braun was President of Veeco from January 1990 to March 2003, with the exception of a six-month period between May and October 2000. Prior to 1990, Braun served as Executive Vice President and Chief Operating Officer of Veeco's predecessor. Braun joined the predecessor in 1966 and held numerous positions with it, including Director of Marketing, General Manager and Chief Operating Officer. Braun knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well

5

as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Veeco paid Defendant Braun millions of dollars in salary, bonus and other compensation, and granted him hundreds of thousands of options to purchase Veeco stock. Braun is a citizen of New York.

17.    Defendant Peter J. Simone ("Simone") joined the Veeco board in July, 2004, and remains a member of the board and member of the Audit Committee at this time.  Simone currently serves as an independent consultant for North Bridge Venture Partners and Spinner Asset Management.  He is currently a member of the Boards of Directors of Cymer Inc., Newport Corporation, Sanmina-SCI Corp. and several private companies.  Because of Simone's position on the board, he knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  Simone is a citizen of Massachusetts.

18.    Throughout the Relevant Period, Defendant Richard J. D'Amore ("D'Amore") has been a member of Veeco's board and was a member of the board's Compensation Committee.  Because of his position on the board, D'Amore knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. He has been a general partner of North Bridge Venture Partners since 1994. He also serves on the board of directors of Solectron Corporation. D'Amore is a citizen of Massachusetts.

19.    Throughout the Relevant Period Defendant Joel A. Elftmann ("Elftmann") has been a member of Veeco's board and was a member of the board's Audit Committee. Because of his position on the board and on the Audit Committee, Elftmann knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Elftmann is currently the President and a Director of Custom Fab Solutions LLC, a supplier to semiconductor capital equipment manufacturers. Elftmann is a citizen of Minnesota.

20.    Throughout the Relevant Period Defendant Heinz K. Fridrich ("Fridrich") has been a member of Veeco's board and has been a member of the board's Audit Committee. Because of his position on the board and on the Audit Committee, Fridrich knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports

and other information provided to him in connection therewith. Fridrich is a director of CH Energy Group, Inc. and Solectron Corporation. He is a citizen of Florida.

21.     Throughout the relevant period, Defendant Douglas A. Kingsley ("Kingsley") has been a member of Veeco's board and has been a member of the board's Audit Committee and Chairman of its Nominating and Governance Committee. Because of his position on the board and on the Audit Committee, Kinglsey knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Kingsley is a citizen of Massachusetts.

22.     Throughout the Relevant Period, Defendant Paul R. Low ("Low") has been a member of Veeco's board and has been a member of the board's Compensation, Nominating and Governance committees. Because of his position on the board, Low knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Low is also a director of Applied Materials, Inc. and Solectron Corporation. He is a citizen of New York.

23.     Throughout the Relevant Period, Defendant Roger D. McDaniel has been a member of Veeco's board and serves as Chairman of the Compensation Committee and as a member of the Nominating and Governance committee. Because of his position on the board,

McDaniel knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. McDaniel is a citizen of Arizona

24.     Throughout the Relevant Period, Defendant Irwin H. Pfister ("Pfister") has been a member of Veeco's board and serves as Chairman of the Audit Committee.  When Veeco's board meets in Executive Session, without the presence of Veeco employees, Pfister presides over these sessions.  Because of his position on the board, the Audit Committee, and as the director who presides over the board when it meets in Executive Session, Pfister knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  Pfister is a citizen of Nevada.

25.     Throughout the Relevant Period, Defendant Walter J. Scherr ("Scherr") has been a member of Veeco's board.  Because of his position on the board, Scherr knew, or recklessly failed to know, the below-described adverse non-public information about the business of Veeco, as well as its finances, markets and its internal accounting controls, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board of directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. Scherr has been employed by

9

Veeco as a consultant since December 1995. From December 1993 through December 1995, he was Veeco's Executive Vice President. From January 1990 through December 1993, he was its Chief Financial Officer. Scherr joined Veeco's predecessor in 1986 as General Manager of its UPA Technology Division. Scherr is employed as a consultant to Veeco with respect to acquisitions and new business opportunities, as well as certain other matters. Mr. Scherr received $104,200 for his services in such advisory capacity as well as $27,000 in director's fees in 2003. On April 1, 2003, Mr. Scherr also received options to purchase 10,000 shares of Common Stock at an exercise price of $15.48 per share. Scherr is a citizen of Texas.

26.     Defendants Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, Pfister, and Scherr are referred to herein as the "Individual Defendants."

27.     By reason of their positions as directors, and with regard to some, Officers, and/or fiduciaries of Veeco, the Individual Defendants owed Veeco and its shareholders fiduciary obligations of trust, loyalty, due care, good faith, and fair dealing and were and are required to use their utmost ability to control Veeco in a fair, just, honest and equitable manner.

28.     Each director and officer of the Company owes to Veeco and its shareholders the fiduciary duty to exercise due care and good faith and diligence in the administration of the Company's affairs, and the highest obligations of fair dealing. In addition, as directors of a publicly held company, the Individual Defendants had a duty to insure that the Company had sufficient internal controls to ensure that it promptly disseminated accurate and truthful information with regard to the Company's financial results, that the Company had adequate corporate checks to protect against the plethora of accounting improprieties at the Company's TurboDisc division, as described below, and to ensure that the Company complied with export laws in connection with its international sales.

29.    To discharge their duties, the directors of Veeco were required to exercise reasonable and prudent supervision over management, and the Company's policies, practices and financial controls. By virtue of such duties, the Veeco directors were required to, among other things:

(a)    Ensure that an adequate system of internal controls was in place such that Veeco complied with applicable laws and financial results were reported accurately;

(b)    Ensure that the Company had adequate corporate checks in place to ensure the Company was in compliance with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    Ensure that management was conducting the affairs of the Company in an efficient, business-like manner to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock; and

(d)    Remain informed as to how Veeco conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws.

30.    The conduct of the Individual Defendants complained of herein involves a reckless and/or knowing violation of their obligations as directors and officers of Veeco, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.    -The Individual Defendants breached their fiduciary duties by failing to implement an adequate system of internal controls, which failure caused the Company to misrepresent the financial condition of its TurboDisc division and violate federal export laws, as detailed below. In addition, as a result of certain improper actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of the federal securities laws. As a result, Veeco has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Veeco and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy any adverse judgments.

32.    Moreover, these actions have irreparably damaged Veeco's corporate image and goodwill. For at least the foreseeable future, Veeco will suffer from what is known as the "liar's discount," a term applied to the stocks of companies implicated in illegal behavior and that misled the investing public, such that Veeco's ability to raise equity capital or debt on favorable terms in the future is now impaired.

33.    During all times relevant hereto, the Individual Defendants breached their fiduciary duties to Veeco's shareholders by failing to prevent financial statements from being issued that misrepresented to the investing public, including shareholders of Veeco, the Company's actual financial results; and failing to prevent and/or adequately investigate the Company's violations of export laws, all as set forth herein.

## BACKGROUND

34.     Veeco designs, manufactures, markets and services a line of equipment primarily used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and high-brightness light emitting diode industries.

35.     On November 3, 2003, Veeco announced it would acquire TurboDisc from Emcore Corporation.  According to Veeco, the acquisition would "create a Global Leader in Compound Semiconductor Deposition Technologies."  In connection with the acquisition, Veeco issued a press release which stated, in part:

> Combined with Veeco's molecular beam epitaxy (MBE) business, the acquisition makes Veeco the only company that provides both key compound semiconductor epitaxial deposition technologies. Emcore's MOCVD revenue was $51.1 million for the trailing twelve months ended June 30, 2003.

> The ability to provide complementary MBE and MOCVD technologies will enable Veeco to address the full range of applications requiring the high performance aspects of compound semiconductor technologies, including lower power, higher frequency operation, and light-emitting characteristics. MOCVD tools are particularly well-suited for the critical first step in the growth of high speed electronic, wireless and optoelectronic compound semiconductor materials employed in advanced wireless telecommunications and rapidly growing high brightness light-emitting diode (LED) lighting applications.

36.     The press release further quoted Defendant Braun who stated:

> This acquisition strengthens Veeco's position in the compound semiconductor market, as we are now uniquely able to provide "one-stop" shopping for epitaxial deposition solutions—both MOCVD and MBE. The MOCVD market is twice the size of the MBE available market. Emcore's MOCVD business is a good fit with Veeco's acquisition criteria: history of technology leadership and innovation, complementary technology for an existing Veeco market, leading market position, strong R&D and high market growth potential. We believe that Emcore's MOCVD business will be accretive to Veeco on a cash basis by the second quarter of 2004.

\* \* \*

> The addition of MOCVD strengthens our existing compound semiconductor and wireless/telecommunications position and permits penetration of the rapidly emerging LED market opportunity.

37.    On November 10, 2003, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2003 with the SEC. The Company reported revenues of $63.1 million for the quarter and a net loss of $2.1 million. The Company reported inventory assets of $86.1 million and deferred income tax assets of $39.5 million. The Company also reported $14.2 million in accounts payable. The Form 10-Q reiterated Veeco's statements concerning the TurboDisc acquisition referenced above.

38.    On February 6, 2004, Veeco announced its financial results for the quarter and year ended December 31, 2003. According to the press release, Veeco's revenues were $76.9 million for the quarter, up 22% from the previous quarter. The Company reported a net loss of $4.8 million, or $0.16 per share. Defendant Braun stated:

> Veeco's fourth quarter orders revenues in EBITA improved both sequentially and year over year. Order strength reflected a broad industry upturn across all of our markets and in all geographic regions. Capacity and technology drivers were evident in semiconductor data storage, wireless, compound semiconductor and scientific research. Fourth quarter orders of $96.8 million (up 51% sequentially) were Veeco's strongest overall orders in 10 quarters. Fourth quarter revenue of $76.9 million was up 22% sequentially.

39.    Defendant Braun further touted the TurboDisc acquisition stating:

> The November 2003 acquisitions of TurboDisc MOCVD and Advanced Imaging Inc.'s precision lapping technologies allowed us to significantly broaden our product and technology offerings to Veeco's core markets in 2004.

40.    For the full year, Veeco announced its sales were $279.3 million. The press release further stated for the full year:

> Veeco incurred an operating loss of $9.3 million in 2003 compared
> to an operating loss of $137.9 million in 2002. Included in the
> 2003 operating loss was a $1.5 million charge for the write-off of
> in-process R&D, a $1.7 million reduction in gross profit from
> purchase accounting adjustments due to the required capitalization
> of profit in inventory and permanent elimination of certain
> deferred revenue, and $5.4 million of merger and restructuring
> costs. Exclusive of these charges Veeco's 2003 EBIDTA was
> $13.0 million compared to $1.3 million in 2002 which also
> excludes restructuring charges. Veeco's net loss for 2003 was $9.7
> million ($0.33) per share compared to a net loss of $123.7 million
> ($4.25 per share in 2002). Excluding certain charges, 2003
> earnings were $0.11 per diluted share compared to the loss of
> $.010 per share in 2002. Mr. Braun commented, "Industry market
> conditions improved dramatically in the fourth quarter and we
> appear to be at the start of a sustainable recovery cycle after two
> years of historically low capex investment by our customers.
> Veeco's diversification strategy should serve us well as multiple
> Veeco markets are forecasted to experience 2004 growth.

41.    On March 12, 2004, the Company filed its annual report on Form 10-K with the

SEC for the period ended December 31, 2003 (the "2003 Form 10-K"). The 2003 Form 10-K

was signed by Defendants Braun, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel,

Pfister and Scherr. In this report the Company confirmed it's previously announced financial

results, and reported year-end inventories of $97.6 million and deferred income tax assets of

$18.1 million.

42.    The annual report also discussed the recent purchase of the TurboDisc business

unit from Emcore Corporation Stating:

> On November 3, 2003, Veeco acquired substantially all of the
> assets of the TurboDisc Metal Organic Chemical Vapor Deposition
> ("MOCVD") business from Emcore Corporation. The acquisition
> makes Veeco the only company that provides both molecular beam
> epitaxy ("MBE") and MOCVD—two key compound
> semiconductor epitaxial deposition technologies. Emcore's
> TurboDisc revenue was $51.1 million for the twelve months ended
> June 30, 2003. Veeco paid $61.5 million in cash for the net assets
> of the TurboDisc business. The transaction also includes a two-
> year earn-out feature that would require payment of up to an
> additional $20 million if future revenue targets are achieved. The

TurboDisc business includes the assets necessary for engineering, design and manufacturing of MOCVD systems ranging from research and development systems to high-volume production systems, a manufacturing facility and applications lab located in Somerset, New Jersey and significant intellectual property. As a result of this acquisition, approximately 120 employees of Emcore involved in the TurboDisc business became employees of Veeco.

43.    Although the TurboDisc unit had only been a part of Veeco for less than two months of 2003, the addition of that unit had a measurable impact on the Company's financial results.    According to the annual report, TurboDisc and Aii, another recent acquisition, contributed $6.1 in sales in 2003.

44.    TurboDisc also had a substantial impact on Veeco's 2003 orders.  According to the annual report, a "6% improvement in process equipment orders was driven by a total of $12.7 million in orders for TurboDisc systems," and "[b]y industry, the largest increase [in orders] was a 33% increase in compound semiconductor/wireless, mostly due to $11.3 million in orders received for TurboDisc products."

45.    Defendant Braun, in his capacity as Veeco's CEO, also certified the following in connection with the annual report:

> Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report.
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report.
>
> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

(a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

(b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

(c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

46.    The 2003 Form 10-K also included the following representations regarding the

Company's internal control system and disclosure procedures:

**Item 9a. Controls and Procedures.**

The Company's senior management is responsible for establishing and maintaining a system of disclosure controls and procedures (as defined in Rule 13a-14 and 15d-14 under the Securities Exchange Act of 1934 (the "Exchange Act")) designed to ensure that

17

information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive officer or officers and principal financial officer or officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

The Company has evaluated the effectiveness of the design and operation of its disclosure controls and procedures under the supervision of and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, within 90 days prior to the filing date of this report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective in timely alerting them to material information required to be included in our periodic Securities and Exchange Commission filings.

Subsequent to that evaluation there have been no significant changes in our internal controls or other factors that could significantly affect these controls after such evaluation.

47.    In connection with the 2003 Form 10-K, Defendant Braun submitted an additional

certification pursuant to 18 U.S.C. § 1350, which stated, in relevant part: "[t]he information

contained in the Report fairly presents, in all material respects, the financial condition and results

of operations of the Company."

48.    On April 26, 2004, Veeco announced its financial results for the quarter ended

March 31, 2004. The Company reported first-quarter 2004 revenues of $94.5 million, up 23%

sequentially from the prior quarter, and a net loss of $0.7 million, or ($0.02) per share.

Defendant Braun touted the contribution of TurboDisc stating:

We are pleased to report the first quarter revenue's earnings and bookings all exceeded our quarterly guidance. . . .  Veeco received

18

several multiple system orders for our TurboDisc MOCVD products from worldwide customers who are increasing their manufacturing capacity of green, blue and white light emitting diodes (LEDs). The growth of this newly acquired product line has surpassed our initial expectations and we see the LED market as an exciting growth opportunity for Veeco in 2004 and 2005. . . . First quarter 2004 orders were the strongest in 13 quarters and are indicative of the first growth opportunities available to Veeco through our multi-market strategy.

49. On May 3, 2004, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2004 with the SEC, confirming the above-referenced results. The Company also reported inventory assets of $104.4 million, deferred income tax assets of $9.7 million, and accounts payable of $25.1 million. Once again, the Company touted the TurboDisc business stating:

By region, there continues to be a shift in sales from the U.S. to the Asia Pacific region, although all regional sales have increased due to the TurboDisc business and Aii acquisitions, particularly the Asia Pacific region, which saw a $10.2 million increase in sales in the first quarter of 2004 due to the acquired companies. The Company believes that there will continue to be quarter-to-quarter variations in the geographic distribution of sales.

50. Veeco also reported TurboDisc's significant contribution to the Company's financial results. Based on Veeco's segment analysis, the TurboDisc and Aii acquisitions increased net sales for Veeco's Process Equipment segment by more than 66%. Most of that increase was due solely to the TurboDisc business unit. TurboDisc had an even greater impact on Veeco's orders for the first quarter of 2004. Combined with Aii, Turbo Disc added $35.9 million in orders for Veeco during that period.

51. The May 3, 2004 Form 10-Q, included the same representations regarding the Company's internal control system and disclosure procedures set forth in the 2003 Form 10-K.

52.     On July 26, 2004, the Company announced its financial results for the quarter ended June 30, 2004. The release was entitled "Results Were Above Prior Quarter and Prior Year and at High-End of Guidance." The Company reported second quarter 2004 sales of $102.9 million with net income of $1.6 million or earnings per diluted share of $0.05 per share. Defendant Braun stated:

> We are pleased to report that Veeco's second quarter 2004 orders, revenue and earnings all exceeded the prior year and prior quarter, and met or exceeded our guidance as we continue to experience a multi-market recovery in our core semiconductor, compound semiconductor/wireless and data storage markets.
>
> *   *   *   *
>
> We are pleased to report that Veeco's second quarter 2004 orders, revenue and earnings all exceeded the prior year and prior quarter, and met or exceeded our guidance as we continue to experience a multi-market recovery in our core semiconductor, compound semiconductor/wireless and data storage markets.

53.     On August 3, 2004, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2004 with the SEC, which repeated the representations in the July 26, 2004 press release. The Company also reported inventory assets of $108.1 million, deferred income-tax assets of $16.1 million, and accounts payable of $46.5 million.

54.     Reporting by segment, Veeco noted that the acquisitions of TurboDisc and Aii had added more than 62% in net sales to Veeco's Process Equipment, Veeco's largest business segment. TurboDisc and Aii also increased orders by 157% for that business segment in the second quarter of 2004.

55.     For the six months ending June 30, 2004, Veeco reported that the majority of Veeco's 78% increase in net sales for the Process Equipment business segment was principally due to $40.9 million in sales of TurboDisc and Aii products. It also noted that a 155% increase

in orders for process equipment over these six months "was driven by a total of $79.0 million in orders for TurboDisc and Aii systems...."

56.    Regarding Veeco's outlook, the Company stated that it expected the TurboDisc business unit to substantially improve the Company's financial results over the next year. Specifically, the report stated, "Veeco currently expects that it's MOCVD and precision bar lapping technologies [TurboDisc] (acquired in November 2003) will add approximately $100 million in revenue for 2004 compared with only a minimal contribution to Veeco's 2003 performance due to the fact that these acquisitions were consummated near the end of the 2003 year. A substantial portion of this revenue growth is coming from the MOCVD business."

57.    The August 3, 2004 Form 10-Q was signed by Defendant Braun, who also signed a certification confirming that Veeco's financial statements for the period ended June 30, 2004 did not contain any untrue statements of material facts or omit material facts necessary to make them, in light of the circumstances under which the statements were made, not misleading. These certifications were essentially identical to those referenced in above paragraphs 45 and 47.

58.    The August 3, 2004 Form 10-Q also repeated the disclosures regarding Controls and Procedures contained in the May 3, 2004 Form 10-Q.

59.    On October 12, 2004, Veeco pre-announced its expected financial results for the quarter ended September 30, 2004. The Company stated:

> Veeco Instruments Inc. (Nasdaq:  VECO) today announced that weak industry-wide capital equipment conditions, particularly in compound semiconductor adversely impacted its results for the quarter ended September 30, 2004.
>
> As a result Veeco's orders for the third quarter of 2004 are expected to be approximately $80 million, compared to $64 million in the third quarter of 2003 and $125 million in the second quarter of 2004. (Veeco's order guidance provided on 7/26/04 was $125-130 million).

Veeco expects third quarter 2004 revenues to be approximately $93 million, compared to $63 million in the third quarter of 2003, and $103 million in the second quarter of 2004. (Revenue guidance was $105-110 million).

Veeco's third quarter 2004 GAAP loss is expected to be between ($0.06) and ($0.04) per share compared to third quarter 2003 GAAP loss of ($0.07 per share and GAAP earnings of $0.05 per diluted share in the second quarter of 2004. (Veeco's third quarter guidance was GAAP earnings between $0.06 and $0.09 per diluted share on a GAAP basis).

60.     On October 25, 2004 Veeco issued a press release announcing its financial results for the period ending September 30, 2004. For the quarter, the Company reported sales of $92.4 million and a net loss of $1.5 million, or $0.05 per share. Earnings excluding certain charges were $0.05 per diluted share. Concerning the Company's outlook, the press release continued, in pertinent part, as follows:

Edward H. Braun, Veeco's Chairman and Chief Executive Officer, commented, "As previously announced, Veeco was adversely impacted this quarter by weak, industry-wide capital equipment spending conditions particularly in compound semiconductor and data storage markets. In response to these conditions, we intend to reduce expenses by 10% in order to improve profitability in 2005. While we expect our customers' current capital spending reluctance to continue for several quarters, we believe it will ultimately be outweighed by their need to fund their 2005 new product technology roadmaps and to invest in the expected high growth of next-generation consumer electronics. Veeco remains well positioned to provide leadership technologies for growth applications in semiconductor, data storage, compound semiconductor and scientific research."

Veeco currently expects fourth quarter sales in the range of $93-$100 million and orders in the range of $85 to $95 million. Veeco expects to take a charge of between $4.5 to $5.5 million in the fourth quarter related to the future spending reductions and restructuring and product rationalization costs and in-process R&D write-off related to the acquisition of MTI. The Company currently expects to report a fourth quarter GAAP loss in the range of $0.10 to $0.15 per share. Excluding these charges and amortization, Veeco's fourth quarter earnings per diluted share are expected to be between $0.05 and $0.10 using a 35% tax rate.

61.     On November 9, 2004, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2004 with the SEC. The Form 10-Q reported the Company's "actual" results - net sales for the quarter of $92.4 million and net loss of $0.6 million. The Company also reported inventory assets of $123.9 million, deferred income tax assets of $15.3 million and accounts payable of $47.1 million.

62.     The Form 10-Q further stated, "Epitaxial process equipment margins improved from 37.0% to 39.5%, due to the favorable mix of TurboDisc MOCVD sales which are higher in margin than the MBE products." The report also noted that "MOCVD products [TurboDisc's products] represented approximately 31.3% of Veeco's September backlog."

63.     Reporting by segment, the report stated that Veeco enjoyed a 290% increase in net sales for Veeco's Epitaxial Process Equipment business segment in the third quarter of 2004. The report noted that this improvement was "primarily due to $21.3 million in sales from the TurboDisc business...." It also added that a 606% increase in epitaxial process equipment orders was "principally due to $12.1 million in orders for TurboDisc...."

64.     For the nine months ending September 30, 2004, the report stated that a 185% increase in net sales for epitaxial process equipment was due solely to $51.9 million of TurboDisc sales, and a 634% increase in orders for epitaxial process equipment was principally due to approximately $86.2 million in orders for TurboDisc products over those nine months. Based on these numbers, TurboDisc alone increased Veeco's net sales by more than 25% and its orders by 43% for the first nine months of 2004.

65.     Regarding the Company's outlook, Veeco expected the TurboDisc business unit to substantially improve the Company's financial results over the next year. Specifically, the report stated, "Veeco currently expects that it's MOCVD and precision bar lapping and slicing

technologies (acquired in November 2003 and October 2004) will add approximately $90 to $95 million in revenue for 2004 compared with only a minimal contribution to Veeco's 2003 performance due to the fact that these acquisitions were consummated prior to the fourth quarter of 2003. A substantial portion of this revenue growth is coming from the MOCVD business."

66.    The quarterly report was signed by Defendant Braun who certified the results in the same manner as set forth above in Paragraphs 45 and 47. The Form 10-Q repeated the disclosures regarding Controls and Procedures contained in the August 3, 2004 and May 3, 2004 Forms 10-Q.

### THE TRUTH BEGINS TO EMERGE

67.    On February 11, 2005, Veeco announced that it was postponing the release of its financial results for the fourth quarter and full year 2004 pending completion of an internal investigation of improper accounting transactions at its TurboDisc division. The Company further revealed "The investigation focuses principally on the value of inventory, accounts payable and certain revenue items carried on the books of TurboDisc."

68.    On this news, shares of Veeco common stock dropped by roughly 10% to close at $16.96 per share.

69.    On March 8, 2005, the Company announced in a Form 8-K filed with the SEC that numerous securities fraud class action lawsuits had been filed against Veeco, its officers and directors following the February 11, 2005 announcement regarding the internal investigation of accounting improprieties at the TurboDisc division.

70.    On March 16, 2005, Veeco filed its annual report with the SEC on Form 10-K. In this filing, Veeco was forced to admit that it lacked the proper controls and oversight to adequately and responsibly report its financial results. In the Form 10-K, Veeco stated:

> As a result of the discovery by management of improper
> accounting entries made at its TurboDisc business unit which led
> to adjustments requiring the restatement of the Company's
> financial statements for the quarterly periods ended March 31,
> 2004, June 30, 2004 and September 30, 2004, **management has
> now determined that a deficiency existed in the internal control
> over financial reporting at the end of such quarterly periods.
> Since November 10, 2003, the date of the acquisition of the
> assets constituting the TurboDisc business unit, the business
> unit was operating under a legacy accounting system which
> was under the supervision of one individual and did not
> provide management with the depth of information Veeco is
> typically accustomed to** (emphasis added).

71.    As a result of these inadequate controls and oversight at TurboDisc, Veeco was

forced to restate its financial results for the first three quarters of fiscal 2004, which included a

reduction of pre-tax earnings of $10.2 million, comprised of $8.1 million in adjustments relating

to inventory, accounts and accounts payable, and $2.1 million in adjustments relating to revenue

recognition issues.

72.    On April 1, 2005, Veeco filed its Amended Forms 10-Q with the SEC, restating

its financial results for the first three quarters of fiscal 2004 to correct Veeco's previous

misstatements regarding net sales, cost of sales, gross profit or loss, current assets, non-current

assets, current liabilities, and shareholder's equity.

73.    Each of the Amended Forms 10-Q contained the following description of the

Company's investigation of accounting improprieties at Veeco's Turbo Disc business unit:

> On February 11, 2005, Veeco announced the postponement of the
> release of audited results for the fourth quarter and year ended
> December 31, 2004, pending completion of an internal
> investigation of improper accounting transactions at its
> TurboDisc® business unit. Veeco acquired the assets of TurboDisc
> in November 2003. The investigation focused principally on the
> value of inventory, accounts payable and certain liabilities, as well
> as certain revenue transactions of TurboDisc. The investigation
> was commenced after Veeco's internal audit staff and corporate
> financial management discovered improper accounting

transactions in the course of a Veeco internal audit and transitioning the business to Veeco's SAP accounting system during the fourth quarter of 2004. The Audit Committee of the Company's Board of Directors supervised the accounting investigation and authorized Veeco's outside counsel, Kaye Scholer LLP, to hire Jefferson Wells International to perform forensics and accounting reconstruction work as part of the investigation. The investigation has been completed. Conclusions reached during the investigation included that the improper accounting entries were made by a single individual at TurboDisc whose employment had been terminated prior to the commencement of the investigation, and that there was no evidence found of embezzlement or diversion of corporate assets.

On March 16, 2005, Veeco reported that it had completed its internal investigation and would be restating the financial statements previously issued for the three quarterly periods and nine months ended September 30, 2004. The pre-tax decrease to earnings previously reported is $2.8 million, $4.3 million and $3.1 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. In addition, as a result of revenue recognition adjustments, (decreases) increases to revenues previously reported will be $(3.6) million, $(3.6) million and $5.0 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. These revenue adjustments, in the aggregate, do not reduce total revenue recognized for 2004.

74.    The restatement of Veeco's quarterly report for the period ended March 31, 2004 substantially and materially revised the Company's previously reported financial results for that quarter.  The restatement resulted in a reduction of net sales of $3.6 million, a reduction of gross profit of more than $3 million, a change in operating income from a *gain* of $1.07 million to a *loss* of $1.7 million, a decrease in current assets of more than $6 million, and an increased net loss of more than $2 million, taking a reported net loss per share of $0.02 down to $0.09.

75.    These restated financial reports told a significantly different story about Veeco's business than did the Company's previously released financial results.  In April of 2004, the Company had proclaimed it was "pleased to report the first quarter revenue's earnings and

bookings all exceeded our quarterly guidance…." That guidance, as stated in Veeco's February 6, 2004 press release, forecast a net loss of between $0.05 and $0.09 per share for the first quarter of 2004. The previously reported net loss of only $0.02 per share for the first quarter did indeed beat the Company's guidance by a wide margin. However, Veeco's actual net loss of $0.09 per share, as reported in the amended quarterly report, was significantly below the reported result, and fell at the absolute bottom of the Company's forecast.

76.    The restatement of Veeco's quarterly report for the period ended June 30, 2004 also substantially and materially changed the Company's previously reported financial results for that quarter. The restatement resulted in a reduction of net sales of $3.6 million, a reduction of gross profit of $4.4 million, a reduction in operating income of $4.27 million, a decrease in current assets of more than $10 million, and a change in net income from a *gain* of $1.5 million to a *loss* of $1.66 million, taking a reported net *gain* per share of $0.05 and turning it into a net *loss* of $0.6 per share.

77.    These restated financial reports present a very different picture of the Company. They show that instead of a successful quarter as Veeco previously announced, the Company actually had a losing one. Specifically, the Company had announced in July of 2004 that Veeco's second quarter results "were above prior quarter and prior year and at high-end of guidance," whereas according to Veeco's restated quarterly report, the Company actually suffered a greater net loss ($1.66 million) and net loss per share ($0.06) in the second quarter of 2004 than it did in the same quarter in 2003, when the Company reported a net loss of only $1.1 million and a net loss per share of only $0.04. According to the restated financial results, the Company was actually moving backward, not forward.

78.    Likewise, the restatement of Veeco's quarterly report for the period ended September 30, 2004 substantially and materially changed the Company's previously reported financial results for that quarter. This restatement resulted in a reduction of gross profit of more than $3.2 million, a reduction of operating income of $3.1 million, a decrease in current assets of more than $8.7 million, thereby increasing Veeco's net loss by more than $700,000, taking a reported net loss per share of $0.05 down to $0.07.

79.    Again, the restated numbers were below the Company's guidance for earnings per share of between $0.06 and $0.09. Significantly, the restatement showed, contrary to what was previously reported, that the Company's actual loss per share ($0.07) was at a level equal to Veeco's loss per share for the same quarter in 2003. Thus, once again, where the Company's misstated financial reports made it appear that the Company's results had improved over the prior year's and the Company was moving forward, the restated financial statements showed that the Company was actually stagnant or moving backwards.

80.    The restatements also impacted the Company's previously reported sales numbers. Net sales for the first six months of 2004 were actually $7.3 million less than previously reported, and gross profit was actually $7.5 million less than previously reported, which turned a previously reported operating *profit* of $5.8 million into a *loss* of $1.3 million, and a previously reported $877,000 net *profit* into a $4.4 million net *loss* for that period, resulting in a $0.15 *loss* per share instead of the $0.03 *profit* previously reported. For the first nine months of 2004, the restatement showed that Veeco's gross profit was $10.7 million less than previously reported, turning the previously reported operating *profit* of $5.4 million into a *loss* of $4.8 million, and increasing net loss by nearly $6 million. Veeco's net loss per share was actually $0.22, instead of the $0.02 loss previously reported.

81.    These restatements were material.  In each of the three quarters at issue, the originally reported financial results appeared to beat the Company's results for the same quarters in 2003, as well as the Company's forecast for these quarters.  However, as illustrated in the following chart, the Company's restated results were actually *worse* than the prior years' results and *worse* than Veeco's forecasts.

|  | Q1 | Q2 | Q3 |
|---|---|---|---|
| 2003 earnings (loss) per share | ($0.06) | ($0.04) | ($0.07) |
| 2004 forecast earnings (loss) per share | ($0.05-$0.09) | $0.01-$0.04 | $0.06-$0.09 |
| 2004 originally reported earnings (loss) per share | ($0.02) | $0.05 | ($0.05) |
| 2004 restated earnings (loss) per share | ($0.09) | ($0.06) | ($0.07) |

82.    The trend evinced by the originally filed earnings shows a company on the move and one that actually posted a gain for one quarter.  The trend evinced by the restated financial reports, however, shows a company moving backwards despite well hyped acquisitions like TurboDisc.  Had Veeco's board fulfilled their duties to shareholders by instituting dependable financial controls and monitoring the Company's financial reporting, the aforementioned material misstatements would not have been made.

## UNDISCLOSED EVENTS

83.    Based upon third-party documents acquired by counsel through their ongoing proprietary investigation of these claims, Plaintiffs have uncovered additional, heretofore undisclosed, instances of alleged misconduct by Veeco employees which further demonstrate Veeco's lack of sufficient internal controls and oversight, and which expose the Company to substantial additional harm.

84.    In February 2004, an employee of Veeco reviewing overseas sales and shipments for export law compliance reported that he/she uncovered the shipment of a restricted item to Malaysia. The shipment of that item, posted on the last day of Veeco's fourth quarter and fiscal year 2003, was purportedly in violation of federal export laws promulgated to promote national security and protect against terrorism.

85.    According to the employee, Veeco then conducted an audit that revealed the violations of law were much more pervasive than the single incident first reported. The audit revealed at least nine other shipments that allegedly violated federal export laws, the aggregate value of which shipments eclipsed $15 million. According to the employee, these violations were then communicated to senior members of Veeco's management. It is reasonable to infer that the Audit Committee, which is responsible for the Company's compliance with applicable laws and whistle blower reports of this nature, exercised its supervisory role over the audit, and thus was aware of, or recklessly failed to be aware of, the results.

86.    Rather than report these violations to the Department of Commerce as it was required to do, the former employee reports that Veeco sought to attain a *post-hoc* reclassification of the equipment illegally shipped overseas in the hopes of escaping prosecution for the Company's transgressions.

87.    On or about April 30, 2004, Veeco submitted a formal request to the Commerce Department's Bureau of Industry to reclassify the offending devices so they would not require export licenses to be shipped overseas. However, according to the employee, this request omitted important information, the inclusion of which would result in the denial of its request. The Company also failed to disclose to the Bureau that it committed numerous violations of the export laws by shipping this equipment under the existing designation without a license.

88.    According to the employee, based on Veeco's misleading application, the Bureau of Industry granted its request for a reclassification on or about June 22, 2004.

89.    In September 2004, the same Veeco employee reported the discovery of a second set of export violations relating to shipments made by Veeco to a Hong Kong distributor. After alerting her supervisor to these violations, the employee was purportedly asked to "pump" the technical engineering staff for information that would support yet another reclassification request, even though information supporting such a request did not exist.

90.    Under Paragraph 4 of the Audit Committee's Charter (Compliance and Other Oversight Responsibilities), the Audit Committee is responsible for:

> a) *Whistleblower* - In compliance with SEC and Nasdaq rules, the Committee shall establish procedures for the receipt, retention and treatment of complaints or concerns, including confidential and anonymous submissions received by the Company regarding accounting, internal accounting controls or auditing matters.
>
>        \*      \*      \*
>
> (c) *Legal Compliance* - The Committee shall review with the Company's internal legal counsel any legal and regulatory matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations pertaining to financial disclosure, and any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

91.    However, instead of dealing with the information reported by the former employee in an appropriate manner, Veeco allegedly tried to doctor the records so the transactions passed scrutiny.  Either Defendants were aware of and disregarded these problems, or the procedures established by Defendants, if any, were wholly inadequate, failed to work and exposed the Company to potentially enormous harm in connection with its export violations.

92.    A single violation of export laws as alleged above can lead to fines and suspension of the Company's export privileges.  Approximately 70% of Veeco's revenues are derived from export sales.  Given Veeco's dependence on overseas markets, a suspension of those export privileges would substantially affect the Company's performance and could jeopardize the future viability of Veeco.  Such reckless stewardship of the Company's assets, reputation and export privileges, as alleged above, was a breach of the fiduciary duties the Individual Defendants owe their shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.    Plaintiffs bring this action derivatively in the right and for the benefit of Veeco to redress injuries suffered, and to be suffered, by Veeco as a direct result of the breaches of fiduciary duty by the Individual Defendants.  Veeco is named as a nominal Defendant solely in a derivative capacity.

94.    Plaintiffs will adequately and fairly represent the interests of Veeco in enforcing and prosecuting its rights.

95.    Plaintiffs are and were owners of the stock of Veeco during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

96.     The current board of directors of Veeco consists of the following nine individuals:
Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, and Pfister.  Defendant
Scherr was a member of Veeco's Board until May 25, 2005, when his term expired.  Plaintiffs
have not made any demand on the present Board of Directors of Veeco to institute this action
because such a demand would be a futile, wasteful and useless act, particularly for the following
reasons:

97.     As a result of their access to and review of internal corporate documents;
conversations and connections with other corporate officers, employees and directors; and
attendance at management and Board meetings, each of the Defendants knew, or was reckless in
not knowing, the adverse non public information regarding the state of the Company's internal
financial controls and the accounting improprieties related to TurboDisc, as well as the
heretofore undisclosed allegations of export law violations.

98.     Veeco's board maintains a Compensation Committee which sets the
compensation levels of senior management and administers Veeco's stock option plans and
employee stock purchase plan. The Compensation Committee operates under a charter, under the
terms of which it is directly responsible for establishing annual and long-term performance goals
and objectives for the Company's elected officers.  This responsibility includes: (i) reviewing
and affirming all contractual employment and compensation arrangements for proxy officers of
the Company ; (ii) reviewing, approving and making recommendations to the Board of Directors
regarding matters of succession planning, organizational development, and other major Human
Resources planning issues as it deemed appropriate; (iii) establishing annual and long-term
performance criteria and goals and maximum individual awards at the beginning of each
performance period, and certifying results achieved at the end of each performance period for

executive officers of the Company; (iv) making individual compensation determinations including, but not limited to, salary, annual and long-term incentive awards of cash and stock, stock option grants, and the totals thereof with respect to the Chief Executive Officer and, upon recommendation of the Chief Executive Officer, with respect to other proxy officers, other executive officers, and members of senior management of the Company and, if not included in any of the foregoing groups, the five highest paid employees of the Company; (v) reviewing the structure and level of the compensation of non-employee members of the Board; and, when recommended by the Chairman of the Board, will review and recommend to the Board compensation arrangements for non-employee members of the Board of Directors; and (vi) overseeing compliance with respect to compensation disclosure and reporting requirements under applicable laws, rules and regulations; including the review and approval of the compensation section of the Company's annual proxy statement including the Committee's annual report to stockholders on the compensation of the Chief Executive Officer and other executive officers of the Company.

99.    The Compensation Committee is comprised of Defendants D'Amore, Low and McDaniel.    As the members of the Compensation Committee singularly control the other Defendants' awards, the remaining members of the Board will not institute this action against Defendants D'Amore, Low and McDaniel.    To do so would jeopardize each Defendant's personal financial compensation.    Thus, demand on Defendants Braun, Simone,  Elftmann, Fridrich, Kingsley, Pfister, and Scherr is, and would have been, futile.

100.    The principal professional occupation of Defendant Braun is his employment with Veeco, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.    Specifically, for fiscal 2003, 2002 and 2001, Veeco paid

Defendant Braun $ 636,538, $555,000, and, $925,000 respectively, in salary, bonus and other compensation, and granted him options to purchase 140,000, 200,000 and 200,000 shares of Veeco stock, respectively. Accordingly, Defendant Braun lacks independence from Defendants D'Amore, Low and McDaniel, Defendants who are not disinterested and/or independent and who exert influence over Defendant Braun's compensation by virtue of their position as members of the Compensation Committee. This lack of independence, together with his employment with Veeco, renders Defendant Braun incapable of impartially considering a demand to commence and vigorously prosecute this action.

101.    Veeco's directors are not disinterested or independent because they are personally liable for the breach of fiduciary duties for failing to implement proper internal controls and reporting systems, resulting in the Company's misrepresenting its financial condition and allowing and/or acquiescing in the violations of export law complained of herein. Thus, the Veeco board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Veeco to millions of dollars in liability for possible violations of applicable securities laws.

102.    Veeco's board also maintains an Audit Committee which is responsible for, among other things, reviewing the scope and results of the audit and other services provided by Veeco's independent auditors. The Audit Committee's charter sets forth additional responsibilities of the Committee including:

> a) *Whistleblower* - In compliance with SEC and Nasdaq rules, the Committee shall establish procedures for the receipt, retention and treatment of complaints or concerns, including confidential and anonymous submissions received by the Company regarding accounting, internal accounting controls or auditing matters.

*     *     *

(c) *Legal Compliance* - The Committee shall review with the Company's internal legal counsel any legal and regulatory matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations pertaining to financial disclosure, and any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

103.    During 2003, the Audit Committee met twelve times.

104.    Five of the ten board members, Elftmann, Fridrich, Kingsley, Simone and Pfister serve on the Audit Committee. As such, they breached their fiduciary duties to the Company by failing to ensure Veeco had an adequate system of internal controls such that its financial results were accurately reported and by failing to insure against and/or acquiescing in Veeco's violations of export laws. Because Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister cannot be expected to bring an action against themselves, it is, and would have been, futile to make a demand on the other five Defendants, Braun, D'Amore, Low, McDaniel and Sherr, as no majority would or could be reached in favor of instituting such action.

105.    The Audit Committee is also responsible for overseeing Veeco's Code of Ethics, and any violations thereof must be reported to the Committee.

106.    The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the false and misleading statements surrounding TurboDisc and the failure to protect against violations of export law, as detailed herein above, the majority of the Board, including the Defendants listed below, are subject to the following prejudicial entanglements:

(a)    Defendants D'Amore, Fridrich and Low are long-time business associates, each serving not only on Veeco's board, but also on the board of directors of Solectron, Inc. Defendants Low and Fridrich also both worked for IBM. Because of their long-standing and entangling business and professional relationships, neither D'Amore, Fridrich nor Low will take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants;

(b)    Defendants Braun, Elftmann, McDaniel and Pfister are also long time associates as directors, former directors, and past chairmen of the trade association, Semiconductor Equipment Materials International ("SEMI"). Because of their long standing association with SEMI, Defendants Braun, Elftmann, McDaniel, and Pfister will not take action as requested by plaintiffs herein against one another or the remainder of the Individual Defendants;

(c)    Defendants Braun and Simone are also long-time business associates and both serve on the Board of Directors at Cymer Inc. Because of their relationship on the board of Cymer, neither Defendant Braun nor Simone will take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants;

(d)    Defendants Simone and McDaniel also had a business relationship through SpeedFam-Ipec, a supplier of chemical mechanical planarization systems used in the manufacture of semiconductors, where Defendant McDaniel was a member of the Board of Directors and Defendant Simone was the Chairman of the board of directors. Based on this relationship neither Simone nor McDaniel will take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants;

(e)     Defendant Simone serves as a consultant to NorthBridge Venture Partners ("Northbridge"). Defendant D'Amore is the general partner of Northbridge. Because of their affiliations with Northbridge, Defendants Simone and D'Amore will not take action as requested by plaintiffs herein against one another or the remained of the Individual Defendants; and

(f)     NorthBridge has also done work for both Veeco and Solectron, a company for which Defendants D'Amore, Fridrich and Low are board members. Because of this interrelated business relationship, the board members will not take action as requested by plaintiffs against each other.

107.     In order to bring this suit, all of the directors of Veeco would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

108.     The acts complained of constitute violations of the fiduciary duties owed by Veeco's officers and directors and these acts are incapable of ratification.

109.     Any suit by the current directors of Veeco to remedy these wrongs would likely expose the Individual Defendants and Veeco to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

110.     Veeco has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Veeco any part of the damages Veeco suffered and will suffer thereby.

111.    If Veeco's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance, then they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Veeco.    However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Veeco against these Defendants, known as the "insured versus insured exclusion."    As a result, if these directors were to sue themselves or certain of the officers of Veeco, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.    On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.    If there is no directors' and officers' liability insurance at all, then the current directors will not cause Veeco to sue them, since they would face a large uninsured liability.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties

112.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owed and owe Veeco fiduciary obligations by which they are required to afford Veeco the highest obligation of good faith, fair dealing, loyalty and due care.

114.    The Individual Defendants, and each of them, violated and breached their fiduciary duties.

115.    Each Individual Defendant knew or was grossly reckless in not knowing that Veeco did not have adequate internal accounting controls in place, that the lack of proper controls had resulted in the inaccurate reporting of the Company's financial statements, and that the Company would fail to adequately disclose its lack of internal accounting controls and accounting improprieties relating to TurboDisc. These Defendants also knew or should have known that the Company's lack of oversight had led to ongoing violations of the federal export laws.

116.    The Individual Defendants failed to take any good faith steps to remedy these deficiencies or to prevent the illegal and/or improper conduct from occurring. Thus, these actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

117.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Veeco has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

118.    Plaintiffs on behalf of Veeco have no adequate remedy at law.

## COUNT II

### Against All Defendants for Waste of Corporate Assets

119.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

120.    As a result of the inadequate disclosure of the accounting improprieties relating to TurboDisc, by failing to properly consider the interests of the Company and its public

shareholders by failing to conduct proper supervision, and by failing to implement proper controls and oversight of the Company's export shipments, the Individual Defendants have caused Veeco to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and by incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

121.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

122.    Plaintiffs on behalf of Veeco have no adequate remedy at law.

### COUNT III

#### Against All Defendants for Unjust Enrichment

123.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

124.    By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Veeco.

125.    Plaintiffs, as shareholders and representatives of Veeco, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

a.    Against each Individual Defendant and in favor of nominal Defendant Veeco for the amount of damages sustained by the Company as a result of the breaches of fiduciary duties alleged herein;

41

b.    Requiring the Individual Defendants to return to Veeco all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Veeco;

c.    Ordering the Individual Defendants, and those under their supervision and control, to implement and enforce policies, practices and procedures on behalf of Veeco and its stockholders that are designed to detect and prevent the misconduct described herein;

d.    Awarding plaintiffs the costs and disbursements of this action, together with reasonable attorneys' fees and costs and expenses;

e.    Ordering Veeco to implement remedial measures to ensure the practices and acts as complained of herein are not repeated

f.    Such other and further relief as is just and proper in light of all the circumstances of this case.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: September 26, 2005

_____/s/_____
Brian D. Penny (*pro hac vice*) (BP-4301)
Mark S. Goldman (*pro hac vice*) (MG-4683)
Paul J. Scarlato (*pro hac vice*) (PS-3007)
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone: (484) 342-0700

Leigh Lasky (LL-6919)
**LASKY & RIFKIND, LTD**
100 Park Avenue, 12th Floor
New York, New York 10017
Telephone: (212) 907-0700

*Attorneys for Plaintiff Huneke*

Robert I. Harwood (RH-3286)
Samuel K. Rosen (SR-3287)
Joshua D. Glatter (JG-0184)
**WECHSLER HARWOOD LLP**
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400

Robert B. Weiser (*Of Cousnel*)
**THE WEISER LAW FIRM, P.C.**
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2616

*Attorneys for Plaintiff Schupp*

Nadeem Faruqi (NF-1184)
Shane Rowley (SR-0740)
Beth A. Keller (BK-9421)
**FARUQI & FARUQI**
320 East 39th Street
New York, NY 10016
Telephone: (212) 983-9330

*Attorney for Plaintiff Altman*

## CERTIFICATE OF SERVICE

I, Brian D. Penny, hereby certify that I have this date caused a copy of the Consolidated

Amended Verified Shareholder Derivative Complaint, to be served via Federal Express on the

following:

> Robert F. Serio, Esquire
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue, 47th Floor
> New York, NY 10166
> (212) 351-5395

_____/s/_____
Brian D. Penny
