## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------- x
In re VEECO INSTRUMENTS, INC.          :        Case No.: 7:05-md-1695 (CM)
SECURITIES LITIGATION                  :
----------------------------------------------------- x
----------------------------------------------------- x
THIS DOCUMENT RELATES TO               :
ALL ACTIONS                            :
----------------------------------------------------- x
```

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiff, the Steelworkers Pension Trust ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Veeco Instruments, Inc. ("Veeco" or the "Company"), securities analysts' reports and advisories about the Company, information obtainable on the Internet, and information obtained from certain former Veeco employees, including certain Confidential Witnesses whose roles at Veeco are described in detail below. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the securities of Veeco between November 3, 2003 and February 10, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     On February 11, 2005, before the market opened, Veeco shocked the market by announcing that it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of improper accounting transactions at its TurboDisc division which Veeco had acquired from Emcore in November 2003. The Company stated that the investigation focused principally on the value of inventory, accounts payable and certain liabilities, as well as certain revenue transactions of TurboDisc. In addition, Veeco indicated that it expected that this investigation would lead to adjustments requiring the restatement of the financial statements previously issued for the quarterly periods and nine months ended September 2004, and that they expected to complete the investigation and to file the financials by March 16, 2005.     The Company stated that it expected that the restatement would reduce Veeco's pretax earnings for the nine months ending September 30, 2004 by between $5.5 and $7.5 million.

3.     Following this announcement, shares of Veeco fell $1.90 per share, or 10.07 percent, from $18.86 at the close of trading on February 10, 2005, to $16.96 per share at the close of trading on February 11, 2005, on unusually high trading volume of 5.7 million shares, seven times the previous day's trading volume, thereby damaging Lead Plaintiffs and the Class. Notably, on the same day Veeco's price dropped, all market indicators *rose*: the Dow Jones Industrial Average rose by 47 points; the Nasdaq Composite Index rose by 23 2/11 points; and the S&P 600 Information Technology Index (of which Veeco is a component) rose by 3 points. In a conference call with

analysts on February 11, 2005 . Defendants distanced themselves from the improprieties by blaming them on "1 or 2 people who have been replaced"- the "controller and head of operations of TurboDisc." Defendants acknowledged control deficiencies at TurboDisc and stated that the improprieties "masked" more fundamental profitability problems at TurboDisc. In the weeks following the disclosure, the price of Veeco stock continued to slide, falling to $13.97 at the close of trading on March 15, 2005.

4.     On March 16, 2005, the Company announced that it had completed its internal investigation and had determined that its previously issued financial statements were required to be restated to decrease pre-tax earnings by $2.8 million, $4.3 million and $3.1 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. The Company attributed the restatement to the actions of a "single individual at TurboDisc whose employment had been terminated."

5.     On April 1, 2005,  the company issued the restatement of its previously reported quarterly financial information for the first three quarters of 2004 that was contained in its Forms 10-Q for the quarterly periods ended March 31, 2004, June 30, 2004, and September 30, 2004, by filing a "Form 10-Q/A (Amended Quarterly Report)" for each of those three periods.

6.     As the defendants admitted by the restatement, Veeco's initially disseminated financial statements for the first three quarters of 2004 overstated Veeco's pretax earnings by $10.2 million, and reflected the improper recognition of revenue and the improper understatement of expenses. Moreover, the defendants admitted in their March 16, 2005 press release and Form 10-K for the year-ended December 31, 2004 filed the same day (" 2004 10-K") that TurboDisc was seriously unprofitable. The 2004 10-K stated that "[t]he most serious profitability issue Veeco faced

during 2004 was at its TurboDisc business unit." Lead Plaintiff's counsel's interviews with confidential sources have revealed the true details of the basis of the improper accounting for revenues and expenses that caused the financial statements to be materially false and misleading, thereby inflating the price of Veeco securities and causing damages to Lead Plaintiff and the Class when the announcement of the restatement was made on February 11, 2005.

7.     Individuals who provided information in drafting this Complaint did so on a confidential basis and are identified as follows by number as confidential witness ("CW__") with a description of their connection to the Company:

| CW1 | a former Veeco employee who was a buyer for the TurboDisc division during the Class Period. |
| CW2 | a former Veeco employee who was a manufacturing engineer for TurboDisc prior to and during the Class Period. |
| CW3 | a former Veeco employee who was a high level accounting officer at Veeco during the Class Period. |

8.     These witnesses reveal that the restatement was not, as defendants have stated, triggered by "improper accounting entries" made by "a single individual at TurboDisc" and it was not uncovered in the course of instituting a new accounting system at TurboDisc in the fourth quarter of 2004 as defendants claimed on March 16, 2005. Instead the witnesses' testimony shows that defendants were aware of and were responsible for undisclosed practices which fraudulently inflated the revenues and income and understated the expenses of the Company from the beginning of the Class Period on November 3, 2003. They have separately and together supplied facts of an undisclosed scheme by defendants to fraudulently inflate Veeco's earnings by overstating the

TurboDisc division's revenue and income and understating its expenses to conceal the material fact that the TurboDisc division was unprofitable and many of its products were defective and unsaleable.

9.      As detailed below, these witnesses have also confirmed that defendants Braun, Rein, Kiernan and Weiss, Veeco's top executive officers, directly participated in and/or were aware of the fraud or recklessly ignored the fact that Veeco's public statements about its business and financials to the public and the SEC during the Class Period materially misrepresented Veeco's business, revenues, expenses, gross margins, and earnings.  Accordingly, all of the defendants are liable under the securities  laws for having issued materially false and misleading financial statements with scienter.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10-b promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331.

12.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District and Veeco conducts business in this District.  The Company maintains its principal executive offices  at 100 Sunnyside Boulevard, Suite B, Woodbury, New York, 11797.

13.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.    Lead Plaintiff, Steelworkers Pension Trust, as set forth in the accompanying Amended Certification, attached hereto and incorporated by reference herein, purchased Veeco securities at artificially inflated prices during the Class Period and has been damaged thereby.

15.    Defendant Veeco is a Delaware corporation with its corporate headquarters located at 100 Sunnyside Boulevard, Suite B, Woodbury, New York, 11797. Veeco designs, manufactures, markets and services a line of equipment primarily used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and high-brightness light emitting diode ("LED") industries. During the Class Period, Veeco stock traded on the National Association of Securities Dealers Association Quotal-System (NASDAQ) under the ticker symbol "VECO."

16.    Defendant Edward H. Braun ("Braun") was, at all relevant times, Chairman and Chief Executive Officer of Veeco. Braun participated in making the materially false and misleading statements decribed herein, including signing Veeco's Forms 10-Q for the quarterly periods ending March 31, 2004, June 30, 2004 and September 30, 2004 during the Class Period which contained certain of the materially false and misleading statements alleged herein.

17.    Defendant John F. Rein, Jr. ("Rein") was, at all relevant times, Executive Vice President, Chief Financial Officer and Secretary of Veeco. Rein participated in making materially the false and misleading statements described herein, including signing Veeco's Forms 10-Q for the

quarterly periods ending March 31, 2004, June 30, 2004, and September 30. 2004 which contained certain of the materially false and misleading statements alleged herein.

18.    Defendant John P. Kiernan ("Kiernan") was at all relevant times, Vice President, Finance and Corporate Controller (principal accounting officer) of Veeco. Kiernan participated in making materially false and misleading statements described herein.

19.    Defendant R. Michael Weiss ("Weiss") was, at all relevant times, Vice President and General Manager of Veeco's Asia/Pacific region. Weiss participated in making materially false and misleading statements described herein.

20.    Defendants Braun, Rein, Kiernan and Weiss are sometimes collectively referred to in the Complaint as the "Individual Defendants."

21.    Defendants Kiernan and Weiss have been added in this Amended Consolidated Class Action Complaint. Defendants Veeco, Braun and Rein were named in the original complaints filed in this action.

## CLASS ACTIONS ALLEGATIONS

22.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the securities of Veeco during the Class Period November 3, 2003 through February 10, 2005 ("the Class"), and who were damaged thereby. Excluded from the Class are defendants, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer or director of defendant Veeco Instruments, Inc., any entity in which any excluded person has a controlling interest and the legal representatives, heirs, successors and assigns of any excluded person.

-7-

23.    Because Veeco has millions of shares of common stock outstanding, and because the Company's common stock was at all relevant times actively traded, on the NASDAQ National Markets, members of the Class are so numerous that joinder of all members is impracticable. As of March 4, 2004, Veeco had about 29.62 million shares outstanding. While the precise number of Class members in unknown to Lead Plaintiff at this time and can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether the defendants engaged in acts or conduct in violation of the federal securities laws as alleged herein;

b.    Whether defendants had a duty to disclose certain information;

c.    Whether defendants, during the Class Period, knowingly or recklessly made materially false and misleading statements or knowingly or recklessly failed to correct such statements upon learning that they were materially false and misleading;

d.    Whether the market price of Veeco's securities, during the Class Period, was artificially inflated because of the defendants' conduct complained of herein; and

e.    Whether member of the Class have sustained damages and, if so, the proper measure of those damages.

25.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are contrary to or in conflict with the members of the Class Lead Plaintiff seeks to represent.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.    There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

28.     Incorporated in 1989, Veeco designs, manufactures, markets and services a broad line of products primarily used by leading manufacturers in the data storage, semiconductor, compound semiconductor/wireless and HG-LED (high brightness light emitting diode) industries.  These companies, in turn, use Veeco's process equipment to create a wide range of "high-tech" products, such as computer integrated circuits, personal computers, hard disk drives, network servers, digital cameras, wireless phones, TV set-top boxes and personal digital assistants.  In addition, Veeco sells a "metrology" product line of nanotechnology equipment (enabling the manipulation and measurement of atomic-size material) to the scientific and industrial research community.  Veeco

manufactures and sells its products throughout the world, primarily in the United States, Europe and Asia. Many of Veeco's products are high technology "tools" used to make many of the high technology products described above.

29.    One of the Veeco's process equipment products is its Epitaxial Process Equipment product. Epitaxial Process Equipment uses epitaxial deposition technology, which is capable of precisely depositing or etching thin film products, and is primarily used in the manufacture of data storage components such as compound semiconductor/wireless devices.    Until November 2003, Veeco manufactured and sold only one type of epitaxial equipment, the Molecular Beam Epitaxy ("MBE") system. Veeco's MBE operations were located in St. Paul, MN.

30.    On November 3, 2003, Veeco gained the ability to provide another key epitaxial deposition technology, when it acquired the TurboDisc Metal Organic Chemical Vapor Deposition ("MOCVD") business from Emcore Corporation, ("Emcore"). MOCVD epitaxial technology is mainly used in light-emitting diode ("LED") applications such as backlighting for wireless telephones, digital cameras and automotive use, and has a much larger market than MBE technology. As described by Veeco, Emcore's TurboDisc division was the market leader in MOCVD production with over 500 TurboDisc reactors, called GaNzillas, shipped worldwide. Patented TurboDisc technology was known for its unique high-speed rotating disc deposition technique ideal for high production rates. Emcore's TurboDisc revenue was $51.1 million for the twelve months ended June, 30 2003. The Company stated that the acquisition would greatly expand its customer base and revenues by making Veeco a "one-stop shopping" source as the only company providing equipment based on both MBE and MOCVD technologies, the two key component semiconductor epitaxial technologies that determine compound semiconductor device brightness and frequency.

-10-

31.    The November 3, 2003 announcement of the TurboDisc acquisition could not have come at a better time for Veeco. On October 27, 2003, the Company had announced lower than expected revenues and earnings, and, more ominously, had also reported weaker than expected bookings of new orders by customers, for the second straight quarter, causing the price of Veeco's stock to decline. Upon issuance of the November 3, 2003 press release, the price of Veeco's stock jumped to close at $26.39 (from a closing price of $25.30 per share at the close of the previous trading day) and thereafter continued to climb, reaching a Class Period high of $34.40 per share on January 20, 2004.

## THE NATURE OF VEECO'S FRAUD

32.    Veeco acquired the TurboDisc MOCVD business from Emcore on November 3, 2003, for a total cost of $63.7 million. The $63.7 million was a major cash outlay, which represented more than twenty percent of Veeco's equity. Announcing the acquisition on November 3, 2003, defendants proclaimed that TurboDisc would yield cost-saving "synergies" under Veeco ownership that would increase TurboDisc's gross margin to 46% and yield an operating profit of 15%, when under Emcore's control gross margin and operating profit was 36% and 3.7%, respectively. Defendants continued to tout the purported "synergies" throughout the Class Period.

33.    Contrary to their public statements, defendants knew that there was no possible way that Veeco could achieve "synergies" with TurboDisc. Based on their own four months of pre-acquisition due diligence and their knowledge of their own business, defendants knew that TurboDisc's operations could not be combined with Veeco's. TurboDisc manufactured a totally different product based on a totally different technology, employed a separate work force with unique

specialized skills, and was based in a different geographic location. TurboDisc was located in Somerset, New Jersey whereas Veeco's MBE factory was located in St. Paul, Minnesota.

34.     Unbeknownst to the investing public, defendants hoped to increase TurboDisc's profitability by gambling that Veeco could manufacture component parts in-house instead of buying them. The strategy called for a major change in TurboDisc's manufacturing operations. Immediately after Veeco's acquisition of TurboDisc, Veeco began to manufacture critical precision components in-house instead of continuing to purchase them from reliable vendors as Emcore had done, despite the fact that Veeco had no previous experience in manufacturing these components. The high-risk "make" as contrasted to "buy" plan placed the newly acquired TurboDisc division in jeopardy, and quickly resulted in higher warranty costs, and an accumulation of unsaleable parts and equipment, and loss of customer confidence.

35.     In addition, defendants sought to increase TurboDisc's reported margins and profits by initiating an experimental program of building generic MOCVD reactors on speculation, with the hope that the reactors they built could later be customized to a customer's specifications. Building generic reactors was an unprecedented and risky experiment for Veeco. Previously, the manufacturing time to build a customized TurboDisc MOCVD reactor was an average of 120 days and they were custom built to the specifications of the customer. Because defendants wanted to be able to fill hoped-for future orders more quickly, they decided to build and stockpile "generic" reactors that they hoped they could later customize to the customer's specifications. The speculative venture resulted in an accumulation of virtually worthless machines because (a) they were built with Veeco's defective in-house manufactured components, and therefore were non-working; and (b) they could not be sold because customers wanted reliable machines that were built to their specifications.

-12-

36.    Also, Veeco improperly recognized revenue on machines that had not yet been sold. Veeco further improperly recognized revenue under a Transitional Services Agreement ("TSA") which Veeco entered into with Emcore as part of the TurboDisc acquisition. The agreement provided that Veeco would provide equipment and support services to Emcore as a favored customer on a year-to-year basis for up to five years and furnish Emcore with a billing statement at the end of each year. Because no interim billing occurred pursuant to the terms of the TSA, Veeco improperly recorded excessive revenue over the year because the revenue overstatements were assured to be non-detectable for a year.

37.    Veeco's revenues did indeed increase as a result of the above described fraudulently recognized revenues, and expenses did indeed drop as a result of manufacturing parts in-house instead of buying from third-parties. However, the cost-cutting initiatives resulted in serious quality problems which led to rapidly increasing warranty costs, the loss of customers, and the build-up of an inventory of non-saleable parts and MOCVD reactors built on speculation. These negative effects more than offset the earnings effect of cost savings and the improperly recognized revenue. The quality problems led to mushrooming warranty claims, the loss of customers and an accumulation of more than $5 million of inventory which should have been written down but was not. TurboDisc's true operating margin *dropped* dramatically and it suffered losses. These facts were concealed during the Class Period. Investors were deceived because Veeco's financial statements, conference calls and press releases did not reveal these facts.

38.    Because disclosure of the severe quality problems would undoubtedly have resulted in sales cancellations and adversely impacted TurboDisc's business prospects, defendants concealed the adverse information and, instead, filed materially false and misleading reports with the SEC and

-13-

issued materially false and misleading financial statements which falsely portrayed the TurboDisc division as robust and increasing in profitability.

39.    Moreover, as CW3 has stated, defendants failed to disclose that after the acquisition, TurboDisc's accounting department had been reduced from a standing staff of six to eight people under Emcore, to two under Veeco. The cutback materially weakened TurboDisc's internal accounting controls and created and fostered an environment that permitted defendants to conceal the false financial reporting.

40.    On February 11, 2005, when defendants announced the need to restate Veeco's financial statements and the truth (albeit, lacking certain details, as described herein) about TurboDisc's unprofitability was revealed, the price of Veeco's stock fell more than 10%, from $18.86 to $16.96 on a day the market rose significantly. The stock price continued to drop in the ensuing weeks falling to $13.97 at the close of trading on March 15, 2005.

**Defendants' Explanation for the $10.2 Million Restatement**.

41.    Veeco described its restatement in the Company's Form 10-K for the year ended December 31, 2003 (the "2003 10-K"), issued on March 12, 2004 as follows:

> On February 11, 2005, Veeco announced the postponement of the release of audited results for the fourth quarter and year ended December 31, 2004, pending completion of an internal investigation of improper accounting transactions at its TurboDisc business unit. Veeco acquired the assets of TurboDisc in November 2003. The investigation focused principally on the value of inventory, accounts payable and certain liabilities, as well as certain revenue transactions of TurboDisc. The investigation was commenced after Veeco's internal audit staff and corporate financial management discovered improper accounting transactions in the course of a Veeco internal audit and transitioning the business to Veeco's SAP accounting system during the fourth quarter of 2004. The Audit Committee of the Company's Board of Directors supervised the accounting investigation and authorized Veeco's outside counsel, Kaye Scholer LLP, to hire Jefferson Wells International to

-14-

perform forensics and accounting reconstruction work as part of the investigation. The investigation has been completed. Conclusions reached during the investigation included that the improper accounting entries were made by a single individual at TurboDisc whose employment had been terminated prior to the commencement of the investigation, and that there was no evidence found of embezzlement or diversion of corporate assets.

On March 16, 2005, Veeco reported that it had completed its internal investigation and would be restating the financial statements previously issued for the three quarterly periods and nine months ended September 30, 2004. The pre-tax decrease to earnings previously reported is $2.8 million, $4.3 million and $3.1 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. In addition, as a result of revenue recognition adjustments, (decreases) increases to revenues previously reported were $(3.6) million, $(3.6) million and $5.0 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. These revenue adjustments, in the aggregate, do not reduce total revenue recognized for 2004.

42.    During a March 16, 2005 conference call with analysts, in which defendants Rein and

Braun participated, the defendants provided some detail. First, defendant Rein explained that the

accounting improprieties surfaced "in connection with the close of the fourth quarter of 2004."

Second, defendant Rein stated:

The restatements consist of a $10.2 million adjustment to pre-tax earnings for the first nine months of 2004, including $8.1 million in adjustments of inventory accruals and accounts payable, as well as $2.1 million in adjustments in the gross profit related to recognition of revenues. The adjustment to pre-tax earnings was higher than [the $5.5-$7.5 million pre-tax earnings impact] originally estimated by Veeco on February 11, [2005] principally as a result of the gross profit impact of revenue items adjusted and TurboDisc warranty accrual adjustments.

43.    Defendant Braun explained that the "TurboDisc mishap includes within it a very

high warranty cost. Typically, in our equipment business, warranty runs 2 to 3 percent of revenue.

...[A]s TurboDisc started to work on a new configuration of some of the major elements, their

warranty costs in these last quarters has been as high as 8 percent."

-15-

44.    In answer to a question from analyst David Dudley, defendant Braun stated:

> . . . and so one discovered not only accounting entries, but warranty costs that
> were very high and being unattended to and appeared in Q3 and Q4 and will
> be corrected in Q1 and Q2...

Defendant Rein also stated in the March 16 conference call that there were "unrecorded [warranty]

adjustments."

**The True Elements of the Fraud Underlying the $10.2 Million Restatement.**

**THE TRANSITIONAL SERVICE AGREEMENT**

45.    In the November 3, 2003 conference call with analysts in which Veeco announced

the TurboDisc acquisition, defendant Braun mentioned that the "[t]he transaction includes a five-year

strategic equipment supplier agreement between Veeco and Emcore, as Emcore becomes an

important Veeco customer." In its own conference call discussing the sale, Emcore also referenced

the equipment supply agreement, under which Emcore would receive advantageous pricing and

support, as part of the rationale for the sale of TurboDisc to Veeco. However, no further details of

the agreement were provided.

46.    CW3 has described the agreement as the Transitional Service Agreement ("the TSA")

under which Veeco was required to provide certain products and services to Emcore at preferential

pricing, and certain other support services at no charge.    According to CW3, the TSA was a 500

page document which set forth the provisions of an annually renewable (for 5 years) agreement,

starting on the date of the acquisition, November 3, 2003.  Pursuant to the TSA (1) Veeco rented

to Emcore 25% of TurboDisc's production facility located at 394 Elizabeth Avenue in Somerset,

New Jersey (a fact which was not disclosed in any of Veeco's filings with the SEC); (2) Veeco

provided materials to Emcore at preferential prices; and (3) Veeco provided analytical support

-16-

services, reactor maintenance services, machine shop support services, government contract support services, New Mexico support services, Ortel support services, and Darpa 4" GaNFETs support services (government project R&D support service) to Emcore (other facts which were not disclosed in any of Veeco's filings with the SEC).

47.     The accounting for these items was analogous to inter-company accounting. Each month, the TurboDisc division would prepare journal entries setting forth the amounts owed by Emcore to Veeco for each of the chargeable categories (i.e. rent, inventory usage, labor, support, etc.) and revenue was recognized in the amount journalized. Veeco recorded the revenue (i.e. rental income, service income, product sales income, etc.) and a receivable ("Due From Emcore") was established on the books of Veeco, although no invoices had been sent to Emcore. Furthermore, the TSA was an open-ended acquisition-related agreement which, among other things, provided for a wholesale give-away of services by Veeco to Emcore. Veeco recorded these free services as revenue even though Veeco had no expectation of getting paid for them.

48.     According to CW3, from Emcore's perspective, the TSA arrangement was advantageous because it permitted Emcore to utilize Veeco's valuable resources and to delay settling its bill with Veeco until the annual expiration of the TSA. For Veeco, the arrangement was advantageous because it permitted Veeco an opportunity to improperly and prematurely recognize excessive and un-invoiced income from Emcore that was virtually certain to go unchallenged, with no remittances from Emcore, for at least a year.

49.     According to CW3, the fraud was fostered by the material weakness in internal controls that existed at the TurboDisc facility. The relationship between Emcore employees and TurboDisc employees in TurboDisc's Somerset, New Jersey facility was informal and casual,

-17-

because about 120 of the former Emcore TurboDisco employees simply became Veeco TurboDisc employees on November 3, 2003. Accordingly, Emcore employees were permitted by their former co-workers to requisition components from TurboDisc's inventory without a formal purchase order. Because purchase orders were not used, each withdrawal of components or parts from TurboDisc's inventory presented an opportunity to record a journal entry that reflected the sale of an item at an overstated amount.

50.    The effect of this was that, between November 3, 2003 and September 30, 2004, $771,199.10 was recognized as revenue in connection with Emcore's withdrawal of parts and components from TurboDisc's inventory, although only $352,999.02 should have been recognized as revenue pursuant to the terms of the TSA. Thus, the revenue had been overstated by $418,200.08 in connection with the journalization of requisitioned items.

51.    As described by CW3, between November 3, 2003 (the date of Veeco's acquisition of TurboDisc from Emcore) and the end of September 2004, $679,128.31 was recognized as revenue in connection with certain support services (analytical support, reactor maintenance support, machine shop support, government contract support, New Mexico support, Ortel support, and Darpa 4" GaNFETs support) performed by Veeco, although only $136,053.29 was supposed to have been recognized as revenue pursuant to the terms of the TSA. Accordingly the revenue had been overstated by $543,075.02 in connection with the journalization of support services revenue.

52.    Similarly, in the same period (November 3, 2003 through September 30, 2004), $364,360.95 in paid time off ("PTO") - mainly vacation time and sick time - had been journalized as Due From Emcore, thereby permitting the recognition of $364,360.95 of income. Under the terms

-18-

of the TSA, only $160,753.06 should have been recorded. Thus, revenue had been overstated by $203,607.89 in connection with the journalization of PTO items.

53.    In addition, between November 3, 2003 and September 30, 2004, $97,551.20 of rent-related charges such as insurance, property taxes, landscaping services, as well as other items were improperly journalized as Due From Emcore, thereby permitting the improper recognition of $97,551.20 of income.

54.    Emcore's fiscal year ended on September 30, 2004. According to CW3, near the end of August 2004, in connection with its preparation for the fiscal year-end closure of its books, Emcore requested an itemization of the amounts they owed Veeco as of September 30, 2004 pursuant to the TSA. CW3 states that in the process of preparing this itemization for Emcore, Veeco internal auditor Gary Reifert prepared a document which revealed that the amounts recorded as revenue on Veeco's books for parts, services and other items journalized as due from Emcore were improperly overstated and that the adjustment required to bring those overcharges to the agreed preferential prices under the TSA would reduce Veeco TurboDisc division revenue by over $1.26 million. The document reflected the fact that Veeco had inappropriately recognized $1,262,434.19 of excessive income between November 3, 2003 and September 30, 2004, as follows:

| | Revenue Recognized | Correct Amount | Adjustment |
|---|---|---|---|
| Service Support: | | | |
| Analytical | 93,768.25 | 98,512.39 | 4,744.14 |
| Reactor maintenance | 96,174.34 | 32,329.65 | (63,844.69) |
| Machine shop | 5,322.60 | 5,211.25 | (111.35) |
| Government contract | 269,662.28 | -0- | (269,662.28) |
| New Mexico | 32,805.72 | -0- | (32,805.72) |
| Ortel | 94,201.47 | -0- | (94,201.47) |
| Darpa 4" GaNFETs | 87,193.65 | -0- | (87,193.65) |
| Subtotal | 679,128.31 | 136,053.29 | (543,075.02) |

| | | | |
|---|---|---|---|
| Vacation/sick time | 364,360.95 | 160,753.06 | (203,607.89) |
| Parts and components | 771,199.10 | 352,999.02 | (418,200.08) |
| | 1,814,688.36 | 649,805.37 | (1,164,882.99) |
| Other Items | | | (97,551.20) |
| Total | | | (1,262,434.19) |

55.    According to CW3, when the document detailing these adjustments was presented

to defendant Rein, "before Veeco's third quarter 2004 earnings release," **CW3 was specifically**

**instructed by defendant Kiernan, Veeco's Vice President of Finance and Controller, at the**

**direction of defendant Rein, to "book the adjustments in October"** (i.e. in the fourth quarter of

2004 financial results, which were not released until February 2005). As a result, the $1,262,434.19

income overstatement, which was known by defendants Rein and Kiernan, was improperly pushed

into the fourth quarter of 2004 where it was "buried" with other adjustments. Defendant Braun either

knew or recklessly failed to know of the income overstatement and the fact that it was improperly

pushed into the fourth quarter where it was buried. This was a violation of GAAP, because the $1.26

million adjustment was required to have been pushed back (through restatement) to the first three

quarters of 2004, pursuant to APB Opinion No. 20, Accounting Changes.

56.    Nondisclosure of the 2004 fourth quarter $1,262,434.19 income overstatement

adjustment in Veeco's 2004 year end financial statements violated GAAP (APB Opinion No. 28,

Interim Financial Reporting) which provides:

> When interim financial data and disclosures are not separately reported for
> the fourth quarter, security holders often make inferences about that quarter
> by subtracting data based on the third quarter interim report from the annual
> results. In the absence of a separate fourth quarter report or disclosure of the
> results (as outlined in ¶ 30) for that quarter in the annual report, disposals of
> segments of a business and extraordinary, unusual, or infrequently occurring
> items recognized in the fourth quarter, as well as the aggregate effect of
> year-end adjustments which are material to the results of that quarter (see ¶¶

4 and 17) should be disclosed in the annual report in a note to the annual financial statements.

## OVERSTATEMENT OF MOCVD SALES REVENUE

### Fraudulent Recognition of Revenue from the Sanan Group Contract.

57.    On April 26, 2004, Veeco issued a press release announcing that it received an order in excess of $10 million for multiple TurboDisc MOCVD production systems from Fujian Quanzhou Sanan Group Ltd., a manufacturer of high brightness light-emitting diodes (HB-LEDs) based in Fujian Province, China (the "Sanan Group").

58.    Revenue from the sale could not be recognized until the MOCVD reactor had been delivered to China, installed on site, Veeco conducted an on-site advanced materials demonstration to show that the equipment operated in accordance with the customer's specifications, and a written customer acceptance of the MOCVD equipment was obtained.

59.    According to CW3, the Individual Defendants clearly understood the terms of the contract, but they were eager to accelerate the recordation of revenue. Thus, although they knew that the work required to be performed to recognize revenue had not yet been performed, they induced employees in China, through payments of increased bonuses, to obtain fictitious customer sign-offs stating that the work had been completed and accepted. The fictitious sign-offs resulted in overstatements of revenue in contravention of GAAP, of approximately $3,624,000, $3,638,000, and $2,200,000 in the first, second, and third quarters of 2004, respectively. Significantly, $3,624,000 of revenue was recognized on the Sanan Group sales agreement during the quarter ended March 31, 2004, almost one month *before* the agreement was signed and publicized late in April 2004.

-21-

60.    The Individual Defendants were aware of the contract because it was an extremely large contract and because, as CW3 stated, at the end of each quarter, personnel at TurboDisc prepared a binder which listed all of the sales of reactors and parts and which included copies of contracts. This binder was sent to Scott Glassman (whom CW3 characterized as Veeco's in-house accounting expert and revenue recognition expert for purposes of SEC reporting) who then forwarded copies to defendants Rein and Braun, according to CW3. Included in one such binder was the Sanan Group sales contract.

61.    Veeco's restated filings with the SEC never disclosed the true facts. Instead, the March 31, 2004 Form 10-Q/A, June 30, 2004 Form 10-Q/A, and September 30, 2004 Form 10-Q/A each stated that "improper accounting entries were made by a single individual at TurboDisc," when in fact the restatement was the result of outright fraud by Veeco's top management.

## UNDERSTATEMENT OF WARRANTY LOSSES

**Veeco's Substitution of Home-Made Inferior Quality Parts For
Reliable Parts Made by Tested Outside Sources.**

62.    CW1 described the TurboDisc Division as manufacturing MOCVD reactors "which ranged in size from the size of a Volkswagen to the size of a 16-wheeler tractor-trailer." According to CW1 "each reactor took between 2 and 6 months to build, was custom built for the particular needs of the customer, and sold for prices which ranged from $1 million to $2 million." Each of the "Veeco MOCVD reactors was sold with a one-year warranty-which provided repair or replacement during that time period." As CW1 stated: "There were constant efforts at Veeco to increase profit margins through re-designing the product, and the research scientists and engineers were experimenting with everything."

63.    CW2 corroborated this testimony of CW1, stating: "Almost immediately after Veeco had purchased the TurboDisc Division customers began to have problems with the MOCVD reactors. The problems were with the reactor filaments burning out prematurely. The reactor filaments were what controlled the heat in the reactor, and if the heat was not hot enough, the reactor would not lay down the surface" on the wafer. According to CW2, "this was a major problem." CW2 added that "the problem did not exist while Emcore owned the TurboDisc Division," and "only began after Veeco took over."

64.    All of these facts were also confirmed by CW3 who provided additional detail. CW3 stated that, on the Tuesday after Labor Day in September 2003, two months before Veeco acquired the TurboDisc Division from Emcore, defendant Braun announced his plans to eventually move the TurboDisc Division from Somerset, New Jersey to the Veeco operations center in St. Paul, Minnesota. To achieve this, immediately after the acquisition, defendant Braun named three people in the St. Paul Veeco operation to take over management of the TurboDisc Division. The three were Marlin A. Braun (Sr. V.P. Compound Semiconductor) who was appointed to the position of General Manager of TurboDisc, Paul Hofemann (Sr. V.P. Strategic Marketing), and James Ralston. None of these individuals was at all familiar with the TurboDisc division's operations. Indeed, Marlin Braun never visited the facility before December 2004. Hofemann made only sporadic visits, while Ralston finally moved to New Jersey.

65.    Because defendant Braun had planned to eventually move TurboDisc's operations to Veeco's St. Paul facility, and because he had also made a decision to cut costs by manufacturing TurboDisc product components in-house, immediately after the acquisition of TurboDisc, defendant Braun instituted a number of changes in TurboDisc's operations. Upon acquisition, defendant Braun

-23-

directed TurboDisc to cease purchasing certain components, and instead had them manufactured in Veeco's St. Paul facility. These components were TurboDisc's glove box, gas panel, lift mechanism assembly, GRP power center, and motorized vacuum feedthru.

66.     Subsequently, defendant Braun also directed TurboDisc to cease purchasing the following additional components from third party vendors, and he directed TurboDisc to instead use replacement components which were manufactured in Veeco's St. Paul facility. These components were LL exhaust assembly, glove box gate valve, seal pump assembly, power supplies, baseplate weldment, flow flange weldment, LL chamber weldment, reactor gate valve, shutter weldment, LL chamber lid, confined inlet weldment, cold plate weldment, chiller assembly, cabinet, reactor weldment, heater assembly, vacuum robot, flow pressure controls, primary pump, moly parts, ceramic parts, concentration monitor, computer, brooks recalibration, and various other components including flow flanges and heating filaments.

67.     When it was owned by Emcore Corporation, TurboDisc had historically purchased critical precision parts from manufacturers with a proven record of providing superior quality products. For example, Brooks Automation had historically supplied flow/pressure controls, Ebara had historically supplied primary pumps, F&A Machine had historically supplied moly parts, Ferro-Ceramic Grinding had historically supplied ceramic parts, Lorex Industries had historically supplied concentration monitors, Micromax Computers had historically supplied computer and GSI Automation had historically supplied brooks recalibrations.

68.     Flow flanges and heating filaments were historically purchased from Norcal, a California-based third-party technologically superior parts source. The flow flanges regulated the gas flow through the nozzle into the reactor which controlled the chemical layer which was applied

on the wafers. It was an essential part of the reactor. The filaments controlled the heat in the reactor and it was essential to maintain a specific temperature during the process of applying a layer onto the wafer.

69.    In contrast, when the parts described above were made by Veeco St. Paul, the quality that had previously existed was lost. In particular, the flow flanges and heating filaments produced by the St. Paul operations failed miserably in the field. According to CW3, these failures resulted in significantly increased warranty costs.

70.    As further stated by CW3, from 1990 through November 2003, the TurboDisc Division had experienced a warranty rate of 0.89% of sales. In contrast, primarily because of the failures of the inferior Veeco-manufactured flow flanges and heating filaments, the warranty rate shot up to 8% during the Class Period. This was admitted in a post-class period conference call on March 16, 2005, when defendant Braun said:

> [A]s TurboDisc started to work on a new configuration of some of the major elements, their warranty costs in these last quarters has been as high as 8 percent. And that is part of the hurt in the TurboDisc margin.

71.    By February 2004, and certainly by no later than August 26, 2004, defendant Rein and every other member of Veeco's senior management knew of the quality problems and the huge increase in warranty claims, because the problems were openly discussed at TurboDisc's Semi-Annual Divisional Reviews. According to CW3, although there was an unusual spike in warranty claims, defendants Braun and Rein refused to permit Veeco's financial statements to reflect charges to income required to fairly reflect accruals for warranty losses, in violation of GAAP (FASB Statement No. 5, Accounting for Contingencies) which requires the accrual of losses from warranty obligations. When CW3 prepared a journal entry to properly increase the warranty accrual

-25-

by $250,000, CW3 was instructed by defendant Kiernan at the direction of defendant Rein to reverse the accrual.

72.     Moreover, according to CW3, defendant Braun knew of the quality problems and the increasingly high warranty claims, because defendant Braun took a keen interest in TurboDisc at all relevant times and would frequently call CW3 with questions regarding TurboDisc's financial position and results of operations.

73.     CW3 stated that another TurboDisc undertaking, initiated by defendant Braun, was to build a huge high-capacity GaNzilla MOCVD reactor. In order to do this, the engineers took parts from the efficient model D-180 reactor which handled 6 wafers at a time, and installed them in the newly conceived giant reactor which was being designed to handle between 18 and 20 wafers at a time. The giant GaNzilla reactor was intended to sell for $1.5 million.

74.     As stated by CW3, there were major design problems with TurboDisc's new GaNzilla reactor. In addition, the new GaNzilla reactor suffered from the same problems as all of Turbodisc's other reactors: inferior and non-working flow flanges, heater filaments, and other components that were manufactured by the Veeco St. Paul, Minnesota facility. According to CW3, "as a result of these problems, the reactors failed miserably in the field and led to increased warranty costs" which defendants refused to recognize for financial reporting purposes.

**Writedowns of Worthless Inventory**

75.     CW3 stated that prior to its acquisition by Veeco, Emcore's TurboDisc division had historically built their MOCVD reactors "to order," customized to each individual customer's specifications which had varied considerably from customer to customer. After the acquisition, however, defendant Braun directed TurboDisc to "build to stock" a generic reactor. According to

CW3, defendant Braun's dramatic departure from the traditional method to a "build to stock" approach was intended to provide an inventory of reactors which would be available for immediate sale, in order to "hit the market while it was hot," because "the market was cyclical." The generic reactor was also cheaper to produce and if sold could yield higher margins. However, it was not feasible that a generic MOCVD reactor could be built that could then be easily customized to the specific needs of an individual customer. Moreover, the reactors suffered from the use of Veeco's defective manufactured parts. Thus, Veeco found itself with stockpiles of large amounts of non-customized reactors which could not be sold. As a result, according to CW3, Veeco accumulated stockpiles of non-saleable or obsolete inventory of components and reactors. Under GAAP, this stockpiled inventory should have been timely written down during the Class Period but was not until the belated restatement in February 2005.

76.    As confirmed by CW3, the restatement of Veeco's financial statements resulted in a $5,562,000 write-down of Veeco's inventory. This write-down represented the belated charge to earnings required to reflect the worthlessness of the Veeco's "build to stock" machines, and defective parts, as required by GAAP (Accounting Research Bulletin No. 43, Restatement and Revision of Accounting Research Bulletins) which states:

> Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

77.    At all relevant times, defendants Braun, Rein, and Kiernan knew about the stockpiling of defective and non-saleable reactors and parts. According to CW3, based on discussions during

the TurboDisc semi-annual division reviews, and based on "twice-monthly conference calls, and

quarterly binders prepared for Veeco management, Braun, Rein and Kiernan all had been informed

of the increasing inventory levels throughout 2004."

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING
## THE CLASS PERIOD

78.    On November 3, 2003, Veeco issued a press release announcing its purchase of

Emcore's TurboDisc Metal Organic Chemical Vapor Deposition ("MOCVD") business. The press

release stated that "Emcore's MOCVD revenue was $51.1 million for the trailing twelve months

ended June 30, 2003." The press release described the acquisition as follows:

> The purchased MOCVD business includes the assets necessary for
> engineering, design and manufacturing of MOCVD (TurboDisc) systems
> ranging from R&D to high-volume production systems, the business unit's
> manufacturing facility and applications lab located in Somerset, New Jersey
> and Emcore's significant MOCVD intellectual property. It is expected that
> approximately 120 employees of Emcore involved in the TurboDisc business
> will become employees of Veeco...Emcore is a recognized industry leader in
> MOCVD production systems, with over 500 TurboDisc reactors shipped
> worldwide. TurboDisc reactors are used in the growth of III-V compounds for
> numerous compound semiconductor applications, including data and
> telecommunications modules, cellular telephones and solar cells. Emcore's
> GaNzilla® production systems are the recognized leader in growing gallium
> nitride-based devices, most notably green, blue and white high brightness
> LEDs used in backlighting wireless mobile devices, and automotive
> applications. Emcore's patented TurboDisc technology is known for its
> unique, high-speed rotating disc deposition technique ideal for high
> production rates. TurboDisc reactors are capable of depositing a wide variety
> of materials - GaAs, AlGaAs, InP, InGaAlP, InGaN, AlGaN, SiC and GaN
> - onto a substrate to grow compound semiconductor materials on the atomic
> scale.

79.    The November 3, 2003 press release quoted defendant Braun as stating: "*We believe*

*that Emcore's MOCVD business will be accretive to Veeco on a cash basis by the second quarter*

*of 2004.*"

80.     In a conference call with analysts that same day to discuss the acquisition, defendants

again stated that synergies from the acquisition would reduce TurboDisc's costs and raise margins

substantially:

> EDWARD BRAUN: Well, there -- gross margins vary as they do in our
> systems business from model number to model number within the TurboDisc
> product line, that a range of gross margin somewhere around the 35% is
> probably a good aggregate, and I think you are correct *as Jack [Rein]*
> *indicated that we see synergies, further synergies of about $4m a year that*
> *are cost savings from operating spending and who have made some*
> *significant spending reductions themselves, but I think the advantage of*
> *being part of Veeco equipment company allows some additional savings.*
>
> \*\*\*\*\*
>
> EDWARD BRAUN: *No. The model that we would put together, Jack, I*
> *think, has a model, we think that MOCVD should have a target gross*
> *margin of 46% and should have a target operating profit of 15%* quite
> similar to what we target for PVD, IVD, and IBE.

Also during the November 3, 2003 conference call, defendant Braun stated that integration of

TurboDisc's "sales and service, and finance will be our first step" thereby evidencing Veeco's

immediate control over TurboDisc's finance function.

81.     The November 3, 2003 press release and certain of the comments made by defendants

Rein and Braun during the conference call were materially false and misleading because they:

   a.     falsely led the investment community to believe that Veeco could vastly
          increase the profitability of TurboDisc, through synergies, when defendants
          knew or recklessly disregarded that no synergies were possible because the
          MOCVD manufacturing process was totally different from Veeco's MBE
          manufacturing process, it employed specialized personnel, unique
          components, and it was operated in a separate facility in Somerset, New
          Jersey;

   b.     failed to disclose that, in a bet-the-division gamble to increase margins,
          defendants were instituting a strategy to substitute key TurboDisc
          components which were obtained from known and reliable suppliers before

-29-

the acquisition with unproven and untested in-house manufactured components;

c.     failed to disclose that Veeco would build generic MOCVD reactors hoping they could be sold, a departure from the historic industry-wide build-to-order approach; and

d.     led the investment community to believe that TurboDisc would be accretive to Veeco on a cash basis by the second quarter of 2004 when, in fact, defendants had no realistic expectation that their bet-the-division gamble (that Veeco could manufacture precision parts in-house without adversely impacting the quality of TurboDisc's proven products and that Veeco could produce and sell reliable generic reactors) would result in increased cash.

82.     On March 12, 2004, Veeco filed its Form 10-K for the year ended December 31, 2003 with the SEC ("the 2003 Form 10-K"). This document, which was signed by defendants Braun, Rein and Kiernan, again touted TurboDisc's reputation as a "recognized industry leader"by including substantially the same representation quoted in ¶ 78 above.

83.     These statements in the 2003 Form 10-K were materially false and misleading because the defendants led the investment community to believe that TurboDisc (which it had acquired from Emcore) continued to be the "recognized industry leader in MOCVD production systems" when this was no longer true due to the product quality defects discussed above, and because they

a.     failed to correct previously issued statements which falsely led the investment community to believe that Veeco could vastly increase the profitability of TurboDisc, through synergies, when defendants knew or recklessly disregarded that this was not possible because TurboDisc manufactured a different product, employed a separate work force with unique skills, and was based in a separate facility in Somerset New Jersey;

b.     failed to disclose that defendants had drastically changed certain components of TurboDisc's products and substituted critical components which were previously purchased from reliable sources with defective in-house-

manufactured components, thus creating non-workable and unsaleable products;

c.    failed to disclose that warranty costs were sky-rocketing due to the non-workability of the products that TurboDisc was selling;

d.    failed to disclose that TurboDisc was engaged in a "build to stock" endeavor, and that the products being built were non-saleable because they were built with Veeco's defective in-house parts and because there was no market for non-customized (generic) reactors causing stockpiles of unsold and defective products to accumulate that were required to be written down; and

e.    failed to disclose that TurboDisc's accounting department had been drastically reduced to two people under Veeco, which materially weakened the Division's internal accounting controls and fostered an environment favorable to defendants' concealment of financial statement fraud.

84.    On April 26, 2004, Veeco issued a press release announcing its financial results for the first quarter ended March 31, 2004. The press release reported that first quarter 2004 revenues were $94.5 million, up 23% sequentially from the $76.9 million reported in the fourth quarter of 2003. It quoted defendant Braun as stating that "[r]evenues increased sequentially in all markets, led by a 60% increase in compound semiconductor/wireless and a 41% increase in semiconductor, and represent Veeco's strongest performance in nine quarters." With respect to TurboDisc, defendant Braun also stated:

Compound semiconductor/wireless orders were $39.0 million in the first quarter of 2004, a 47% sequential increase. Veeco received several multiple system orders for our TurboDisc MOCVD products from worldwide customers who are increasing their manufacturing capacity of green, blue and white light emitting diodes (LEDs). *The growth of this newly acquired product line has surpassed our initial expectations...*

85.    Defendants' statements in the April 26, 2004 press release quoted above were materially false and misleading because they failed to disclose that Veeco's reported revenues and earnings were improperly inflated and its expenses were understated for the following reasons:

a.  Defendants failed to increase reserves against rising warranty claims, even though warranty costs were sky-rocketing from a historical rate of 0.89% of sales to 8.0% of sales due to the non-workability of the Veeco-manufactured components that TurboDisc was using in the products that it was producing;

b.  Defendants failed to write down stockpiles of unsaleable inventory resulting from Veeco's decision to make components as opposed to purchasing them and Veeco's decision to switch to "build to stock" instead of manufacturing customized products based upon specifications set forth in sales contracts.

c.  Defendants improperly recognized revenue from the sale of reactors to the Sanan Group when the terms of the contract prevented them from doing so as set forth in ¶¶ 58 and 59.

d.  Defendants improperly recognized product and service revenue on transactions with Emcore as set for in ¶¶ 45-56.

e.  Defendants reported materially overstated net sales, gross profit, operating income, and the results of operations for the quarter ended March 31, 2004, as later admitted through restatement. Net sales were overstated by $3,624,000, or 3.83%. Gross profit was overstated by $3,040,000, or 7.60%. Operating income was overstated by $2,800,000 or 248.22%. The results of operations were overstated by $2,006,000, or 284.94%.

86.  The statement in the April 26, 2004 press release that TurboDisc's "growth. . . has surpasssed our initial expectations" was materially false and misleading because the "growth" was due to the fraudulent recognition of $3,624,000 revenue in the first quarter of 2004, when the contract providing for the manufacture of this product was signed in April 2004.

87.  On May 3, 2004, Veeco filed its Form 10-Q for the quarterly period ended March 31, 2004 with the SEC ("the March 31, 2004 Form 10-Q"). This document, which was signed by defendants Braun and Rein, contained substantially the same financial data that appeared in the April 26, 2004 press release. Accordingly, it was materially false and misleading for the reasons specified in ¶¶ 85 and 86 above.

88. The March 31, 2004 Form 10-Q also set forth Veeco's relevant accounting policies

as follows:

Effective January 1, 2000, the Company changed its method for accounting for revenue recognition in accordance with Staff Accounting Bulletin ("SAB") No. 101, Revenue Recognition in Financial Statements. In December 2003, the SEC issued SAB No. 104, Revenue Recognition, which updates the guidance provided in SAB 101.... *For products produced according to a particular customer's specifications, revenue is recognized when the product has been tested and it has been demonstrated that it meets the customer's specifications and title passes to the customer.... The Company provides for warranty costs at the time the related revenue is recognized.*

\*\*\*\*\*

*The Company estimates the costs that may be incurred under its warranty and records a liability in the amount of such costs at the time the related revenue is recognized. Factors that affect the Company's warranty liability include historical and anticipated rates of warranty claims and costs per claim. The Company periodically assesses the adequacy of its recorded warranty liability and adjusts the amount as necessary.*

\*\*\*\*\*

Inventories are stated at the lower of cost (principally first-in, first-out method) or market. *Management evaluates the need to record adjustments for impairment of inventory on a quarterly basis.* The Company's policy is to assess the valuation of all inventories, including raw materials, work-in-process, finished goods and spare parts. Obsolete inventory or inventory in excess of management's estimated usage for the next 18 to 24 month's requirements is written-down to its estimated market value, if less than its cost. Inherent in the estimates of market value are management's estimates related to Veeco's future manufacturing schedules, customer demand, technological and/or market obsolescence, possible alternative uses and ultimate realization of excess inventory.

89. These representations, which were substantially identical to the representation which

appeared in Veeco's 2003 Form 10-K and which purported to reflect the accounting policies used

in preparing Veeco's financials statements, were materially false and misleading because, as

-33-

discussed and as admitted through restatement, Veeco's 2004 first quarter financial statements did

not comply with GAAP because they reflected:

    a.    the improper recognition of product, service and other revenue on transactions with Emcore;

    b.    the recognition of sales revenue before products had been tested, before it had been demonstrated that the products met the customer's specifications, and before title had passed to the customer;

    c.    warranty accruals based upon *Emcore's* historical experience, and not warranty accruals based upon Veeco's experience and Veeco's "anticipated rates of warranty claims and costs per claim" which were rising because of the non-workable and defective products that TurboDisc was turning out after Veeco substituted in-house made components for the precision components which Emcore had used;

    d.    inventory that was not stated at the lower of cost or market.

    90.    The March 31, 2004 Form 10-Q contained certifications pursuant to 13-a-14(a) or

Rule 15d-14(a) of the Securities Exchange Act signed by defendants Braun and Rein, in which each

represented as follows:

    1.    I have reviewed this quarterly report on Form 10-Q for the period ended March 31, 2004 of Veeco Instruments, Inc.

    2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

    3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

    4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (c)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)    All significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The March 31, 2004 Form 10-Q also contained signed certifications by defendants Braun and Rein pursuant to 18 U.S.C. Section 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, in which they represented that the quarterly report "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]he information contained in the Report fairly represents, in all material respects, the financial condition and results of operations of the Company."

91.    These representations about Veeco's financial statements and financial controls were materially false and misleading for the reasons specified in ¶¶ 83, 85, and 89. Moreover, defendants failed to disclose during the Class Period that, as CW3 has stated, TurboDisc's accounting department had been reduced from a standing staff of six to eight people under Emcore, down to two under Veeco. The cutback materially weakened TurboDisc's internal accounting controls and created and fostered an environment that permitted defendants to conceal the false financial reporting.

92.    An admission was later contained in Veeco's Form 10-K for the year ended December 31, 2004, filed on March 16, 2005 ("2004 Form 10-K") that "management has now determined that a deficiency existed in the internal control over financial reporting at the end of such [March 31, June 30, and September 30, 2004] quarterly periods." The 2004 Form 10-K stated, in part, that:

> As a result of the discovery by management of improper accounting entries made at its TurboDisc business unit which led to adjustments requiring the restatement of the Company's financial statements for the quarterly periods of March 31, 2004, June 30, 2004 and September 30, 2004, *management has now determined that a deficiency existed in the internal control over financial reporting at the end of such quarterly periods.* Since November 10, 2003, the date of the acquisition of the assets constituting the TurboDisc business unit, the business unit was operating under a legacy accounting system which was under the supervision of one individual and did not provide management with the depth of information Veeco is typically accustomed to. Management determined to institute a new accounting system at the business unit and in the course of the final implementation of such systems in the quarter ended December 31, 2004, the improper accounting entries were discovered. Management believes that the new accounting system and attendant control process, together with the replacement of financial personnel at the TurboDisc business unit has remedied the deficiency in control over financial reporting that lead to the restatement and that the Company maintained effective internal control over financial reporting as of December 31, 2004.

-36-

93.    Moreover, defendants did not comply with their SEC disclosure requirements in the

Management Discussion and Analysis ("MD&A'") section of the March 31, 2004 Form 10-Q.

Defendants Braun, Rein and Kiernan were familiar with the applicable provisions of SEC Staff

Accounting Bulletin No. 101 ("SAB 101") as evidenced by the fact that the 2003 Form 10-K, which

each of them signed, specifically cited SAB 101 in describing Veeco's revenue recognition policy.

SAB 101 states:

> *Management's Discussion and Analysis (MD&A) requires a discussion of*
> *liquidity, capital resources, results of operations and other information*
> *necessary to an understanding of a registrant's financial condition,*
> *changes in financial condition and results of operations. This includes*
> *unusual or infrequent transactions, known trends or uncertainties that*
> *have had, or might reasonably be expected to have, a favorable or*
> *unfavorable material effect on revenue, operating income or net income*
> *and the relationship between revenue and the costs of the revenue.* Changes
> in revenue should not be evaluated solely in terms of volume and price
> changes, but should also include an analysis of the reasons and factors
> contributing to the increase or decrease. The Commission stated in Financial
> Reporting Release (FRR) 36 that *MD&A should "give investors an*
> *opportunity to look at the registrant through the eyes of management by*
> *providing a historical and prospective analysis of the registrant's financial*
> *condition and results of operations, with a particular emphasis on the*
> *registrant's prospects for the future."*

94.    The MD&A section, with which defendants were familiar, in the March 31, 2004

Form 10-Q was materially false and misleading because if failed to "give investors an opportunity

to look at the registrant through the eyes of management" because it failed to disclose:

> a.    that revenue and earnings had been materially inflated through the fraudulent
> recognition of a sale to the Sanan Group;
>
> b.    unusual transactions with Emcore, such as agreeing to perform government
> contract support services, New Mexico support services, Ortel support
> services, and Darpa 4" GaNFETs support services for free;
>
> c.    uncertainties that have had, or might reasonably be expected to have, a
> favorable or unfavorable material effect on revenue, operating income or net

income, such as the uncertainties associated with the pervasive component replacement initiatives and "build to stock" initiative which had been implemented; and

d.    the relationship between revenue and the costs of the revenue which were skyrocketing due to the inordinate increase in warranty claims.

95.    On July 26, 2004, Veeco issued a press release announcing its financial results for the second quarter and six months ended June 30, 2004. The press release, which also lauded the fact that the reported results were above the Company's prior quarter and prior year as well as at the high end of the Company's guidance reported:

> Veeco's second quarter 2004 sales were $102.9 million with net income of $1.6 million or earnings per diluted share of $0.05 per share. Earnings excluding certain charges were $0.15 per diluted share. The Company's second quarter orders were $124.7 million. The Company's second quarter guidance (provided on April 26, 2004) was: revenues of $95 to $100 million, earnings per diluted share of $0.01-$0.04, earnings excluding certain charges of between $0.11 and $0.14 per diluted share, and orders of between $120-$125 million.

96.    The July 26, 2004 press release was materially false and misleading because it failed to disclose that Veeco's reported revenues and earnings were inflated and its expenses were understated for the following reasons:

a.    Defendants failed to increase reserves against rising warranty claims, even though warranty costs were sky-rocketing from an historical rate of 0.89% of sales to 8.% of sales due to the non-workability of the Veeco-manufactured components that TurboDisc was using in the products it was producing;

b.    Defendants failed to writedown stockpiles of unsaleable inventory resulting from Veeco's decision to manufacture components in-house and its failed experiment to "build to stock" instead of manufacturing customized products based upon specifications set forth in sales contracts;

c.    Defendants improperly recognized revenue from the sale of reactors to the Sanan Group as set forth in ¶¶ 58 and 59;

-38-

     d.     Defendants improperly recognized product, service and other revenue on transactions with Emcore as set forth in ¶¶ 45-56;

     e.     Defendants reported materially overstated net sales, gross profit, operating income, and the results of operations for the quarter ended June 30, 2004, as later admitted through restatement. Net sales were overstated by $3,638,000, or 3.54%. Gross profit was overstated by $4,428,000, or 9.77%. Operating income was overstated by $4,276,000, or 91.6%. The results of operations were overstated by $3,238,000, or 204.81%; and

     f.     Defendants reported materially overstated net sales, gross profit, operating income, and the results of operations for the six months ended June 30, 2004, as later admitted through restatement. Net sales were overstated by $7,262,000, or 3.68%. Gross profit was overstated by $7,467,000, or 8.77%. Operating income was overstated by $7,076,000, or 122.70%. The results of operations were overstated by $5,244,000, or 597.95%.

97.     On August 3, 2004, Veeco filed its Form 10-Q for the quarterly period ended June 30, 2004 with the SEC ("the June 30, 2004 Form 10-Q"). This document, which was signed by defendants Braun and Rein, contained substantially the same financial data that appeared in the July 26, 2004 press release, and substantially the same representations regarding TurboDisc and the Company's key accounting policies that appeared in Veeco's 2003 Form 10-K and March 31, 2004 Form 10-Q. Accordingly, it was materially false and misleading for the reasons specified in ¶96 above.

98.     The June 30, 2004 Form 10-Q contained certifications by defendants Braun and Rein which were substantially identical to the certifications by defendants Braun and Rein which appeared in the March 31, 2004 Form 10-Q. These certifications were materially false and misleading for the same reasons that the certifications in the March 31, 2004 Form 10-Q were materially false and misleading as specified in ¶¶ 83, 85, 89, and 91 above.

99.    The June 30, 2004 Form 10-Q contained an MD&A section which was materially false and misleading for the same reasons that the MD&A section which was contained in the March 31, 2004 Form 10-Q was materially false and misleading as specified in ¶ 94 above.

100.    On September 8, 2004, addressing a Smith Barney Citigroup Technology Conference, defendant Braun explicitly touted Veeco as having "a strong revenue and earnings recovery year" with first half revenue up 42% from the previous year, leadership in MOCVD and other technology, and growth in all "core" markets, including LED/wireless.    Touting the second quarter 2004 rise in orders and revenue, defendant Rein called the second quarter of 2004, "the strongest performance in ten quarters, so very strong second quarter."    Answering a question from an analyst about why gross margins on the process equipment side had declined from 2003 to 2004, defendant Braun again assured the market that TurboDisc was making progress to achieve the 45% gross margins previously mentioned in the Company's November 3, 2003 press conference, stating that "the MOCVD acquisition" started the year with a 33.35% gross margin but *"will end the year with about a 45% gross margin."*  He further stated that about Veeco's "growth going forward" and even half of Veeco's *"current growth in 04"  was attributable to growth from the [TurboDisc] MOCVD and [Aii] precision lapping" acquisitions."*    Specifically touting the TurboDisc acquisition, he stated that *"this year's increase was [due to] the MOCVD acquisition and the recovery of the MOCVD gross margin contributes to the improvement in [Veeco's process] equipment [segment] margin at the end of the year."*

101.    Defendants' statements at the Smith Barney conference, touting TurboDisc's success and their assurances that TurboDisc was on its way to achieving a 45% gross margin, were materially false and misleading because defendants possessed contradictory negative information about

TurboDisc that gave them no reasonable basis for the statement, for the reasons stated in ¶¶ 81 and 83 above.

102.     On October 12, 2004, Veeco issued a press release announcing disappointing preliminary 2004 third quarter financial results below the Company's previous guidance, and a 70% drop in customer orders for Veeco's TurboDisc-MOCVD equipment in the quarter.   The press release blamed the poor third quarter results on "weak industry-wide capital equipment conditions, particularly in compound semiconductor, [which] adversely impacted its results for the quarter ended September 30, 2004" as customers cut back on spending.  The Company similarly attributed the "dramatic" 70% decrease in TurboDisc orders from LED manufacturers to "spending freezes initiated by many Asian customers at the end of the quarter, as they paused to absorb the significant amount of Veeco equipment purchased in the first half of 2004." The Company announced that it expected below-guidance third quarter revenues of $93 million, a GAAP loss of between ($0.06) and ($0.04) per share, and earnings excluding amortization of between $0.04 and $0.06 per diluted share.

103.     The October 12, 2004 press release also quoted defendant Braun as stating:

> We are disappointed not only by our third quarter performance but by our lack of visibility of this slowdown. In the near-term, we expect our customers' current capital spending reluctance to continue, but believe it will be outweighed by their need to fund their 2005 new product technology roadmaps and to invest in the expected high growth of next-generation consumer electronics. *Despite this setback, we still expect 2004 to be a strong growth year for Veeco compared to 2003. Veeco remains well positioned to provide leadership technologies for growth applications in semiconductor*, data storage, compound semiconductor and scientific research."

104.    Defendants' October 12, 2004 third quarter earnings preannouncement and defendant

Braun's statement were materially false and misleading because they:

    a.    failed to correct previously issued statements which falsely led the investment community to believe that Veeco could vastly increase the profitability of TurboDisc, through synergies, when defendants knew or recklessly disregarded that synergies were not feasible. TurboDisc manufactured a different product, employed a separate work force with unique skills, and was based in a separate facility in Somerset New Jersey;

    b.    failed to disclose that defendants had drastically changed certain components of TurboDisc's products and substituted critical components previously purchased from reliable sources with in-house-manufactured components, thus creating non-workable and unsaleable products;

    c.    failed to disclose that TurboDisc was engaged in a "build to stock" endeavor, and that the products being built were non-saleable because they were manufactured with Veeco's defective components and because it was necessary to customize these complex products as Emcore had traditionally done before Veeco's acquisition of TurboDisc, resulting in stockpiles of unsold products that were required to have been written down;

    d.    failed to disclose that warranty costs were sky-rocketing from a historical rate of 0.89% of sales to 8.0% of sales due to the non-workability of the Veeco-manufactured components that TurboDisc was using in the products that it was producing;

    e.    failed to disclose the fact that Veeco's third quarter financial results included improperly recognized revenues on transactions with Emcore as set forth in ¶¶ 45-56;

    f.    failed to disclose that TurboDisc's accounting department had been drastically reduced to two people under Veeco, which materially weakened the Division's internal accounting controls and fostered an environment favorable to defendants' concealment of financial statement fraud; and

    g.    Defendants improperly recognized revenue from the sale of reactors to the Sanan Group as set forth in ¶¶ 58 and 59.

105.    Furthermore, defendants' statements in the October 12, 2004 press release attributed

the 70% decrease in customers orders for TurboDisc's products orders to "spending freezes" by

Asian customers and failed to disclose the material information that, in fact, the decrease was in large part due to the poor quality of the MOCVD products it was manufacturing as discussed in ¶¶ 62-77 above.

106.    On October 25, 2004, Veeco issued a press release announcing its actual financial results for the third quarter and nine months ended September 30, 2004. The press release reported that, in line with the third quarter earnings preannouncement two weeks earlier, Veeco's third quarter 2004 sales were $92.4 million with a net loss of $1.5 million, or $0.05 per share. The press release also repeated that customer orders for TurboDisc MOCVD equipment had dropped by 70% in the third quarter, and attributed the dramatic falloff in new business orders to "spending freezes initiated by many Asian customers at the end of the quarter, as they paused to absorb the significant amount of Veeco equipment purchased in the first half of 2004."

107.    The October 25, 2004 press release quoted defendant Braun as stating:

> As previously announced, Veeco was adversely impacted this quarter by weak, industry-wide capital equipment spending conditions particularly in compound semiconductor and data storage markets. In response to these conditions, we intend to reduce expenses by 10% in order to improve profitability in 2005. While we expect our customers' current capital spending reluctance to continue for several quarters, we believe it will ultimately be outweighed by their need to fund their 2005 new product technology roadmaps and to invest in the expected high growth of next-generation consumer electronics. Veeco remains well positioned to provide leadership technologies for growth applications in semiconductor, data storage, compound semiconductor and scientific research.

108.    The October 25, 2004 press release was materially false and misleading for the same reasons that the October 12, 2004 press release was materially false and misleading as specified in ¶ 104 above. In addition, the October 25 press release was materially false and misleading because it failed to disclose that the reported September 30, 2004 third quarter earnings were materially

-43-

overstated, at least in part, by not including a portion of the $1,262,434.19 of adjustments to income that were improperly deferred to the fourth quarter of 2004 by instruction of defendant Kiernan, as described in ¶ 55 above.

109.    The Company's October 25, 2004 press release, like the October 12 earnings preannouncement was materially false and misleading because it stated that the 70% decrease in its MOCVD business resulted from "customer spending freezes" when, in fact, the decrease was largely due to the poor quality of the MOCVD products it was manufacturing as discussed in ¶¶ 62-77 above and because the press release:

    a.    reported a materially understated cost of sales and operating loss and a materially overstated results of operations for the quarter ended September 30, 2004, as later admitted through restatement. Cost of sales were understated by $8,279,000, or 15.44%. Operating loss was understated by $3,130,000, or 759.71%. Gross profit was overstated by $3,279,000, or 8.46%. The results of operations were overstated by $718,000, or 49.35%.

    b.    reported a materially understated cost of sales, and a materially overstated gross profit, operating income and results of operations for the nine months ended September 30, 2004, as later admitted through restatement. Cost of sales were understated by $8,484,000, or 5.12%. Gross profit was overstated by $10,746,000, or 8.67%. Operating income was overstated by $10,206,000, or 190.59%. The results of operations were overstated by $5,962,000, or 1031.49%.

110.    On November 9, 2004, Veeco filed its Form 10-Q for the quarterly period ended September 30, 2004 with the SEC ("the September 30, 2004 Form 10-Q"). This document, which was signed by defendants Braun and Rein, contained substantially the same financial data that appeared in the October 25, 2004 press release, and substantially the same representations regarding TurboDisc and the Company's key accounting policies as appeared in the Veeco's 2003 Form 10-K, March 31, 2004 Form 10-Q and June 30, 2004 Form 10-Q. Accordingly, it was materially false and

misleading for the reasons specified in ¶¶ 104, 108 and 109 above, and because it failed to correct

the materially false and misleading statements which appeared in the October 25, 2004 press release.

      111.    Significantly, the September 30, 2004 Form 10-Q contained a restatement of Veeco's

segment information and the following explanatory and elaborative narratives:

> During the quarter ended September 30, 2004, the Company changed the
> structure of its internal organization in a manner which caused the
> composition of its reportable segments to change. *The Company currently
> manages, reviews operating results, and assesses performance, as well as
> allocates resources, based upon this reporting structure.* The change
> implemented by the Company was to split out the former process equipment
> segment into two separate reportable segments. The first segment, called
> "ion beam and mechanical process equipment", combines the etch,
> deposition, and dicing and slicing products sold mostly to data storage
> customers. This segment includes the production facilities in Plainview, New
> York, Ft. Collins, Colorado, and Camarillo, California. *The second segment,
> called "epitaxial process equipment", includes the Molecular Beam
> Epitaxy ("MBE") and Metal Organic Chemical Vapor Deposition
> ("MOCVD") products primarily sold to high brightness light emitting
> diodes ("HB-LED") and wireless telecommunications customers. This
> segment includes the production facilities in St. Paul, Minnesota, and
> Somerset, New Jersey. The metrology segment, which includes the
> production facilities in Santa Barbara, California, and Tucson, Arizona,
> remains unchanged. As such, the Company has restated the segment
> information for prior periods as if the composition of its reportable
> segments described above had existed in such prior periods.*
>
>                             \*\*\*\*\*
>
> *. . . The Company currently manages, reviews operating results, and
> assesses performance, as well as allocates resources, based upon this
> reporting structure. The change implemented by the Company was to split
> out the former process equipment segment into two separate reporting
> segments.* The new ion beam and mechanical process equipment segment
> combines the etch, deposition, and dicing and slicing products sold mostly to
> data storage customers. *The new epitaxial process equipment segment
> includes the MBE and MOCVD products sold to HB-LED and wireless
> customers.* The metrology segment remains unchanged. Accordingly, the
> Company has restated the segment information for the prior periods.

112.    Based upon the above, there is no question that defendants' reviewed TurboDisc's financial data in conjunction with management's assessment of the operating results of the new epitaxial process equipment segment.

113.    In addition, the September 30, 2004 Form 10-Q stated that: "HB-LED/wireless customers decreased 71.4%, due to a $30.3 million decrease in TurboDisc orders. This decrease in business resulted from spending freezes initiated by many Asian customers at the end of the quarter, as they paused to absorb the significant amount of Veeco equipment purchased in the first half of 2004..."

114.    The foregoing statement was materially false and misleading because the $30.3 million decrease in TurboDisc orders was not due to customer spending freezes. The decrease was largely due to the poor quality of the products which TurboDisc was manufacturing as discussed in ¶¶ 62-77 above.

115.    The September 30, 2004 Form 10-Q contained certifications by defendants Braun and Rein which were substantially identical to the certifications by defendants Braun and Rein which appeared in the March 31, 2004 Form 10-Q and the June 30, 2004 Form 10-Q. These certifications were materially false and misleading for the same reasons that the certifications in the March 31, 2004 Form 10-Q and the June 30, 2004 Form 10-Q were materially false and misleading as specified above.

116.    The September 30, 2004 Form 10-Q contained an MD&A section which was materially false and misleading for substantially the same reasons that the MD&A section which was contained in the March 31, 2004 Form 10-Q and the June 30, 2004 Form 10-Q was materially false and misleading as specified above.

-46-

**THE TRUTH IS REVEALED**

117.    On February 11, 2005, Veeco issued a press release announcing an expected restatement of its prior financial statements and the postponement of its earnings release pending an internal investigation of "improper accounting transactions at its TurboDisc division." The press release stated that Veeco expected adjustments requiring the restatement of the financial statements previously issued for the quarterly periods and nine months ended September 2004, and that "Veeco currently expects that the pre-tax earnings impact will be between $5.5 million and $7.5 million for the nine months ended September 30, 2004."

118.    The February 11, 2005 press release quoted defendant Braun as stating: "Errors and improper entries were uncovered by Veeco's internal audit staff and were limited to a single Veeco business unit, TurboDisc, which was acquired in November 2003. We have taken prompt corrective action and are working diligently to finish the audit and report complete financial results in conjunction with our March filings." In addition, it quoted defendant Rein as stating: "We have taken swift action to resolve this accounting issue, including making appropriate staffing changes and transitioning TurboDisc's accounting system to Veeco's SAP system."

119.    The March 16, 2005 press release also provided the following information concerning the restatement of Veeco's previously issued financial statements:

|  | Q1 2004 as filed | Adjustments | Q1 2004 as restated |
|---|---|---|---|
|  |  | ($ In Thousands) |  |
| Net sales | $94,487 | $(3,624) | $90,863 |
| Cost of sales | 54,649 | (584) | 54,065 |
| Gross profit | 39,838 | (3,040) | 36,798 |

| | | | |
|---|---|---|---|
| Costs and expenses | 38,767 | (240) | 38,527 |
| Operating income (loss) | 1,071 | (2,800) | (1,729) |
| Interest expense, net | 2,199 | - | 2,199 |
| Loss before income taxes | (1,128) | (2,800) | (3,928) |
| Income tax (benefit) | (424) | (794) | (1,218) |
| Net loss | $(704) | $(2,006) | $(2,710) |
| Net loss per common share | $(0.02) | $(0.07) | $(0.09) |

| | Q2 2004 as filed | Adjustments | Q2 2004 as restated |
|---|---|---|---|
| | | ($ In Thousands) | |
| Net sales | $102,884 | $(3,638) | $99,246 |
| Cost of sales | 57,541 | (790) | 58,331 |
| Gross profit | 45,343 | (4,428) | 40,915 |
| Costs and expenses | 40,647 | (152) | 40,495 |
| Operating income (loss) | 4,696 | (4,276) | (420) |
| Interest expense, net | 2,239 | - | 2,239 |
| Income (Loss) before income taxes | 2,457 | (4,276) | (1,819) |
| Income tax (benefit) | 876 | (1,038) | (162) |
| Net loss | $1,581 | $(3,238) | $(1,657) |
| Net income (loss) per common share | 0.05 | (0.11) | (0.06) |

| | Q3 2004 as filed | Adjustments | Q3 2004 as restated |
|---|---|---|---|
| | | ($ In Thousands) | |
| Net sales | $92,367 | 5,000 | $97,367 |
| Cost of sales | 53,634 | 8,279 | 61,913 |
| Gross profit | 38,733 | (3,279) | 35,454 |
| Costs and expenses | 39,145 | (149) | 38,996 |
| Operating income (loss) | (412) | (3,130) | (3,542) |
| Interest expense, net | 1,793 | - | 1,793 |
| Loss before income taxes | (2,205) | (3,130) | (5,353) |
| Income tax (benefit) | (750) | (2,412) | (3,162) |
| Net loss | $(1,455) | $(718) | $(2,173) |
| Net loss per common share | (0.05) | (0.02) | (0.07) |

124.    Cumulative restatement adjustments for the six months ended June 30, 2004 and for the nine months ended September 30, 2004 are as follows:

-48-

|  | Q2 2004 6 months as filed | Adjustments | Q2 2004 6 months restated |
|---|---|---|---|
|  |  | ($ In Thousands) |  |
| Net sales | $197,371 | $(7,262) | $190,109 |
| Cost of sales | 112,191 | 20 | 112,396 |
| Gross profit | 85,180 | (7,467) | 77,713 |
| Costs and expenses | 79,413 | (391) | 79,022 |
| Operating income (loss) | 5,767 | (7,076) | (1,309) |
| Interest expense, net | 4,438 | - | 4,438 |
| (Loss) income before income taxes | 1,329 | (7,076) | (5,747) |
| Income tax (benefit) provision | 452 | (1,832) | (1,380) |
| Net loss | $877 | $(5,244) | $(4,367) |
| Net income (loss) per common share | 0.03 | (0.12) | (0.15) |

|  | Q3 2004 9 months as filed | Adjustments | Q3 2004 9 months restated |
|---|---|---|---|
|  |  | ($ In Thousands) |  |
| Net sales | $289,738 | $(2,262) | $287,476 |
| Cost of sales | 165,825 | 8,484 | 174,309 |
| Gross profit | 123,913 | (10,746) | 113,167 |
| Costs and expenses | 118,558 | (540) | 118,018 |
| Operating income (loss) | 5,355 | (10,206) | (4,851) |
| Interest expense, net | 6,231 | - | 6,231 |
| (Loss) income before income taxes | (876) | (10,206) | (11,082) |
| Income tax (benefit) provision | (298) | (4,244) | (4,542) |
| Net loss | $(578) | $(5,962) | $(6,540) |
| Net income (loss) per common share | (0.02) | (0.20) | (0.22) |

125.    On January 31, 2002, the SEC, the ultimate authority regarding GAAP and matters

of financial reporting (SEC Accounting Series Release Nos. 4 and 150), submitted an Amicus Curiae

Brief in the case *In re: Sunbeam Securities Litigation*, 98-8258-Civ. (S.D. Fl.) ("the SEC Brief")

which unequivocally stated the SEC's position with regard to restated financial statements, as

follows:

> [C]orrected financial statements are highly probative of at least two of the
> elements of a private action under the federal securities laws: whether there
> was a misstatement in the original financial statements and whether the
> misstatement was material. *See, e.g., In re Telxon Corp. Secs. Litig.*, 133 F.
> Supp. 2d 1010, 1025 (N.D. Ohio 2000) (when ruling on defendants' motion

to dismiss action under PSLRA, court held that company defendant was not in a position to dispute that it misstated material facts in its financial disclosures because company admitted its prior disclosures were materially misstated when it issued the restatements which gave rise to the litigation) (citing *In re Peritus Software Servs., Inc. Secs. Litig.*, 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("after the fact accounting admissions may suffice to show that material misstatements occurred")). Restated financial statements are probative of these two issues because under GAAP and GAAS they cannot be filed unless the original financial statements contained material errors as defined in GAAP. See pages 11-12, above. Thus, under GAAP, restated financial statements must constitute an admission of past errors...By filing restated financial statements with the Commission, a company announces that it had previously materially misstated its financial condition or its results of operations. This exposes it to a high risk of civil and criminal investigations and legal actions by the federal government..."]

126.    There is no question that by filing restated financial statements with the Commission, Veeco announced that it had previously disseminated materially misstated financial statements to the investing public. In addition, based upon the facts alleged herein, there is also no question that the Individual Defendants had contemporaneous actual knowledge that these previously issued financial statements were materially misstated.

127.    The SEC has stated, in Securities Act Release No. 6349, that "it is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

128.    The Company's key management -- defendants Braun, Rein and Kiernan -- failed to disclose the above discussed facts concerning the Company's business practices and materially deficient and fraudulent accounting. Consequently, they concealed from the investment community those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of Veeco's business and financial position.

129.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.

130.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate. Regulation S-X (17 C.F.R. §210.10(a)) also requires that interim financial statements comply with GAAP.

## SCIENTER ALLEGATIONS

### Defendants' Knowledge

131.    As alleged herein, defendants acted with scienter in that they knew or recklessly ignored that the public documents, press releases, and statements, issued or disseminated by or in the name of the Company, were materially false and misleading; knew or recklessly ignored that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Veeco and its TurboDisc division (particularly regarding revenue recognition, accounting controls, warranty costs, TurboDisc reactor contracts, product manufacturing and design, inventory levels, and the terms of the acquisition) their control over and/or receipt of Veeco's materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Veeco, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew or recklessly ignored facts concerning the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

-51-

132.    Individual Defendants knew or recklessly ignored that the Company fraudulently recognized revenue in connection with the $10 million contract for the sale of TurboDisc reactors to the Sanan Group, beginning with $3.6 million fraudulently recognized in first quarter of 2004 (ended March 31, 2004) *even though the contract was signed in late April 2004.* For example, CW3 has stated that the Individual Defendants clearly understood these facts of the contract, but were eager to accelerate the recordation of revenue and thus paid Chinese employees bonuses to obtain fictitious sign-offs stating that the work had been completed and that the reactors had been accepted by the customer.

133.    Individual Defendants knew or recklessly ignored that TurboDisc's warranty costs were dramatically increasing during the Class Period from 0.08 % under Emcore to 8% under Veeco ownership because of Veeco's undisclosed high-risk strategy of manufacturing parts in Veeco's St. Paul facility instead of continuing to purchase parts from TurboDisc's historic outside suppliers, and because the Company knowingly failed to timely increase reserves for warranty claims. All three confidential witnesses have confirmed that the product failures began immediately after Veeco acquired TurboDisc and CW3 has stated that defendant Braun directed TurboDisc to stop purchasing components from reliable historic sources. CW3 has also specifically stated that defendant Braun took a keen interest in TurboDisc and frequently telephoned CW3 to inquire about various items of revenue and expense. CW3 has also stated that during mid-February 2004, defendant Rein and every other member of Veeco's senior management knew of the quality problems and the huge increase in warranty claims because the problems were openly discussed at TurboDisc's February 2004 Semi-Annual Divisional Review meeting. Furthermore, CW3 has stated that when CW3 prepared a $250,000 journal entry to properly increase the accrual for warranty costs. Defendant Kiernan, at the instruction of defendant Rein, specifically instructed CW3 to *reverse* the accrual.

-52-

134.    Individual Defendants knew or recklessly ignored that the Company's manufacture of defective parts and its new and changed strategy to build TurboDisc reactors "to stock" instead of building reactors "to order" resulted in Veeco's inability to sell the generic reactors which were produced, causing Veeco to accumulate stockpiles of nonsaleable inventory which should have been written down in the amount of over $5 million, and were not until the post-Class Period restated financial statements were prepared. CW3 has stated that defendant Braun was aware of the inventory stockpiling and the reasons for it at all times. The other defendants knew or recklessly ignored the facts of the defective parts and inventory stockpiling. Because the parts and inventory involved the TurboDisc reactor which constituted such a large expense and was an important core product for Veeco, defendants should have either known, or alternatively, recklessly ignored the defective parts and inventory stockpiling.

135.    Individual Defendants knew or recklessly ignored that Emcore and Veeco had entered into the TSA and knew that the terms involved giving preferential pricing to Emcore and knew or recklessly ignored of the accounting fraud associated with the TSA. Indeed, CW3 stated that CW3 was instructed by defendant Kiernan at the direction of the defendant Rein to improperly push the $1.26 million of known income adjustments into the fourth quarter of 2004, instead of properly reflecting them as prior period adjustments (via restatement) as of September 2004. Defendant Braun either knew or recklessly failed to know of the fraudulent recognition of revenue and the fact that it was buried in the fourth quarter 2004.

136.    Defendants knew or recklessly ignored that the Company lacked sufficient internal accounting controls during the Class Period. As CW3 has stated, defendants failed to disclose that TurboDisc's accounting department had been reduced from a standing staff of six to eight people under Emcore, to two under Veeco. The cutback materially weakened TurboDisc's internal

accounting controls and created and fostered an environment that permitted defendants to conceal the false financial reporting. Indeed, after the Class Period the Company admitted in its 2004 10-K filed on March 16, 2005 that "management has now determined that a deficiency existed in the internal control over financial reporting at the end of such quarterly periods [i.e. the first three quarterly periods of 2004]."

137.    Because the Company sold so few of the TurboDisc machines at such a high price, and because the TurboDisc division was the key part of Veeco's epitaxial process equipment segment, and a "core" part of Veeco's business and technology, Individual Defendants, who were the Company's CEO, CFO and other key officers knew or or recklessly ignored that TurboDisc's internal controls were inadequate and that its accounting was improper. This is particulary true in view of the fact that as admitted on November 3, 2003 (during a conference call), defendant Braun announced that integration of TurboDisc's finance function was a priority.

138.    CW3 also stated that "Braun was cognizant of all revenue, orders, sales and bookings of the TurboDisc Division and reviewed all work as a participant in teleconferenced meetings with the TurboDisc Division held every two weeks." Defendant Braun received detailed financial reports from TurboDisc on a monthly and quarterly basis, and reviewed them meticulously. CW3 noted, "Braun reviewed everything. I would get questions from him all the time regarding gross margin, inventory, revenue, bookings - everything. The questions were asked when Braun picked up the phone and called me, and they were asked during the teleconferenced meetings which were held every two weeks."

139.    Based upon CW3's regular participation in the teleconferenced meetings and one-on-one discussions with defendant Braun, CW3 had first-hand knowledge of which financial and operating materials defendant Braun reviewed. According to CW3, based upon discussions with

defendant Braun, CW3 was certain that defendant Braun knew everything of significance that had transpired at TurboDisc during the Class Period.

**Individual Defendants were Motivated to Engage in the Scheme to Justify its Expensive TurboDisc Acquisition and to Protect the Reputation of a Key Product and a Core Business Division**

140.    Defendants were motivated to lie about TurboDisc's "synergies" with Veeco and about its operations and financial results in order the justify the huge investment they had made in buying TurboDisc from Emcore. Veeco had expended over $60 million in cash to buy TurboDisc in November 2003, at a time when the acquisition represented over 20% of Veeco's equity. To justify this costly acquisition, defendants wanted to ensure that TurboDisc reported higher revenues and margins than it had when previously owned by Emcore.

141.    Defendants were also motivated to closely guard from the public that TurboDisc's reactors were defective and unsaleable, and that warranty expenses were sky-rocketing due to the fact that Veeco manufactured products were unreliable and defective, in order to protect the reputation of the TurboDisc MOCVD, and to avoid losing future customers. The Company manufactured and sold a limited quantity of the massive TurboDisc reactors, and any adverse impact on the orders and sales of TurboDisc would have a material adverse effect on Veeco's business. The Company itself admitted in its 2003 Form 10-K: "We derive[s] a substantial portion of our business from the sale of a relatively small number of high priced systems."

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### Fraud-On-The-Market Doctrine

142.    At all relevant times, the market for Veeco securities was an efficient market for the following reasons, among others:

　　　　a.    Veeco stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

-55-

b.    As a regulated issuer, Veeco filed periodic public reports with the SEC and the NASDAQ;

c.    Veeco regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, transcripts of conference calls which were carried by national newswires, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Veeco was followed by several securities analysts employed by major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. During the Class Period, Veeco was followed by analysts at firms including: (i) Needham & Company; (ii) W.R. Hambrecht & Co.; (iii) Smith Barney Citigroup; (iv) Institutional Shareholder Services ISS; (v) Adams Harkness & Hill; (vi) D.A. Davidson & Co.; and (vii) Wells Fargo Securities LLC.

143.    As a result of the foregoing, the market for Veeco securities promptly digested current information regarding Veeco from all publicly-available sources and reflected such information in Veeco's stock price. Under these circumstances, all purchasers of Veeco securities during the Class Period suffered similar injury through their purchase of Veeco securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

144.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

-56-

defendants are liable for those forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Veeco who knew that those statements were false when made.

## UNDISCLOSED ADVERSE INFORMATION CAUSED THE ARTIFICIAL INFLATION IN THE PRICE OF VEECO'S SECURITIES DURING THE CLASS PERIOD

145.    The market for Veeco securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Veeco securities traded at artificially inflated prices during the Class Period. The artificial inflation continued until the time Veeco announced improper accounting transactions at its TurboDisc division leading to the restatement of financial statements for the first three quarters of 2004, and these statements were communicated to, and/or digested by, the securities markets. Lead Plaintiff and other members of the Class purchased or otherwise acquired Veeco relying upon the integrity of the market price of Veeco and market information relating to Veeco, and have been damaged thereby.

146.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Veeco, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

147.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Veeco's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Veeco and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**COUNT I**

**For Violations Of Section 10(b) Of The
1934 Act And Rule 10b-5 Promulgated
Thereunder Against All Defendants**

148.    Lead Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against defendants Veeco and the Individual Defendants.

149.    During the Class Period, defendants Veeco, Braun, Rein, Kiernan and Weiss, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Veeco securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Veeco securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants Veeco and the Individual Defendants, and each of them, took the actions set forth herein.

150.    These defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

-58-

statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Veeco securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary participants in the wrongful and illegal conduct charged herein. These defendants are also sued herein as controlling persons of Veeco, as alleged below.

151.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

152.    Defendants Veeco, Braun, Rein, Kiernan, and Weiss, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Veeco as specified herein. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Veeco's value and performance and substantial growth, which included the making of, or the participation in the

making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Veeco and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Veeco securities during the Class Period.

153.    Defendants Braun's, Rein's, Kiernan's and Weiss's primary liability, and controlling person liability, arise from the facts that: defendants Braun, Rein, Kiernan, and Weiss were all high-level executives and/or directors at the Company during the Class Period, and each had knowledge or recklessly ignored facts concerning the issuance of false statements to the investing public as set forth in ¶¶ 131-141.

154.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Veeco's securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Veeco's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Veeco securities during the Class Period at artificially inflated high prices and were damaged thereby.

155.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Veeco, which were not disclosed by defendants,

Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Veeco securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

156.    By virtue of the foregoing, Veeco and each of the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

157.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**

**For Violations Of Section 20(a) Of The**
**1934 Act Against Individual Defendants**

158.    Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against Individual Defendants.

159.    The Individual Defendants were and acted as controlling persons of Veeco within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, defendants Braun, Rein, Kiernan, and Weiss had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Defendants Braun, Rein, Kiernan and Weiss were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

160.    In addition, defendants Braun, Rein, Kiernan and Weiss had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

161.    As set forth above, defendants Veeco, Braun, Rein, Kiernan and Weiss each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, defendants Braun, Rein, Kiernan and Weiss are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding Lead Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

(c)    Awarding Lead Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

-62-

(d)    Such other relief as this Court deems appropriate.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: November 7, 2005

BERGER & MONTAGUE, P.C.

Sherrie R. Savett (I.D. 17646)
Phyllis Parker
Douglas M. Risen
Jeffrey Osterwise
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4636 (fax)
***Lead Counsel for the Class***

399830.wpd

## VEECO INSTRUMENTS, INC. (NYSE:VECO)
## AMENDED CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Steelworkers Pension Trust ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed a complaint against Veeco Instruments, Inc. and certain of its officers, and Plaintiff approves of its contents, and authorizes its filing.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of its counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff's transactions in the securities of Veeco Instruments, Inc. between and including November 3, 2003 through February 10, 2005, inclusive (the "Class Period"), are as follows:

| Shares Sold | Shares Purchased | Date of Purchase or Sale | Price per Share |
|---|---|---|---|
| 40,000 | | January 6, 2004 | $31.421 |
| | 6,675 | May 19, 2004 | $23.84 |
| | 33,325 | May 20, 2004 | $23.47 |

5.     Plaintiff has sought to serve as a class representative in the following other actions filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed:

*In re Marsh & McLennan Companies Litigation*, Civil Action No. 1:04-CV-8144 (SWK) (S.D.N.Y. 2004)

*In re Williams Securities Litigation*, Civil Action No. 02-CV-72-H(M) (N.D. Okla. 2002)

*The Steelworkers Pension Trust, et al. v. Nortel Networks Corporation, et al.*, Civil Action No. 04-CV-2249 (GBD) (S.D.N.Y. 2004)

*The Steelworkers Pension Trust, et. al v. The St. Paul Travelers Companies, Inc., et al.*, Civil Action No. 04-4510 (D. Minn. 2004)

*L. Norman Showers, et al. v. Pfizer, Inc., et al.*, Civil Action No.: 04-CV-9866-RO (S.D.N.Y. 2004)

6.    Plaintiff has been appointed as a lead plaintiff or an officer, director, or fiduciary of a lead plaintiff, in the following securities class action(s) during the past three (3) year period:

*The Steelworkers Pension Trust, et al. v. Baxter International, Inc., et al.*, Civil Action No. 04C 4909 (N.D. Ill.2004)

*In re Excelsior, Federated and Scudder Mutual Funds Investment Litigation*, Civil Action No. 04-md-15861-03 (D. Md. 2004) (Post-Retirement Health Insurance Plan)

*In re Veeco Instruments Inc. Securities Litigation*, Civil Action No. 1:05-md-1695 (CM) (S.D.N.Y. 2005)

7.    Plaintiff has not accepted and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond its pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 4th day of November, 2005.

By: _____
Richard S. Hoffmann
General Counsel, Steelworkers Pension Trust