# EXHIBIT A

LEXSEE 2004 U.S. DIST. LEXIS 26488

## IN RE: FLEMING COMPANIES INC. SECURITIES & DERIVATIVE LITIGATION, THIS DOCUMENT RELATES TO ALL CASES

### CIVIL ACTION NO. 5-03-MD-1530 (TJW), MDL-1530

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS

*2004 U.S. Dist. LEXIS 26488*

**June 10, 2004, Decided**

**SUBSEQUENT HISTORY:** Transferred by *In re Fleming Cos. Inc. Secs. & Derivative Litig., 2005 U.S. Dist. LEXIS 10674 (J.P.M.L., Apr. 20, 2005)*

**PRIOR HISTORY:** *In re Fleming Cos. Secs. & Derivative Litig., 269 F. Supp. 2d 1374, 2003 U.S. Dist. LEXIS 11029 (J.P.M.L., 2003)*

**DISPOSITION:** [*1] Defendants' Motions to Dismiss granted in part and denied in part.

**COUNSEL:** For In re: Fleming Companies, Inc., Securities & Derivative Litigation, Plaintiff: Samuel Franklin Baxter, Attorney at Law, Marshall, TX.

For Named Plaintiffs, Plaintiff: Steven W Pepich, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA.

For In re: Fleming Companies, Inc., Securities & Derivative Litigation Defendants: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX; Randall Mark Foret, Secore & Waller, Dallas, TX; Stephen Cass Weiland, Patton Boggs, Dallas, TX.

For Thomas. Dahlen, Defendant: David Alan Stephan, McManemin & Smith, Dallas, TX.

For Morgan Stanley & Co. Incorporated, Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Wachovia Securities, Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY;

Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas [*2] Even, Haynes and Boone, Dallas, TX.

For Deutsche Bank Securities Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Lehman Brothers Inc., Defendant: Kenneth R David, Simpson Thacher & Bartlett, New York, NY; Michael J Chepiga, Simpson Thacher & Bartlett, New York, NY; Peter E Kazanoff, Simpson Thacher & Bartlett, New York, NY; Nicholas Even, Haynes and Boone, Dallas, TX.

For Mark D Shapiro, Defendant: Terence J Hart, Munsch Hardt Kopf & Harr, Dallas, TX.

For Deloitte & Touche, Defendant: Keefe Michael Bernstein, Akin Gump etal, Dallas, TX.

For Alice M Peterson, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Carlos M Hernandez, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Robert S Hamada, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Carol B Hallett, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal [*3] LLP, Dallas, TX.

For Archie R Dykes, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Kenneth M Duberstein, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Herbert M Baum, Defendant: Diane Marie Sumoski, Carrington Coleman Sloman & Blumenthal LLP, Dallas, TX.

For Stephen. Davis, Defendant: Jim L Flegle, Loewinsohn & Flegle, Dallas, TX.

For Terry Slater, Defendant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; T Brent Walker, Cauley Bowman Carney & Williams, Little Rock, Ar; J Allen Carney, Cauley Bowman Carney & Williams, Little Rock, Ar; Marcus Bozeman, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, Little Rock, Ar.

For Neal J Rider, Defendant: Stephen Cass Weiland, Patton Boggs, Dallas, TX.

For Anthony Colarich, Movant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, Little Rock, Ar.

For Raheela Zaman, Movant: S Gene Cauley, Cauley Bowman Carney & Williams, Little Rock, Ar; Tiffany M Wyatt, Cauley Bowman Carney & Williams, [*4] Little Rock, Ar.

**JUDGES:** T. JOHN WARD, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** T. JOHN WARD

**OPINION:**

### MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This private securities class action case relates to Fleming Companies, Inc. ("Fleming"). Fleming, at one time the second largest food distributor in the United States, first foreshadowed problems on July 30, 2002.

The problems continued, culminating in a formal SEC investigation into Fleming's accounting practices. A series of class actions followed, which were consolidated. In April 2003, the company declared bankruptcy and announced its need to make a massive restatement of its earnings for 2001 and 2002. The company has yet to make any restatements of its earnings. An MDL proceeding ensued, and the cases were all transferred to this court for pre-trial handling. The court has appointed a lead plaintiff and set a briefing schedule. The plaintiffs filed their Third Amended Consolidated Class Action Complaint ("TAC"). The defendants have moved to dismiss the TAC on various grounds. The court held an oral hearing on the matter and, after considering the motions, responses, the [*5] arguments, and the applicable law, is of the opinion that the following order should issue.

### II.  FACTUAL  BACKGROUND  AND PROCEDURAL POSTURE

The facts are stated in the light most favorable to the plaintiffs as alleged in the TAC. *Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996)*. Fleming is a wholesale distributor of groceries. A wholesaler like Fleming purchases groceries from vendors and sells them to supermarkets and grocery stores. During the 1990s, Fleming struggled, due in part to its sharp business practices with its customers. Fleming's earnings steadily declined from 1995 through 1998, culminating in the termination of CEO Robert Smith in July, 1998.

In November 30, 1998, Fleming appointed Mark Hansen as CEO and Chairman of the Board. A week later, Fleming announced a "Strategic Plan to Improve Performance." One part of the plan was to improve the performance of Fleming's retail segment. Although Fleming had historically been a grocery wholesaler, the company identified a retail segment of price impact supermarkets as a potential growth opportunity. A price impact supermarket is a sort of "no frills" approach to selling groceries. Price impact [*6] supermarkets typically cost less to build and operate, lack amenities such as delis, and, ultimately, pass the savings along to customers in the form of lower prices. Hansen told shareholders at an annual meeting that Fleming would make a stronger and more focused push on retailing than ever before.

Throughout 1999, 2000, and 2001, Fleming made various statements concerning its strategic plan to analysts and investors. Fleming stated in a January 2000, press release that it attributed revenue growth to its emphasis on Food4Less price impact stores and expected future retail growth on a "same store" basis. To illustrate, Fleming expected that sales in retail stores 1, 2, and 3 would increase over the numbers realized by those stores in the preceding year. The court notes that same store

sales comparison is important because it allows analysts and investors to evaluate the actual internal growth of the company, unclouded by acquisitions or divestitures.

Throughout 2000, Fleming indicated that its focus would be on price impact stores, at the expense of conventional stores. Fleming began to divest its conventional stores and, by May, 2001, represented that it had sold all of its conventional [*7] stores. During that same time period, Fleming reported earnings growth, attributed in part to the success of its retail strategy. Also during this time period, Fleming and certain officers made public statements touting the success of its retail strategy. One Fleming press release stated, for instance, that Fleming's reported 36% net earning increase for the fourth quarter of 2001 "validated our strategic initiatives" relating to price impact supermarkets. (TAC, P 82). Fleming's 10K for 2000 also promoted this retail strategy.

Throughout the first half of 2001, analysts reacted favorably to Fleming's strategy. Bear, Stearns & Co., Deutsche Banc Alex. Brown, and UBS Warburg all issued reports commenting favorably on Fleming's retail operations focus. (TAC, P 86-88). Additional analysts responded favorably throughout the balance of 2001 and into the first half of 2002. (TAC, PP 89-92).

All was not well inside Fleming, however. The plaintiffs allege that Fleming used accounting manipulations to inflate its earnings numbers for 2001 and 2002. The details of this scheme are discussed in more detail below; however, for present purposes, it is sufficient to note that the plaintiffs allege [*8] first that Fleming executives instituted a practice wherein Fleming's retail and wholesale divisions would arbitrarily and improperly deduct amounts payable from vendors' invoices, without cause and with no expectation that the vendors would approve the deduction. At the same time, although Fleming would reserve for a portion of those deductions, the reserves were often woefully inadequate to cover the amount of deductions. This practice had the effect of inflating the quarterly and yearly earnings reported by the company in press releases, SEC quarterly and annual reports, and Registration Statements filed in March and June 2002, for public offerings of securities.

The second significant area of numbers manipulations that the plaintiffs attack is the company's reporting of same store sales growth. The plaintiffs allege that certain Fleming executives instituted a practice whereby the reported same store sales figures were inflated. These inflated numbers led the investing public to assume that Fleming's retail strategic plan was growing. The plaintiffs allege that the true same store sales figures, had they been revealed, would have shown that Fleming's retail segment was suffering [*9] and that its price impact format was not successful.

In July 2002, despite the company's statements concerning the success of its business strategy, Fleming began to foreshadow problems in its retail segment. On July 30, 2002, Fleming issued a press release which indicated it was evaluating strategic alternatives to its retail segment, and in particular, its price impact retail stores. The company stated that comparable store sales declined 4.7 percent. At the same time, according to the plaintiffs, Fleming overstated its wholesale earnings and masked the extent of retail losses to cushion any decline in stock value. Although Fleming reiterated its prior earnings forecasts, analysts began to doubt the validity of those numbers. J.P. Morgan analyst Stephen Chick, for instance, cut Fleming from "market perform" to "market underperform." An article in Supermarket News observed that Fleming's announcement concerning alternatives to its retail segment "appears to have caught most analysts by surprise." (TAC, P 272).

On September 4, 2002, the Dow Jones Newswire released an article on Fleming which disclosed customer dissatisfaction with certain of Fleming's price impact retail stores, [*10] inventory problems in those stores, and Fleming's practice of taking large vendor deductions to increase the company's cash flow. Although the article noted that the company was not alone in this practice, some of Fleming's unidentified customers said they had stopped shipping to Fleming because of the practice and one such customer, referring to Fleming, noted that "when it comes to deductions, they're off the scale compared to other customers." On September 5, 2002, the Wall Street Journal published the expose' released by the Newswire the day before.

Fleming responded to the September 5, 2002 article by holding a conference call that day with analysts. The company's CFO, Neal Rider, stated on the conference call that Fleming's vendor deductions were "appropriately reserved for" and Fleming's CEO stated that "we have absolutely no issues with how we treated deductions, we reserve against deductions, and we certainly don't assume 100% collection." (TAC, P 282). In the same conference call, the officers stated that Fleming's financial condition was solid and that the deductions were an ordinary part of the business, and were an industry-accepted practice. Indeed, according to Rider, [*11] "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that's risen to the level that we are at an impasse today." (TAC, P 289). The plaintiffs contend that these statements were false.

The stock market reacted adversely to the September 4 and 5 articles. On September 3, 2002, Fleming stock was trading at $ 9.31 per share. By September 5, the stock closed at $ 6.92 per share, a decline of 26%. According to the plaintiffs, even though the stock price de-

clined significantly, the statements by Fleming's executives cushioned the fall of the stock because those statements represented that the deductions that might reach "impasse" were minimal and that the deductions in any event were an industry standard practice and were properly accounted for. (TAC, PP 295-296).

On September 24, 2002, Fleming announced the divestiture of its price impact stores. Thereafter, on October 23, 2002, Fleming announced its third quarter earnings, confirmed its decision to divest its price impact stores, and suggested that its relationship with its largest customer, Kmart, might be in jeopardy because of Kmart's bankruptcy [*12] proceedings and reorganization.

On November 13, 2002, Fleming announced that the SEC had commenced an informal investigation into Fleming's accounting practices. In particular, the SEC's investigation focused on Fleming's vendor trade practices and the company's calculation of comparable store sales in its discontinued retail operations. Following Fleming's January 23, 2003, announcement of a $ 190 million loss in retail operations for 2002, and its announcement of the loss of the Kmart contract in February 2003, Fleming's CFO insisted that the notion that Fleming would seek bankruptcy protection was "ludicrous." On February 25, 2003, the SEC reclassified its investigation as a formal one.

In February and March, 2003, Fleming's credit ratings were downgraded. On March 3, 2003, Fleming announced the resignation of its CEO. Contrary to the previous representations of Fleming's CFO and unable to secure alternate sources of financing, Fleming announced on April 1, 2003, that it had filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

On April 17, 2003, Fleming announced that it would restate its 2001 annual and quarterly financial statements and 2002 [*13] quarterly financial statements previously filed with the Securities and Exchange Commission and that it would revise its previously announced 2002 fourth quarter and annual financial results. The Fleming press release stated in part that "the Company expects that the related restatements of the results for the full-year 2001 and the first three quarters of 2002 will reduce the pretax financial results from continuing operations for such periods by an aggregate amount of not more than $ 85 million." According to the press release, the restatements "mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts." (TAC, P 322). Finally, the press release stated that Fleming's "fourth quarter 2002 pre-tax loss from continuing operations will be increased by expenses totaling not more than $ 80 million as a result of a number

of factors, including increased vendor payback rates, the Kmart contract cancellation and corrections identified as a result of the Audit and Compliance Committee's independent investigation." (TAC, P 322). Fleming subsequently announced it would restate its 2000 annual financial statements. To date, Fleming [*14] has not actually made its restatements.

These securities fraud cases raise the same issues involved in the SEC investigation and the announced restatements. The claims in this case may be divided into two categories: those brought under the 1934 Act and those brought under the 1933 Act. As will be seen, different standards apply to each.

In their 1934 Act claims, brought under *section 10* and *Rule 10b(5)* promulgated thereunder, the plaintiffs complain of the conduct of five individual defendants. These defendants are referred to in this opinion either by individual name or collectively as the 1934 Act Individual Defendants. The 1934 Act Individual Defendants include the following past or present company officers: Mark Hansen, Fleming's Chief Executive Officer ("CEO"), Neal J. Rider, Fleming's Chief Financial Officer ("CFO"), Mark D. Shapiro, Fleming's Chief Accounting Officer ("CAO"), Thomas Dahlen, a Fleming Executive Vice-President and head of Fleming's Retail Division, and E. Stephen Davis, a Fleming Executive Vice-President and head of Fleming's Wholesale Division. The plaintiffs have also asserted securities fraud claims under the 1934 Act against Deloitte and Touche ("D&T"), [*15] Fleming's outside auditor. The basis for the plaintiffs' fraud claims against D&T is that D&T conducted its audits while ignoring several "red flags" that D&T should have investigated and, by failing to do so, acted with severe recklessness sufficient to warrant liability under *section 10*.

In their 1933 Act claims, brought under *sections 11* and *12(a)(2)* of that act, the plaintiffs complain of the conduct of several additional individuals, namely the outside directors and any other executive who signed the Company's Registration Statements filed with the SEC in March 2002 and June 2002. These individuals are referred to in this opinion as the 1933 Act Individual Defendants. The 1993 Act Individual Defendants include the following chief officers, directors and general counsel: Mark Hansen, Neal J. Rider, Mark D. Shapiro, Herbert M. Baum, Kenneth M. Duberstein, Archie R. Dukes, Carol B. Hallett, Robert S. Hamada, Alice M. Peterson, Edward C. Joulian, III, Guy A. Osborn and Carlos M. Hernandez. Also, the plaintiffs join as defendants to their 1933 Act claims the various underwriters involved in the June 2002 offering. These defendants are referred to herein as the Underwriter Defendants. [*16] D&T is also joined as a defendant to the 1933 Act claims. The court will sometimes refer to the defendants to the 1933

Case 1:05-md-01695-CM-GAY    Document 68-2    Filed 12/22/2005    Page 6 of 32

Page 5
2004 U.S. Dist. LEXIS 26488, *

Act claims collectively as the 1933 Act Defendants. The court now turns to a discussion of the applicable legal standards, followed by a discussion of securities law, and, finally, to the analysis of the myriad issues raised by the motions to dismiss.

## III. STANDARDS FOR MOTIONS TO DISMISS IN SECURITIES LITIGATION

### A. Rule 12(b)(6)

The court begins with bedrock. *Federal Rule of Civil Procedure 12(b)(6)* provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. A court may only dismiss a complaint under *Rule 12(b)(6)* when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Jones v. M.L. Greninger, 188 F.3d 322, 324 (5th Cir. 1999)*. The court must accept as true all well-pleaded facts in the complaint, and the complaint is to be liberally construed in favor of the plaintiff. [*17] *Abrams v. Baker Hughes, Inc., 292 F.3d 424, 430 (5th Cir. 2002); Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)*. A plaintiff need only allege, not prove, sufficient facts to survive a motion to dismiss. *Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999)*. Conclusory allegations, however, or legal conclusions masquerading as factual allegations will not suffice to prevent dismissal under *Rule 12(b)(6)*. *S. Christian Leadership Conference v. Supreme Court of State of La., 252 F.3d 781, 786 (5th Cir. 2001)*. The court may consider the totality of the allegations in the complaint in their entirety. *Haack v. Max Internet Communications, Inc., 2002 U.S. Dist. LEXIS 5652, 2002 WL 511514, at *5 (N.D. Tex. April 2, 2002)*.

Courts apply *Rule 12(b)(6)* principles to motions to dismiss in securities class action cases, but it must be remembered that a securities cause of action deals primarily with very fact-specific inquiries. [*18] *2002 U.S. Dist. LEXIS 5652, [WL] at *3 (citing Basic Incorporated v. Levinson, 485 U.S. 224, 240, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988))*. Notwithstanding that the cases are fact-specific, a district court evaluating a motion under *Rule 12(b)(6)* must consider the strict pleading requirements of *Rule 9(b)* and the Private Securities Litigation Reform Act ("PSLRA") in a securities fraud case.

### B. Rule 9(b)

*Rule 9(b)* states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b)*. *Rule 9(b)* applies to private securities fraud claims under the PSLRA. *Abrams, 292 F.3d at 430*. The Fifth Circuit has

held that the particularity requirement of *Rule 9(b)* sets "the same standard" required by the PSLRA. *ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 349 (5th Cir. 2002)*. It is settled in this circuit that *Rule 9(b)* requires the plaintiff "to specify the statements contended to be fraudulent, identify [*19] the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Nathenson v. Zonagen, 267 F.3d 400, 412 (5th Cir. 2001)*.

### C. PSLRA

The express provisions of the PSLRA augment the *Rule 9(b)* requirements in several respects. The effect is to require plaintiffs to particularize the allegations of fraud so that individual defendants are given fair notice of the claims against them as well as their alleged roles in the fraudulent conduct. *ABC Arbitrage, 291 F.3d at 349 n.6*. The PSLRA provides in relevant part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts [*20] on which that belief is formed.

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)-(2)*.

The requirements of the statute are onerous. The statute was not, however, enacted to raise the pleading burdens under *Rule 9(b)* and § *78u-4(b)(1)* to such a level that facially valid claims, which are not brought for

nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on *Rule 9(b)* and *12(b)(6)* motions. *ABC Arbitrage, 291 F.3d at 348.* A securities fraud plaintiff need not allege all facts that may be related to his claims-such a requirement is impossible at the pleading stage because usually only the defendants know all the facts related to the alleged fraud. *Id.* Therefore, the particularity rules should not be interpreted to require [*21] the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession. *Id.* Finally, the totality of the complaint determines whether a claim has been pled with particularity. *Goldstein v. MCI Worldcom, 340 F.3d 238, 246-47 (5th Cir. 2003).*

### D. Section 10(b) and Rule 10b-5

In the TAC, plaintiffs seek class certification for a class on behalf of all persons who purchased or acquired the publicly traded equity and debt securities of Fleming between May 9, 2001, and February 25, 2003, inclusive, including those who purchased or acquired such Fleming securities issued in, pursuant to, or traceable to the March 14, 2002 Registration Statement or the June 17, 2002 Registration Statement. The private rights of action involved with respect to the securities fraud claims alleged in the TAC flow from alleged violations of *sections 10(b)* and *20(a)* of the 34 Act and *Rule 10b-5* of the SEC, promulgated pursuant to the 1934 Act. The court now examines those provisions.

*Section 10(b)* provides that it is unlawful for any person "to use or employ, in connection with the purchase or sale of any security . [*22] . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. § 78j(b). Rule 10b-5* states that it is unlawful for any person, directly or indirectly, "to employ any device, scheme, or artifice to defraud; to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b-5.*

The intersection of *Rule 9(b)*, the PSLRA and the elements of a claim under *section 10(b)* and *Rule 10b-5* yields a result which requires a plaintiff to allege, in connection with the purchase or sale of securities, the following:

(1) specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2) identify the speaker;

(3) state when and [*23] where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*ABC Arbitrage, 291 F.3d at 350; Nathenson, 267 F.3d at 406-07.* In addition, if an allegation is made on information and belief, the plaintiff must (7) state with particularity all facts on which that belief is formed, i.e., set forth a factual basis for such belief. *ABC Arbitrage, 291 F.3d at 350.* This is the who, what, when, where, and how required under *Rule 9(b)* and the PSLRA. *Id.*

*Section 10(b)* and *Rule 10b-5* require that the defendant make a material misstatement or omission. With regard to misstatements, the PSLRA establishes a safe harbor shielding a forward-looking statement from liability where such a statement is made by a natural person unless defendants prove that it was made with "actual knowledge . . . that the statement was false and misleading." A statement is forward looking if it is [*24]

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pur-

suant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer. . . .

*15 U.S.C. § 78u-5(i)(1)(A).* The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important [*25] factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *15 U.S.C. § 78u-5(c)(1)(A)(i) and (ii).* Where the forward-looking statement is not accompanied by cautionary language, plaintiffs must demonstrate that the defendant made the statement with "actual knowledge" that it was "false or misleading." *15 U.S.C. § 78u-5(c)(1)(B).* The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.

There is a judicially created equivalent to the PSLRA's "safe harbor" provision, the "bespeaks caution" doctrine, which "operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, so as to bespeak caution' to investors that actual results may differ, thereby shielding the statements from *section 10(b)* and *Rule 10b-5* liability." [*26] *In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002)*(quoting *Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276 n.7 (11th Cir. 1999)).* The Fifth Circuit has rejected the application of the "bespeaks caution" doctrine as a *per se* bar to liability. *Rubinstein v. Collins, 20 F.3d 160, 162 (5th Cir. 1994).* Under Fifth Circuit precedent, "cautionary language is not necessarily sufficient in and of itself, to render predictive statements immaterial as a matter of law. Rather, . . . materiality is not judged in the abstract, but in light of the surrounding circumstances." *Id. at 167-68* (citing *Krim v. BancTexas Group, 989 F.2d 1435, 1448-49 (5th Cir. 1993)).* "The appropriate inquiry is whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment.' " [*27] *Id. at 168* (citing *Krim, 989 F.2d at 1445).*

In a similar vein, vague optimistic statements are not actionable because a reasonable investor would not rely on them in deciding to buy or sell securities. *In re Enron, 235 F. Supp. 2d at 576.* "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are puffery,' projections of future performance not worded as guarantees,' and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001)* (citing *Krim, 989 F.2d at 1446).*

If allegations regarding the statements or omissions are made on information and belief, the complaint must state with particularity sufficient facts to support that belief. *ABC Arbitrage, 291 F.3d at 353.* The plaintiffs are not required to plead with particularity every single fact upon which their beliefs concerning false or [*28] misleading statements are based. *Id.* If the allegations in the complaint come from confidential sources, there is no requirement that the sources be named, provided they are described generally in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *Id.* In that situation, the plaintiffs will have pleaded enough facts to support their belief, even though some arguably relevant facts have been left out. *Id.* Accordingly, a complaint can meet the pleading requirement by providing a sufficient general description of the personal sources of the plaintiffs' beliefs. *Id.*

In *ABC Arbitrage*, the Fifth Circuit found instances where the allegations as to confidential sources had been both adequately and inadequately pleaded. The court found that "allegations concerning a conversation between a high ranking [Company] official' who was a top executive of [the Company]'" and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the [*29] standard for pleadings based on information and belief in that "this executive, and his conversation with the [company's executive vice president], is described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded and that, to the extent it is necessary, construing the allegations in the light most favorable to Plaintiffs, this executive was himself Plaintiff's source for this information." *Id. at 357.*

On the other hand, with regard to allegations that the company had understated its losses, the court held insufficient certain allegations that the source of the information was consultations and interviews with "Swiss, Thai, and Indonesian business journalists, employees of Deutsche Telecom and other Alcatel customers throughout the world, trade union officials, and Telecom analysts" in the course of counsel's investigation. *Id. at 358.* These allegations, according to the court, had not been pleaded with sufficient particularity to withstand the requirements of the PSLRA.

Securities fraud claims are, of course, *fraud* claims. The requirement is that a company officer [*30] or agent acted with a culpable mental state. To that end, "scienter" is a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).* The PSLRA did not alter the substantive scienter requirement for claims brought under *section 10(b)* and *Rule 10b-5. Nathenson, 267 F.3d at 408.* The court must consider cumulatively any evidence of scienter pleaded by the plaintiffs. *Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994).* Therefore, the court must consider whether all facts and circumstances "taken together" are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.

Under the PSLRA, it is "not enough to particularize false statements or fraudulent omissions made by a corporate defendant . . . plaintiffs must also particularize intent allegations raising a strong inference of scienter.'" *Goldstein, 340 F.3d at 238.* "For securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts that, assumed [*31] to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted" with the required mental state. *In re Electronic Data Systems Corp. Sec. & ERISA Litig., 298 F. Supp. 2d 544 at 556, 2004 WL 52088, at *8 (E.D. Tex. 2004)(quoting Coates v. Heartland Wireless Communications, Inc., 100 F. Supp. 2d 417, 422 (N.D. Tex. 2000)).*

A plaintiff can demonstrate scienter with allegations of conscious misconduct or severe recklessness. *Abrams, 292 F.3d at 439.* Severe recklessness includes "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams, 292 F.3d at 430; Tuchman, 14 F.3d at 1067.* Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. [*32]    *In re Triton Energy Ltd. Secs. Litig.,*

*2001 U.S. Dist. LEXIS 5920, 2001WL 872019, at *10 (E.D. Tex. Mar. 30, 2001); see also Abrams, 292 F.3d at 436* (stating an allegation of actual knowledge is not required to withstand a motion to dismiss).

Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements" or have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud." *Abrams, 292 F.3d at 432-33; ABC Arbitrage, 291 F.3d at 351-54; Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).* Under such circumstances, defendants knew, or more importantly, should have known that they were misrepresenting material facts relating to the corporation. *Kalnit v. Eichler, 264 F.3d 131, 138 (2nd Cir. 2001).* In addition, courts have found sufficient allegations when plaintiffs have alleged "specific and detailed allegations about defendants' [*33] violation of GAAP, as well as other alleged misstatements regarding the company's earnings and technical problems [which] when viewed in their entirety-supported the claim." *Haack, 2002 U.S. Dist. LEXIS 5652, 2002 WL 511514, at *7.*

Due to the fact that there will rarely be direct evidence of intent to defraud, allegations of circumstantial evidence of conscious misbehavior or recklessness justifying a strong inference of scienter will suffice to withstand dismissal of the securities claims. *Goldstein, 340 F.3d at 246; Nathenson, 267 F.3d at 424-25; Novak, 216 F.3d at 307.* The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11.* But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. *Abrams, 292 F.3d at 432.* At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it. [*34] *Tuchman, 14 F.3d at 1067.* Thus, the requisite strong inference of fraud may be established where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud (2) engaged in deliberately illegal behavior (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. *Novak, 216 F.3d at 311.*

A corporate official, acting with scienter, who on behalf of the corporation signs a document that is filed with the SEC that contains material misrepresentations, such as a fraudulent Form 10-K, regardless of whether he participated in the drafting of the document, "makes" a statement and may be liable as a primary violator under

section 10(b) for making a false statement. *In re Enron Corp. Securities, Derivative & ERISA Litig., 258 F. Supp. 2d 576, 587 (S.D. Tex. 2003)*. A misrepresentation alone is not enough, as the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. [*35] *Abrams, 292 F.3d at 433*. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information. *Id.* When the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11.*

*Rule 10b-5* does not impose on a corporation an affirmative duty to disclose all nonpublic material information that it has about the corporation, and where a material omission is alleged, there is no liability under the federal securities laws unless that corporation has a duty to disclose such information. *SEC v. Fox, 855 F.2d 247, 252 (5th Cir. 1988)*. The duty to disclose only arises if the person is in a position of trust. *Id.* One instance where a duty to disclose is imposed by law on corporations, is when a corporation makes a disclosure of material fact, voluntarily or involuntarily, the courts have recognized that there is a duty to make it complete and accurate. [*36] *Rubinstein, 20 F.3d at 170*. The Fifth Circuit has held that "under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'" *Id.* In addition, the defendants "have a duty under Rule 10b-5 to correct statements if those statements become materially misleading in light of subsequent events." *Id. at 170 n.41.*

While allegations of motive and opportunity alone are insufficient to satisfy the pleading requirements of the PSLRA, appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter. *Nathenson, 267 F.3d at 412*. Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations of motive and opportunity in and of themselves fail. *Abrams, 292 F.3d at 434* (dismissing motive and opportunity allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices); *see also* [*37] *Tuchman, 14 F.3d at 1068-69*. Thus, some "motives," particularly those possessed by almost all corporate executives, do nothing to aid a plaintiff in pleading scienter.

Much of the parties' briefing is devoted to the issue of the group pleading or group publication doctrine. After the plaintiffs filed the TAC and after oral argument was held on the motions to dismiss, the Fifth Circuit held

in *Southland Securities Corporation v. Inspire Ins. Solutions, Inc., 365 F.3d 353 (5th Cir. 2004)*, that the group pleading doctrine did not apply in cases under the PSLRA. The effect of that case is to clarify the pleadings requirements in securities fraud cases which, as this one does, rely on press releases and SEC documents that are not attributable to any one person, but instead are published by the company itself. n1 The court will thus examine the ramifications of the Fifth Circuit's recent holding by providing an overview of the group publishing doctrine, followed by a discussion of *Southland*. The court will then apply *Southland* and the additional requirements discussed above to the allegations of the TAC.

---

n1 The Ninth and Tenth Circuits have continued to apply the group pleading doctrine following the passage of the PSLRA. *Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065-66 (9th Cir. 2000); Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1254 (10th Cir. 1997)*. The First Circuit has yet to decide the issue. *In re Cabletron Systems, Inc., 311 F.3d 11, 40 (1st Cir. 2002)*.

---

[*38]

The group pleading or "group publishing" doctrine was a creation of the courts. The doctrine permitted "plaintiffs to rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information," are the collective work of those individuals with direct involvement in the everyday business of the company.'" *Southland, 365 F.3d at 363* (quoting *In re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999)*(quoting in turn *In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1108 (D. Nev. 1998))).* "Instead of being required to plead that a particular defendant actually made, authored, or approved an offending statement in a corporate communication, the group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland, 365 F.3d at 363*. Under the doctrine as it existed before the PSLRA, a plaintiff in a securities fraud case did not need to allege any facts demonstrating an individual defendant's participation in [*39] the particular communication containing the misstatements or omission where the defendants were "insiders or affiliates" of the company. *Id.*

The TAC in this case relies heavily on press releases and filings with the SEC. The vast majority of the plain-

tiffs' complaint is devoted to establishing (1) that *Fleming* understated its earnings in 2001 and 2002 (2) that *Fleming* disclosed those statements of its earnings in the company's press releases, 10Q Forms, 10K Forms, and Registration Statements. Under *Southland*, these are the types of documents one ordinarily would expect to see associated with group pleading because the information contained in the forms is generally the result of a collaborative effort on the part of the officers and agents of the company.

The plaintiffs have represented repeatedly that they do not rely on the group pleadings doctrine. This is a smart move because *Southland* has now explicitly held that they may not. But saying one is not relying on the group pleading doctrine only advances the issue part of the way. This case is about the overstatement of a company's earnings, and the representations concerning those overstatements are found largely [*40] in corporate documents that are the product of collaborative preparation efforts. *Southland* is clear that under the PSLRA:

> corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement.

*Southland*, 365 F.3d at 365.

Under this language, to the extent the plaintiffs are relying on representations of Fleming's earnings in press releases or SEC filings, it is not enough to plead that *Fleming* said or did something because the plaintiffs here do not sue Fleming. [*41] They sue individual defendants. As a result, the court must examine the TAC and determine whether the plaintiffs have alleged (1) that any or all of the 1934 Act Individual Defendants signed a corporate document containing a misrepresentation or (2) particular factual allegations explaining an individual

defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement. *Id.*

### E. Section 20(a) controlling person liability

The previous discussion addressed liability for primary violations of the 1934 Act. *Section 20(a)* provides a basis for additional liability and states that "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)* [*42] . Since *section 20(a)* is a secondary liability provision, it is necessary that a primary violation be established before liability under *section 20(a)* arises. *ABC Arbitrage, 291 F.3d at 348 n.57.* Controlling person liability under *section 20(a)* is not subject to the heightened pleading requirements of *Rule 9(b)*, but is instead governed by *Rule 8*. *In re Enron Corp. Sec., Derivative & ERISA Litig., 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *12-13 (S.D. Tex. 2003)*. Rule 8 is a "simplified notice pleading standard" that "applies to all civil actions, with limited exceptions," and requires merely a statement that "gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)*.

## IV. DISCUSSION

### A. Analysis of the 1934 Act Issues

The court now addresses the various arguments made by the 1934 Act Defendants in the light of the standards set forth above. The 1934 Act Defendants filed a joint motion to dismiss, and each filed his own separate motion to dismiss to address issues peculiar to that [*43] defendant. The court will first detail the alleged fraud itself; then the court will address the 1934 Act Defendants' arguments as presented in their joint brief and will address the individual arguments, to the extent necessary, after considering those positions common to the group.

In the TAC, Lead Plaintiff Jackson Capital Management alleges a scheme by the 1934 Act Individual Defendants to inflate the price of Fleming securities and defraud the investing public. The TAC alleges that Fleming's external auditors, D&T, had knowledge of the fraud and/or was severely reckless with regard to the fraud and made materially false and misleading statements to the public. The TAC alleges that these 1934 Act Individual Defendants personally perpetrated the fraud.

Many of the plaintiffs' allegations come from information provided by four inside sources ("Sources") who allegedly observed much of the alleged accounting manipulations and the involvement of each of the 1934 Act Individual Defendants and D&T. According to the TAC, Sources 1 and 4 were financial analyst managers in Fleming's retail segment. Sources 2 and 3 were chief accountants for two of Fleming's principal wholesale divisions. [*44] Source 1 was employed at Fleming from the fall of 2001 to the summer of 2002. Source 4 was employed at Fleming from the summer of 2001 to early 2003. Source 2 was employed at Fleming from the 1980s to 2002 and served as a chief accountant for a wholesale division in 2001 and 2002. Source 3 was employed at Fleming as a chief accountant for a wholesale division from 2001 through 2002.

Because the TAC relies heavily on the Sources, it is important to understand the information alleged to be possessed by them. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen, Rider, Shapiro, Dahlen, and Davis. (TAC, P 95). The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment." (TAC, P 96).

The TAC alleges that starting in July [*45] of 2001 through the class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to Defendants Hansen and Rider, and electronic copies were provided to Defendant Dahlen." (TAC, P 122). The TAC alleges that from early 2001 through the class period, Sources 2 and 3 had access to company-wide financial information and frequently communicated with one another about accounting issues that affected the various divisions. (TAC, P 144).

The court now turns to the specific allegations of fraud. It is helpful to recall, as the court noted in the factual background section of this opinion, that Fleming's press releases, and SEC filings made various statements concerning the company's earnings and the success of Fleming's retail operations strategies. As is true in any fraud claim, the plaintiffs' complaint is that the defendants made certain statements with knowledge of information to the contrary. Bearing this in mind, the court now examines the allegations contained in the TAC.

The TAC alleges that Source 1 prepared earnings analyses prior to the closing [*46] of the books for the various reporting periods and that the CFO for the retail segment "directed that a new revenue or margin number, which they supplied, be substituted for the original number in the analysis, while providing no basis or back-up documentation for the change." (TAC, P 98). Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] n2 received." (TAC, P 98).

> n2 The position of retail CFO during the class period was filled initially by John Simrell and later Tim Otte. Since the two men are not being sued individually the use of their individual names is unnecessary.

The TAC further alleges that Source 1 was required by the retail CFO to reduce accounts payable by a specified amount in order to account' for deductions' that Fleming planned to claim from as-yet-unidentified vendors, for as-yet-unidentified products." (TAC, P 99). The TAC alleges that the standard industry practice was to propose deductions to [*47] vendors for return of merchandise, adjustments for incorrect quantities invoiced, adjustments for incorrect pricing, and adjustments pursuant to written contractual arrangements, i.e., co-operative advertising agreements and volume discount agreements. (TAC, P 99). The TAC alleges that according to Source 1, "Fleming did not follow standard industry practice" in that they "did not propose deductions." Fleming unilaterally took them without authorization from the vendors and that "there was no basis for concluding that the vendors would accept the improper and baseless deductions." (TAC, P 100). The TAC alleges that the deductions "had already been accrued by Fleming's accounting department by the time Source 1 was told to change [the earnings analyses], even though the vendor, the product, and the basis for the deduction had not yet been identified." (TAC, P 101).

The plaintiffs also allege that accrual of these unauthorized, improper, and unsustainable deductions was directed by Dahlen and the retail CFO; and that the retail CFO often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, [*48] would be likely to accept deductions. (TAC, P 101). According to the TAC, Source 1 stated that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." (TAC, P 102). Each financial analyst manager had a deduction worksheet, which was reviewed by higher-level executives. The TAC alleges that "by June 2002, Source

1 was emailing Source 1's deduction worksheets to Dahlen [and the retail CFO] with a frequency of three to five times a week" and that "even after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction." (TAC, P 103). The TAC alleges that "Hansen and Dahlen directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $ 3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." (TAC, P 104). Further, the TAC alleges that "Fleming didn't correct its financial statements to reflect any such repayments [of the deductions], nor did the Company stop taking the improper deductions. [*49] " (TAC, P 105).

The TAC alleges that the 1934 Act Individual Defendants and specifically Hansen attended Monday meetings where the handling of deductions and margins would be discussed. (TAC, P 106). The executives allegedly reviewed documents showing that sales in Fleming's retail segment were flat or declining, and that there was a difference between publicly reported margins and internally calculated margins. (TAC, P 106). Further Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by Dahlen. (TAC, P 107). According to Sources 1 and 4 Hansen, Rider, Shapiro, and Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. (TAC, P 108).

With regard to D&T, the TAC alleges that Source 1 provided back-up for these accrued deductions at D&T's request, but that D&T "never asked Source 1 any questions about the deductions that they were supposedly examining." (TAC, P 109). The TAC alleges that the retail CFO hired D&T [*50] to validate deductions claimed by Fleming retail and that Source 1 provided information to D&T about the deductions. (TAC, P 110). The TAC alleges that both Fleming wholesale and retail took deductions from vendors on the same product resulting in a double accrual of deductions on the books for a single product. (TAC, P 112). In addition, the TAC alleges that when Fleming's wholesale group secured a contract with Kmart at thin margins, "the retail segment booked more and more deductions in order to prop up company-wide margins" and "even accrued large disputed deductions on its purchases from Fleming's wholesale segment." (TAC, P 114). The TAC alleges that there was a strong "push for unauthorized, improper, and unsustainable deductions in Fleming's retail segment reflecting-serious company-wide problems."

The TAC alleges that any reserves kept in the event that the deductions were reversed were inadequate and were eventually done away with in order to increase earnings. (TAC, PP 283-285). Specifically, according to Source 3 Fleming's policy was to reserve against only 50% of claimed deductions, but that the wholesale management frequently reversed the reserves to increase earnings. [*51] (TAC, P 283). Further, according to Source 3, the accounting managers were told by the wholesale managers at the direction of Fleming's corporate management to stop taking reserves in the second quarter of 2002. (TAC, PP 284-285).

The plaintiffs also contend that the 1934 Act Individual Defendants misrepresented the company's same store sales data. According to Sources 1 and 4, the TAC alleges that "Fleming manipulated its same store' sales data to show increases in same-store sales." (TAC, P 115). Specifically, "Fleming's financial analyst managers tracked the real same store sales data" that consistently showed "large declines in same-store sales." (TAC, P 117). However, the TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide the adverse sales trend" by rejecting the data from the financial analysts and "changing the composition of the population of stores which constituted the Company's same stores.'" (TAC, P 118).

Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year same store' revenues, [*52] in order to inflate current-year same-store revenues and earnings and created the false impression of growth" resulting in "revenue and earnings reports [that] did not truly reflect a same store' comparison as is commonly understood in the retail industry." (TAC, P 118). The TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." (TAC, P 128). The TAC alleges that "according to Source 1, in November 2001, Fleming's retail financial analyst managers expressed concern to [the retail CFO] that Fleming's retail segment was over-reporting the strength of its sales, especially its comparable store' sales," but that the retail CFO told them "not to raise concerns, or they would lose their jobs." (TAC, P 119).

Further, the TAC alleges that "according to Sources 1 and 4, beginning in 2001 and continuing into 2002, Fleming [*53] also inflated its same store and/or comparable store sales figures by including certain sales, re-

ferred to as red tag' sales." n3 (TAC, P 120). The TAC alleges that "even though red tag sales were not made through any Fleming retail store, Fleming would falsely attribute ! the revenue from these sales to the retail stores included in its same store and/or comparable store analyses, thereby inflating the total amount of same store and/or comparable store sales." (TAC, P 120). The TAC alleges that when Source 4 was first given "red tag" sales numbers by the retail CFO and asked what they were, the retail CFO answered: "You don't want to know." (TAC, P 125).

> n3 "Red tag" sales are one-time transactions in which Fleming purchased and immediately sold large lots of a commodity which had been located for Fleming by a broker.

In addition, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Dahlen-at the direction of Dahlen and the retail CFO-reduced the previously reported [*54] same store sales for the year 2000 fiscal year by subtracting $ 1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $ 4.7 million in red tag sales. (TAC, P 120). The plaintiffs allege that same store sales information was also misstated by a process called diverting. n4 (TAC, P 123). According to Source 4, Fleming included this revenue in "same store" sales figures despite its not being attributable to any of the retail stores. (TAC, P 123). The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. The TAC alleges that the "total same store and/or comparable store figure for 2001 was falsely inflated, and the growth for the same store or comparable store figure was also falsely inflated [whereby] the market was misled about growth in same store sales." (TAC, P 120).

> n4 "Diverting" is a practice where the retail operations purchase product and resell it at a higher price to another company but where the retail operations do not take possession of the product or sell it through a particular store.

[*55]

The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "hard copies of these reports were given directly to de-

fendants Hansen and Rider, and electronic copies were provided to defendant Dahlen." (TAC, P 122). The TAC alleges that Hansen received special sales reports giving even more current information than Sources 1 and 4 received showing the declining sales trends. (TAC, P 131). In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report-including defendants Hansen, Rider, and Dahlen-that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." (TAC, P 124). Source 4's reports in 2002 also listed same store sales separately in each of Fleming retail's seven regions showing that overall same store sales were declining in almost all of the company's regions, [*56] some at up to 20% over the course of a year. (TAC, P 127). In addition, Hansen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. (TAC, PP 459, 462). Also, Hansen, Shapiro, Rider, and Davis received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. (TAC, P 459).

The TAC alleges that the actual sales trends clearly showed that the price-impact format was not working according to Source 4. (TAC, P 132). Specifically, between July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. (TAC, P 133). Using data that had been available to Hansen, Rider, and Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. (TAC, P 133). The TAC alleges that it was apparent [*57] in 2001 and 2002 from reports provided to defendant Hansen that newly-purchased stores were performing poorly and routinely were not meeting the revenue and earnings projections prepared by Source 4 with information provided to him that were used to justify the purchases. (TAC, P 134). The TAC alleges that "with the knowledge and direction of the 1934 Act Individual Defendants, Fleming continued to purchase retail stores based on unrealistic projections in order to create the fiction of a new source of revenue to hide the decline in the Company's sales." (TAC, PP 134, 135).

The plaintiffs allege that defendants Hansen and Dahlen received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, they made public

statements claiming that Fleming's retail segment was growing. (TAC, P 455). In addition, Hansen, Rider, Shapiro, Dahlen, and Davis received weekly, monthly and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, yet, they made public statements claiming that Fleming's retail segment was growing. (TAC, P 456). Also, the TAC [*58] specifically alleges that Hansen, Rider, Shapiro, Dahlen, and Davis attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. (TAC, P 457). According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. (TAC, P 460)

In addition to the vendor deductions and the same store sales issues, the TAC alleges that according to Sources 1 and 4 "Fleming often reported normal[, recurring] operating expenses as strategic plan charges' or other one time charges even when the expenses were not related to Fleming's strategic plan" despite the "financial analyst managers stating in meetings with management that the charges in question were recurring" thereby "increasing its reported margins and falsely suggesting to analysts and investors that the expenses would not recur in future reporting periods." (TAC, P 136).

The above discussion has related [*59] generally to the company's retail operations. The TAC also alleges that Fleming "engaged in a series of manipulations during the Class Period [in its wholesale segment] involving improper inflation of revenues and earnings; the accrual of unauthorized, improper, and unsustainable vendor deductions; a scheme to obtain unearned promotional funds through the use of nonexistent stores; the improper failure to recognize inventory losses; and the improper classification of prior-year expenses." (TAC, P 137).

According to Source 4, Fleming "inflated its earnings by booking losses to discontinued operations' when the losses were in fact attributable to continuing operations" thereby "overstating the earnings of its continuing operations and burying the losses in the presumably less important discontinued operations' category." (TAC, PP 138, 139). Specifically, following a September 24, 2002 press release announcing the divestment of its price-impact Food4Less and Rainbow Foods Stores these stores were "treated as discontinuing operations, while the limited-assortment Yes!Less stores were [still treated as] continuing operations." (TAC, PP 138, 139). According to Source 4, "Yes!Less would [*60] sell its excess inventory to the price-impact stores at full price" and the

"price-impact stores would then resell the excess inventory to . . . another retailer[] at a fifty percent mark-down." (TAC, P 139). "In this way, the discontinued' price-impact stores assumed the excess-inventory losses of the continuing' Yes!Less stores" thereby overstating the earnings for continuing operations. (TAC, P 139).

According to the plaintiffs, beginning at least as early as 2000 and continuing through the Class Period, Fleming manipulated its wholesale earnings through a scheme whereby the company's internal controls were weakened and the company's upper management, including defendants Hansen and Davis, put pressure on the divisional staff to meet budgeted targets by any means necessary. (TAC, P 140). In early 2001, the company centralized its accounting operations and terminated divisional accounting managers and clerks. Essentially, the plaintiffs contend that management put pressure on its staff to meet targets even though those goals were unrealistic. (TAC, P 146, 148).

According to Source 3, the accountants routinely discussed among themselves the Company's financial condition in both [*61] the wholesale and retail divisions based on their access to actual results showing large losses and "that Fleming's publicly disseminated rosy consolidated financial statements were completely contrary to reality." (TAC, P 151). These accountants even asked their directors where the publicly claimed profits were coming from, but received no valid or plausible response. (TAC, P 151). The TAC alleges that after December 2001 these accountants "routinely discussed the fact that Fleming was a sinking ship that eventually would have to declare bankruptcy." (TAC, P 151).

The TAC alleges that "one of Fleming wholesale's most pervasive methods of inflating its earnings was to take unauthorized, improper, and unsustainable deductions from accounts payable to vendors." (TAC, P 156). "According to Sources 2 and 3, Fleming's division officers directed accounting managers to recognize unauthorized, improper, and unsustainable deductions from vendors' invoices in order to enable the divisions to meet their targets" that eventually "increased in a snowball effect from period to period." (TAC, P 157). The TAC further alleges that "upon determining the amount of the division's shortfall to the forecast, [*62] the division staff would fax to the [accounting] managers sufficient unauthorized, improper, and unsustainable deductions, backdated to the financial period closing date, to make up the shortfall." (TAC, P 158).

According to Sources 2 and 3, Fleming maintained a "Vendor Compliance Manual" that was "an open check-book' that authorized division accountants to impose deductions for any reason that" was used by the divisions, "especially those that struggled to meet their tar-

gets." (TAC, P 159). In one situation Fleming allegedly took an $ 800 deduction from a vendor because the truck was late making its delivery. The "deduction documents" sent to vendors "did not identify any specific vendor invoices that were the subject of the deduction" and one vendor said " it would take four months to figure out why Fleming took the deduction, and another four months to get it back.'" (TAC, PP 160, 161). The TAC alleges that once the "deduction documents" were prepared, the deduction would be accrued even though in most cases Fleming ended up reinstating all or almost all of the amount deducted from a vendor's invoice. (TAC, PP 161, 163).

According to Source 3, at one point in July 2002, the disputed [*63] deductions totaled about $ 100 million at the corporate level in addition to $ 20 million at the divisional level in the wholesale segment. (TAC, P 167). The TAC alleges that even though the deductions inevitably would have to be remitted to vendors and the accrual reversed, the deductions nevertheless were accrued because they created the illusion of present earnings. (TAC, P 167). "According to Sources 2 and 3, in order to compensate for the adverse earnings consequences caused by writing checks to vendors to cover amounts improperly deducted, Fleming would initiate another round of unauthorized, improper, and unsustainable deductions" leading to "a vicious cycle which continually served to falsely inflate current earnings . . . eventually resulting in a huge charge to earnings." (TAC, P 166).

The TAC includes excerpts from a September 5, 2002 *Wall Street Journal* article in its allegations detailing complaints from various vendors about the large deductions taken by Fleming being unjustified. (TAC, PP 171-174, 177-179). These articles include claims by former Fleming executives and employees that the disputed deductions amounted to $ 100 million during the middle of 2001, that [*64] the Fleming managers took the deductions at the direction of upper management, that Fleming took deductions for items it never actually put into distribution due to the cancellation of orders, and that executives resigned after disagreeing with Fleming about its practices. (TAC, PP 173, 177, 178).

The plaintiffs allege a variety of other accounting improprieties. According to Source 3, Fleming inflated earnings by booking sales and earnings to a fictitious store in order to earn promotional discounts from vendors and then failing to reverse the fictitious earnings. (TAC, PP 180-192). Also, Fleming, at the direction of defendant Shapiro, did not recognize a $ 1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. (TAC, PP 193-199). Fleming recognized an inventory surplus of $ 6.2 million and booked it to income even though it was due to inventory

that actually belonged to one of Fleming's customers and should have been offset by a liability. (TAC, P 200).

Hansen, Shapiro, Rider, and Davis received regular reports showing the revenue, cost, and margin numbers for the wholesale segment [*65] and were well aware of the magnitude and invalidity of massive deductions taken by Fleming. (TAC, P 458). According to the plaintiffs, Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO, and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, defendants Hansen, Rider, Shapiro, and Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. (TAC, P 461).

As can be seen, the gist of the plaintiffs' complaint is that the 1934 Act Individual Defendants made false statements concerning Fleming's earnings with knowledge of contrary information and/or reckless disregard for the truth of those earnings statements. The TAC alleges that the 1934 Act Individual Defendants had the motive to make materially false and misleading statements. (TAC, P 468). Specifically, the TAC alleges that the defendants made the materially false and misleading statements in order to facilitate Fleming's offering which netted $ 170 million in exchange for stock, $ 200 million in exchange for senior notes, and a $ 975 million in new credit facilities. (TAC, P 468). [*66] In addition, the plaintiffs allege that the defendants had the motive to manipulate earnings since their bonuses were tied directly to reporting certain targeted earnings which were met in 2001 as a result of the manipulations. (TAC, P 469).

### 1. Group Pleading

The 1934 Act Individual Defendants contend that the TAC should be dismissed because the plaintiffs impermissibly rely on group pleading when they make allegations against the 1934 Act Individual Defendants as a whole and against Fleming. The plaintiffs respond that both parties have used the shorthand reference to the defendants in their pleadings and that allegations in the TAC against the 1934 Act Individual Defendants are as to each and everyone of them individually. The plaintiffs contend that the only paragraphs that arguably rely on group pleading concern the allegations that press releases were false and misleading and that the 1934 Act Individual Defendants knew of their falsity. The plaintiffs argue that there is a reasonable basis for believing that the individuals knew of their falsity based on the rest of the allegations in the TAC. Further, the plaintiffs contend that the viability of the group pleading [*67] doctrine after the enactment of the PSLRA is an open issue in this judicial district and the Fifth Circuit. Finally, the plain-

Case 1:05-md-01695-CM-GAY    Document 68-2    Filed 12/22/2005    Page 17 of 32

Page 16
2004 U.S. Dist. LEXIS 26488, *

tiffs respond that the TAC makes adequate allegations against the individuals by name as well.

The Fifth Circuit's recent decision in *Southland*, discussed above, disposes of many of these issues. First, the court rejects the plaintiffs' argument to the extent it relies on the supposed potential "viability" of the doctrine in this circuit. The doctrine now has no viability at all. The court will not permit the use of such shorthand references to "defendants" to meet the particularity requirements of the PSLRA. This notwithstanding, the court observes that the plaintiffs do make substantial allegations that particular defendants were identified in press releases and conference calls with analysts. Likewise, the plaintiffs note, when appropriate, the signatories to the various SEC filings. No party has suggested that further re-pleading is necessary at this stage; accordingly, the court will consider the TAC as it stands under the decision in *Southland*.

### 2. Failure to Adequately Identify the Source of their "Information and Belief"

The 1934 [*68] Act Individual Defendants next contend that the TAC should be dismissed because the plaintiffs have not adequately identified the source of the allegations that are not based on the plaintiffs' personal knowledge. In addition, these defendants contend that no inference of fraud is raised without an adequate showing of the foundation of the Sources' information and its reliability. The defendants argue that the TAC fails to describe the details concerning how, when, and where any of the Sources acquired their information.

The plaintiffs respond by stating that even though they did not disclose the names, they provided information about the Sources' job positions to support the probability that those persons would possess the information pleaded to support the allegations, as well as used information that predated their employment to know that the misrepresentations had been ongoing. The plaintiffs respond further by stating that these Sources have personal knowledge of the events, meetings, and internal reports that evidence the misrepresentations and personal knowledge that the defendants attended the meetings and reviewed the documents and reports.

Applying the standards announced [*69] in *ABC Arbitrage*, the court finds that the plaintiffs have sufficiently identified the Sources who provided the information for their allegations. Although the TAC does not name the Sources, it discloses specific information about the positions held by the Sources, the time period in which they worked for the Company, and their job responsibilities. The TAC also discusses how the Sources received the information underlying the allegations and to whom the information was forwarded. Based on the particularity with which the allegations discuss the

Sources themselves and the specifics regarding how the Sources acquired the information and knowledge underlying the allegations, the court holds that the allegations in the TAC are adequately pleaded to support the probability that the Sources would possess the information pleaded that support the allegations of false or misleading statements by the defendants.

### 3. Failure to Plead Fraud with Particularity

The 1934 Act Individual Defendants raise several issues with respect to whether the plaintiffs have sufficiently pleaded fraud with particularity. First, the defendants attack the pleading as it relates to financial reports, [*70] reports on retail stores, and Monday meetings. The defendants argue that the TAC does not allege specifically how the Sources know that the 1934 Act Individual Defendants knew about the improper earnings manipulations or knew what was being discussed at the Monday meetings, In addition, the defendants contend that there are no allegations that show that the 1934 Act Individual Defendants knew that the vendor deductions, same store sales analysis and improper classification of recurring expenses in the retail segment were improper.

The plaintiffs respond by arguing that the defendants are merely pointing to isolated paragraphs but that the totality of the complaint is what is determinative. With regard to the financial reports, reports on retail stores, and Monday meetings, the plaintiffs posit that the Sources prepared the financial reports with the manipulations as directed by defendants Dahlen and Hansen and known to the other 1934 Act Individual Defendants, prepared charts of retail store sales growth at the request of Hansen, and that the charts and manipulations were discussed at the Monday meetings.

Although documentary evidence, such as internal reports, may be the basis underlying [*71] the allegations in the TAC of false and misleading statements, an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. *Abrams, 292 F.3d at 432* (stating that plaintiffs did not point to any particular reports or information-available to the defendants before the announced financial restatements-that are contrary to the restatements and that it would be easier to infer that they had received such reports if information were given about who generated the reports, when they were reviewed, how defendants responded, etc.). Such allegations must have corroborating details regarding the content of allegedly contrary reports, their authors and recipients. *Id.* A plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. *ABC Arbitrage, 291 F.3d at 356*. However, the Fifth Circuit has expressly declined

to adopt as a standard the threshold requirement in every case that the plaintiffs must provide report titles, when they were prepared, who prepared [*72] them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information. *Id. at 355.*

A complaint can satisfy the PSLRA by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs. *ABC Arbitrage, 291 F.3d at 352.* In this case, the plaintiffs have satisfied the pleading requirements by providing not only a sufficient factual basis for the internal reports, but also a sufficient factual basis for the information contained in the reports by virtue of the allegations concerning the Sources discussed above. The allegations contain numerous references to reports as outlined above, but in each instance the allegations contain sufficient factual information concerning the reports as required by *ABC Arbitrage* and/or are based upon information provided by the Sources. Therefore, the allegations in the complaint concerning internal reports are adequately pleaded.

Likewise, the allegations concerning the defendants and the Monday meetings are based on factual allegations provided by the Sources. The factual allegations in the TAC concerning the Sources [*73] support the belief that the Sources would possess the information about the Monday meetings. As discussed in *ABC Arbitrage,* as long as the factual basis concerning the Sources is adequate, the plaintiffs' allegations of false or misleading statements based on information provided by the Sources are adequate to satisfy the heightened pleading standards.

The court now considers whether the plaintiffs have sufficiently attributed any misrepresentation of fact to any particular 1934 Act Individual Defendant in light of the *Southland* decision. The court will address Fleming's statements concerning its earnings, followed by the same store sales reporting, and conclude with a discussion of the defendants' arguments concerning puffery, materiality and forward-looking statements. At the outset, the court agrees with the plaintiffs that Fleming's need to restate its earnings makes the plaintiffs' burden to demonstrate the falsity of particular earnings statements easier to discharge. The company made a public announcement that its earnings needed to be restated and that the restatement of its earnings for 2001 and 2002 would approximate $ 85 million, or 79% of Fleming's reported earnings [*74] for the time period at issue. At this point, the court is not addressing the scienter requirement; rather, the court is addressing whether the plaintiffs have sufficiently pleaded with particularity the falsity of the statements that any individual defendant made about Fleming's 2001 and 2002 earnings. The magnitude alone of the forecasted restatement is a testament to its materiality. And, although the court is not at this point address-

ing scienter, the size of the restatement shall figure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter.

The earnings statements made in the May 29, 2001, August 24, 2001, and November 15, 2001 Form 10Qs filed with the SEC are pleaded with sufficient particularity as against defendant Neal Rider, who signed the Form 10Qs for 2001 Q1 and Q2. They are also sufficient as against defendant Mark Shapiro, who signed the Form 10Q for Q3 of 2001. The plaintiffs have not alleged how any person other than Rider or Shapiro contributed to any specific portions of the Form 10Qs. Therefore, the claims based on the Form 10Qs are limited to defendant Rider and Shapiro, as they signed the forms.

As to the [*75] March 6, 2002 Form 10K filed with the SEC reporting year end financial information, the statements of earnings contained therein are pleaded with sufficient particularity as to defendants Hansen, Rider and Shapiro. (TAC, PP 204, 210, 217, 229). The company's earnings as reported in the Registration Statement filed in anticipation of the March 2002 Note Offering, which incorporated the Form 10K from 2001 is also pleaded with particularity as to defendants Hansen, Rider and Shapiro.

With respect to the 2001 earnings reports set forth above, the plaintiffs have adequately alleged why the statements are false. The plaintiffs have alleged that Fleming itself has announced that its 2001 earnings information is false, and materially so. In the court's opinion, the announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false. There is no reasonable argument that could be made that the proposed restatement, even though it has not yet occurred, is anything other than a material one. Consequently, as to the 2001 earnings information, the court is persuaded that the plaintiffs have sufficiently alleged the who, what, why, [*76] where, when, and how required by *Rule 9(b)* as against the defendants included above.

The court now turns to the 2002 earnings information. First, the plaintiff has pleaded with sufficient particularity the statements contained in Fleming's Form 10Q filed with the SEC on May 17, 2002 (TAC, P 245) and signed by defendant Shapiro. Second, defendant Rider's statements made in the conference call following the release of the 1Q 2002 results that "our EBITDA, for continuing operations was $ 32.6 million for 4.87 percent of sales" is also sufficiently pleaded with particularity. (TAC, P 244). Third, the earnings reported in the June 2002 Registration Statement which, in turn, incorporated the company's financial results included in the 2001 10K filed with the SEC and signed by defendants Hanson, Rider and Shapiro is sufficiently pleaded with particular-

Case 1:05-md-01695-CM-GAY    Document 68-2    Filed 12/22/2005    Page 19 of 32

Page 18
2004 U.S. Dist. LEXIS 26488, *

ity. Fourth, the earnings reported in the August 27, 2002 Form 10Q filed with the SEC and signed by defendant Shapiro are pleaded with sufficient particularity. Fifth, with respect to reserves, defendant Rider's statements on the September 5, 2002 conference call with analysts that "everything would be appropriately reserved for, correct" and [*77] that "less than one-tenth of one percent of all the vendors we deal with, and even a smaller amount of that in terms of dollars, have a dispute that risen to the level that we are at an impasse today" are sufficiently pleaded with particularity. Sixth, the court finds that the earnings reported in the company's amended 10Qs and 10K filed with the SEC on October 16, 2002 for Q1 and Q2 of 2002 of FY 2001 and signed and/or certified by Shapiro, Hansen and Rider are pleaded with particularity. Seventh, the court holds that the representations of earnings contained in Fleming's 10Q for the third quarter of 2002 have been pleaded with particularity. That form was signed by Shapiro and certified by Hansen and Rider. Finally, the court holds that the statements made by Shapiro in the January 23, 2003 conference call are pleaded with sufficient particularity. (TAC, P 311).

As to defendant Stephen Davis, the plaintiffs do not allege that Davis personally made any particular oral false statements or signed any of the press releases or SEC forms which contained the alleged misstated earnings. n5 Consequently, the court examines whether there are any "particular factual allegations explaining [*78] an individual defendant's involvement in the formulation of either the entire document, or that specific portion of the document containing the statement." The closest that the plaintiffs come is "during that same period, Fleming's wholesale president-defendant Stephen Davis-with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants, also utilized a variety of techniques, including the accrual of unauthorized, improper and unsustainable deductions from accounts payable due to vendors, to inflate earnings in violation of accepted accounting practices." (TAC, P 14). But the plaintiffs' allegation that Davis performed accounting "manipulations" or violated accounting standards or that he did so with the knowledge and/or reckless disregard of the true facts *by the other* 1934 Act Individual Defendants falls far short of alleging specific facts that Davis prepared any portion of a Fleming report or that, even if he did, that he did so with the knowledge or reckless disregard for the truth that the federal securities laws require to maintain a fraud claim. As such, the court dismisses the primary liability claims asserted against defendant [*79] Stephen Davis under *section 10.* The TAC is also silent as to specific allegations that Davis possessed the power or authority to control the operations of the company in general or had specific control over the activity upon which the primary violation is predicated. *McNamara v. Bre-X Minerals, Ltd.,*

*46 F. Supp. 2d 628, 638 (E.D. Tex. 1999).* The court therefore dismisses the controlling person claims against him as well.

> n5 The TAC alleges that ". . . Hansen, Rider, Shapiro, Dahlen, and Davis made public statements claiming that Fleming's retail segment was growing." (TAC, P 456). The plaintiffs, however, point to no particular statement made by Davis, making it impossible to gauge whether the remaining requirements of the PSLRA have been satisfied. This allegation is, therefore, equivalent to no allegation at all.

The court now turns to a discussion of the statements claimed to be corporate puffing, nonmaterial, or forward-looking. The statements primarily under attack by the 1934 Act Defendants [*80]  include: (1) statements regarding a "culture of thrift" or cost savings in light of the existence of the Fleming Air Force (2) statements regarding Fleming's overvalued retail stores (3) statements regarding Fleming not having a liquidity problem (4) Fleming's artificially inflated earnings in the October 23, 2002 press release and (5) Fleming's artificially inflated earnings in the January 23, 2003 press release. Because the motion to dismiss could be read, however, to challenge a broader range of statements (Joint Motion to Dismiss, p. 18 "moreover, many of the alleged statements are either not material, or they are not false and misleading."), the court has endeavored to examine all of the alleged statements to assess their materiality and falsity.

The "culture of thrift" statement is not actionable. The plaintiffs argue that a statement that Fleming instituted "a culture of thrift" was misleading in light of their use of jets to fly home on the weekends and that one of the Sources knew that the executives had not instituted this culture. This statement is simply too general to constitute a material misstatement as required under *Rule 10b-5.* [*81]  It is more in the nature of a corporate statement concerning a competitive strength of the company. As the defendants correctly observe, the courts have consistently held that analysts and investors rely on *facts* in making investment decisions, not vague expressions of corporate optimism or competitive strengths. *Rosenzweig v. Azurix Corp., 332 F.3d 854, 869-70 (5th Cir. 2003).* "The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Id. at 869.* The TAC does not contain any allegations as to why the statement is rendered

false by the allegations concerning the Fleming Air Force. Therefore, the statement is not actionable.

The next statement involves a January 14, 2003, press release where Fleming announced that it was marking down the "realizable value" of its retail stores by $ 116 million. The press release stated that "the company will record a non-cash charge of approximately $ 116 million to discontinued operations in the fourth quarter, to adjust the carrying value of the retail assets to their estimated net realizable value. [*82] " The plaintiffs contend that this is a material misstatement in that this write-down did not result in the assets being adjusted "to their estimated net realizable value." The plaintiffs point to a subsequent press release from April 17, 2003, in which the Company announced "an additional impairment charge to discontinued operations of approximately $ 90 million related to retail store operations held for sale, due to a reduction in the net realizable value of such operations." Further, plaintiffs allege that the 1934 Act Individual Defendants, specifically Hansen, Rider, and Dahlen, received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and the lack of success of the retail stores. In the second half of 2002, Source 4 prepared a report charting the trends in sales for newly-opened price-impact stores showing that the sales for a typical Fleming store declined consistently after opening, and never increased. The plaintiffs conclude that these allegations show that the net realizable value after the January 2003 write down was a material misrepresentation that the 1934 Act Defendants knew was false.

These allegations are not sufficient to [*83] make the statement actionable. The allegations do not provide enough information to show that the defendants knew even within a reasonable estimate the actual amount of the net realizable value. Measuring the net realizable value of a group of assets is not an exact science. The April, 2003, write-down easily could have been the result of the defendants being too optimistic in January of 2003 about how much a willing purchaser would pay for the assets or the result of subsequent events in the economy or operations. More to the point, the allegations revolve around the knowledge of the defendants in 2002, but does not address the knowledge of the defendants at the time of the first write-down. As such, the court holds that this statement is not actionable.

The third statement that the 1934 Act Defendants specifically contend is not adequately pleaded is a statement in a January 23, 2003 conference call in which an unidentified officer of the company stated in response to a question suggesting that the Company was having liquidity problems that "no [we are not dipping lower and lower versus the loan covenants,] . . . three of the four covenants, we are consistently-have ample room [*84]

underneath those covenants. The one covenant that we keep bumping up against, at least over the past few quarters, is debt-to-EBITDA." The question posed specifically addressed the loan covenants and Fleming's ability to meet the loan covenants. The plaintiffs do not provide any specific allegations, other than the Company's eventual bankruptcy on April 1, 2003, to show that the defendant knew the statement was false when it was made and that the Company did not have ample room underneath the three covenants. Therefore, the plaintiffs' allegations are not sufficient to make the statement actionable. n6

n6 As noted above, the court has carefully examined the totality of the allegations in the TAC to assess whether the claimed statements are actionable misrepresentations. The court will detail some of these statements below, but the parties should assume that if the court has not specifically held a statement to be (a) a material misrepresentation that is (b) pleaded with sufficient particularity, then the court has concluded that the statement is not actionable under *Rule 10b-5*.

The following statements are either too vague to be actionable or are forward-looking statements protected by the safe-harbor provision of the PSLRA: the statement attributed to defendant Hansen in the October 24, 2001 press release that "our price impact formats, with their high volumes and low operating costs, are a great fit with our distribution strategy" (TAC, P 215); the statements in the November 5, 2001 DSN Retailing Today article attributed to Hansen that the value retailing market represents an opportunity for expansion with "significant growth potential," and that the "formats have received overwhelming customer response" (TAC, PP 219-20); the statements in the Form 10K attributed to the signatories of the 10K that "our price impact supermarkets offer name-brand food and consumable goods at significantly lower prices than conventional format retail store operators because of the many low-cost features of our stores" and "we expect to be able to grow our price impact supermarket operations while incurring lower capital expenditures" (TAC, P 229); the statements attributed to defendant Dahlen in the April 16, 2002 press release concerning Fleming's "excitement" about the acquisition of seven new retail stores in the Dallas market (TAC, P 236-37); the statements in the May 7, 2002 press release attributed to defendant Hansen concerning Fleming's "outstanding start to 2002" and the com-

pany's "keenly focused" strategies (TAC P 239); the statements attributed to Hansen in the conference call following the release of the first quarter 2002 results that "we are very pleased about that and feel good about the customer acceptance" and that he was "almost giddy [about] the progress we are making in this area" (TAC, P 244); the statements quoted from the June 2002 Registration Statement concerning the successful price impact retail format (TAC, P 250); the company's ability to secure favorable terms and volume discounts on its purchases (TAC, PP 254-56); and the statement attributed to Rider in the second conference call concerning "closing of the gap" (TAC, P 266). Although these statements may have evidentiary significance in the trial of this case, they are not actionable misrepresentations in the context of a *Rule 10b-5* claim.

[*85]

The next two statements concern the allegations that the defendants overstated Fleming's wholesale earnings in an October 23, 2002 press release and January 23, 2003 press release. (TAC, P 312-313). The defendants contend that the allegations are conclusory and refer to the entire press release quoted in its entirety in a previous paragraph. The defendants are correct, in that plaintiffs cannot simply recite portions of publicly disclosed documents and summarily allege that they are false and misleading. *BMC Software, 183 F. Supp. 2d at 886*. With respect to the October 23, 2002 press release, the plaintiffs do not allege who the earnings information is attributed to; therefore, they have not satisfied *Southland*. As to the January 2003, press release, the allegations specifically attribute the statements only to defendant Shapiro; accordingly the court holds that the statements are only pleaded with sufficient particularity as to that defendant.

The plaintiffs' allegations, moreover, specifically state that "in the October 23, 2002, press release and in the conference call, the 1934 Act defendants overstated Fleming's wholesale earnings" and "in the . . . January 23, 2003 press [*86] release[] . . ., the 1934 Act Individual defendants again knowingly or recklessly overstated Fleming's earnings by failing to account for the manipulations described in this Complaint." The bullet items listed below the allegations are the links to the previous allegations supporting why the statements as to earnings were false. Looking at the totality of the TAC and its allegations concerning the ongoing use of various manipulations and overstatement of earnings throughout the Class Period up until the announced restatements in April of 2003, the court finds the allegations sufficient. Therefore, the court finds that the plaintiffs' allegations

are sufficient to plead with particularity the material misstatements and why they are false and misleading with respect to the January 2003 press release.

#### 4. Failure to Adequately Plead Scienter

The 1934 Act Individual Defendants and D&T also contend that plaintiffs failed to adequately plead allegations giving rise to a strong inference of scienter as to each defendant. The plaintiffs respond by stating that they have adequately pleaded scienter against each of the 1934 Act Individual Defendants by alleging not only motive and [*87] opportunity, the close involvement of the individual defendants with the operations of Fleming, the violation of GAAP, and the magnitude of the fraud; but also the plaintiffs allege direct evidence of scienter by pointing to individual defendants and alleging that they directed manipulations resulting in misrepresentations on numerous occasions and knew about discrepancies in financial information and either made misstatements or omissions about the information or failed to correct previous misrepresentations or omissions.

The plaintiffs contend that they have adequately pleaded scienter against D&T by alleging red flags, numerous violations of the accounting and auditing standards, GAAP and GAAS, the simplicity of the accounting principles violated, the relative ease with which the fraud could have been detected, the magnitude of the restatement, and motive and opportunity. With the above standards as to pleading allegations of a strong inference of scienter in mind, the court now turns to the allegations as to each defendant.

Mark Hansen was Chief Executive Officer of Fleming from November 1998 until March 3, 2003. Hansen contends that the allegations of scienter against him are [*88] insufficient. Hansen contends that Fleming's deduction practices have not been shown with particularity to be fraudulent and thus the allegations are not sufficient to show scienter. Also, Hansen contends that the TAC does not state with particularity that he had the information or knew of the information with regard to allegedly fraudulent deductions and accounting practices, only that he must have known about them. In addition, Hansen contends that the TAC does not specifically state what was in the reports and comparisons available to him. Finally, Hansen states that the TAC includes impermissible general allegations against the defendants as a whole that is foreclosed due to the fact that the group pleading doctrine is no longer followed after the enactment of the PSLRA.

The plaintiffs urge that Hansen himself publicly touted Fleming's strategic plan, portrayed himself as knowledgeable concerning Fleming's earnings, sales, and operations, and represented to the market that earnings and sales were growing. The plaintiffs further contend

that the deduction practices were fraudulent in that they went beyond industry practices, were done without vendor permission, and were improper [*89] and baseless. Specifically, the plaintiffs point to statements by Source 1 that deductions were taken and accrued to increase earnings before Fleming had even identified the vendor, the product, and the basis for the deduction. The plaintiffs argue that these allegations give rise to a strong inference that the deductions were not a legitimate cost reduction, but were instead accounting manipulations.

Additionally, plaintiffs point out that Source 1 personally participated in the delivery of reports showing revenue, cost, and margins in both the wholesale and retail segments to Hansen that showed the true financial picture for Fleming. The plaintiffs contend that the Sources give direct evidence that defendant Hansen was provided information showing that Fleming's internally-reported earnings were substantially different from Fleming's publicly-reported earnings. Also, the plaintiffs contend that Hansen's presence at Monday meetings where there were reports showing the discrepancies and discussions about the deduction practices supports a strong inference of scienter.

The plaintiffs thus attempt to allege a strong inference of scienter with regard to Hansen with numerous allegations [*90] that he knew of accounting manipulations, received reports showing the actual numbers, and made statements or signed filings containing representations that conflicted with the information that he knew about or recklessly disregarded. With regard to receiving reports of financial information and attending meetings where the manipulations and financial information were discussed the TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Hansen. According to Source 1, Hansen received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. Also, the TAC alleges that the general ledger was published during the Class Period to Hansen.

Source 4 also contributed to the allegations related to Hansen. Starting in July of 2001 and continuing through the class period, Source 4 "was responsible [*91] for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to Hansen. At the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating

to recipients of the report -- including Hansen -- that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining.

According to Sources 1 and 4, Hansen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Further, Hansen received special daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he made public statements claiming that Fleming's retail segment was growing. In July 2002 and September 2002, defendant Hansen asked Source 4 to chart the trends in sales for newly-opened price-impact stores. Using data that had been available to Hansen prior to July 2002, Source 4's chart demonstrated that [*92] the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format. In addition, Hansen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

With regard to Hansen's personal participation in the manipulations, the TAC alleges that "Hansen . . . directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $ 3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors" resulting in only $ 78,000 of the deductions being accepted. Thus, under the plaintiffs' theory and allegations, Hansen personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. [*93]

Hansen cites two Fifth Circuit cases that he contends support his motion to dismiss: *Goldstein v. MCI Worldcom* and *Abrams v. Baker Hughes Inc.* In *Goldstein*, the court held that the plaintiffs' circumstantial evidence relating to the timing of accounts receivable write-offs, the magnitude of the write-offs, the defendants' close involvement in the day-to-day operation and management of the company, and the defendants' positions in the company and alleged decision-making roles in writing off uncollectible accounts failed to sufficiently connect the defendants to support a strong inference of scienter. *340 F.3d at 248-54.* In *Abrams*, the court held that the plaintiffs' circumstantial evidence relating to the defendants' receipt of financial reports that apprised them of

the company's true financial status, the company's violations of GAAP, the defendants' desire to raise money and protect their incentive compensation, and the timing of the resignation of certain accounting department employees was insufficient to demonstrate a strong inference of scienter. [*94] *292 F.3d at 431-35.*

These decisions notwithstanding, the allegations against Hansen taken as a whole sufficiently allege a strong inference of scienter. The allegations in the TAC include not only circumstantial evidence similar to that discussed in the cases above, but also direct evidence of Hansen's knowledge of and involvement in the scheme, In addition, the weakness of the allegations as to internal reports discussed by the Fifth Circuit in the two cases discussed above is not present in this case.

In *Abrams*, the Fifth Circuit held that "an unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *292 F.3d at 432* (quoted in *Goldstein, 340 F.3d at 253-54*). The court went on to state that "such allegations must have corroborating details regarding the contents of allegedly contrary reports of their authors and recipients." *Id.* Here, the allegations are supported by Sources who worked in the Company's accounting department and not only prepared some of the reports discussed at the request of the defendants, [*95] but also delivered them to the defendants. Other allegations state that the Sources saw reports that were prepared by other accounting managers, knew the contents of the reports, and knew that the reports were forwarded to the defendants.

In *ABC Arbitrage* the Fifth Circuit held that plaintiffs could satisfy the reports "standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them." *291 F.3d at 356* (quoting *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72, 73 (2d Cir. 2001))*. Further, the court held that the allegations as to Monthly Management Reports in the case met the standard because they identified the reports as "being prepared monthly by each subsidiary's controller's office and transmitted to the defendants at the beginning of each month to convey information about the Telecom sector at each subsidiary by comparing actual results to budgeted numbers." *Id. at 357.* The allegations in this case are sufficiently similar and satisfy the standard as well.

In addition, these Sources had knowledge of the manipulations that resulted in the actual numbers in the reports being [*96] different from those reported to the public. The defendants contend that allegations where the Sources themselves were not actually involved in the events, but claim to have knowledge of the events are

insufficient. The court in *ABC Arbitrage* noted that if the documentary evidence does not provide an adequate basis for believing that the defendants' statements or omissions are false, then the plaintiffs can satisfy their pleading burden with allegations from confidential sources as long as the sources described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief. *291 F.3d at 353.* Here, the allegations as to the documentary evidence and the Sources are sufficient to give rise to a strong inference of at least severe recklessness as to Hansen.

Neal Rider was the Chief Financial Officer of Fleming from January 2000 to February 2003. Rider contends that the allegations in the TAC against him are insufficient to give rise to a strong inference of scienter because they do not show what specific information was allegedly provided to him, why that information was false and misleading, or how he [*97] knew the information was false or that he acted with severe recklessness.

The plaintiffs respond by stating that Rider had access to all of the same information and reports alleged by the Sources. In addition, Source 4 specifically states that Rider personally approved the manipulation of same-store sales data, such that the data did not even compare sales for the same stores. The TAC also alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Rider. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale segment."

Rider also allegedly received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. The TAC alleges that starting in July of 2001 and continuing through the [*98] class period, Source 4 "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the Company," and that "hard copies of these reports were given directly to . . . Defendant Rider." In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report-including Defendant Rider-that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures re-

quired by defendant Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence."

Further, the TAC alleges that Rider received reports throughout 2001 and 2002 showing the declining sales numbers for the retail stores and [*99] the lack of success of the retail stores yet, he made public statements claiming that Fleming's retail segment was growing. According to Sources 1 and 4, Rider received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. Using data that had been available to Rider prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never increased showing the ineffectiveness of the price-impact format.

Finally, the TAC specifically alleges that Rider attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC specifically alleges that Rider received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. The TAC alleges that Rider participated in meetings with the financial analyst managers, the retail CFO, [*100] and Dahlen where internal cost and margin numbers were reviewed and, therefore, Rider either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

Rider cites *In re Capstead Mortgage Corp. Sec. Litig.* to support his contention that the allegations are insufficient to support a strong inference of scienter. *258 F. Supp. 2d 533 (N.D. Tex. 2003)*. In that case the plaintiffs attempted to show knowing misconduct by alleging that senior officers and directors had access to and control over internal corporate data and other non-public information (specifically monthly reports on the company's intranet and monthly management reports) which contradicted their positive representations about the company's mortgage servicing operation. *Id. at 564-65.* The plaintiffs did not specifically identify any particular internal documents containing the alleged adverse information, the contents of such adverse or negative information, when the internal document containing the negative or adverse information was prepared, by whom it was prepared, or to whom it was directed. [*101] *Id. at 565.* The court stated that plaintiffs must allege facts which

demonstrate that at the time defendants made representations regarding projected earnings and dividends, defendants knew or were severely reckless in not knowing information that adversely impacted the earnings. *Id.* The court specifically held that allegations the defendants were aware of the adverse information were insufficient due to the fact that the plaintiffs had not cited any documentary evidence or personal sources to establish the basis for this belief. *Id.* In this case, by contrast, the plaintiffs have not only cited documentary evidence and reports with particular facts as to their contents, who prepared them, and who received them, but the plaintiffs have also cited the Sources to support the allegations as to the reports and their contents and defendants and their knowledge. The court holds that the TAC pleads specific facts to support a strong inference of at least severe recklessness as against Rider.

Mark Shapiro was Senior Vice President of Finance and Control and Chief Accounting Officer from at least 2001 to February 2003, at which time he was appointed Chief Financial [*102] Officer and served until late April 2003. Shapiro contends that the allegations are insufficient to allege a strong inference of scienter. Shapiro contends that a majority of the allegations are not specific to him but to the management in general and that when Shapiro is specifically mentioned the TAC does not provide facts from which one could conclude that Shapiro knew any particular statement to be inaccurate when made. Further, Shapiro contends that the allegations that he had reports that showed variances and discrepancies are not specific enough and that allegations concerning the Monday meetings do not state when he was there or what was discussed at them.

The plaintiffs argue that Shapiro received the reports and information showing discrepancies between internal financial information and publicly-reported numbers and the deduction practices and participated in Monday meetings where flat or declining retail sales, variances between public and internal finances, and deduction practices were discussed. Further, the plaintiffs allege that Shapiro had a central role in the intentional weakening of Fleming's accounting practices, the linchpin of the manipulation scheme, when all [*103] divisional accounting operations were centralized in Oklahoma City and managed by unqualified division reports. This, the plaintiffs contend, allowed the company to put tight reigns on the manipulations and oversee them.

In addition, plaintiffs contend that Sources 2 and 3 have knowledge of Shapiro's knowledge of and participation in a scheme to defraud vendors to obtain unearned promotional funds to inflate its earnings. The plaintiffs allege that Shapiro directly participated in inventory manipulations to inflate earnings and shift losses from continuing operations to discontinued operations.

The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Shapiro. According to Sources 1 and 4, Shapiro received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002. The TAC also alleges that Shapiro [*104] participated in meetings with the financial analyst managers, the retail CFO, and Dahlen where internal cost and margin numbers were reviewed and, therefore, Shapiro either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements. The TAC specifically alleges that Shapiro attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins.

Under the allegations of the TAC, Shapiro received regular reports showing that same-store sales were declining, and that Fleming was manipulating its same-store sales data. Also, the TAC alleges that Fleming, at the direction of Shapiro, did not recognize a $ 1 million inventory loss from continuing operations in 2001, but instead deferred the loss to 2002 and then booked it as a loss from discontinued operations. The TAC further alleges that "Source 1 saw reports [for the wholesale segment] in the executives' offices, and . . . reviewed [them] to assess the retail segment's performance in comparison with the wholesale [*105] segment." The TAC alleges that Shapiro received regular reports showing the revenue, cost, and margin numbers for the wholesale segment and was well aware of the magnitude and invalidity of massive deductions taken by Fleming. On balance, and reading the complaint as a whole, the court is persuaded that the allegations raise a strong inference of at least severe recklessness against Shapiro.

Thomas Dahlen was Executive Vice President and President, Retail and Marketing for Fleming in April 2001, and resigned effective December 31, 2002. Dahlen contends that the allegations are insufficient to support a strong inference of scienter. The court disagrees. The TAC alleges that Source 1 "received detailed weekly reports from Fleming's retail stores and product category managers'" along with other financial analysts and "compiled Fleming's actual revenue, costs, and margin'" into "weekly, monthly, and quarterly reports" and "personally delivered these reports to the top Fleming executives," including Dahlen. The TAC further alleges that "Source 1 saw [similar] reports [for the wholesale segment] in the

executives' offices, and . . . reviewed [them] to assess the retail segment's performance [*106] in comparison with the wholesale segment."

In addition, Dahlen allegedly personally directed the accrual of unauthorized, improper, and unsustainable deductions from vendors' invoices in the retail segment and participated in the manipulation of "same store" revenues, in order to create the false impression of revenue and earnings growth. Source 1 states that "Dahlen was involved in the margin manipulations and always received from Source 1 the same information that the [retail CFO] received." The TAC further alleges that "accrual of these unauthorized, improper, and unsustainable deductions was directed by Defendant Dahlen [and the retail CFO; and that the retail CFO] often accrued deductions, and then asked the financial analyst managers and product category managers to determine which of the Company's vendors, if any, would be likely to accept deductions." In the TAC Source 1 alleges that "Dahlen and [the retail CFO] manipulated earnings during the entire time that Source 1 worked at Fleming." The TAC alleges that "by June 2002, Source 1 was emailing Source 1's deduction worksheets to Defendant Dahlen [and the retail CFO] with a frequency of three to five times a week" [*107] and that "even after a deduction was rejected by a vendor and removed by Source 1 from the worksheet, the retail executives often reinstated the deduction. "

The TAC alleges that "Defendant Dahlen directed Source 1 to deduct from vendors' invoices a two case' deduction [amounting to a $ 3.5 million accrual that increased earnings], based on the concept that vendors should provide new retail stores with two free cases of product," but that they were "overwhelmingly rejected by vendors." Further, Source 1 states that the publicly reported retail margins were higher than those reflected in the internal analysis seen and discussed by the executives due to manipulations made by the retail CFO and directed by defendant Dahlen. According to Sources 1 and 4, Dahlen received comparisons between the budget plan and the earnings report for the retail stores showing the actual experienced earnings shortfalls beginning in early 2002.

The TAC alleges that "Dahlen and [the retail CFO] on numerous occasions manipulated the publicly reported same-store sales figures in order to hide adverse sales trend" by rejecting the data from the financial analysts and changing the composition of the population [*108] of stores which constituted the Company's same stores.'" Specifically, the TAC alleges that "Dahlen and [the retail CFO] often commingled better performing new stores' revenue and earnings with current-year same store' revenues, in order to inflate current-year same-store revenues and earnings and created the false impres-

sion of growth" resulting in "revenue and earnings reports [that] did not truly reflect a same store' comparison as is commonly understood in the retail industry." In addition, the TAC alleges that, according to Source 4, Rider approved manipulations of same store sales figures required by Dahlen whereby "new stores . . . were being compared with old stores located within two to five miles of the new stores, but which had been closed two or three years before the comparison" resulting in a comparison of "stores in their *first* year of existence with sales at stores in their *last* year of existence." Further, the TAC alleges that according to Source 1, in at least one instance in late 2001 or early 2002, Fleming -- at the direction of Dahlen and [the retail CFO] -- reduced the previously reported same store sales for the year 2000 fiscal year by subtracting [*109] $ 1.3 million in red tag sales while at the same time inflating the 2001 figure for same store or comparable store sales by at least $ 4.7 million in red tag sales." The TAC alleges that according to Source 4 Dahlen required that red tag and diverting sales be included in publicly reported same-store sales data. In addition, at the beginning of 2002, in his "same store sales" reports, "Source 4 began breaking out red tag and diverting sales into a separate category . . . demonstrating to recipients of the report -- including Defendant Dahlen -- that Fleming was including in its same store sales' data that were not attributable to any stores and that same store sales were declining." The TAC alleges that Source 4, from July 2001 through the end of the Class Period, "was responsible for circulating weekly, monthly, and quarterly retail same-store sales reports throughout the company" which demonstrated that same-store sales were declining, and that "electronic copies were provided to defendant Dahlen." Using data that had been available to Dahlen prior to July 2002, Source 4's chart demonstrated that the sales for a typical Fleming store declined consistently after opening, and never [*110] increased showing the ineffectiveness of the price-impact format. The TAC specifically alleges that Dahlen received weekly, monthly, and quarterly reports showing the revenue, cost, and margin numbers for the retail segment illustrating a decline in sales and earnings, as well as, received daily retail store performance reports from the financial analyst managers showing that sales and earnings were declining, yet, he either made or failed to correct misrepresentations claiming that Fleming's retail segment was growing.

Also, the TAC specifically alleges that Dahlen attended Monday meetings where finances were reviewed and deductions were discussed showing that Fleming's retail sales were flat or declining and that there was a material difference between reported margins and internally calculated margins. The TAC alleges that defendants Hansen, Rider, and Shapiro participated in meetings with the financial analyst managers, the retail CFO,

and defendant Dahlen where internal cost and margin numbers were reviewed and, therefore, Dahlen either knew or recklessly disregarded the material differences between Fleming's internal reports and public statements.

The TAC includes allegations [*111] that Dahlen made false and misleading public statements about Fleming's financial results, the health of the company, its prospects for growth, and the true nature and extent of the fraud, as well as, disclose false financial information and made public statements that were false, misleading, and in conflict with the information that the Sources had personally communicated to him. According to Source 1, Dahlen had the responsibility for approving the publicly reported and margin numbers in the retail segment despite receiving information from the financial analyst managers showing declining revenues and margins. The court finds that the allegations are sufficient to support a strong inference of scienter as to Dahlen. The allegations are specific as to the information that Dahlen possessed and his participation in the accounting manipulations.

D&T was the outside auditor for Fleming beginning in at least 1994 and throughout the Class Period. Defendant D&T contends that the plaintiffs failed to adequately allege scienter with respect to claims under *section 10(b)* of material misrepresentations involving D&T's issuance of its allegedly false and misleading 2001 audit opinion and quarterly [*112] Review Reports. D&T contends that the TAC is not sufficiently detailed and argues that the plaintiffs' alternative pleading that D&T either "knew" or "should have known" is not sufficient to show recklessness. Specifically, D&T states that the plaintiffs do not allege that the specific vendor deductions actually tested were fraudulent. Further, D&T points to the TAC's allegations that the fraud was concealed by Fleming and its employees from D&T and states that these allegations undercut the plaintiffs' scienter allegations as to D&T. Also, D&T contends that motive and opportunity alone do not suffice for an inference of scienter. Finally, D&T argues that it is not liable as an aider and a better under *Central Bank*.

The plaintiffs respond by stating that the following facts establish a strong inference of scienter: (1) numerous red flags existed that should have alerted D&T of Fleming's fraud, (2) the magnitude of the restatement was significant, (3) violations of Generally Accepted Accounting Principles ("GAAP") were repetitive and over several fiscal years, (4) the accounting principles violated were relatively simple, (5) D&T failed to obtain sufficient evidentiary support [*113] for account balances in violation of Generally Accepted Auditing Standards ("GAAS"), (6) D&T failed to follow-up on known accounting errors in violation of GAAS, (7) the fraudulent vendor deduction scheme could have been identified with relative ease, and (8) D&T had a financial motive to

engage in fraudulent or reckless conduct. The plaintiffs contend that the totality of these allegations in the TAC in light of the restatement give rise to a strong inference of scienter.

More specifically, the plaintiffs contend that the following sixteen red flags existed during the Class Period that should have alerted D&T that Fleming was artificially inflating its financial results: (1) a decline in net income for the years 1995-2000 that gave Fleming an incentive to manipulate its financial results, (2) self-imposed pressure by Fleming by setting aggressive earnings targets and unrealistic forecasts, (3) the gutting of Fleming's accounting staff and weakening of internal controls and centralization of accounting at the company's headquarters, (4) making non-accountant division presidents responsible for the financial reporting functions, (5) shortening of the monthly closing period and increased [*114] time pressure, (6) entering into large long-term contract with tight profit margins, (7) improper lengthening of the amortization period for long-term assets to reduce expense and increase income, (8) overstatement of inventory at one of the divisions by $ 1 million, (9) the remitting of payments by Fleming during the time of the 2001 audit field work to vendors who refused to accept deductions, (10) increase in the vendor deduction account to $ 120 million, (11) the elimination of the reserve against vendor deductions (12) the tying of executive bonuses to targeted earnings and the achievement of those earnings and payment of bonuses equaling 200% of the base salaries in 2001, (13) the findings of Ernst & Young of Fleming's excess price charges to its customers and demand by the auditor to be transferred away from Fleming when Fleming would not correct the overcharges, (14) the pending of lawsuits for overcharging customers, (15) Fleming's debit memos for vendor deductions did not identify the vendor invoices from which the deductions were taken, (16) the reporting by both the wholesale and retail segments of vendor deductions from the same product resulting in double accruals. [*115]

The plaintiffs state that with regard to testing, the allegations need only state that the auditor failed to test the items altogether, or inadequately tested items by selecting an insufficient sample size, or adequately tested items but turned a blind eye to errors that were discovered. The plaintiffs contend that "should have known" allegations are sufficient and that even though Fleming provided allegedly false information there was no basis or backup documentation supporting the information and that if D&T had sought backup in accordance with auditing procedures it would have learned of the falsity. The plaintiffs further contend that motive and opportunity can add weight to the scienter calculus and that D&T's consulting work and corresponding fees amounting to two

times the audit fees is sufficient motive. Finally, the plaintiffs state that D&T is not alleged to be an aider and a better, but instead is liable as a primary violator upon the false statements contained in the audit opinion and review reports. n7

n7 D&T also attacks the standing of one of the lead plaintiffs with respect to plaintiffs' *section 10(b)* claims. D&T contends that the Lead Plaintiff, Jackson Capital, does not have standing to assert *section 10(b)* claims on behalf of a putative class including purchasers of Fleming bonds because Jackson Capital pleads that it purchased only Fleming common stock. The plaintiffs respond by stating that a stockholder plaintiff may press bondholder claims so long as both arose out of the same scheme to defraud. The court finds D&T's argument unpersuasive and rejects it. At the pleading stage, Lead Plaintiff Jackson Capital has standing to assert a *section 10(b)* claim on behalf of purchasers of all securities against a defendant who makes "any untrue statement of material fact in connection with the purchase or sale of *any security*" because the various purchasers' claims arise out of the same material misstatements. *17 C.F.R. § 240.10b-5* (emphasis added). As discussed *infra* at pages 83-85, under *section 11 of the 1933 Act*, standing is limited to those purchasers who purchase securities pursuant to a specific registration statement containing a material misstatement because the claim arises out of that particular registration statement and the misrepresentations made within it. *See    In re Paracelsus Corp., 6 F. Supp. 2d 626 (S.D. Tex. 1998).*

[*116]

With regard to sufficiently alleging scienter against auditors, courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an auditor performed a reckless or fraudulent audit: 1) red flags regarding accounting matters, 2) restated financial statements, 3) an auditor's failure to obtain sufficient support for account balances, and 4) an auditor's failure to follow-up on known accounting errors. *In re Enron, 235 F. Supp. 2d at 677-79, 706-07.* The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct. *Id.* Although the existence of a restatement may not by itself satisfy the scienter requirement, a restatement can tip the scales in favor of a finding of scienter when the restatement is viewed with the totality of the circum-

stances surrounding the restatement. *In re Triton, 2001 U.S. Dist. LEXIS 5920, 2001 WL 872019, at *11.* A restatement adds significant weight to the scienter calculus due to the magnitude of a restatement, the repetitiveness of GAAP violations requiring the restatement, and the simplicity of the accounting [*117] principles that were violated. *Id.*

Likewise, mere publication of inaccurate accounting figures or failure to follow Generally Accepted Accounting Principles (GAAP), without more, does not establish scienter in a *section 10(b)* action against an accounting firm. *Abrams, 292 F.3d at 430, See also Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir. 1994)*("boilerplate averments that the accountants violated particular standards are not, without more, sufficient to support inferences of fraud"); *Umsted v. Andersen LLP, 2003 U.S. Dist. LEXIS 1250, 2003 WL 222621, at *3 (N.D. Tex. Jan. 28, 2003)*(noting that there is a judicial consensus that mere general allegations of violations of GAAP and/or GAAS are insufficient to state a claim for securities fraud. The plaintiffs must link such allegations of violations of GAAP and/or GAAS with fraudulent intent by showing that the firm deliberately misrepresented material fact or acted with reckless disregard about accuracy of its audits or reports. [*118] *Abrams, 292 F.3d at 430; Novak, 216 F.3d at 308.*

Recent cases provide insight about circumstances under which allegations of financial restatements and/or GAAP or GAAS violations, under the totality of circumstances, may constitute important factors in evaluating whether scienter has been adequately pleaded. Some of the factors recent courts have frequently addressed include: (a) the nature, size, and scope of GAAP violations; (b) the magnitude and frequency of restatements; and (c) whether the allegations of GAAP violations and/or restatements are accompanied by allegations of insider trading. Securities Litigation Update, SJ014 ALI-ABA 505, 516 (2003). In addition, in cases where the auditor is the defendant, courts look for "red flags" that should have put the auditor on notice of the company's financial improprieties. *Id.; see also, e.g., Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001).*

When the defendant is an auditor, allegations that the audit was conducted negligently and allegations that the defendant lacked adequate internal controls are also routinely found insufficient. On the other hand, courts appear [*119] willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to previously reported numbers, where the allegations are accompanied by detailed allegations of insider trading, or where there are myriad other detailed allegations of

wrongdoing. Securities Litigation Update, SJ014 ALI-ABA 505, 516 (2003).

For example, in *In re Ikon Office Solutions, Inc. Securities Litigation,* the court found the plaintiff properly pleaded scienter by alleging defendant (1) violated auditing principles and (2) had notes in its accounting file regarding an audit committee meeting which specifically referred to one employee "cooking the books." *66 F. Supp. 2d 622, 629-34 (E.D. Pa. 1999).* In *In re Health Management, Inc. Sec. Litig.,* the court denied an auditor's motion to dismiss where plaintiff pleaded violations of GAAP/GAAS coupled with red flags of suspicious inventory shipments, and an analyst's letter alerting the auditor to inflated accounts receivables. [*120] *970 F. Supp. 192, 202-03 (E.D.N.Y. 1997).* In *Carley Capital Group v. Deloitte & Touche, L.L.P.,* the court denied an auditor's motion to dismiss, finding plaintiffs adequately pleaded scienter by alleging violations of GAAS coupled with the auditor's unrestricted access to financially records, heavy involvement in management and highly suspicious revenue manipulations that would have "put prudent auditors on notice." *27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998).* The court concluded that alleged violations of accounting principles "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *Id.*

Recently, in *In re Worldcom, Inc. Sec. Litig.* the court held the pleadings of scienter sufficient as to an outside auditing firm and denied its motion to dismiss. *2003 U.S. Dist. LEXIS 10863, 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).* The court noted that the auditor had unlimited access to the company's books and records [*121] and an obligation to review and evaluate those records in order to form an opinion regarding the company's financial statements. The court discussed the obligations of an outside auditor as follows:

> Independent auditors [have unlimited access to the client's books and records and] are charged with obtaining and evaluating evidence concerning the assertions made in their client's financial statements. Auditors are not entitled to allow representations from a company's management to substitute for the auditing procedures that are necessary to provide a reasonable basis for forming an opinion regarding the financial statements that are the subject of the audit. In auditing the financial statements, an auditor may consider as evi-

dence all books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations and reconciliations. The underlying accounting data should be considered when forming an opinion as to the financial statements. Professional auditors are required to act diligently and in good faith, and to apply a professional skepticism to their evaluation of [*122] evidence. An auditor should conduct the audit objectively, thoroughly and carefully. Before certifying financial statements, an auditor should have an understanding of the factors that may have a significant effect on the financial statements.

*2003 U.S. Dist. LEXIS 10863, [WL] at *3-4.* The court further noted that the defendant's books and records contained no support for or documentation of the accounting treatment of significant merger reserves and line costs. The court noted that had the auditor reviewed the company's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. Additionally, the court pointed to the fact that the complaint identified the steps the auditor should have taken and failed to take, and the fraud it would have discovered if it had taken those steps. In that case, the defendants pointed to the subsequent indictments and guilty pleas of former company executives showing that the company's senior management had lied to and concealed the falsification of the books from the auditors as evidence that the defendants lacked scienter. The court rejected [*123] the argument noting that the auditor would have uncovered the fraud perpetrated by the company if it had conducted the review it was required to do before issuing its audit opinions and that the auditor's audit opinions included in the company's year-end financial statements materially misrepresented the company's financial state.

In this case, the court finds that the TAC in its totality sufficiently alleges scienter as to D&T. To begin with, the TAC includes allegations substantial allegations of motive and opportunity. Specifically, the TAC alleges that D&T served continuously as the company's auditor from at least 1994 through the class period. During that time D&T personnel were present at the company's headquarters frequently throughout the year and had continual access to and knowledge of Fleming's private and confidential corporate, financial, and business information giving D&T thorough knowledge of all aspects of Fleming's financial history, accounting practices, internal controls, and business operations.

Additionally, the TAC's allegations that D&T had sufficient motive through its work as the company's consultant and receipt of consulting fees amounting to twice that [*124] of its auditing fees are sufficient to support an inference of scienter as well. *Nathenson, 267 F.3d at 412* (holding that motive and opportunity to commit fraud may be facts that add to the scienter calculus); *see also In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 at 345, 2004 WL 763890, at *20-21 (S.D.N.Y. 2004)*(finding motive allegations sufficient where the auditor generated consulting fees of six times its auditing fees and noting that an auditor may take on "a vested interested in the performance and profitability" of its client, and consequently "weaken[] its ability to rely on its reputation in countering as irrational' allegations that it participated in a client's fraud")(quoting *In re MicroStrategy, Inc. Secs. Litig., 115 F. Supp. 2d 620, 655 (E.D. Va. 2000))*. Courts have been especially ready to find motive pleading adequate to survive dismissal in cases where the auditing company plays a dual rule n8 with respect to the client. *Id. at 20* (collecting cases).

> n8 In 2001 Fleming paid D&T $ 1,800,000 in consulting fees; $ 400,000 in attestation services and $ 1,000,000 in auditing fees.

[*125]

The allegations surrounding D&T's failure to uncover the lack of internal controls and accounting manipulations are also pleaded sufficiently to give rise to a strong inference of scienter. Specifically, as to the lack of internal controls, the TAC alleges that during the latter part of 2001 the company terminated the controllers, the accounts receivable and accounts payable managers, and clerks from each division and centralized its accounting operations at the company's headquarters. Further, the TAC alleges that the company terminated its divisional internal audit staff and outsourced the function to Ernst & Young. Subsequently, the lone E&Y internal auditor allegedly demanded a transfer to another client after learning of the company's widespread improprieties. The TAC alleges that these conditions -- inadequate staffing of accounting personnel, the absence of documentation supporting transactions, journal entries, and lack of any internal auditing of operations -- required D&T to expand the extent of procedures applied as required by GAAS (AU § 312). n9

2004 U.S. Dist. LEXIS 26488, *

n9 In planning an audit, an auditor must assess the audit risk by looking at the various risks at issue in each audit, such as inherent risk and control risk, to assess the extent and scope of the audit.

[*126]

With regard to the accounting manipulations, the TAC alleges that the Company accrued large amounts of unauthorized vendor deductions that D&T failed to discover during its audit and review procedures. The TAC alleges that the company violated GAAP by reducing both its accounts payable and cost of goods sold by the amount of the vendor deductions even before the vendor had received the debit memorandum and approved the deduction in contravention of FASB Statement No. 5. n10 The accrual of these vendor deductions resulted in earnings being overstated by up to $ 120 million at any one time during 2001 and 2002 amounting to more than 10% of the accounts payable during the class period and resulting in a material reduction of accounts payable that obligated D&T to audit their validity.

n10 In accounting for contingencies, contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.

The TAC alleges that, according to [*127] Source 3, D&T received copies of the debit memorandums in its audit packages, but never requested the invoices for which the debit memorandums were issued and never asked any questions, requested supporting documents, or sought verification of any documents or entry in contravention of GAAS (AU § § 326 and 330). n11 The TAC alleges that if D&T during its interim reviews starting in mid-2001 had compared the magnitude of the dollar amount of vendor deductions issued during the fiscal quarter with the magnitude of the dollar amount of vendor deductions issued during the comparable prior period's quarter and during the immediate proceeding quarter in accordance with GAAS (AU § 722) n12, then D&T would have learned of the huge dollar amount of unauthorized, improper, and unsustainable deductions.

n11 Evidential matter from independent sources outside an entity provides greater assurance of reliability than that secured solely within the entity.

The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly. In the examination of accounts payable, for example, alternative procedures [to sending written confirmation requests] may include examination of subsequent cash disbursements, correspondence from third parties, or other records to provide evidence for the completeness assertion.

[*128]

n12 During a review of interim financial information an auditor should compare interim financial information with comparable information for the immediately preceding interim period and for corresponding previous periods.

The TAC alleges that although the Company created debit memorandums supporting the deduction amounts, the debit memorandums did not include vendor invoice numbers that would allow the tracking of the deductions to the relevant invoice in an attempt to determine its validity. The TAC posits that had D&T adequately tested the debit memorandums in accordance with GAAS (AU § 150) n13 to determine their validity by inspecting vendor correspondence, examining signed vendor contracts, and inspecting the vendor statements, D&T would have learned that the claimed deductions were after-the-fact and after-delivery de facto unsubstantiated deductions disputed by the vendors. Additionally, the TAC alleges that letters from irate vendors disputing large deductions such as Agrilink Foods Inc., Kellogg Co., Unilever PLC, Oil-Dri, Solo Cup Co. were readily available for review by D&T in [*129] the vendor correspondence files. Further, the TAC alleges that the Company's reserve against doubtful deductions to accounts payable was at all times either insufficient to cover the extent of the disputed deductions or reversed to eliminate any reserve for the deductions.

n13 Standard of Field Work No. 3 requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations.

With the amount of the deductions allegedly increasing to, at one point, upwards of $ 120 million, D&T's failure to test the legitimacy of the vendor deductions and the reserve account exceed an inference of negligence. Finally, the company's announcement in April of

2003 of a restatement of earnings of $ 85 million due to accounting irregularities accounting for 79% of the company's reported earnings for the time period at issue adds to and supports the allegations of a material misrepresentation in the company's financial statements and an inference of scienter. [*130]  *In re MicroStrategy, 115 F. Supp. 2d at 652* (holding that the magnitude of the restatement and the simplicity of the GAAP principles violated in the case and the ease with which the violations could be detected suggest a deliberate ignorance on the auditor's part and support an inference of scienter). Therefore, the court finds that the totality of the allegations of scienter in the TAC sufficiently support a strong inference of scienter as to D&T. As a result, D&T's motion to dismiss the 1934 Act claims is denied.

### 5. Failure to Adequately Plead Loss Causation

The 1934 Act Defendants contend that the plaintiffs have failed to adequately plead loss causation. The defendants do not dispute that the plaintiffs have adequately pleaded transaction causation through the allegations of price inflation, but the defendants contend that the plaintiffs have failed to allege that the fraudulent conduct was in some reasonably direct way responsible for the loss caused by the decline in the price of their securities. The "loss causation" provision in the PSLRA provides that

> In any private action arising under this chapter, the plaintiff shall have the burden [*131] of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

*15 U.S.C. §  78u-4(b)(4)*. At trial, the plaintiffs will be required to show that the untruth was in some reasonably direct, or proximate, way responsible for their loss. *Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981)*. The necessary element of causation includes both "loss causation" and "transaction causation." *Coates, 26 F. Supp. 2d 910 at 922*. Transaction causation, similar to "but for" causation, is another way of describing reliance and is satisfied by allegations that the "misrepresentations or omissions induced [the plaintiff] to make the investment." *Id*. On the other hand, loss causation is satisfied by allegations that the plaintiff "would not have invested had he known the truth, and that the untruth was in some reasonably direct way responsible for the loss." *Id*.

At the motion to dismiss stage, the sole inquiry is whether the plaintiffs adequately plead loss causation,

not whether they can prove it. [*132]  *Zuckerman v. Foxmeyer Health Corp., 4 F. Supp. 2d 618, 626 (N.D. Tex. 1998)*. The PSLRA does not affect causation pleadings, thus the allegations must only meet the traditional "fair notice" standards. *Id*. To adequately plead loss causation and survive a motion to dismiss, "plaintiffs need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *Id*.

In this case, the plaintiffs' allegations outline the alleged misrepresentations and omissions leading up to the stock decline that caused the stock to be artificially inflated. Next, the allegations discuss in detail the sequence of events starting with Fleming's first press release on July 30, 2002, that caused the stock price to fall from $ 16.18 to 10.81, and the subsequent stair step decline in the price of the stock following the release of negative information from the company and articles in the financial news culminating with the SEC's upgrading [*133]  of its investigation to formal on February 25, 2003, after which the price fell from $ 2.97 to $ 1.85, and the filing of bankruptcy in April of 2003. (TAC, PP 6-12). As in *Coates*, the plaintiffs allege tremendous drops in stock price in the days after the "truth" was revealed. *26 F. Supp. 2d at 922*. The court in *Coates* noted that even if the plaintiffs may not ultimately be able to prove that the decline resulted from the announcements, the foregoing allegations are adequate to demonstrate loss causation. *Id*.

### 6. Failure to State a Claim for Controlling Person Liability

The defendants contend that the TAC does not state a claim for liability under *section 20(a) of the 1934 Exchange Act*. Specifically, defendants contend that plaintiffs have not alleged that any of the 1934 Act Individual Defendants, in their positions as officers of the Company, controlled any of the other 1934 Act Defendants such that liability under *section 20(a)* could exist for other individuals' primary violations. In addition, the defendants contend that plaintiffs have failed to adequately plead the necessary control to establish *section 20(a)* liability for the actions of [*134]  Fleming. Finally, the defendants contend that the failure to allege the existence of underlying violations of *section 10(b)* and *Rule 10b-5* by either Fleming or any of the 1934 Act Defendants negates any claim for controlling person liability.

*Section 20(a)* provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this title or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. 78t(a).* Since *section 20(a)* is a secondary liability provision, it is necessary that a primary violation be established before liability under *section 20* arises. *ABC Arbitrage, 291 F.3d at 348 n.57.* In considering whether the plaintiff has stated a claim under *section 20,* the court must determine whether the plaintiff has pled facts sufficient to establish that a defendant was in control of the primary violators. [*135] Control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *17 C.F.R. § 240.12b-2(f); see G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 957 (5th Cir. 1981).*

Under the control person doctrine, officers and directors may be found liable even if they did not make a representation themselves or play a significant role in the preparation of a misrepresentation. *In re Enron, 235 F. Supp. 2d at 594-96; G.A. Thompson & Co., 636 F.2d at 958* (holding that a plaintiff need not demonstrate "actual participation" in the underlying fraudulent transaction). However, controlling person liability requires more than merely identifying a defendant's place in the hierarchy of the company or his job title and cannot hinge solely upon a defendant's position or title. *Id. at 621; Dennis v. General Imaging Inc., 918 F.2d 496, 509-510 (5th Cir. 1990).* "[A] person should be presumed to be a controlling person . . . if they occupy a status or position that [*136] ordinarily bestows authority to control the primary violator generally, or specifically with respect to the matter or affairs that produced the Securities Act violation.'" *In re Enron, 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *18* (quoting Loftus C. Carson, II, *The Liability of Controlling Persons Under the Federal Securities Acts, 72 Notre Dame L. Rev. 263, 281-83(1997)).* In various cases the Fifth Circuit has provided the possible alternative or overlapping bases: day-to-day control of the corporation operations; knowledge of the underlying primary violation by the controlled person; or facts showing the defendant had the requisite power directly or indirectly to control or influence corporate policies. *Id.; see G.A. Thompson & Co., 636 F.2d at 958*

(holding that in determining whether a plaintiff has made a *prima facie* showing of "control," a plaintiff must plead facts indicating that the defendant "had the requisite power to directly or indirectly control or influence corporate policy"); [*137] *McNamara, 46 F. Supp. 2d at 638* (stating that although it has not been explicitly addressed by the Fifth Circuit, it does not appear that a plaintiff must establish that the defendant "actually participated in the general, day-to-day control [of the general affairs of the company]").

*Federal Rule of Civil Procedure 9(b)* and *15 U.S.C. § 78u-4(b)(2)* do not apply to control person claims. *In re Enron, 2003 U.S. Dist. LEXIS 1668, 2003 WL 230688, at *42-45.* The plaintiffs are not required to plead facts supporting every element of a prima facie case, but must only provide the defendants fair notice of the plaintiffs' claims and the grounds upon which they rest. *Id.* Controlling persons of a controlled entity are subject to liability as a controlling person even where the controlled entity is not joined as long as there are sufficient allegations of primary violations of the securities laws by the controlled person as an element of the action. *SEC v. Savoy, 190 U.S. App. D.C. 252, 587 F.2d 1149, 1170 n.47 (D.C. Cir. 1978).* At this stage, the court has concluded that the plaintiffs have pleaded sufficient [*138] facts under the PSLRA to survive the motions to dismiss as to certain primary violations alleged against the defendants Hansen, Rider, Shapiro and Dahlen. The court will, at this stage, deny the motions to dismiss on the grounds that the plaintiffs have sufficiently pleaded controlling person liability as against these named defendants. This concludes the court's discussion of the issues related to the 1934 Act claims.

*B. Analysis of the 1933 Act Issues*

The court now turns to the 1933 Act claims. These claims arise from offerings of Fleming securities to the public by means of two allegedly material false and misleading Registration Statements in March and June of 2002. The first, a March 2002, exchange offering involved the issuance of $ 400 million of 10 5/8% Series D Senior Subordinated Notes in exchange for all outstanding Series B and Series C notes. The second, a June 2002, offering involved the sale of 8 million shares of common stock at $ 19.40 per share and $ 200 million of 9 1/4% Senior Notes from a previous shelf offering that allowed for the delayed or continuous sale of up to $ 600 million of debt or common stock or some combination thereof over a two-year [*139] period. The plaintiffs allege that the FY01 financial statements used in both offerings were materially false and misleading and that Fleming acknowledged later the FY01 financial statements were false and need to be restated. In addition, the plaintiffs allege that the registration statements contained materially false and misleading statements regarding