UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____x

In re VEECO INSTRUMENTS, INC.                    05 MD 1695 (CM)
SECURITIES LITIGATION

_____x

## ORDER AND DECISION DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

McMahon, J.:

Lead Plaintiff The Steelworkers Pension Trust ("Steelworkers"), brings this securities

fraud class action on behalf of itself and all others who purchased securities in Veeco

Instruments, Inc. ("Veeco"), between November 3, 2003 and February 10, 2005 ("the Class

Period"), and allegedly were injured thereby. Plaintiffs allege that Veeco and several of its high-

ranking officers, including Edward H. Braun, John F. Rein, Jr., John P. Kiernan, and Michael

Weiss, made material misrepresentations and omissions regarding, *inter alia*, Veeco's earnings

and the profitability of its TurboDisc division, thereby causing the price of Veeco stock to

become artificially inflated, in violation of § 10(b) of the Securities Exchange Act of 1934 ("the

Exchange Act") and Rule 10b-5 promulgated thereunder, and § 20(a) of the Exchange Act.

Plaintiffs move for class certification under Federal Rule of Civil Procedure 23(a) and

(b)(3).

Defendants oppose plaintiffs' motion and cross-move to dismiss the Complaint under

Federal Rules of Civil Procedure 9(b) and 12(b)(6), for failure to plead fraud with particularity

and failure state a claim under the securities laws.

For the reasons discussed below, defendants' motion is denied and plaintiffs' motion is granted.

### Facts

The relevant facts, as alleged in the Complaint, are as follows:

Defendant Veeco designs, manufactures, markets and services a broad line of tools, equipment and systems used by leading manufacturers in the data storage, semiconductor, and wireless industries, including equipment used to make high brightness light-emitting diodes (HB-LEDs), which are used in, among other things, personal computers, wireless phones, and digital cameras. Complaint ("Cplt.") ¶ 28. In particular, Veeco manufactures epitaxial process equipment, which is used in the manufacture of data storage components. Until November 2003, Veeco manufactured and sold only one type of epitaxial equipment, the Molecular Beam Epitaxy ("MBE") system. Cplt. ¶ 29.

On November 3, 2003, Veeco acquired Emcore Corporation's TurboDisc division, which manufactures Metal Organic Chemical Vapor Deposition ("MOCVD") technology, a more advanced line of epitaxial deposition technology than Veeco's existing product. Cplt. ¶ 30. The acquisition cost Veeco $63.7 million, which represented more than 20% of Veeco's equity. Cplt. ¶ 32.

Veeco announced the acquisition on the same day, November 3, 2003– only days after Veeco announced lower than expected revenues and earnings, and weaker than expected bookings of new orders by customers, for the second straight quarter, causing the price of Veeco's stock to decline. Cplt. ¶ 31. As a result of Veeco's announcement of the TurboDisc

acquisition, in which Veeco declared that TurboDisc would yield cost-saving synergies under Veeco ownership and that the acquisition would make Veeco a "one-stop shopping" source as the only company providing both MBE and MOCVD technologies, the price of Veeco stock jumped from $25.30 to $26.39, and continued to climb to a Class Period high of $34.40 on January 20, 2004. Cplt. ¶¶ 30-32.

On February 11, 2005, Veeco announced that it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of "improper accounting transactions" at its TurboDisc division. Cplt. ¶ 2. Veeco stated that the investigation focused principally on the value of inventory, accounts payable and certain liabilities, as well as certain revenue transactions at TurboDisc. Cplt. ¶ 2. Veeco indicated that the investigation likely would lead to adjustments in Veeco's pre-tax earnings for the nine months ending on September 30, 2004, requiring the restatement of its financial statements for the first three quarters of 2004. Cplt. ¶ 2.

Following this announcement, Veeco stock fell from $18.86 at the close of trading on February 10, to $16.95 at the close of trading on February 11– a decrease of $1.90 per share or 10.07%. Cplt. ¶ 3. In the weeks following the disclosure, the price of Veeco stock continued to slide, falling to $13.97 at the close of trading on March 14, 2005. Cplt. ¶ 3.

On March 16, 2005, Veeco announced that it had completed its internal investigation and had determined that its previously issued financial statements for the first three quarters of 2004 overstated its pre-tax earnings by a total of $10.2 million. Accordingly, Veeco's quarterly reports would be amended to decrease pre-tax earnings by $2.8 million, $4.3 million and $3.1 million for the quarters ending on March 31, 2004, June 30, 2004, and September 30, 2004, respectively.

3

Cplt. ¶ 4. Veeco attributed the restatement to the actions of a "single individual at TurboDisc whose employment had been terminated." Cplt. ¶ 4.

In its Form 10-K for the year ending on December 31, 2004, which was also issued on March 16, 2004, Veeco indicated, "The most serious profitability issue Veeco faced during 2004 was at its TurboDisc business unit." Cplt. ¶ 6. Veeco's Form 10-K also stated that ". . . a deficiency existed in the internal control over financial reporting at the end of [each of the three] quarterly periods." Cplt. ¶ 92.

On April 5, 2005, Veeco issued restatements of its previously reported financial statements for each of the first three quarters of 2004. Cplt. ¶ 5.

Within days of Veeco's February 11, 2005, announcement, the first of several securities class action suits was filed against defendants. On August 22, 2005, the Judicial Panel on Multidistrict Litigation consolidated, and assigned to this court, ten securities fraud class actions pending in the Eastern and Southern Districts of New York. On October 12, 2005, this court designated Steelworkers as the lead plaintiff, and Berger & Montague, P.C., Steelworkers' counsel, as lead counsel in the consolidated action. Lead Plaintiffs filed a Consolidated Amended Class Action Complaint and moved for class certification on November 7, 2005. Defendants moved to dismiss the Amended Complaint on December 2, 2005.

## **Defendants' Motion to Dismiss**

### I.    **Standard of Review**

Dismissal of a complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is proper where "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Harris v. City of New York, 186

F.3d 243, 247 (2d Cir.1999). The test is not whether the plaintiff ultimately is likely to prevail, but whether he is entitled to offer evidence to support his claims. Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir.1998). As a general rule, "In considering a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc. 937 F.2d 767, 773 (2d Cir. 1991). The court assumes that all factual allegations in the complaint are true, and draws all reasonable inferences in the plaintiff's favor. EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir.2000).

## II.    Analysis

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraudulent activities in connection with securities transactions. Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any
> security . . . any manipulative or deceptive device or contrivance in
> contravention of such rules and regulations as the Commission
> may prescribe as necessary or appropriate in the public interest or
> for the protection of investors.

15 U.S.C. § 78j(b). Rule 10-b specifies that, under the Exchange Act, it is unlawful, among other things,

> To make any untrue statement of material fact or to omit to state a
> material fact necessary in order to make the statements made, in
> the light of the circumstances under which they were made, not
> misleading . . .

17 C.F.R. § 240.10b-5. Section 20(a) of the Exchange Act, moreover, imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" under § 10(b) or 10b-5. 15 U.S.C. § 78t(a).

Plaintiffs allege that defendants fraudulently overstated earnings during the first three quarters of 2004, in violation of § 10(b) and Rule 10b-5 and, with respect to the individual defendants, § 20(a). Specifically, plaintiffs assert that defendants made false and misleading statements and failed to disclose material information to the investment community about the following accounting improprieties and their financial impact on Veeco:

(1)    Defendants fraudulently recognized $1.26 million of revenue in the first three quarters of 2004 from a Transitional Services Agreement ("TSA") with Emcore by recording reduced-price sales to Emcore at full prices and by recording free give-aways to Emcore as revenue. Defendants then "buried" the adjustment to the overstatement in the fourth quarter of 2004, in violation of the Generally Accepted Accounting Principles ("GAAP"). Cplt. ¶¶ 45-56.

(2)    Defendants prematurely recognized revenue from a contract to sell $10 million worth of MOCVD "GaNzilla" reactors to the Sanan Group in China, even though the terms of the contract were not yet fulfilled, in violation of GAAP, the explicit terms of the Sanan Group contract, and Veeco's own revenue recognition accounting policies. Cplt. ¶¶ 57-61.

(3)    Defendants understated warranty losses resulting from Veeco's switch from purchasing parts for TurboDisc reactors from outside vendors to manufacturing them in-house. Despite an increase in parts failures, customer complaints and warranty claims, defendants failed to reflect accruals of warranty losses on Veeco's financial statements, in violation of GAAP and Veeco's own internal accounting policies. Cplt. ¶¶ 62-74.

(4)    Defendants failed to write down more than $5.6 million of stockpiled unsaleable TurboDisc reactors, which resulted from Veeco's move from manufacturing customized reactors to building generic reactors, in violation of GAAP and Veeco's own internal accounting policies. Cplt. ¶¶ 75-77.

Plaintiffs further allege that, as of result of defendants' alleged misrepresentations and omissions, Veeco's securities became artificially inflated. Upon disclosure of the alleged fraud, Veeco's stock plummeted, thereby damaging plaintiff shareholders.

Defendants move to dismiss the Consolidated Amended Class Action Complaint,

asserting that plaintiffs fail to plead fraud with particularity under Rule 9(b), and fail to sufficiently allege scienter and loss causation, as required by the Private Securities Litigation Reform Act ("PSLRA") and the law of this Circuit. Moreover, defendants claim that, to the extent they made any misrepresentations or failed to disclose any material information, such statements omissions are protected under the PSLRA's safe harbor provision, or are otherwise not actionable. The court disagrees on all accounts.

A.     Plaintiffs Plead Fraud with Particularity

Pursuant to Federal Rule of Civil Procedure 9(b), "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Securities fraud allegations under § 10(b) and Rule 10b-5 are among the claims subject to Rule 9(b)'s heightened pleading requirements. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir. 1994). To satisfy 9(b)'s particularity requirement, a complaint must (1) specify the statements that the plaintiff contends were false or misleading, (2) explain why the statements were fraudulent, (3) state where and when the statements were made, and (4) identify the speaker(s). See, e.g., Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

Likewise, under the PSLRA, in any private action in which the plaintiff alleges that the defendant made an untrue statement of material fact or omitted to state a material fact necessary to make a statement not misleading, ". . . the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading . . ." 15 U.S.C. § 78u-4(b)(1).

Having reviewed the detailed 63-page Consolidated Amended Class Action Complaint, it is evident that plaintiffs' allegations of securities fraud are pled with the requisite particularity.

Plaintiffs identify almost a dozen SEC filings, press releases, and other statements released by the defendant corporation during the Class Period, which allegedly contain misrepresentations and material omissions. Plaintiffs further specify the date each statement was made or issued and, where applicable, the speaker. These allegedly fraudulent statements include:

- November 3, 2003 press release announcing Veeco's purchase of Emcore's TurboDisc MOCVD business, which quoted defendant Braun as saying, "We believe that Emcore's MOCVD business will be accretive to Veeco on a cash basis by the second quarter of 2004." Cplt. ¶¶ 78, 79.

- November 3, 2003 conference call with analysts regarding acquisition of TurboDisc, during which Braun stated, ". . . we see synergies, further synergies of about $4m a year that are cost savings . . .," and predicted that MOCVD would have a gross margin of 46% and a target operating profit of 15%. Cplt. ¶ 80.

- March 12, 2004 issuance of Veeco's Form 10-K for the year ending December 31, 2003, which was signed by defendants Braun, Rein and Kiernan, and which stated that TurboDisc was the "recognized industry leader in MOCVD production systems." Cplt. ¶ 82.

- April 26, 2004 press release announcing Veeco's financial results for the first quarter of 2004, and reporting that revenues for the first quarter were $94.5 million, up 23% from the fourth quarter of 2003. The press release quoted Braun as stating, "Revenues increased sequentially in all markets . . ." and, with respect to TurboDisc, "The growth of this newly acquired product line has surpassed our initial expectations . . ." Cplt. ¶ 84.

- May 3, 2004 issuance of Veeco's Form 10-Q for the quarterly period ending March 31, 2004, which was signed and certified by Braun and Rein, and included statements similar to those in the April 26, 2004 press release. The Form 10-Q also sets forth the following relevant accounting policies: "For products produced according to a particular customer's specifications, revenue is recognized when the product has been tested and it has been demonstrated that it meets the customer's specifications and title passes to the customer . . . The company provides for warranty costs at the time the related revenue is recognized . . . The Company periodically assesses the adequacy of its recorded warranty liability and adjusts the amount as necessary . . . Management evaluates the need to record adjustments for impairment of inventory on a quarterly basis." Cplt. ¶¶ 87, 88.

- July 26, 2004 press release announcing Veeco's financial results for the second

quarter of 2004, which reported results above the Company's prior quarter.  Cplt. ¶ 95.

- August 3, 2004 issuance of Veeco's Form 10-Q for the quarterly period ending June 30, 2004, which was signed by Braun and Rein, and which contained financial data substantially similar to that appearing in the July 26, 2004 press release, the 2003 10-K, and the 10-Q for the first quarter of 2004.  Cplt. ¶ 97.

- September 8, 2004 statement at a Smith Barney Citigroup Technology Conference, in which Braun stated that Veeco was having "a strong revenue and earnings recovery year," and was experiencing growth in all core markets, including LEC/wireless.  Braun also insisted that TurboDisc "will end the year with about a 45% gross margin," and stated that "this year's increase was [due to] the MOCVD acquisition."  Cplt. ¶ 100.

- October 12, 2004 press release announcing disappointing preliminary third quarter financial results, including a 70% drop in customer orders for Veeco's MOCVD equipment.  The press release, which quoted Braun, blamed the poor results on "weak industry-wide capital equipment conditions," and "spending freezes initiated by many Asian customers at the end of the quarter, as they paused to absorb the significant amount of Veeco equipment purchased in the first half of 2004."  Cplt. ¶¶ 102, 103.

- October 25, 2004 press release announcing actual financial results for the third quarter of 2004, quoting Braun and reiterating the results contained in the October 12, 2004 press release.  Cplt. ¶¶ 106, 107.

- November 9, 2004 issuance of Veeco's 10-Q for the quarterly period ending September 30, 2004, which was signed by Braun and Rein, and contained substantially the same financial data that appeared in the October 25, 2004 press release, and substantially the same representations regarding TurboDisc and Veeco's key accounting policies that appeared in the 2003 Form 10-K and the 10-Q Forms for the first and second quarters of 2004.  Cplt. ¶ 110.

Moreover, plaintiffs detail why each of the above-referenced statements is allegedly fraudulent.  See, e.g., Cplt. ¶ 81, 83, 85, 86, 89, 91, 96, 98, 101, 104, 105, 108, 109.  Specifically, plaintiffs allege that defendants's statements (and subsequent failure to issue timely corrective disclosures) falsely led the investment community to believe that Veeco could vastly increase, and indeed was increasing, the profitability of TurboDisc, despite defendants' knowledge or

reckless disregard at the time the statements were made of the fact that no "synergies" were possible. Further, defendants' statements allegedly failed to disclose that Veeco drastically reduced TurboDisc's accounting department from six to eight employees under Emcore to only two employees under Veeco, materially weakening the division's internal accounting controls. Most significantly, plaintiffs allege that defendants' statements failed to disclose, and misrepresented the effect on Veeco's reported revenues and earnings of, the following alleged accounting improprieties: (1) Veeco's improper recognition of product and service revenue on transactions with Emcore; (2) Veeco's improper recognition of revenue from the sale of reactors to the Sanan Group when the terms of the contract prohibited it from doing so; (3) defendants' failure to increase warranty reserves despite sky-rocketing warranty costs caused by Veeco's in-house manufacture of defective TurboDisc parts; and (4) defendants' failure to write down stockpiles of unsaleable inventory resulting from Veeco's manufacture of generic rather than customized reactors. Finally, plaintiffs allege that defendants' October 12 and October 25 press releases were fraudulent in that they materially misrepresented the reasons for Veeco's poor third quarter results.

Plaintiffs' extensive allegations of fraud– whether or not sufficient to ultimately establish defendants' liability– undoubtedly satisfy Rule 9(b)'s and the PSLRA's heightened pleading requirements.

B.     Plaintiffs Satisfy the Requirements for Pleading on Information and Belief

In addition to requiring plaintiffs in securities fraud actions to identify allegedly misleading statements and the reasons they are misleading, the PSLRA requires that ". . . if an allegation regarding a statement or omission is made on information and belief, the complaint

10

shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

On the first page of the Consolidated Amended Class Action Complaint, plaintiffs concede that their allegations are based, in part, upon personal knowledge as to their own acts, "and information and belief as to all other matters." Cplt. at 1. As the complaint reveals, plaintiffs' belief, to a large extent, is based on information obtained from three former Veeco employees, referred to as CW1, CW2, and CW3.

Defendants contend that, because plaintiffs' do not reveal the identity of the three confidential witnesses on which they rely, they have failed to state with particularity the facts underlying their belief. In support of this argument, defendants cite to unpublished opinions from this district, and non-binding opinions from other district courts. Defendants, however, ignore the controlling law in this Circuit.

"[T]here is nothing in the caselaw of this circuit that requires plaintiff[s] to reveal confidential sources at the pleading stage." Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000). According to the Second Circuit, "[A] complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." Id. at 314. In other words, "[T]here is no requirement that [confidential sources] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." Id.; see also In re NTL, Inc. Sec. Litig., 347 F.Supp.2d 15, 24 (S.D.N.Y. 2004). The Novak court reasoned that, "Imposing a general requirement of disclosure of confidential sources serves no legitimate pleading purpose while it could deter informants from providing critical information to investigators in meritorious

11

cases or invite retaliation against them." Id.

In this case, plaintiffs describe with sufficient particularity the confidential sources on which they rely. The complaint includes the following chart identifying the positions that plaintiffs' three confidential sources held at Veeco during the Class Period:

| CW1 | a former Veeco employee who was a buyer for the TurboDisc division during the Class Period |
| CW2 | a former Veeco employee who was a manufacturing engineer for TurboDisc prior to and during the Class Period |
| CW3 | a former Veeco employee who was a high level accounting officer at Veeco during the Class Period |

Cplt. ¶ 7. Moreover, plaintiffs reveal that CW3– the source on which they primarily rely– regularly participated in teleconference meetings and one-on-one discussions with defendant Braun, and thus has first-hand knowledge of, among other things, which financial and operating materials defendant Braun reviewed. Cplt. ¶ 139. "Because it is likely that these [] employees would have been knowledgeable about [Veeco's alleged accounting improprieties and defendants' alleged fraudulent intent], the allegations are adequately sourced." In re NTL, Inc. Sec. Litig., 347 F.Supp.2d at 24.

C.    Plaintiffs Sufficiently Plead Scienter under the PSLRA

While Rule 9(b) states that "malice, intent, knowledge or other conditions of mind" may be "averred generally," the PSLRA and long-standing law in this circuit provide more stringent requirements for pleading securities fraud. Fed. R. Civ. P. 9(b). In order to state a claim under § 10(b) and Rule 10b-5, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The required state of mind is defined as "an intent to deceive, manipulate or defraud." In re Geopharma, Inc. Sec. Litig., --- F.Supp.2d ---, 2006 WL 213274, *4 (S.D.N.Y. Jan. 27, 2006) (citing Ganino v. Citizens Utils. Corp., 228 F.3d 154, 168 (2d Cir. 2000)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 307 (internal citations omitted).

(1)    *Motive and Opportunity*

A plaintiff pleads "motive and opportunity" by demonstrating "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," as well as the means and likely prospect of achieving those concrete benefits. Id. (citing Shields, 25 F.3d at 1130). A showing of the type of motive possessed by virtually all corporate insiders, such as the desire to maintain a high corporate credit rating or the desire to maintain a high stock price in order to increase executive compensation, is insufficient. Rather, plaintiffs must allege that defendants benefitted in some concrete and personal way from the purported fraud, such as by keeping stock prices artificially high in order to profit from extensive insider sales. Id.

The court agrees with defendants that the complaint fails to allege adequate motive and opportunity. Plaintiffs assert that, "Defendants were motivated to lie about TurboDisc's 'synergies' with Veeco and about its operations and financial results in order to justify the huge investment they had made in buying TurboDisc from Encore." Cplt. ¶ 140. Additionally, "Defendants were . . . motivated to closely guard from the public that TurboDisc's reactors were defective and unsaleable, and that warranty expenses were skyrocketing due to the fact that

13

Veeco-manufactured products were unreliable and defective, in order to protect the reputation of the TurboDisc MOCVD, and to avoid losing future customers." Cplt. ¶ 141.

According to the Second Circuit, however, "The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not 'entail concrete benefits.'" Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996). The motives identified by plaintiffs are neither personal nor specific, but could be imputed to any publicly-owned corporation or its high-ranking officials. They are, therefore, insufficient to establish scienter. Were the rule otherwise, "[V]irtually every company in the United States that experienced a downturn in stock price could be forced to defend securities fraud actions." Id. (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)).

(2)    *Conscious Misbehavior or Recklessness*

The Second Circuit has defined recklessness as conduct which is "highly unreasonable," and which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak, 216 F.3d at 308 (quoting Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978)). Furthermore, "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." Id. (quoting Chill, 101 F.3d at 269).

The court rejects defendants' argument that plaintiffs fail to plead recklessness with sufficient particularity. "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a

14

strong inference of fraudulent intent.'" <u>In re Geopharma, Inc. Sec. Litig.</u>, 2006 WL 213274 at

*4. "Thus, to survive dismissal, plaintiffs must minimally allege that the defendants' conduct

falls within the definition for recklessness." <u>In re Winstar Commc'ns v. Rouhana</u>, 2006 WL

473885, *6 (S.D.N.Y. Feb. 27, 2006). Taking plaintiffs' allegations as true– as the court must do

on a motion to dismiss– the court concludes that plaintiffs satisfy the scienter requirement by

identifying specific facts constituting strong circumstantial evidence of defendants' recklessness,

and possibly even conscious misbehavior.

 First, plaintiffs allege that defendants had knowledge of or recklessly ignored a series of

accounting improprieties, each of which violated GAAP and Veeco's own internal policies.

Specifically, plaintiffs assert that: (1) Defendants had knowledge of or recklessly ignored

Veeco's premature recognition of $10 million in revenues from the Sanan Group during the first

three quarters of 2004. Cplt. ¶ 59. Pursuant to GAAP, Veeco's own accounting policies, and the

terms of the Sanan Group contract– which was included in a binder that was forwarded to

defendants Rein and Braun– revenue was not to be recognized until the MOCVD reactor was

delivered to China and installed on-site, and Veeco obtained a written customer acceptance of the

MOCVD equipment. Cplt. ¶¶ 58, 60, 88. Nevertheless, according to CW3, defendants paid

Veeco employees working in China increased incentive bonuses in order to obtain fictitious

customer sign-offs stating that the reactors had passed an on-site advanced materials

demonstration and had been accepted in writing by the customer. Cplt. ¶ 59. (2) Defendants had

knowledge of or recklessly ignored the dramatic increase in TurboDisc's warranty costs under

Veeco ownership. As alleged in the complaint, defendant Rein and Veeco's other senior

management openly discussed at TurboDisc's February 2004 Semi-Annual Division Reviews the

15

poor quality of Veeco's "home-made" products and the resulting increase in warranty claims. Cplt. ¶ 133. Nevertheless, in violation of GAAP, defendants Braun and Rein allegedly refused to permit Veeco's financial statements to reflect charges to income required to fairly reflect accruals for warranty losses. Cplt. ¶ 71. In fact, according to CW3, upon his preparation of a $250,000 journal entry to increase the accrual for warranty costs, defendant Kiernan, at the direction of Rein, instructed CW3 to reverse the accrual. Cplt. ¶ 133. (3) Defendants had knowledge of or recklessly ignored Veeco's accumulation of stockpiles of nonsaleable inventory. According to CW3, defendants Braun, Rein, and Kiernan knew of the inventory build-up throughout 2004, as the issue was discussed at semi-annual division reviews, twice-monthly conference calls and in quarterly binders prepared for management. Cplt. ¶ 77. However, defendants failed to write down more than $5 million in nonsaleable inventory in violation of GAAP and Veeco's internal inventory accounting policy. Cplt. ¶¶ 76, 88. (4) Defendants had knowledge of or recklessly ignored Veeco's improper recognition of revenues in connection with the TSA, resulting in a $1.26 million overstatement of income. Despite the fact that GAAP mandated disclosure of the overstatement as of September 30, 2004, CW3 asserts that he was specifically instructed by defendant Kiernan, at the direction of Rein, to "book the adjustments in October," so as to push them into the fourth quarter and "bury" them with other adjustments. Cplt. ¶¶ 55-56, 135.

As the Second Circuit has recognized, such alleged actions, which are contrary to expressed policy and prior practice, "form the basis for proof of recklessness." See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 77 (2d Cir. 2001). Moreover, courts have recognized that accounting manipulations involving premature revenue recognition, such as those alleged by plaintiffs with respect to the Sanan Group, are especially indicative of conscious misbehavior

since such violations "do not commonly occur inadvertently," but instead "suggest a conscious decision to improperly recognize revenue." In re Gilat Satellite Networks, Ltd., 2005 WL 2277476, *20 (E.D.N.Y. Sept. 19, 2005) (quoting In re Baan Co. Sec. Litig., 103 F.Supp.2d 1, 21 (D.D.C. 2000). Further, plaintiffs' allegations regarding Veeco's failure to write down nonsaleable inventory, are substantially similar to those considered by the Second Circuit in Novak. In that case, the court rejected the contention– also made by defendants in the case at bar– that failure to write down worthless or unsaleable inventory constituted a matter of business judgment. Novak, 216 F.3d at 312. Rather, the court concluded, "When managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws." Id.

Second, plaintiffs allege that, despite defendants' knowledge or reckless ignorance of the above improprieties and the detrimental effect of each on Veeco's earnings, defendants repeatedly assured investors that TurboDisc was increasingly profitable and was yielding cost-saving synergies. In addition, once the realities of Veeco's financial situation came to light, defendants falsely attributed the need for a restatement to the actions of a "single individual at TurboDisc whose employment had been terminated." Cplt. ¶ 4. "When a company is forced to restate its previously issued financial statements," as is the case here, "the mere fact that the company had to make a large correction is some evidence of scienter." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004). Moreover, the Second Circuit has held that securities fraud claims typically have sufficed to state a claim based on recklessness "when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew

17

or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Novak, 216 F.3d at 308. Therefore, taking plaintiffs' allegations as true, defendants' false statements about Veeco's performance and the reason for its restatement, in the face of contrary information, constitute strong circumstantial evidence of recklessness.

Third, plaintiffs allege that defendants recklessly ignored red flags regarding Veeco's internal accounting controls. As the complaint asserts, the size of TurboDisc's accounting department was dramatically reduced after Veeco acquired the division. Cplt. ¶ 136. This cutback allegedly weakened TurboDisc's internal accounting controls and created and fostered an environment that permitted defendants to conceal accounting improprieties and false financial reporting. Cplt. ¶ 91. Because, as this court has recognized, a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter, see, e.g., In re Oxford Health Plans, Inc. Sec. Litig., 51 F.Supp.2d 290, 294 (S.D.N.Y. 1999), defendants' reduction by 75% of the internal accounting staff of its newly acquired division, allegedly resulting in a loosening of accounting control, constitutes strong circumstantial evidence of recklessness (if not conscious misbehavior). See Novak, 216 F.3d at 208.

Finally, the court rejects defendants' contention that plaintiffs fail to plead recklessness with respect to the individual defendants. As discussed above, CW3 maintains that defendants Braun, Rein, and Kiernan had actual knowledge of Veeco's alleged accounting improprieties. Even if they did not have actual knowledge, however, plaintiffs sufficiently plead scienter under the "group pleading" doctrine. Defendants' argument that this doctrine is no longer good law in light of the PSLRA has been considered and rejected by this court. In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 142 (S.D.N.Y. 1999); see also In re Livent, Inc. Sec. Litig., 78

18

F.Supp.2d 194, 219 (S.D.N.Y. 1999). Indeed, plaintiffs are permitted to "rely on a presumption

that statements . . . in annual reports, press releases, or other group-published information, are the

collective work of the those individuals with direct involvement in the everyday business of the

company." Id. (citations omitted). Accordingly, "Knowledge of the falsity of a company's

financial statements can be imputed to key officers who should have known of facts relating to

the core operations of their company that would have led them to the realization that the

company's financial statements were false when issued." In re Atlas Air Worldwide Holdings,

Inc. Sec. Litig., 324 F.Supp.2d at 490. Moreover, "Where [] accounting irregularities relate to

accounting practices that are sufficiently critical to the core operations of the company,

knowledge of the accounting improprieties may be imputed to the company's officers and

directors who are involved in the day-to-day operations of the company. Id. at 497. Thus,

plaintiffs' allegations of scienter are properly imputed to defendants Braun, Rein, Kiernan, and

Weiss.

       D.     Plaintiffs Adequately Allege Loss Causation

     Under the PSLRA, ". . . the plaintiff shall have the burden of proving that the act or

omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff

seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "It is settled that causation under federal

securities law is two-pronged: a plaintiff must allege both transaction causation, i.e., that *but for*

the fraudulent statement or omission, the plaintiff would not have entered into the transaction;

and loss causation, e.g., that the subject of the fraudulent statement or omission was the cause of

the actual loss suffered." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87,

95 (2d Cir. 2001); see also Spencer Trask Software & Info. Serv. LLC v. RPOST Int'l Ltd., 383

19

F.Supp.2d 428, 455 (S.D.N.Y. 2003).

In this case, the first prong, transaction causation, is presumed. Pursuant to the "fraud on the market" doctrine, there is a rebuttable presumption that investors rely on the integrity of the price of the stock set by the market. In re Harcourt Brace Jovanovich, Inc. Sec. Litig., 838 F.Supp. 109, 112 (S.D.N.Y. 1993). As the Supreme Court explained:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements . . . The causal connection between the defendant's fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

Id. (citing Basic, Inc. v. Levinson, 485 U.S. 224 (1988)). Likewise, transaction causation is presumed where a plaintiff's claims are based on a defendant's failure to disclose material information. See Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 187 (2d Cir. 2001). "Because, in such situations, the plaintiff is unaware of the omitted information, the record generally fails to provide a basis from which a finder of fact may evaluate how the plaintiff would have reacted if he or she had been aware of the withheld information." Litton Ind., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 967 F.2d 742, 748 (2d Cir. 1992). Therefore, plaintiffs enjoy a rebuttable presumption that they would not have purchased Veeco securities but for defendants' false statements and material omissions.

In order to sufficiently plead loss causation, plaintiffs must demonstrate a "causal link between the alleged misconduct and the economic harm ultimately suffered by plaintiff." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d at 161, 172 (2d Cir. 2005) (citing Emergent Capital Inv.

20

Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003)).  Such a causal

connection exists when the alleged misstatement or omission concealed something from the

market that, when disclosed, negatively affected the value of the security.  Id. at 173.  This

requires a "showing that plaintiff suffered an economic loss fairly attributable to the public airing

of the alleged fraud."  In re Winstar Commc'ns, 2006 WL 473885 at *13 (citations omitted).  A

plaintiff fails to establish loss causation if an intervening cause supercedes the effects of the

material misrepresentation or omission.  In re QLT Inc. Sec. Litig., 312 F.Supp.2d 526, 536

(S.D.N.Y. 2004).

      Plaintiffs allege that defendants' fraudulent statements and omissions regarding Veeco's

earnings and TurboDisc's profitability caused Veeco securities to trade at artificially inflated

prices during the Class Period.  "The artificial inflation continued until the time Veeco

announced improper accounting transactions at its TurboDisc division leading to the restatement

of financial statements for the first three quarters of 2004, and these statements were

communicated to, and/or digested by, the securities markets."  Cplt. ¶ 145.  According to

plaintiffs, Veeco's February 11, 2005 press release and subsequent statements disclosing

defendants' misrepresentations and material omissions directly caused the price of Veeco stock

to plummet, thereby injuring plaintiff shareholders.  Because plaintiffs expressly link the subject

of defendants' fraud (and the subsequent corrective disclosure thereof) to their financial loss, and

because neither party alleges any intervening cause, plaintiffs sufficiently plead loss causation.

Cf. Lentell, 396 F.3d at 175.

      Moreover, defendants' reliance on Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627

(2005), is misplaced.  In Dura, the Supreme Court held that a plaintiff cannot establish loss

causation solely by alleging that a security's price was inflated as a result of a fraudulent misrepresentation. Rather, a complaint must allege that the share price fell significantly after the truth became known. McCabe v. Ernst & Young, LLP, 2006 WL 42371, *7 (D.N.J. Jan. 6, 2006); see also Brumbaugh v. Wave Sys. Corp., 2006 WL 52752, *10 (D. Mass. Jan. 11, 2006). In this case, plaintiffs allege that they were harmed when Veeco's stock plummeted as a result of defendants' disclosure of prior misrepresentations and material omissions relating to the company's performance and earnings. The complaint thus "contains the very allegations regarding share price decrease and public exposure to the truth the Supreme Court found lacking in the Dura complaint." In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1025 (S.D.Cal. 2005).

E.    The Majority of Defendants' Statements and Omissions are Not Protected By the
       Bespeaks Caution Doctrine or the PSLRA's Safe Harbor Provision

Defendants contend that, even if plaintiffs sufficiently plead fraud, scienter, and loss causation– which the court concludes they do– the complaint fails to state a claim because their allegedly fraudulent statements and omissions are not actionable. Specifically, defendants argue that any statements they made about Veeco's (or TurboDisc's) performance were routine expressions of corporate optimism, or were otherwise immaterial as a matter of law.

A statement is material under the securities laws if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." In re American Bank Notes Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424, 442 (S.D.N.Y. 2000) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988)). "Financial reports stating profits and losses of a company are, of course, of great interest to investors, and are ordinarily material to the

22

decision of a shareholder to buy or sell a share." Id. at 442-43. Moreover, pursuant to GAAP, previously issued financial statements should be restated only to correct *material* accounting errors that existed at the time the statements were originally issued. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Supp.2d at 486.

Because defendants' challenged statements and omissions directly relate to Veeco's profits and losses, including "those key variable and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of Veeco's business and financial position," they were likely material in plaintiffs' investment decisions. Cplt. ¶ 128. In addition, the fact that defendants restated their financial information for the first three quarters of 2004 reinforces the conclusion that defendants had made, and were correcting, *material* misrepresentations.

Nonetheless, defendants posit that, under both the "bespeaks caution" doctrine and the PSLRA's safe harbor provision, their forward-looking statements of optimism about TurboDisc were not material– and therefore not actionable– as a matter of law.

Pursuant to the judicially-created "bespeaks caution" doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered immaterial as a matter of law. "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendant's representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor . . ." Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002) (internal citations omitted). This rule applies only where the cautionary language is reasonably specific– as opposed to generic or boilerplate– so as to constitute a real warning to investors. See

id. at 359.

The PSLRA's "safe harbor" provision similarly protects forward-looking statements. Under its two-pronged analysis, statements are non-actionable where (1) they are identified as forward-looking and are accompanied by meaningful cautionary statements or are immaterial; or (2) plaintiffs fail to prove that they were made with actual knowledge that the statements were false or misleading.  See 15 U.S.C. § 78u-5(c).  The Reform Act defines a "forward-looking statement," in relevant part, as follows:

> (A)    a statement containing a projection of revenues, income [], earnings [] per share, capital expenditures, dividends, capital structure, or other financial items;
> (B)    a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C)    a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by management or in the results of operations included pursuant to the rules and regulations of the Commission
> (D)    any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C). . .

15 U.S.C. § 78u-5(i)(1).  The safe harbor provision, however, does not provide protection for forward-looking statements contained in a financial statement prepared in accordance with GAAP.  15 U.S.C. § 78u-5(b)(2)(a).

The court concludes defendants' November 3, 2003 statements regarding the TurboDisc acquisition, and Veeco's 2003 Form 10-K (issued on March 12, 2004), were accompanied by meaningful cautionary statements, such that they are protected by the bespeaks caution doctrine and the first prong of the PSLRA's safe harbor provision.  In defendants' November 3, 2003 press release, defendants state, "We believe that Emcore's MOCVD business will be accretive to

Veeco on a cash basis by the second quarter of 2004." Cplt. ¶ 79. This forward-looking

statement was accompanied by a warning that there are "risks associated with integrating

acquired businesses and the acceptance of new products by individual customers and by the

marketplace." Id. Similarly, during defendants' November 3, 2003 conference call, Veeco's

Vice President of Investor Relations acknowledged that Veeco's statements regarding TurboDisc

". . . are forward-looking and are subject to a number of risks and uncertainties that could cause

actual results to differ materially from the statements made." Def. Ex. B at 1. Likewise, Veeco's

Form 10-K for 2003 indicated that, "Acquisitions involve numerous risks, many of which are

unpredictable and beyond our control, including . . . lack of synergy or inability to realize

expected synergies . . . Our inability to effectively manage these risks could materially and

adversely affect our business, financial condition and operating results." Def. Ex. 3 at 33-34.

These warnings could be read as generic acknowledgments that all investments come with some

risk. However, because these statements were made on the day the acquisition occurred and in

the months immediately thereafter, they could not conceivably have contained more specific

warnings. Thus, "defendants' [November 3 and March 12] prospective representations,

'considered together and in context,' could not have 'mislead a reasonable investor regarding the

nature of the securities' at issue." In re Salomon Analyst Winstar Litig., 2006 WL 510526, *11

(S.D.N.Y. Feb. 28, 2006); see also Rombach v. Chang, 355 F.3d 164, 175-76 (2d Cir. 2004).

The remainder of defendants' allegedly fraudulent statements or omissions, however, are

not protected by either the bespeaks caution doctrine or the safe harbor provision, and thus are

actionable under the securities laws. These challenged statements are not forward-looking; rather

they are either affirmative representations about the current or historical performance of Veeco

and TurboDisc, or statements that omit to disclose material information regarding Veeco's alleged accounting improprieties. See, e.g., Cplt. ¶¶ 84, 87, 95, 97. Indeed, because several of defendants' challenged statements were contained in Veeco's 10-Qs and other SEC filings, they fall outside the scope of the safe harbor provision.

Nor are defendants protected by the second prong of the safe harbor provision. As discussed above, plaintiffs have alleged sufficient facts demonstrating that defendants did not "genuinely or reasonably believe [the statements about Veeco's earnings and TurboDisc's success] at the time they were made." See In re Vivendi Universal, S.A. Sec. Litig., 381 F.Supp.2d 158, 182 (S.D.N.Y. 2003).

Finally, defendants assert that certain challenged statements relate to alleged corporate mismanagement or unwise business decisions and, thus, cannot form the basis of a securities fraud claim. See Acito, 47 F.3d at 53. This contention mischaracterizes plaintiffs' allegations. Plaintiffs do not claim that defendants' "build to stock" approach or switch to in-house manufacturing constitute fraud in and of themselves. Rather, plaintiffs maintain that defendants affirmatively misrepresented or omitted to disclose the detrimental effects these business decisions had on Veeco's earnings (a historical fact). Further, plaintiffs cite to these "business decisions" as evidence of defendants' knowledge and fraudulent intent, not as independent grounds for liability under the securities laws. "Although 'poor business judgement is not actionable' under federal securities laws, a plaintiff has alleged more than mere corporate mismanagement when"– as here– "he has adequately alleged that the defendant made false statements concerning historical facts." In re Atlas Air, 324 F.Supp.2d at 494 n.11 (citing Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).

In sum, with the exception of defendants' November 3, 2002 and March 12, 2003 statements, all of defendants' challenged statements and omissions are material and actionable.

F.    Plaintiffs Plead a *Prima Facie* Case of Controlling Person Liability

Section 20(a) of the Exchange Act expands the reach of § 10(b) and Rule 10b-5 by imposing liability on "controlling persons" for acts committed by persons they control in violation of the Exchange Act. See 15 U.S.C. § 78t(a). To establish a *prima facie* case under § 20(a), a plaintiff must demonstrate that (1) there was a primary violation by a controlled person (which can be a corporation, other legal entity, or natural person); (2) control of the primary violator by the defendant; and (3) the controlling person was in some meaningful sense a culpable participant in the primary violation. Dietrich v. Bauer, 126 F.Supp.2d 759, 764 (S.D.N.Y. 2001). Control over a primary violator may be established by showing that the controlling person possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472-3 (2d Cir. 1996) (citing 17 C.F.R. § 240.12b-2). Once plaintiffs have made a *prima facie* case, the burden shifts to the defendant to show that he acted in good faith and did not directly or indirectly induce the act constituting the violation. Id. at 1473.

As discussed above, plaintiffs have sufficiently alleged a primary violation of § 10(b) and Rule 10b-5. Plaintiffs also allege that "[the individual] Defendants were and acted as controlling persons of Veeco within the meaning of Section 20(a)," and that they shouldered at least some of the blame for defendants' fraudulent conduct. Cplt. ¶ 159. Specifically,

By virtue of their high-level positions with the Company,

27

> participation in and/or awareness of the Company's operations
> and/or intimate knowledge of the Company's actual performance,
> defendants Braun, Rein, Kiernan, and Weiss had the power to
> influence and control and did influence and control, directly or
> indirectly, the decision-making of the Company, including the
> content and dissemination of the various statements which plaintiff
> contends are false and misleading.

Id. Therefore, plaintiffs sufficiently plead a claim for controlling person liability under § 20(a).

### Plaintiffs' Motion for Class Certification

Plaintiffs move for class certification pursuant to Rule 23(a) and (b)(3), and seek

certification of a plaintiff class "consisting of all persons who purchased the securities of Veeco

Instruments, Inc. [] during the period from November 3, 2003 to February 10, 2005, inclusive

(the "Class Period"), and were damaged thereby." Cplt. ¶ 22. Plaintiffs seek to exclude from the

class each of the defendants, as well as "members of the immediate families of Edward H. Braun,

John F. Rein, Jr., John P. Kiernan, and R. Michael Weiss [], any parent, subsidiary, affiliate,

officer or director of defendant Veeco Instruments, Inc., any entity in which any excluded person

has a controlling interest and the legal representatives, heirs, successors and assigns of any

excluded person." Id. Moreover, plaintiffs seek certification of Steelworkers as the class

representative, and Berger & Montague, P.C. as class counsel.

Under to Rule 23(a), a suit may proceed as a class action only if (1) the class is so

numerous that joinder of all members is impracticable, (2) there are questions of law or fact

common to the class, (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class, and (4) the representative parties will fairly and adequately

protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to satisfying the four

prerequisites of 23(a), an action must also qualify for class certification under one of the three

28

criteria set forth in Rule 23(b). In this case, plaintiffs move for certification under 23(b)(3), which requires that "questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

The plaintiff bears the burden of establishing each element required by Rule 23. See, e.g., Fiscina v. New York City Dist. Council of Carpenters, 401 F.Supp.2d 345, 358 (S.D.N.Y. 2005). However, "The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation . . . Accordingly, in an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." In re Blech Sec. Litig. 187 F.R.D. at 102.

## I.    Rule 23(a) Prerequisites

Plaintiffs have satisfied their burden under Rule 23(a), by demonstrating that the putative class meets the Rule's numerosity and commonality requirements, and that Steelworkers and their counsel meet the Rule's typicality and adequacy of representation requirements.

### A.    Numerosity

Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). While no minimum number of plaintiffs is required for a suit to be maintained as a class action, "Generally, courts will find a class sufficiently numerous when it comprises 40 or more members." DeMarco v. Nat'l Collector's Mint, Inc., 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (quoting Petrolito v. Arrow Fin. Servs., LLC, 221 F.R.D. 303, 309 (D. Conn. 2004). Moreover, "Precise quantification of the class members is not

necessary because a court may make common sense assumptions regarding numerosity." In re
Blech Sec. Litig., 187 F.R.D. at 103 (citations omitted); see also De la Fuente v. DCI
Telecomms. Inc., 206 F.R.D. 369, 390 (S.D.N.Y. 2002) (citations omitted).

In this case, defendants concede that the numerosity requirement is satisfied. Plaintiffs
allege that approximately 30 million shares of Veeco common stock were outstanding during the
Class Period, and that the stock was actively traded on NASDAQ. Plaintiffs thus believe that
there are hundreds, or even thousands, of putative class members who are dispersed across the
country. Cplt. ¶ 23. The large size and geographical diversity of the putative class makes joinder
impracticable.

B.    Commonality

Pursuant to 23(a)(2), class certification is appropriate where "there are questions of law or
fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement has been
applied permissively in the context of securities fraud litigation. See In re Blech Sec. Litig., 187
F.R.D. at 104. "Commonality is not defeated by slight differences in class members' positions or
because 'all of the allegations do not fit together like pieces in a jigsaw puzzle.'" Id. (quoting
Green, 406 F.2d at 300). In other words, "It is not necessary that all of the questions raised by
arguments are identical; it is sufficient if a single common issue is shared by the class."
DeMarco, 229 F.R.D. at 80 (citations omitted).

Defendants do not dispute that the commonality requirement is satisfied in the present
action. The putative class shares common issues of law and fact, as each member purchased
securities in the same company, and sues under the same provisions of the Exchange Act.
Moreover, the success of each plaintiff's claim turns on establishing the existence, nature and

30

significance of the same alleged misrepresentations and omissions. See De La Fuente, 206 F.R.D. at 390.

C.    Typicality

The typicality requirement of Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Stated another way, the third prerequisite is met "if the claim of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." DeMarco, 229 F.R.D. at 80 (quoting Marisol A. v. Giuliani, 929 F.Supp. 662, 691 (S.D.N.Y. 1996), aff'd 126 F.3d 372 (2d Cir. 1997)). The purpose of this requirement is to ensure that class representatives "have the incentive to prove all elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." In re NASDAQ Market-Makers Antitrust Litig., 172 F.R.D. 119, 126 (S.D.N.Y. 1997) (citations omitted).

Defendants contend that, because Steelworkers relied on money managers to make its investment decisions, it may be subject to unique reliance defenses, thus rendering it an atypical class representative. However, "Typicality [] does not require that the situations of the named representatives and the class members be identical." Id. "There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of lack of typicality, as long as the claims arise out of the same legal or remedial theory." Id. at 127. There is no indication that plaintiffs' potential reliance defense "threatens to become the focus of the litigation." See DeMarco v. Robertson Stephens, Inc., 228 F.R.D. at 471-72.

31

Moreover, defendants' argument fails as a matter of law, as "[i]ndividual questions of reliance do not preclude class certification." De La Fuente, 206 F.R.D. at 391 (citing Korn v. Franchard Corp., 456 F.2d 1206, 1212 (2d Cir. 1972)). This court recently rejected an argument identical to defendants,' stating that a plaintiff's "relative sophistication and the particulars of his investment strategy do not suffice to render [the investor] inadequate or atypical of the class." Id. at 471. A similar argument was also "swiftly rejected" in In re WorldCom Inc., Securities Litigation, in which the court explained:

> Each of these methods of making investment decision is representative of methods used by many other investors. Each of the methods reflects an evaluation of the publicly available information about WorldCom, whether by the named plaintiff, the advisor, or a computer model. There is no suggestion that any of the named plaintiffs had access to non-public information and learned that there was a fraud afoot and decided nonetheless to invest in WorldCom. None of the different strategies that these institutional plaintiffs, each of whom is a fiduciary, used to make investment decisions on behalf of their beneficiaries suggests that these plaintiffs will be vulnerable at trial to a unique defense that will defeat the presumption that they relied on the public statements about WorldCom that are at issue here, or that will threaten to become the focus of the litigation.

In re WorldCom Inc., Sec. Litig., 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003). The WorldCom court further noted that the PSLRA was designed to "increase the likelihood that institutional investors will serve as lead plaintiffs," and that such investors "are likely to use advisors." Id. "Making careful investment decisions does not disqualify an investor from representing a class of defrauded investors or from relying on the presumption of reliance that is ordinarily available . . . in securities fraud actions."[1] Id. Defendants' reliance on pre-PSLRA and pre-Basic case law is

---

[1]Defendants would have the court consider the merits of Steelworker's potential reliance defense at this time. However, as plaintiffs correctly point out, reliance is not an issue to be

of no avail.  Because Steelworkers is typical of the class of putative plaintiffs, the third requirement of 23(a) is satisfied.

      D.    <u>Adequacy of Representation</u>

      To satisfy the final prong of 23(a), plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(b)(4). This requires a two-part inquiry: (1) whether plaintiff's interests are antagonistic to the interest of other members of the class, and (2) whether plaintiff's attorneys are qualified, experienced and able to conduct the litigation.  <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222 F.3d 52, 60 (2d Cir. 2000).

      Here, both elements of the adequacy requirement are satisfied.  First, Steelworkers' interests are directly aligned with those of the putative class members: they are purchasers of Veeco securities who suffered losses a result of those investments, and who will have to prove the same wrongdoing– defendants' making of false statements and material omissions during the Class Period– in order to establish defendants' liability.  Second, this court has already recognized that, "The firm of Berger & Montague, Steelworkers' attorneys, are well known and experienced class counsel." <u>In re Veeco Instruments Inc.</u>, 2005 WL 3288652, * 2 (S.D.N.Y. Oct. 12, 2005).  The fact that Berger & Montague was designated lead counsel in this action underscores the conclusion that they can and will fairly and adequately protect the interests of the class. <u>Id</u>.

      Nevertheless, defendants argue that Steelworker's ability to adequately represent the class

---

decided on a motion for class certification, as reliance on the integrity of the market is presumed. <u>See</u> <u>Basic Inc.</u>, 485 U.S. at 241-49.

is "suspect," because Steelworkers is willing to lend its name to virtually any securities action, Steelworker's representative is not sufficiently familiar with plaintiffs' claims, and Steelworkers is not prepared to bear any litigation costs. These attacks on Steelworkers are without basis in law or fact.

First, having expended $941,269.75 on 40,000 shares of Veeco stock during the Class Period, Steelworkers has a significant interest in the outcome of this action. Steelworkers, in addition, has played and continues to play an integral role in the prosecution of this litigation. The court has no basis on which to conclude that Steelworkers will allow the litigation to be "controlled exclusively by class counsel," as defendants suggest. In fact, Mr. Hoffman, Steelworkers' representative, has testified that, "If there is any disagreement between the Steelworkers Pension Trust and the law firm, we make the decision." (Hoffman Tr. at 135:3-5).

Second, "The Supreme Court . . . expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance." Baffa, 222 F.3d at 61 (citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-374 (1966)). Accordingly, this court has held that, "Plaintiffs are entitled to rely on the 'expertise of counsel,'" and "a class representative will be found inadequate due to ignorance only when they 'have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." In re WorldCom Inc., Sec. Litig., 219 F.R.D. at 286 (citing Baffa, 222 F.3d at 61). The court has no reason to believe that is the case here, and finds it odd that defendants would set themselves up as champions of the class interests by making such an argument.

Finally, defendants' contention that Steelworkers must accept its share of the litigation

costs in order to serve as class representative is patently false. In fact, defendants' argument and the authorities upon which it is based were expressly rejected by the WorldCom court, which explained that New York ethics rules regarding advancing costs do not apply to securities class actions, "Since the PSLRA and Rule 23 together provide even greater assurance than the [ethics rules] that the clients and not their attorneys control the litigation." Id. at 284. Even the Association of the Bar of the City of New York has recognized that requiring plaintiffs to pay litigation expenses "can have deleterious effects on the federal class action device," and thus has rejected application of this rule to class actions. Id. at 284-85.

## II.     Rule 23(b)(3) Requirements

In addition to satisfying the four prerequisite of 23(a), plaintiffs demonstrate– and defendants do not contest– that common questions of law or fact predominate over individual questions and that a class action is superior to other methods of adjudication. Therefore, class certification is appropriate in this action.

### A.     Predominance

"In determining whether common questions predominate, a court's inquiry is directed toward whether the issue of liability is common to the members of the class." Blech Sec. Litig., 187 F.R.D. at 107. While Rule 23(b)(3) requires that common issues of law and fact predominate, it does not require that there be an absence of individual issues. Indeed, "[I]f the liability issue is common to the class, common questions are held to predominate over individual questions." Id. (citations omitted). As the Supreme Court has noted, "Predominance is a test readily met in certain cases alleging . . . securities fraud . . ." Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997).

35

Common questions predominate over any individual issues which may theoretically arise in this case. Plaintiffs, all of whom owned shares of Veeco stock during the Class Period, claim that they were damaged by defendants' allegedly fraudulent misrepresentations and omissions. Thus, questions of fact regarding the content and implications of defendants' statements and defendants' intent in making these statements are central to the claims of each member of the putative class. Any individual issues will necessarily be secondary.

B.    Superiority

Courts have long recognized that, "Class actions are a particularly appropriate and desirable means to resolve claims based on the securities laws." Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985); see also Green v. Wolf Corp., 406 F.2d 291, 296 (2d Cir. 1968). Thus, "In general, securities suits . . . easily satisfy the superiority requirement of Rule 23." In re Blech Sec. Litig., 187 F.R.D. 97, 102 (S.D.N.Y. 1999).

In this case, as in most securities actions, defendants' alleged fraud has ". . . inflict[ed] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is [] not feasible." Id. at 107. The fact that many putative class members suffered relatively small losses makes individual actions even more impractical. Id. As this court has noted, "To force each [] shareholder to litigate separately would be unfair to each of them, as well as to Defendants. It would risk disparate results among those that sought redress and be an inefficient use of judicial resources." Id. at 102. (citations omitted). Thus, class action treatment is the superior method of adjudicating this securities fraud suit.

36

### III.    The Class Defined

In the event that plaintiffs' motion for class certification is granted– which it is–
defendants seek to shorten the Class Period.

Plaintiffs propose that the Class Period should extend from November 3, 2003– when
Veeco announced the acquisition of TurboDisc and made a series of statements relating thereto–
through February 10, 2005– the day before Veeco announced that it would conduct an internal
investigation of TurboDisc's "improper accounting transactions."  Defendants counter that,
because Veeco's November 3, 2003 press release and conference call were not materially false
and misleading, the Class Period should be limited to the period from April 26, 2004– the date
Veeco announced its financial results for the first quarter of 2004– through February 10, 2004.

As discussed above, defendants' November 3, 2003 and March 12, 2004 statements are
protected under the bespeaks caution doctrine and safe harbor provision, and thus are not
actionable under the securities laws.  Therefore, the court certifies the class pursuant to
defendants' proposed definition.  Thus Class Period thus runs from April 26, 2004 through
February 10, 2004.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss the Complaint is denied. Lead Plaintiff's motion for class certification is granted.

The parties are directed to appear for a conference on Thursday, April 20, 2006 at 10:00 a.m. in Courtroom 110, U.S. District Court, 40 Foley Square, New York, New York 10007.

This constitutes the decision and order of the Court.

Dated: March 21, 2006.

_____

U.S.D.J.

BY FAX TO ALL COUNSEL