UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————x
In Re VEECO INSTRUMENTS, INC.,              :      05-MD-1695 (CM)
SECURITIES LITIGATION                       :
—————————————————————x
THIS DOCUMENT RELATES TO:                   :
—————————————————————x
EDWARD J. HUNEKE, derivatively on behalf    :      05-CV-10224 (CM)
of VEECO INSTRUMENTS, INC.,                 :
                                            :
            Plaintiff(s),                   :
                                            :
      vs.                                   :
                                            :
EDWARD H. BRAUN, et al.,                    :
                                            :
            Defendant(s),                   :
—————————————————————x
AUGUST SCHUPP,III, derivatively on behalf of :     05-CV-10225 (CM)
VEECO INSTRUMENTS, INC.,                     :
                                            :
            Plaintiff(s),                   :
                                            :
      vs.                                   :
                                            :
EDWARD H. BRAUN, et al.,                    :
                                            :
            Defendant(s),                   :
—————————————————————x
DAVID ALTMAN, derivatively on behalf of     :      05-CV-10226 (CM)
VEECO INSTRUMENTS, INC.,                     :
                                            :
            Plaintiff(s),                   :
                                            :
      vs.                                   :
                                            :
EDWARD H. BRAUN, et al.,                    :
                                            :
            Defendant(s)                    :
—————————————————————x

**DERIVATIVE PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ........................................................................................... 2

    A.    Background ......................................................................................................... 2

    B.    Specific Allegations Regarding Veeco's Business Demonstrate Demand Futility ...... 2

        1.    The TurboDisc Allegations ................................................................................ 2

        2.    The Export Allegations ..................................................................................... 5

    C.    Specific Allegations Regarding The Board And Its Committees Demonstrate Demand Futility ................................................................................................... 7

III.  ARGUMENT ................................................................................................................. 8

    A.    The General Standards Governing Demand Futility Under Delaware Law ................. 8

    B.    Demand Futility Must Be Evaluated Using The Reasonable Doubt Standard ........... 10

    C.    Under Delaware Law, Plaintiffs Sufficiently Allege that Demand Is Futile Because A Majority Of The Board Lacks Disinterest And/Or Independence ............ 11

        1.    Braun, As An Employee Director Against Whom Securities Fraud Claims Have Already Been Upheld, Lacks Disinterest And Independence ...... 12

        2.    Defendants Elftmann, Fridrich, Kingsley, Simone And Pfister Are Likewise Interested Since Each Faces A Substantial Likelihood Of Liability As Members Of The Audit Committee ................................................ 13

        3.    Reasonable Doubt Regarding Defendants Elftmann's, Fridrich's, Simone's and Pfister's Independence Are Bolstered By Their Long-Standing And Mutually Advantageous Business Relationships ........................ 16

IV.   CONCLUSION ............................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**                                                                        Page(s)

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ........................................................................... 8, 9, 12

*Beneville v. York*,
   769 A.2d 80 (Del Ch. 2000) ................................................................................ 11

*Brehm v. Eisner*,
   746 A.2d 244 (Del. 2000) ......................................................................... 8, 9, 10

*Grimes v. Donald*,
   673 A.2d 1207 (Del. 1996) ..................................................................... 9, 10, 11

*Grobow v. Perot*,
   539 A.2d 180 (Del. 1988) ............................................................................ 10, 11

*Harbor Finance Partners v. Huizenga*,
   751 A.2d 879 (Del. Ch. 1999) ...................................................................... 10, 16

*In re Abbott Labs. Deriv. S'Holders Litig.*,
   325 F.3d 795 (7th Cir. 2003) ............................................................................... 13

*In re Baxter International, Inc. S'Holders Litig.*,
   654 A.2d 1268 (Del. Ch. 1995) ............................................................................. 9

*In re Caremark Int'l, Inc.*,
   698 A.2d 959 (Del. Ch. 1996) ............................................................................. 14

*In re Cendant Corp. Derivative Action Litig.*,
   189 F.R.D. 117 (D.N.J. 1999) ....................................................................... 13, 15

*In re Cooper Co., Inc.*,
   No 12584, 2000 WL 1664167 (Del. Ch. Oct. 31, 2000) ...................................... 12

*In re Lernout & Hauspie Sec. Litig.*,
   286 B.R. 33 (D. Mass. 2002) .............................................................................. 13

*In re New Valley Corporation Derivative*,
   2001 Del. Ch. LEXIS 13 (Del. Ch. 2001) ................................................ 10, 16, 17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   192 F.R.D. 111 (S.D.N.Y. 2000) .......................................................... 8, 13, 14, 15

*In re The Limited, Inc. Shareholders Litig.*,
   2002 Del. Ch. LEXIS 28 (2002) ......................................................................... 12

*In re The Student Loan Corp. Derivative Litig.*,
   No. 17799, 2002 WL 75479 (Del. Ch. Jan. 8, 2002) ........................................... 12

*In re Veeco Instruments, Inc., Sec. Litig.*,
   Case No. 05 MD 1695 (S.D.N.Y. Mar. 21, 2006) ................................................. 2

*International Equity Capital Growth Fund, L.P. v. Clegg*,
   C.A. No. 14995, 1997 Del. Ch. LEXIS 59 (Apr. 21, 1997) ................................. 10

Page(s)

*Kamen v. Kemper Fin. Servs.*,
  500 U.S. 90 (1991).................................................................................................. 8

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) ............................................................................... passim

## **Other Authorities**

Audit Committee Disclosure, Exchange Act Release No. 34-42266
  (effective Jan. 10, 2000).......................................................................................... 13

In accordance with this Court's direction, Plaintiffs[1] submit this memorandum of law concerning demand futility on nominal defendant Veeco Instruments, Inc.'s ("Veeco" or the "Company") board of directors (the "Board").

## I. INTRODUCTION

During the Relevant Period,[2] Veeco acquired TurboDisc to bolster the Company's lagging financial results.[3]  At the same time that Defendants[4] were issuing a stream of representations that this material acquisition was responsible for 43% of the Company's orders (Comp. ¶ 64), the Board, and more specifically its Audit Committee, sat idly by while TurboDisc's internal financial controls were dismantled, leaving a ***single employee*** with ***total control*** over TurboDisc's accounting policies and practices.  Simultaneously, the Board and its Audit Committee, charged with investigating whistleblower complaints and issues of legal compliance (Comp. ¶ 102), allowed rampant violations of federal export laws to occur, even though Veeco relied on exports for 70% of the Company's sales.  Comp. ¶ 92.  Defendants' complete abdication of their fiduciary duties to Veeco was a critical factor leading up to Veeco's restatement of its financial results, an admission by Defendants that the financials were false and misleading.  As a result, the Company and certain of the Director Defendants herein, including

---

[1] Edward J. Huneke, August Schupp, III and David Altman are collectively referred to herein as "Plaintiffs."

[2] Plaintiffs' Consolidated Amended Shareholder Derivative Complaint ¶ 1 (hereinafter, the "Complaint" or "Comp. ¶ __"), filed on September 26, 2005, defines the Relevant Period as November 3, 2003 through February 10, 2005.

[3] *See* Comp. ¶ 40 (noting that the Company suffered an operating loss of $132.7 million in 2002); *see also id.* ¶ 38 (noting that, in the first quarter after the MOCVD acquisition discussed in detail below, the Company had its best quarter for new orders in ten (10) quarters).

[4] Edward H. Braun ("Braun"), Peter J. Simone ("Simone"), Richard J. D'Amore ("D'Amore"), Joel A. Elftmann ("Elftmann"), Heinz K. Fridrich ("Fridrich"), Douglas A. Kingsley ("Kingsley"), Paul R. Low ("Low"), Roger D. McDaniel ("McDaniel"), Irwin H. Pfister ("Pfister"), and Walter J. Scherr ("Scherr") are collectively referred to herein as "Defendants" or "Director Defendants."

1

director defendant Braun, have been exposed to liability for violations of the federal securities laws.[5] Moreover, Defendants' knowing or extremely reckless dereliction of their fiduciary duties in monitoring, managing, and overseeing the Company also subjects each of the Director Defendants to a substantial likelihood of personal liability. As a result, pre-suit demand is excused.

## II. STATEMENT OF FACTS

### A. Background

Veeco designs, manufactures, markets and services a line of equipment primarily used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and high-brightness light emitting diode industries. Comp. ¶ 34. Prior to the Relevant Period, Veeco's sales were heavily concentrated in the molecular beam epitaxy ("MBE") market. Comp. ¶ 35.[6]

In an effort to improperly burnish the Company's consistently poor results, Defendants operated Veeco in an extremely reckless, sometimes unlawful, manner. As reflected in the Complaint, Defendants' "win-at-all costs" mentality created a corporate culture that fostered financial misrepresentations and flagrant violations of export laws, exposing the Company to substantial damages.

### B. Specific Allegations Regarding Veeco's Business Demonstrate Demand Futility

#### 1. The TurboDisc Allegations

On November 3, 2003, Veeco announced that it would acquire TurboDisc from Emcore Corporation. Comp. ¶¶ 1, 35. As acknowledged by Defendants on several occasions, the TurboDisc acquisition was highly material to Veeco because it would allow it to enter the

---

[5] *See In re Veeco Instruments, Inc., Sec. Litig.*, Case No. 05 MD 1695 (S.D.N.Y. Mar. 21, 2006).

[6] According to Defendants, MBE and Metal Organic Chemical Vapor Deposition ("MOCVD") are two "key compound semiconductor epitaxial deposition technologies."

lucrative MOCVD market,[7] a key market in which Veeco had not previously competed in a meaningful manner. By acquiring TurboDisc, Veeco was entering an entirely new business segment, one that would purportedly allow a quick and dramatic increase in the Company's overall revenues. Comp. ¶¶ 1-4, 36, 37-39, 43-44, 48-50, 52-56, 62-65.[8]

Because of TurboDisc's materiality to Veeco's operations, Defendants were duty-bound to ensure that Veeco had implemented a reasonably designed system of internal controls when integrating TurboDisc's business. Comp. ¶¶ 4, 6, 27-29, 31, 101, 114-117. Consistent with their other improper business practices (described below)[9] and desperate to reverse the Company's trend of huge losses,[10] Defendants nonetheless breached their fiduciary duties by creating a false illusion of dramatically increasing revenue growth.[11] Indeed, they made no true effort to establish adequate internal controls at Veeco, ultimately conceding that: (a) *a single* employee had *total control* over TurboDisc's accounting policies and practices;[12] (b) *they had caused* TurboDisc to eliminate basic accounting safeguards; and (c) they had dramatically decreased the number of internal audit personnel at TurboDisc.[13] These crucial failures could not have been the exercise of valid business judgment in light of TurboDisc's admitted materiality to Veeco. In

---

[7] *See, e.g.,* Braun's November 3, 2003 statement that "the MOCVD market is twice the size of the MBE market." Comp. ¶ 36.

[8] *See also* Comp. ¶¶ 3, 64 (alleging that, before disclosures of the fraud, Defendants represented that TurboDisc accounted for a 25% increase in net Company sales and a 43% increase in overall Company orders in the nine months following its acquisition).

[9] *See, e.g.*, Comp. ¶ 83-92.

[10] Comp. ¶¶ 40, 75-82.

[11] Comp. ¶¶ 1-4, 36, 37-39, 43-44, 48-50, 52-56, 62-65.

[12] Instead, they touted the Company's strong operational controls. Comp. ¶ 45-47, 51, 58, 66. These statements were either made on bad faith, or, at the least, lacked any reasonable foundation when issued.

[13] While this fact is not in the Complaint, if Plaintiffs are permitted to amend their operative pleading, they will make this allegation.

short, Defendants, in attempting to reverse the Company's fortunes, knowingly turned a "blind eye" to its TurboDisc segment, which led to disastrous consequences for the Company and its stockholders.

As a result of the foregoing, the Company's revenues, net sales, gross profit, operating income, current assets, net income and earnings per share were materially overstated throughout the Relevant Period.[14]   Comp. ¶¶ 6, 71, 73-81.  Compounding the problems, Defendants issued or caused the Company to issue, during this same period, a series of materially false and misleading statements regarding the Company's financial reporting and the adequacy of its internal controls.  Comp. ¶¶ 38-66.

On March 16, 2005, Defendants caused the Company to publish its Annual Report on Form 10-K (the "2004 10-K") wherein they (partially and incompletely) disclosed what they had known all along – that Veeco's internal controls were materially deficient.  Comp. ¶ 70.  In the 2004 10-K, Defendants also disclosed that the Company would restate its results for the first three quarters of fiscal 2004.  However, Defendants' attempt to "come clean" with their belated disclosures in the 2004 10-K, were materially misleading in and of themselves.  First, Defendants' statement attempting to shift blame for the TurboDisc debacle onto a single employee was misleading because they had either approved or acquiesced in the reduction of TurboDisc's auditing staff.  Thus, Veeco was able to engage in improper revenue recognition without adequate checks, such as booking sales on machines not yet sold, and recognizing revenue despite the fact that contract terms had not been adhered to.  Indeed, some of the Company's most senior management, most notably director defendant Braun, were directly involved in ordering and/or approving the various accounting manipulations at TurboDisc.

---

[14] Or, in some cases, the Company's *loss* per share was materially **understated**.  Comp. ¶¶ 75, 77, 79, 81.

On April 1, 2005, Veeco filed its Amended Forms 10-Q with the SEC, restating its financial results for the first three quarters of fiscal 2004 to correct Veeco's previous misstatements regarding net sales, cost of sales, gross profit or loss, current assets, non-current assets, current liabilities, and shareholder's equity. Comp. ¶ 71. Clearly, these restatements were material. Comp. ¶¶ 74, 81. Significantly, in each of the three quarters at issue, the originally reported financial results appeared to **_exceed_** the Company's results for the comparable quarters in 2003, as well as the Company's forecast for these quarters. Comp. ¶ 81. As illustrated below, however, the Company's restated results were actually **_worse_** than the prior years' results, and **_worse_** than Veeco's forecasts as well.

| | **Q1** | **Q2** | **Q3** |
|---|---|---|---|
| **2003 earnings (loss) per share** | ($0.06) | ($0.04) | ($0.07) |
| **2004 forecast earnings (loss) per share** | ($0.05-$0.09) | $0.01-$0.04 | $0.06-$0.09 |
| **2004 originally reported earnings (loss) per share** | ($0.02) | $0.05 | ($0.05) |
| **2004 restated earnings (loss) per share** | ($0.09) | ($0.06) | ($0.07) |

Comp. ¶ 81.

## 2.    **The Export Allegations**

The TurboDisc debacle was reflective of Defendants' approach to internal control issues in general. As alleged in the Complaint, TurboDisc was not the Company's only internal control problem Defendants were addressing (or should have been addressing) during 2004. The Company also faced at least two violations of federal export laws. As to at least the second violation, the Board was either complicit or recklessly failed to be aware of it. As a result of their actions (or inactions), Defendants put the Company's business at risk. Comp. ¶ 92.

In February 2004, a Veeco employee reviewing overseas sales and shipments for export law compliance reported that he/she uncovered the shipment of a restricted item to Malaysia. Comp. ¶ 84. That item, posted on the last day of Veeco's fiscal year 2003, purportedly violated

federal export laws promulgated to promote national security and protect against terrorism. Comp. ¶ 84. According to the employee, Veeco then conducted an audit that revealed the violations of law were much more pervasive than the single incident first reported. Comp. ¶ 85. The audit revealed at least nine other shipments allegedly violating federal export laws, the aggregate value of which shipments exceeded $15 million. *Id*. According to the employee, these violations were then communicated to senior members of Veeco's management. Had the Audit Committee been acting in accordance with its duties with regard to whistleblower complaints, legal compliance, and the Company's code of ethics (Comp. ¶¶ 90, 102-105), it would have been aware of and acted on these violations.[15]

Rather than report these violations to the Department of Commerce as it was required to do, according to the former employee, Veeco sought, by means of an improperly prepared request to the Commerce Department's Bureau of Industry, to attain a *post-hoc* reclassification of the equipment illegally shipped overseas in the hopes of escaping prosecution for the Company's transgressions. Comp. ¶ 86-87. The Company also concealed from the Bureau that it had committed numerous violations of the export laws by shipping this equipment under the existing designation without a license. *Id*.[16] Veeco was playing a dangerous game here - almost

---

[15] Approximately 70% of the Company's sales were to foreign markets. Comp. ¶ 92; *see also* Defendants' statement in the Company's Form 10-Q for the period ended March 31, 2004, that "[b]y region, there continues to be shift in sales from the U.S. to the Asia Pacific region." It is a fair inference, based on the admitted materiality of Veeco's overseas operations, that the internal audit investigation was overseen or conduced by the Audit Committee, and its results, in turn conveyed to the full Board. This inference is also supported by the terms of the Audit Committee charter, which suggests, at the least, that the alleged violations of law and the internal audit investigation should have been brought to its members' attention, if not the attention of the entire Board. Comp. ¶ 90.

[16] According to the employee, based on Veeco's misleading application, the Bureau of Industry granted its request for a reclassification on or about June 22, 2004. Comp. ¶ 88.

70% of its sales went overseas.  Comp. ¶ 92.  Stated simply, if Veeco could not sell overseas, it could not be in business.  *Id*.[17]

Just seven months later, this same employee reported a second set of export violations to senior management.  Comp. ¶ 89.  Coming so close in time to the prior export issue, Plaintiffs are entitled to the inference that the first export violation audit was either incompetently handled, or, more likely based on the facts alleged in the Complaint, a cover-up designed to prolong the scheme.    This  time,  instead  of  trying  to  fabricate  documentation  for  another  *post-hoc* reclassification, Veeco allegedly attempted to doctor the original relevant records so that the transaction would pass scrutiny without any subsequent adjustments at all.  Comp. ¶ 91.

Similar to the situation at TurboDisc, Defendants were either aware of and disregarded these problems, or the procedures established by Defendants, if any, were wholly inadequate, failed to work, and exposed the Company to potentially enormous harm in connection with its export violations.  Comp. ¶ 115.

## C.    Specific Allegations Regarding The Board And Its Committees Demonstrate Demand Futility

The Complaint in this action details the Board's role in both the TurboDisc and export violations.  First, Plaintiffs have enumerated the duties and responsibilities of Veeco's Board (Comp. ¶ 29), and specifically allege that each Board member knew or recklessly disregarded the accounting and export control problems at the Company via their access to internal Company documents, as well as conversations and connections with management and their fellow Board members.  Comp. ¶¶ 16-25.

---

[17] A single violation of export laws as alleged above can lead to fines and suspension of the  Company's  export  privileges.   Comp. ¶ 92.   Given  Veeco's  undeniable  dependence  on overseas  markets,  a  suspension  of  those  export  privileges  could  substantially  affect  the Company's performance and jeopardize the future viability of Veeco.  *Id*.

The Complaint also specifically identifies the duties and responsibilities of the Board's Audit Committee. Comp. ¶¶ 90, 102-05. In the case of the five Board members who comprise the Audit Committee,[18] the Complaint cites the Committee's charter under which its members are charged with the obligation to: (i) establish a program to address issues raised by "whistleblowers"; (ii) review legal compliance issues; (iii) oversee compliance with Veeco's code of ethics; and (iv) review the scope and results of audits of Veeco. *Id.* The Complaint also identifies prejudicial entanglements among Board members, including prejudicial entanglements among Elftmann, Fridrich, Simone and Pfister, four of the five Audit Committee members. Comp. ¶ 106(a)-(f).

## III. <u>ARGUMENT</u>

### A. <u>The General Standards Governing Demand Futility Under Delaware Law</u>

Delaware law is applicable to the demand futility analysis. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991) ("a court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the state of incorporation"); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 113 (S.D.N.Y. 2000). Under governing Delaware law, it is well settled that demand need not be alleged if the facts pleaded show that such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 807 (Del. 1984), *overruled in part on other grounds Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). As noted by Defendants, where the complaint does not challenge a specific action or decision of the board, demand is excused where the complaint raises a ***reasonable doubt*** that a majority of the directors are disinterested ***or*** independent. *Rales v. Blasband*, 634 A.2d 927, 930 (Del. 1993). Under this test:

---

[18] Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister serve on the Audit Committee. Comp. ¶ 104.

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a ***reasonable doubt*** that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Id*. at 934. This reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here], the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled in part on other grounds Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

A particular director is disqualified from considering a demand where there is a reasonable doubt that he or she is either "interested" *or* lacks "independence." *Rales*, 634 A.2d at 935-37. Pursuant to this well-established principle of Delaware law:

> Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation or the stockholders. In such circumstances, a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision.

*Id.* at 936 (citations omitted). Thus, it has consistently been held that directors are interested where they face a substantial likelihood of liability. *Aronson*, 473 A.2d at 815; *see also In re Baxter International, Inc. S'Holders Litig.*, 654 A.2d 1268 (Del. Ch. 1995).

Independence, on the other hand, "means that a director's decision is based on the corporate merits of the subject before the board ***rather than extraneous considerations or influences***." *Aronson*, 473 A.2d at 816. A director also lacks independence where he or she is "beholden" to interested directors *or* "so under their influence that [his or her] discretion would be sterilized." *Rales*, 634 A.2d at 935-37 (citations omitted). Among other situations, a lack of independence has been found where: (i) a director holds a position as an employee of the

corporation;[19] (ii) there exists "current or past business, personal, and employment relationships with each other and the entities involved;"[20] (iii) there is "a clear pattern of mutual advantage" between the directors.[21]   Moreover, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, the totality of plaintiff's allegations in combination may be sufficient to do so.  *Clegg*, 1997 Del. Ch. LEXIS at 15 (Apr. 21, 1997).

**B.      Demand Futility Must Be Evaluated Using The Reasonable Doubt Standard**

The term "reasonable doubt" as applied by the Delaware courts can be said to mean "reason to doubt" that a board is capable of making an independent or disinterested decision. *Grimes*, 673 A.2d at 1217.  In *Rales*, the Delaware Supreme Court expressly rejected a request for a more stringent standard, holding:

> [W]e ***reject*** the defendants' proposal that, for purposes of this derivative suit and future similar suits, we adopt either a universal demand requirement or a requirement ***that a plaintiff must demonstrate a reasonable probability of success on the merits***.

634 A.2d at 934*; see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988), *overruled in part on other grounds Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (rejecting the more stringent "judicial finding" standard for pleading director interest).

_____

[19] *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices").

[20] *In re New Valley Corporation Derivative*, 2001 Del. Ch. LEXIS 13, at *25 (Del. Ch. 2001).

[21] *International Equity Capital Growth Fund, L.P. v. Clegg*, C.A. No. 14995, Del. Ch. LEXIS 59, at *15 (Del. Ch. Apr. 21, 1997)*; see also Harbor Finance Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (a "long-standing pattern of mutually advantageous business relations" between directors raises a reasonable doubt regarding independence).

Under the "reasonable doubt" standard, plaintiffs need only allege with particularity facts that would give a reasonable shareholder reason to doubt the ability of a board of directors to consider disinterestedly a demand.  *Grobow*, 539 A.2d at 186-87 (endorsing reasonable doubt standard); *Grimes,* 673 A.2d at 1217 n.17 ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

This reasonable doubt standard promotes a strong public policy, since "***the derivative suit . . . [is a] potent tool . . . to redress the conduct of a torpid and unfaithful management.***" *Rales*, 634 A.2d at 933.  It is further particularly appropriate in derivative suits, because plaintiffs typically have not had the benefit of discovery.  *Id*. at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").  Thus, under Delaware law, Plaintiffs' burden at the pleading stage is only to allege particularized facts which, if true, would give a reasonable shareholder reason to doubt that a majority of a board had the ability to disinterestedly, independently and dispassionately consider a demand.  Plaintiffs amply meet that burden.

C.    **Under Delaware Law, Plaintiffs Sufficiently Allege that Demand Is Futile Because A Majority Of The Board Lacks Disinterest And/Or Independence**

At the time Plaintiffs filed the original complaint, Veeco's Board consisted of the following ten directors: Defendants Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low, McDaniel, Pfister and Scher.  Comp. ¶ 96.[22]  Thus, for demand to be excused, Plaintiffs need only raise a reason to doubt the disinterestedness or independence of five of the ten Board members.  *See Beneville v. York*, 769 A.2d 80, 85-86 (Del Ch. 2000) (holding that demand is

---

[22] Defendant Scherr was a member of Veeco's Board until May 25, 2005, when his term expired.  Comp. ¶ 96

excused where a board is evenly divided between interested and disinterested directors).[23]  The

Complaint more than satisfies this standard, pleading particularized facts which create a

reasonable doubt that each of the Veeco directors are incapable of evaluating a demand without

their judgment being governed by "***extraneous considerations or influences***."  *Aronson*, 473

A.2d at 816.

### 1.    Braun, As An Employee Director Against Whom Securities Fraud Claims Have Already Been Upheld, Lacks Disinterest And Independence

Both governing law and common sense demonstrate that Braun lacked independence and

disinterestedness since he was an executive of the Company and received substantial income.

Specifically, for fiscal years 2003, 2002 and 2001, Veeco paid Defendant Braun $636,538,

$555,000 and $925,000, respectively, in salary, bonus and other compensation, and granted him

options to purchase 140,000, 200,000 and 200,000 shares of Veeco stock.  Comp. ¶ 100; *see also*

*Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected

to act independently considering his substantial financial stake in maintaining his current

offices"); *see also In re The Student Loan Corp. Derivative Litig.*, No. 17799, 2002 WL 75479,

at *3 (Del. Ch. Jan. 8, 2002) (holding allegations that a director owes their livelihood to their

employer, without elaboration on the exact compensation, sufficient to demonstrate lack of

independence).[24]  Any doubt about Braun's disinterest was dispelled when this Court upheld the

securities fraud claims against him arising from the same common facts alleged in the

---

[23] *See also In re The Limited, Inc. Shareholders Litig.*, 2002 Del. Ch. LEXIS 28, at *28 (2002) ("where the challenged actions are those of a board consisting of an even number of directors, plaintiffs meet their burden of demonstrating the futility of making demand on the board by showing that half of the board was either interested or not independent").

[24] *See also In re Cooper Co., Inc.*, No 12584, 2000 WL 1664167, at *6-7 (Del. Ch. Oct. 31, 2000) (holding that allegations that employee-directors "'owed their positions and their livelihood to maintaining the good will'" of other directors "creates reason to doubt that [employee-directors] could have responded impartially to a demand").

Complaint. *See In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999) (ruling that a director is sufficiently interested to render demand futile where "he is a defendant in other pending class action suits arising out of the accounting irregularities and faces significant personal liability for the wrongdoing alleged in the complaint").

> ## 2.    Defendants Elftmann, Fridrich, Kingsley, Simone And Pfister Are Likewise Interested Since Each Faces A Substantial Likelihood Of Liability As Members Of The Audit Committee

Demand is also futile when defendants blatantly violate their fiduciary duties of care, loyalty and good faith by completely abdicating their responsibility to oversee and monitor the Company's business and management's participation in the financial reporting process. *Oxford,* 192 F.R.D. at 118 (holding demand excused where defendants violated their fiduciary duty by allowing others to make materially false or misleading statements about the company's financial matters);[25] *Cendant*, 189 F.R.D. at 128-29 (holding demand excused where complaint alleged overstated financial results which were publicly disseminated).[26] More specifically, "director liability may arise from the breach of the duty to exercise appropriate attention to potentially illegal corporate activities" such as the violations of export control laws alleged in the Complaint. *In re Abbott Labs. Deriv. S'Holders Litig.*, 325 F.3d 795, 808 (7th Cir. 2003).

Particularly instructive is the *Oxford* opinion in which the complaint alleged that Oxford's board: (1) failed to institute sufficient financial controls and procedures to monitor a planned conversion to a new computer system; (2) failed to implement and enforce procedures to

---

[25] The SEC has stated that Audit Committees play a critical role in "overseeing and monitoring management and the independent auditor's participation in the financial reporting process." Audit Committee Disclosure, Exchange Act Release No. 34-42266 (effective Jan. 10, 2000).

[26] *See also In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33, 38-39 (D. Mass. 2002) (denying motion to dismiss securities fraud claims against three members of an audit committee because they failed in their "duty to oversee the auditors, that is, **to guard the guardians**").

prevent the appropriation of the Company's information and assets; (3) knowingly or recklessly disseminated, or permitted to be disseminated, misleading information to shareholders; and (4) allowed the Company to engage in wholesale improper billing practices and to violate numerous insurance regulations, thereby subjecting the Company to fines, penalties and further investigations. *Oxford*, 192 F.R.D. at 114 ("The Complaint also alleges against all Directors a generalized failure or neglect to monitor the activities of management, said to amount to reckless conduct as well as corporate waste."). Also instructive is the opinion in *In re Caremark Int'l, Inc.,* 698 A.2d 959 (Del. Ch. 1996), upon which the *Oxford* court relied. In *Caremark*, the chancellor held that a violation of duty exists if the directors "either lack good faith in the exercise of their monitoring responsibilities or permit a known violation of law by the corporation to occur." *Id.* at 972.

Similarly, in this action, Plaintiffs have alleged the direct participation of defendants Elftmann, Fridrich, Kingsley, Simone and Pfister in the wrongful scheme as members of the Audit Committee specifically charged with the responsibility of ensuring "the integrity of the Company's financial statements," "the performance of the Company's internal audit function and internal auditors," and the monitoring of the Company's whistleblower policies and legal compliance. Comp. ¶ 102.[27] The Audit Committee, at best, stood idly by as the entire system of internal controls at TurboDisc – their crucial new acquisition – was dismantled, giving ***a single employee total control*** over the entire division's accounting policies and practices. Likewise, the Audit Committee completely abdicated its responsibility to monitor legal compliance and investigate whistleblowers' claims relating to the flagrant, systemic and repeated violations of

---

[27] The material in quotations is taken directly from the Audit Committee Charter and would be included in any amended complaint filed in this action.

export control laws, even though exports accounted for more than 70% of the Company's revenues. Comp. ¶¶ 85-92, 115.

In both *Oxford* and *Cendant*, the courts found that demand was excused as to the ***entire board*** where there was a such a systemic failure "to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors." *Oxford*, 192 F.R.D. at 117; *Cendant*, 189 F.R.D. at 129. There can be no doubt that in this action Defendants' scheme was of a "significant magnitude," since Defendants themselves represented that TurboDisc accounted for a 25% increase in net Company sales and a 43% increase in overall Company orders in the nine months following its acquisition and exports accounted for more than 70% of Veeco's sales. Comp. ¶¶ 3, 64, 92. In the present case, the duration was not a period of years, as it was in *Oxford* and *Cendant*, but for the purposes of demand futility, this Court needs only evaluate the actions of the Audit Committee, not the entire board. The Audit Committee met 12 times in fiscal year 2003 (Comp. ¶103) and according to Veeco's Proxy dated April 28, 2005,[28] the Audit Committee met 15 times during fiscal year 2004. Thus, the Audit Committee met 27 times while the internal controls were being dismantled at TurboDisc and the audit of flagrant export law violations was being conducted. Comp. ¶ 85. The Audit Committee's complete failure to institute or monitor internal controls and control the rampant violation of export laws through 27 meetings amply meet the requisite standard of substantial likelihood of liability for their complete abdication of their fiduciary duties to the Company.[29]

---

[28] The number of meetings during 2004 is not set forth in the Complaint but would be added to any amended complaint filed herein.

[29] *See Cendant*, 189 F.R.D. at 125.

**3.      Reasonable Doubt Regarding Defendants Elftmann's, Fridrich's, Simone's and Pfister's Independence Are Bolstered By Their Longstanding And Mutually Advantageous Business Relationships**

Defendants Elftmann, Fridrich, Simone and Pfister had long-standing business ties which also raise doubts regarding their independence.  From serving on the same corporate boards with one another, defendants Elftmann, Simone and Pfister had longstanding ties not only with each other, but also with defendant Braun, who now faces substantial long-standing personal liability for securities laws violations arising from the facts alleged in the Complaint.  Comp. ¶ 106(a)-(c).  Similarly, defendant Fridrich has strong business ties with numerous members of the Board through interlocking directorships and business relationships.   Comp. ¶ 106(a), (e), and (f).  Plaintiffs do not claim that these relationships alone are sufficient to render demand futile.  Nevertheless, it would be contrary to human nature to expect Elftmann, Fridrich, Simone and Pfister to be able to evaluate claims asserted against their friends and business associates in an independent and disinterested manner.  *See Harbor Finance Partners*, 751 A.2d at 889 ("This long-standing pattern of mutually advantageous business relations makes me doubtful that Hudson could impartially consider a demand that Republic file a lawsuit adverse to Huizenga's interests."); *see also In re New Valley Corp. Derivative*, 2001 Del. Ch. LEXIS at *24-26 (holding that the existence of a series of business, personal, and employment relationships among a majority of the directors "is enough to defeat a motion to dismiss").

Plaintiffs in the present case allege facts demonstrating that defendants Elftmann, Fridrich, Simone and Pfister have a "long-standing pattern of mutually advantageous business relations" with each other and with other defendants, which would effectively prevent them from independently and impartially evaluating the claims asserted in this action.  Even if "the actual extent of these relationships is not altogether clear" at the pleading stage, "the existence of these

interests and relationships is enough to defeat a motion to dismiss." *New Valley*, 2001 Del. Ch. LEXIS at *26.

## IV.  CONCLUSION

Based upon the foregoing, Plaintiffs have demonstrated beyond a reasonable doubt that six of the ten board members at issue in this case are "interested" parties and could not be expected to objectively consider a demand made on them to essentially sue themselves. Specifically, by virtue of his direct participation in the alleged fraud, and the fact that he has a substantial financial stake in maintaining his current position with the Company, defendant Braun cannot be impartial in this matter.  Additionally, the five members of the Board's Audit Committee breached their fiduciary duties when they knowingly or recklessly failed to ensure Veeco had adequate internal controls, and when they completely abdicated their responsibility to field, investigate and address issues of legal compliance and whistleblower complaints.  As a result, the five directors on the Audit Committee cannot be impartial in considering a demand on them for violations of their own breaches of fiduciary duty.  Accordingly, as demand on a majority of the Company's board of directors would have been futile, demand should be excused.[30]

---

[30] Plaintiffs believe that their existing Complaint establishes their standing.  However, if this Court determines that additional allegations are necessary in order to demonstrate that demand on Veeco's Board is excused as futile, Plaintiffs respectfully request the opportunity to submit a second amended complaint.  As this Court is aware, Defendants have provided written consent for an additional amendment.

DATED: May 3, 2006

/s/ Shane Rowley
Nadeem Faruqi (NF-1184)
Shane Rowley  (SR-0740)
Beth A. Keller (BK-9421)
**FARUQI & FARUQI, LLP**
320 East 39th Street
New York, NY 10016
Telephone:  (212) 983-9330

*Attorneys for Plaintiff Altman*

Brian D. Penny (*pro hac vice*) (BP-4301)
Mark S. Goldman (*pro hac vice*) (MG-4683)
Paul J. Scarlato (*pro hac vice*) (PS-3007)
**GOLDMAN SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone:  (484) 342-0700

Leigh Lasky (LL-6919)
**LASKY & RIFKIND, LTD**
100 Park Avenue, 12th Floor
New York, New York 10017
Telephone:  (212) 907-0700

*Attorneys for Plaintiff Huneke*

Robert I. Harwood (RH-3286)
Samuel K. Rosen (SR-3287)
Joshua D. Glatter (JG-0184)
**WECHSLER HARWOOD LLP**
488 Madison Avenue
New York, NY 10022
Telephone:  (212) 935-7400

Robert B. Weiser *(Of Counsel)*
**THE WEISER LAW FIRM, P.C.**
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2616

*Attorneys for Plaintiff Schupp*

## CERTIFICATE OF SERVICE

I, Shane Rowley, hereby certify that I have this date caused a copy of the foregoing, to be

served via Federal Express on the following:

> Robert F. Serio, Esquire
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue, 47th Floor
> New York, NY  10166
> (212) 351-5395

> _/s/ Shane Rowley_____
>           Shane Rowley