UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――x

In re VEECO INSTRUMENTS, INC.                           05 MD 1695 (CM)
SECURITIES LITIGATION
―――――――――――――――――――――――――――x

THIS DOCUMENT RELATES TO:
―――――――――――――――――――――――――――x

EDWARD J. HUNEKE, derivatively on behalf of
VEECO INSTRUMENTS, INC.,

       Plaintiff,

  -against-                                                         05 CV 10224 (CM)

EDWARD H. BRAUN, PETER J. SIMONE, RICHARD
A. D'AMORE, JOEL A. ELFTMANN, HEINS K.
FRIDRICH, DOUGLAS A. KINGSLEY, DR. PAUL
R. LOW, ROGER D. MCDANIEL, IRWIN H. PFISTER,
and WALTER J. SCHERR, inclusive,

       Defendants,

  and

VEECO INSTRUMENTS, INC.,

       Nominal Defendant.
―――――――――――――――――――――――――――x

DAVID ALTMAN, derivatively on behalf of VEECO
INSTRUMENTS, INC.,

       Plaintiff,

  -against-                                                         05 CV 10225 (CM)

EDWARD H. BRAUN, JOHN F. REIN, JR., WALTER
J. SCHERR, IRWIN H . PFISTER, ROGER D.
MCDANIEL, PAUL R. LOW, DOUGLAS A. KINGSLEY,
HEINZ K. FRIDRICH, JOEL A. ELFTMANN, RICHARD
A. D'AMORE, and PETER J. SIMONE,

       Defendants,

 and

VEECO INSTRUMENTS, INC.,

       Nominal Defendant.

―――――――――――――――――――――――x

AUGUST SCHUPP, III, derivatively on behalf of
VEECO INSTRUMENTS, INC.,

       Plaintiff,

  -against-               05 CV 10226 (CM)

EDWARD H. BRAUN, RICHARD A. D'AMORE,
JOEL A. ELFTMANN, HEINZ K. FRIDRICH,
DOUGLAS A. KINGSLEY, PAUL R. LOW, ROGER
D. MCDANIEL, IRWIN H. PFISTER, WALTER J.
SCHERR, PETER J. SIMONE, JOHN P. KIERNAN,
and JOHN F. REIN, JR.,

       Defendants,

 and

VEECO INSTRUMENTS, INC.,

       Nominal Defendant.

―――――――――――――――――――――――x

**ORDER AND DECISION DENYING DEFENDANTS' MOTION TO DISMISS
CONSOLIDATED DERIVATIVE SUITS**

McMahon, J.:

  These consolidated derivative actions are related to (and have been consolidated for discovery purposes with) a securities fraud class action suit against Veeco Instruments, Inc. ("Veeco" or "the Company") and several of its high-ranking officers, currently pending before this Court under the caption *In re Veeco Instruments, Inc. Securities Litigation*, 05 MD 1695.

Plaintiffs Huneke, Altman, and Schupp (the "derivative plaintiffs" or "plaintiffs"), each holders of Veeco common stock, assert claims on behalf of Veeco against the following current and former members of the Company's board of directors: Edward Braun, Peter Simon, Richard D'Amore, Joel Elftmann, Heinz Fridrich, Douglas Kingsley, Paul Low, Roger McDaniel, Irwin Pfister, and Walter Scherr ("defendants").[1]  Plaintiffs allege, *inter alia*, that defendants breached their fiduciary duties to the Company by failing to oversee, monitor, and manage Veeco's internal accounting controls and compliance with federal export control laws, and thus are liable to Veeco for any resulting losses it sustained.

Defendants move to dismiss the consolidated derivative actions, pursuant to Federal Rule of Civil Procedure 23.1, for failure to make a pre-suit demand on the board of directors.

Derivative plaintiffs oppose the motion, arguing, *inter alia*, that demand would have been futile, because a majority of the directors– including Braun (who is CEO of Veeco and a named defendant in the pending securities fraud class action), and Elftmann, Fridrich, Kingsley, Simone and Pfister (who are members of the Company's Audit Committee)– face a substantial likelihood of personal liability, and thus were not capable of making an independent and disinterested decision regarding the prosecution of this action.  Therefore, plaintiffs contend that demand was excused.

For the reasons discussed below, defendants' motion to dismiss is denied.

**Facts**

---

[1]Two additional defendants, John F. Rein, Jr. and John P. Kiernan, were named in Schupp's original complaint, and John F. Rein, Jr. was named in Altman's original complaint. However, neither Rein nor Kiernan is mentioned in plaintiffs' Consolidated Amended Verified Shareholder Derivative Complaint, dated September 26, 2005.

Veeco Instruments is a Delaware corporation which designs, manufactures, markets and services a broad line of tools, equipment and systems, including epitaxial process equipment, for use in the data storage, semiconductor, compound semiconductor/ wireless and high-brightness light emitting diode industries. Consolidated Amended Verified Shareholder Derivative Complaint ("Cplt.") ¶ 34. Until November 2003, Veeco manufactured and sold only one type of epitaxial equipment, the Molecular Beam Epitaxy ("MBE") system. Consolidated Amended Class Action Complaint ("Class Cplt.") ¶ 29.

Defendants Braun, Simone, D'Amore, Elftmann, Fridrich, Kingsley, Low McDaniel and Pfister are current directors of Veeco. Cplt. ¶¶ 16-24. Defendant Scherr was a director until May 2005, when his term expired. Cplt. ¶ 25. Simone, Elftmann, Fridrich, Kingsley, and Pfister are also members of Veeco's Audit Committee. Cplt. ¶¶ 17, 19, 20, 21, 24. Braun, who has served as Veeco's Chief Operating Officer since January 1990, is the only member of the board who is also an officer. Cplt. ¶ 16.

The TurboDisc Acquisition

On November 3, 2003, Veeco acquired Emcore Corporation's TurboDisc division, which manufactures Metal Organic Chemical Vapor Deposition ("MOCVD") technology, a more advanced line of epitaxial deposition technology than Veeco's existing product. Cplt. ¶ 35. Veeco declared that the acquisition would "create a Global Leader in Compound Semiconductor Deposition Technologies" by making Veeco "uniquely able to provide 'one-stop' shopping for epitaxial deposition solutions– both MOCVD and MBE." Cplt. ¶¶ 35, 36. The acquisition cost Veeco over $60 million, which represented more than 20% of Veeco's equity. Cplt. ¶ 42; Class Cplt. ¶ 32.

Upon Veeco's announcement of the TurboDisc acquisition, the price of Veeco stock jumped from $25.30 to $26.39, and continued to climb to a high of $34.40 on January 20, 2004. Class Cplt. ¶ 31.

On February 11, 2005, Veeco announced that it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of "improper accounting transactions" at its TurboDisc division. Cplt. ¶ 67. Veeco stated that the investigation focused principally on the value of inventory, accounts payable and certain liabilities, as well as certain revenue transactions at TurboDisc. Id. Veeco indicated that the investigation likely would lead to adjustments in Veeco's pre-tax earnings for the nine months ending on September 30, 2004, requiring the restatement of its financial statements for the first three quarters of 2004. Class Cplt. ¶ 2.

Following this announcement, Veeco stock fell from $18.86 at the close of trading on February 10, to $16.95 at the close of trading on February 11– a decrease of $1.90 per share or 10.07%. Cplt. ¶ 68; Class Cplt. ¶ 3. In the weeks following the disclosure, the price of Veeco stock continued to slide, falling to $13.97 at the close of trading on March 14, 2005. Class Cplt. ¶ 3.

On March 16, 2005, Veeco announced that it had completed its internal investigation and had determined that its previously issued financial statements for the first three quarters of 2004 overstated its pre-tax earnings by a total of $10.2 million. Accordingly, Veeco's quarterly reports would be amended to decrease pre-tax earnings by $2.8 million, $4.3 million and $3.1 million for the quarters ending on March 31, 2004, June 30, 2004, and September 30, 2004, respectively. Cplt. ¶¶ 70, 71.

On April 5, 2005, Veeco issued restatements of its previously reported financial statements for each of the first three quarters of 2004. Cplt. ¶ 72. In each of the Amended Forms 10-Q, Veeco attributed the restatement to the actions of a "single individual at TurboDisc whose employment had been terminated." Cplt. ¶ 73.

Alleged Violations of the Federal Export Control Laws

In February 2004, a Veeco employee reviewing overseas sales and shipments for export law compliance reported that he/she uncovered the shipment of a restricted item to Malaysia. Cplt. ¶ 84. According to the employee, following his/her report, Veeco conducted an audit which revealed that at least nine other shipments, worth a total of $15 million, also had violated federal export control laws. Cplt. ¶ 85.

On April 30, 2004, Veeco applied to the Department of Commerce for a post-hoc reclassification of the restricted item. Cplt. ¶¶ 86, 87. On June 22, 2004, the Department's Bureau of Industry granted Veeco's request. Cplt. ¶ 88.

In September 2004, the same Veeco employee reported the discovery of a second set of export violations relating to shipments made by Veeco to a Hong Kong distributor. The employee was then asked to "pump" the Company's technical engineering staff for information that would support another reclassification request. Cplt. ¶ 89.

Securities Fraud Class Action Litigation

Within days of Veeco's announcement that it would conduct an internal investigation into "improper accounting transactions" at its TurboDisc division, the first of several securities class action suits was filed against Veeco and several of its high-ranking officers, including Braun. On August 22, 2005, the Judicial Panel on Multidistrict Litigation consolidated, and

assigned to this court, ten securities fraud class actions pending in the Eastern and Southern Districts of New York. On November 7, 2005, Lead Plaintiffs, The Steelworkers Pension Trust, filed a Consolidated Amended Class Action Complaint and moved for class certification. Defendants opposed class certification and moved to dismiss. On March 21, 2006, this Court denied defendants' motion to dismiss, finding that plaintiffs had stated a claim against defendants under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. In re Veeco Instruments, Inc. Sec. Litig., 2006 WL 759751 (S.D.N.Y. March 21, 2006). The Court also granted plaintiffs' motion for class certification, designated the Class Period as November 3, 2003 through February 10, 2005. Id.

The Derivative Actions

On March 15, 2005, March 29, 2005, and April 22, 2005, respectively, plaintiffs Huneke, Schupp, and Altman brought derivative suits against Veeco's board of directors in the Eastern District of New York. Following consolidation of these three suits, plaintiffs filed a Consolidated Amended Verified Shareholder Derivative Complaint on September 26, 2005. The consolidated actions were transferred to this court on December 9, 2005, and subsequently were consolidated for discovery purposes with the pending class action litigation.

**Discussion**

Defendants move to dismiss plaintiffs' Consolidated Amended Verified Shareholder Derivative Complaint, pursuant to Federal Rule of Civil Procedure 23.1, for failure to make the requisite demand on Veeco's board of directors prior to filing this action, or to plead with particularity why such demand was excused.

Plaintiffs concede that no pre-suit demand was made. However, they argue that any

7

demand on the board would have been futile, as a majority of the board was not capable of making an impartial decision regarding the prosecution of this litigation. Specifically, plaintiffs contend that Defendant Braun is not disinterested as he is both CEO of Veeco and a named defendant in the related securities fraud class action suit. Likewise, plaintiffs allege that Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister are not disinterested because each, as members of the Company's Audit Committee, faces a substantial likelihood of liability for allegedly failing to oversee and monitor the Company's internal accounting controls and compliance with federal export control laws. Additionally, plaintiffs assert that Elftmann, Fridrich, Simone and Pfister had long standing business relationships with each other and with Braun, creating a reasonable doubt as to their independence. Because the Court finds that plaintiffs' allegations raise a reasonable doubt as to a majority of the directors' disinterestedness, it need not reach the issue of Elftmann's, Fridrich's, Simone's or Pfister's independence.

A.   <u>The Legal Framework: Pre-Suit Demand and Demand Futility</u>

Pursuant to Federal Rule of Civil Procedure 23.1:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it . . . [t]he complaint shall [] allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort . . .

In contrast to a motion to dismiss pursuant to Rule 12(b)(6), a Rule 23.1 motion to dismiss for failure to make a demand is not intended to test the legal sufficiency of the plaintiffs' substantive claim. "Rather, its purpose is to determine who is entitled, as between the corporation and its

shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." Levine v. Smith, 1999 WL 150784, *5 (Del.Ch. 1989), *aff'd* 591 A.2d 194 (Del. 1991).

Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon shareholder plaintiffs to make a demand upon the corporation's board of directors prior to commencing an action. See, e.g., Langner v. Brown, 913 F.Supp. 260, 264 (S.D.N.Y. 1996). Indeed, "A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile." Khanna v. McMinn, 2006 WL 1388744, *11 (Del.Ch. May 9, 2006) (citations omitted). This requirement stems from the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation, and that the decision to bring or not to bring a lawsuit is a decision concerning the management of the corporation. Langner, 913 F.Supp. at 264 (citing Spiegel v. Buntrock, 571 A.2d 767, 772-3 (Del. 1990)).

Pre-suit demand requirements, and the futility exceptions thereto, are governed by the law of the state of incorporation. Kamen v. Kemper Fin. Serv., Inc., 500 U.S. 90, 108-109 (1991). Because Veeco is a Delaware corporation, Delaware's demand futility jurisprudence is controlling.

Under Delaware law, "Where officers and directors are under an influence which sterilizes their discretion, they cannot be considered proper persons to conduct litigation on behalf of the corporation." Aronson v. Lewis, 473 A.2d 805813 (Del. 1984), *rev'd on other grounds*. In determining whether demand would be futile, the court, in its discretion, must

decide whether, under the particularized facts alleged, a reasonable doubt is created that (1) the directors are disinterested and independent, and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Id. at 814. If either prong is satisfied, demand is excused. Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000).

The Delaware Supreme Court has recognized, however, that the Aronson paradigm does not apply in all cases. An essential predicate of the Aronson test is that a *decision* of the board of directors is being challenged in the derivative suit. Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993). The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by Aronson– whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction. Id.

In In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del.Ch. 1996), the Chancery Court recognized that director liability may arise from, *inter alia*, "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." 698 A.2d at 967. In such cases, a loss eventuates not from a decision, but from considered inaction. Id. at 968. In order to determine whether demand would be futile in the context of a so-called *Caremark*-case, "A court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgement in responding to a demand." Rales, 634 A.2d at 934. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

A director is interested if he will be materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders.

Seminaris v. Landa, 662 A.2d 1350, 1354 (Del.Ch. 1995) (citing Rales, 634 A.2d at 934). The "mere threat" of personal liability in the derivative action does not render a directed interested; however, a "substantial likelihood" of personal liability prevents a director from impartially considering a demand. Id. Even if a director has no personal interest in a decision, his discretion must also be free from the influence of other interested persons. Id. A director is independent if he can base his decision "on the corporate merits of the subject before the board rather than extraneous considerations or influence." Id. (citing Aronson, 473 A.2d at 815).

Whether plaintiffs have alleged facts sufficient to create a reasonable doubt concerning the disinterestedness and independence of a majority of the board must be determined from the accumulation of all the facts taken together. McCall v. Scott, 239 F.3d 808, 816 (6th Cir. 2001) (applying Delaware law). As is the case with all motions to dismiss, plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged. Brehm, 746 at 255.

B.     Demand on Veeco's Board Would Have Been Futile

Plaintiffs allege that, "Defendants' reckless stewardship of Veeco, particularly their failure to institute appropriate controls and oversight of all areas of the Company's business, has exposed the Company to potentially significant fines and legal liability, has substantially impaired the Company's market capitalization, has eroded the Company's goodwill and trust in the market place, and has threatened the Company's overseas sales." Cplt. ¶ 9. Plaintiffs did not make a demand on the board prior to bringing this claim. Thus, in order for plaintiffs to survive defendants' motion to dismiss, the court must find that plaintiffs' particularized factual allegations create a reasonable doubt as to the disinterestedness and independence of at least five

of Veeco's ten board members. See Beneville v. York, 769 A.2d 80, 85-86 (Del.Ch. 2000); The Limited, Inc. S'holder Litig., 2002 WL 537692, *7 (Del.Ch. March 27, 2002). Because I find that plaintiffs' allegations raise a reasonable doubt as to the disinterestedness of six of Veeco's ten board members, and thus that demand would have been futile, defendants' motion is denied.

1. *Defendant Braun*

Plaintiffs allege, and defendants do not dispute, that Defendant Braun is not a disinterested director, and thus would not have been capable of impartially and objectively considering a demand on the board.

In addition to serving on the board of directors, Braun has been employed by Veeco and/or its predecessor since 1966. Cplt. ¶ 16. Braun served as President of Veeco from January 1990 to March 2003 (with the exception of a six-month period during 2000), and has served as the Company's Chairman and CEO since January 1990. Id. For the 2001, 2002, and 2003 fiscal years, Braun received $925,000, $555,000, and $636,538, respectively, in salary, bonus, and other compensation from Veeco. Cplt. ¶ 100. Additionally, during those same years, respectively, Veeco granted Braun the option to purchase 200,000, 200,000, and 140,000 shares of Veeco stock. Id. There is no question that Veeco, as Braun's principal employer for the past 40 years, is a substantial– if not the sole– source of Braun's income. Accordingly, "Plaintiffs' allegations . . . allow the Court to infer that [Braun's] interest was of 'a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform [his] fiduciary duties without being influenced by [his] overriding personal interest.'" In re General Motors (Hughes) S'holder Litig., 2005 WL 1089021, *8 (Del.Ch. May 4, 2005) (quoting In re General Motors Class H S'holder Litig., 734

A.2d 611, 617-18 (Del.Ch. 1999)).

The fact that Braun faces a "substantial likelihood" of personal liability as a result of the pending class action suit, in which he is a named defendant, renders his ability to impartially consider a demand even more doubtful. In this Court's Order and Decision of March 21, 2006, I declined to dismiss the class action complaint, finding that plaintiffs had sufficiently plead securities fraud claims against Veeco, Braun, and other high-ranking Veeco officers. There is no question then that Braun "is interested because he is a defendant in [a] pending class action suit[] arising out of the [same] accounting irregularities and faces significant personal liability for the wrongdoing alleged in the complaint." In re Cendant Corp. Derivative Action Litig., 189 F.R.D. 117, 129 (D.N.J. 1999) (applying Delaware law).

    2.    *Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister*

Plaintiffs further allege that Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister are not disinterested directors because, as members of the Audit Committee, they each face a "substantial likelihood" of personal liability for their alleged failure to oversee, monitor, and manage Veeco's internal accounting controls and compliance with federal export control laws. Defendants counter that plaintiffs' *Caremark*-claim fails to raise sufficient doubt as to the interest or independence of these five director-Committee members.

A *Caremark*-claim ". . . is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." In re Caremark, 698 A.2d at 967. In order to prevail on a *Caremark*-claim, plaintiffs must demonstrate that the directors either knew or should have known that violations of the law were occurring, and that they took no steps in a good faith effort to prevent or remedy that situation. Id. at 971. Where a claim of directorial liability for

corporate loss is predicated upon conscious inaction, ". . . only a sustained or systematic failure of the board to exercise oversight– such as an utter failure to attempt to assure a reasonable information and reporting system exists– will establish the lack of good faith that is a necessary condition to liability." Id.

However, to survive a Rule 23.1 motion to dismiss, plaintiffs need not demonstrate a probability of success on the merits. Rales, 634 A.2d at 934. They need only establish a reasonable doubt that the board could have properly exercised its independent and disinterested business judgment in responding to a demand.

Viewing all of the facts together and drawing all reasonable inferences in favor of plaintiffs, I conclude that plaintiffs' factual allegations create a reasonable doubt that Defendants Elftmann, Fridrich, Kingsley, Simone and Pfister were capable of making a disinterested decision regarding the prosecution of this litigation.

Veeco's Audit Committee is responsible for, *inter alia*, reviewing the scope and results of the audit and other services provided by Veeco's independent auditors, and overseeing Veeco's Code of Ethics. Cplt. ¶¶ 102, 105. Additionally the Audit Committee's charter sets forth the following responsibilities of the Committee:

> a) *Whistleblower* – In complaint with SEC and NASDAQ rules, the Committee shall establish procedures for the receipt, retention and treatment of complaints or concerns, including confidential and anonymous submissions received by the Company regarding accounting, internal accounting controls or audited matters . . .
>
> (c) *Legal Compliance* – The Committee shall review with the Company's internal legal counsel any legal and regulatory matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations pertaining

>to financial disclosure, and any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting polices.

Cplt. ¶ 102.

Plaintiffs contend that, despite the significant size of the TurboDisc division and its importance to the Company, the Audit Committee failed to ensure the implementation of either an adequate internal reporting system or a system of corporate checks and balances designed to safeguard TurboDisc from financial fraud. The acquisition of Emcore's TurboDisc division cost Veeco $63.7 million, or more than 20% of Veeco's equity. It added a new physical plant, and 120 new employees to Veeco's existing workforce of 1,100. Cplt. ¶ 2. According to a press release issued on November 3, 2003, as a result of the acquisition, Veeco became "uniquely able to provide 'one-stop' shopping for epitaxial deposition solutions– both MOCVD and MBE." Cplt. ¶ 36. Indeed, "The acquisition "created [in Veeco] a Global Leader in Compound Semiconductor Deposition Technologies." Cplt. ¶ 35. In the nine months following the acquisition, Veeco represented that TurboDisc accounted for a 25% increase in net Company sales and a 43% increase in overall Company orders. Cplt. ¶ 64. The significance of the TurboDisc division– both in terms of the money expended to acquire it and the value it purportedly added the Company– coupled with the Audit Committee's role in reviewing matters that significantly impact on the Company's financial disclosures, suggest that the Committee was duty-bound to ensure that Veeco implemented an adequate system of internal controls when integrating the TurboDisc division.

Nevertheless, plaintiffs contend that Elftmann, Fridrich, Kingsley, Simone and Pfister breached their duty to Veeco by recklessly ignoring red flags signaling TurboDics's inadequate

15

system of internal controls. Plaintiffs assert that TurboDisc's accounting department, which had a standing staff of six to eight people under Emcore, was reduced to two employees after it was acquired by Veeco. This dramatic cutback, plaintiffs allege, materially weakened TurboDisc's internal accounting controls and created and fostered an environment that permitted the Company to conceal a number of alleged accounting improprieties and issue a series of allegedly fraudulent financial reports.[2] Indeed, in its Form 10-K for the period ending December 31, 2004, which each of the five director-Committee members signed, Veeco admitted that ". . . a deficiency existed in the internal control over financial reporting . . ." Cplt. ¶ 70; Def. Ex. B. Despite the fact that the Audit Committee met 27 times during 2003 and 2004, plaintiffs assert that the Committee took no action for more than a year after the TurboDisc acquisition to strengthen the existing system or implement a new system of internal accounting controls. According to plaintiffs, by the time the Committee reacted to these shortcomings, substantial

---

[2]The class action complaint asserts that Veeco and certain high-ranking officials, including Braun, had knowledge of or recklessly ignored the following accounting improprieties and their financial impact on the Company: (1) Defendants fraudulently recognized $1.26 million of revenue in the first three quarters of 2004 from a Transitional Services Agreement ("TSA") with Emcore by recording reduced-price sales to Emcore at full prices and by recording free give-aways to Emcore as revenue. Defendants then "buried" the adjustment to the overstatement in the fourth quarter of 2004, in violation of the Generally Accepted Accounting Principles ("GAAP"). (2) Defendants prematurely recognized revenue from a contract to sell $10 million worth of MOCVD "GaNzilla" reactors to the Sanan Group in China, even though the terms of the contract were not yet fulfilled, in violation of GAAP, the explicit terms of the Sanan Group contract, and Veeco's own revenue recognition accounting policies. (3) Defendants understated warranty losses resulting from Veeco's switch from purchasing parts for TurboDisc reactors from outside vendors to manufacturing them in-house. Despite an increase in parts failures, customer complaints and warranty claims, defendants failed to reflect accruals of warranty losses on Veeco's financial statements, in violation of GAAP and Veeco's own internal accounting policies. (4) Defendants failed to write down more than $5.6 million of stockpiled unsaleable TurboDisc reactors, which resulted from Veeco's move from manufacturing customized reactors to building generic reactors, in violation of GAAP and Veeco's own internal accounting policies. See In re Veeco, 2006 WL 759751, *304.

harm had already been done to the Company.

Additionally, plaintiffs allege that the Audit Committee abdicated its responsibility to monitor legal compliance and investigate whitsleblower claims relating to the Company's allegedly flagrant, systematic and repeated violations of export control laws. The complaint asserts that, upon a report by a Veeco employee that the Company had shipped a restricted item to Malaysia, Veeco conducted an audit which revealed that at least nine other shipments– worth a total of $15 million– also had violated federal export control laws. Cplt. ¶¶ 84, 85. Because a single violation of federal export laws can lead to fines and suspension of export privileges, and because approximately 70% of Veeco's revenues are derived from export sales, the reported violations threatened to jeopardize the future viability of Veeco. Cplt. ¶ 92. Nevertheless, seven months after these alleged violations were discovered and brought to the Company's attention, the same employee reported a second set of export violations. Cplt. ¶ 89. Plaintiffs assert that, in light of the second report, the Audit Committee permitted additional violations to occur, either by completely disregarding the first report, or by establishing procedures that were wholly inadequate and ineffective and that failed to protect the Company from potentially enormous liability.

This is not a case where the directors had "no grounds for suspicion" or "were blamelessly unaware of the conduct leading to the corporate liability." See In re Caremark, 698 A.2d at 969. Rather, plaintiffs allege that the director-Committee members "conscientiously permitted a known violation of law by the corporation to occur." See id. at 972; see also Abbott Lab Derivative S'holder Litig., 325 F.3d 795, 806 (7th Cir. 2003) (applying Delaware law). This is precisely the type of case the Delaware Chancery Court was contemplating when it recently

17

Lab Derivative S'holder Litig., 325 F.3d 795, 806 (7th Cir. 2003) (applying Delaware law). This is precisely the type of case the Delaware Chancery Court was contemplating when it recently held, "A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning." David B. Shaev Profit Sharing Account v. Armstrong, 2006 WL 391931, *5 (Del.Ch. Feb. 13, 2006). If true, plaintiffs allegations that the Committee failed to exercise appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty, subjecting Elftmann, Fridrich, Kingsley, Simone and Pfister to a substantial likelihood of liability. Thus, plaintiffs' allegations raise a reasonable doubt that these director-Committee members were disinterested and capable objectively deciding whether or not to prosecute this litigation on the corporation's behalf.

Accordingly, demand would have been futile.

## Conclusion

For the foregoing reasons, defendants' motion to dismiss is denied.

This constitutes the decision and order of the Court.

Dated: June 14, 2006.

_____
U.S.D.J.

BY FAX TO ALL COUNSEL