# EXHIBIT A

# THE WALL STREET JOURNAL ONLINE

FORMAT FOR PRINTING sponsored by  TOSHIBA Don't copy Loud

**March 18, 2006**

PAGE ONE

# The Perfect Payday

Some CEOs reap millions by landing stock options when they are most valuable. Luck -- or something else?

**By CHARLES FORELLE and JAMES BANDLER**
*March 18, 2006*

DOW JONES REPRIN[T]
R  This copy is for you personal, non-commercia only. To order presentatic copies for distribution to y colleagues, clients or cus use the Order Reprints to bottom of any article or vi www.djreprints.com.
• See a sample reprint in format.
• Order a reprint of this ar

On a summer day in 2002, shares of **Affiliated Computer Services** Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.

His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It w same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraord: remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 tic one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. T is understood to be looking at about a dozen companies' option grants with this in mind.

**BUY LOW**

1

View a chart[2] of the number of options grants six executives received between 1995 and 2002 and the odds -- by a Wall Street Journal analysis -- that such a favorable pattern of grants would occur by chance.

Plus, see **how the Journal analyzed**[3] stock-option grants.

The Journal's analysis of grant dates and stock movements su the problem may be broader. It identified several companies w wildly improbable option-grant patterns. While this doesn't pr chicanery, it shows something very odd: Year after year, som companies' top executives received options on unusually prop dates. (Read an explanation of the methodology[4].)

The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the stock boom in the 1990s through the Sarbanes-Oxley corpora reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated from the late 1990s could still profit from them today.

Mr. Rich called his repeated favorable option-grant dates at ACS "blind luck." He said there was no backdating, a practice he termed "absolutely wrong." A spokeswoman for ACS, Lesley Pool, disputed Journal's analysis of the likelihood of Mr. Rich's grants all falling on such favorable dates. But Ms. Po

added that the timing wasn't purely happenstance: "We did grant options when there was a natural dip stock price," she said. On March 6, ACS said that the SEC is examining its option grants.

Stock options give recipients a right to buy company stock at a set price, called the exercise price or st price. The right usually doesn't vest for a year or more, but then it continues for several years. The exe price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, ( p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 option day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 tim 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, tl options would bring in an extra $1 million.

A key purpose of stock options is to give recipients an incentive to improve their employer's performa including its stock price. No stock gain, no profit on the options. Backdating them so they carry a low would run counter to this goal, by giving the recipient a paper gain right from the start.

Companies have a right to give executives lavish compensation if they choose to, but they can't mislea shareholders about it. Granting an option at a price below the current market value, while not illegal in could result in false disclosure. That's because companies grant their options under a shareholder-appr "option plan" on file with the SEC. The plans typically say options will carry the stock price of the da company awards them or the day before. If it turns out they carry some other price, the company coulc violation of its options plan, and potentially vulnerable to an allegation of securities fraud.



It could even face accounting issues. Options priced below the stock market value when they're awarded bring the recipient an instant pay gain. Under accounting rules, that's equivalent to extra pay and thus cost to the company. A company that failed to include such a cost in books may have overstated its profits, and might need to restate past financial results.

The Journal's analysis raises questions about one of the most lucrati stock-option grants ever. On Oct. 13, 1999, William W. McGuire, C giant insurer **UnitedHealth Group** Inc., got an enormous grant in tl parts that -- after adjustment for later stock splits -- came to 14.6 mil options. So far, he has exercised about 5% of them, for a profit of ab $39 million. As of late February he had 13.87 million unexercised o left from the October 1999 tranche. His profit on those, if he exercis them today, would be about $717 million more.

The 1999 grant was dated the very day UnitedHealth stock hit its low for the year. Grants to Dr. McG 1997 and 2000 were also dated on the day with those years' single lowest closing price. A grant in 200 near the bottom of a sharp stock dip. In all, the odds of such a favorable pattern occurring by chance v be one in 200 million or greater. Odds such as those are "astronomical," said David Yermack, an assoc professor of finance at New York University, who reviewed the Journal's methodology and has studie options-timing issues.

Options grants are made by directors, with details often handled by a compensation committee. Many companies make their grants at the same time each year, a policy that limits the potential for date fudg

But no law requires this.

Until last year, UnitedHealth had a very unusual policy: It let Dr. McGuire choose the day of his own grants. According to his 1999 employment agreement, he is supposed to choose dates by giving "oral notification" to the chairman of the company's compensation committee. The agreement says the exer price shall be the stock's closing price on the date the grants are issued.

Arthur Meyers, an executive-compensation attorney with Seyfarth Shaw LLP in Boston, said a contra as that sounded "like a thinly disguised attempt to pick the lowest grant price possible." Mr. Meyers s a pact could pose several legal issues, possibly violating Internal Revenue Service and stock-exchange rules that require directors to set a CEO's compensation. "If he picks the date of his grant, he has argu a portion of his pay. It's just not good corporate governance."

UnitedHealth called the process by which its grants were awarded "appropriate." It declined to answer specific questions about grant dates but noted that on all but two of them, grants were made to a broad of employees.

William Spears, a member of UnitedHealth's compensation committee, said the October 1999 grant w backdated but was awarded concurrently with the signing of Dr. McGuire's employment contract. Mr. said a depressed stock price spurred directors to wrap up negotiations and get options to management. board revised terms of the employment contract last year and will start making stock-option grants at regular time each year, Mr. Spears added.

The SEC's look at options timing was largely prompted by academic research that examined thousand companies and found odd patterns of stock movement around the dates of grants. One study was by E of the University of Iowa. He found that share prices generally fell before option grants and rose after with the result that recipients got options at favorable times. He concluded this was so unlikely to hap chance that at least some grant dates had to have been filled in retroactively.

Another possible explanation for big rises in stock prices following grants is that executives knew fav company news was coming and timed the grants just before it. But academics think timing for compa is a less likely explanation for the patterns, given the consistency of the stock climbs after grant dates. for many of the companies the Journal examined, no obvious company news followed closely upon th option grants.

It's also possible companies sometimes award options after their stock has taken a fall and seems to th be undervalued. In point of fact, the companies can't possibly know what the stock will do next, but th doesn't mean they might not feel confident enough about a recovery to think they are hitting a favorab to grant options.

The use of stock options surged in the late 1990s as young firms that had bright prospects but little rev used them to attract and pay executives. As dot-com and telecom shares exploded, stock options beca source of vast wealth.

They also grew controversial. Critics worried that big options grants tempted executives to do whatev took to get the stock price up, at least long enough to cash in their options. At the same time, during a bull market, the options sometimes richly rewarded executives for stock buoyancy that had little to do their own efforts.

At **Mercury Interactive** Corp., a Mountain View, Calif., software maker, the chief executive and two

resigned late last year. Mercury said an internal probe found 49 cases where the reported date of optio grants differed from the date when the options appeared to have been awarded. The company said it w to restate financial results. The SEC is still looking at Mercury, said someone familiar with the situatic

**Analog Devices** Inc. says it reached a tentative settlement with the SEC last fall. It neither admitted n denied that it had misdated options or had made grants just before releasing good news that would ten push up the stock. The Norwood, Mass., computer-chip maker tentatively agreed to pay a $3 million c penalty and re-price some options. CEO Jerald Fishman tentatively agreed to pay a $1 million penalty disgorge some profits. Analog didn't make him available for comment. The company said it will not r its financial records.

In some instances, backdating wouldn't be possible without inattentive directors, securities lawyers sa one company the SEC is looking at, lawyers say, it appears that someone picked a favorable past date option grant and gave it to directors for retroactive approval, perhaps counting on them not to notice. another case, the lawyers say, a space for the grant date appears to have been left blank on paperwork approved by directors, or dates were later altered.

Until 2002, companies didn't have to report option grants until months later. The Sarbanes-Oxley law, forcing them to report grants within two days, left less leeway to retroactively date a grant.

The new rule reduced stock patterns suggestive of backdating, but didn't eliminate these altogether, ac to a study by M.P. Narayanan and H. Nejat Seyhun of the University of Michigan. They found that companies report about a quarter of option grants later than the two-day deadline -- and that such dela reporting is associated with big price gains after the grant dates. It is a pattern Mr. Narayanan calls "consistent with backdating."

Before the stricter rules, **Brooks Automation** Inc., a semiconductor-equipment maker in Chelmsford, gave 233,000 options to its CEO, Robert Therrien, in 2000. The stated grant date was May 31. That w great day to have options priced. Brooks's stock plunged over 20% that day, to $39.75. And the very n it surged more than 30%.

A June 7 Brooks report to the SEC covering Mr. Therrien's May options activity made no mention of having gotten a grant on May 31, even though the report -- which Mr. Therrien signed -- did cite othei options-related actions he took on May 31. Not until August was the May 31 grant reported to the SE(

It wasn't the only well-timed option grant he got. One in October 2001 came at Brooks stock's lowest price that year, once again at the nadir of a sharp plunge. The Journal analysis puts the odds of such a consistent pattern occurring by chance at about 1 in nine million.

Mr. Therrien, who stepped down as CEO in 2004 and retired as chairman this month, didn't return me seeking comment. Chief Financial Officer Robert Woodbury said Brooks is "in the process of revamp practices so grants come at about the same time each year. Mr. Woodbury, who joined in 2003, said n Brooks would be able to explain the timing of Mr. Therrien's grants.

The highly favorable 2000 grant also benefited two others at Brooks -- the compensation-committee members who oversaw the CEO's grants. Although Brooks directors typically got options only in July year a special grant was awarded just to these two directors, Roger Emerick and Amin J. Khoury. Eac 20,000 options at the low $39.75 price. By the time of their regular July option-grant date, the stock w up to $61.75, a price far less favorable to options recipients.

Mr. Emerick, a retired CEO of Lam Research Corp., declined to be interviewed. Mr. Khoury, the CEO Aerospace Inc. in Wellington, Fla., didn't return messages left at his office.

Another company, **Comverse Technology** Inc., said Tuesday that its board had started a review of its stock-option practices, including "the accuracy of the stated dates of options grants," following questi[ons] about the dates from the Journal. The announcement reversed a prior Comverse statement -- given a w[eek] earlier in response to Journal inquiries -- saying all grants were made in accordance with applicable la[ws and] regulations.

The Journal's analysis spotlighted an unusual pattern of grants to Kobi Alexander, chief executive of t[he New] York maker of telecom systems and software. One grant was dated July 15, 1996, and carried an exer[cise] price of $7.9167, adjusted for stock splits. It was priced at the bottom of a sharp one-day drop in the s[tock] which fell 13% the day of the grant and then rebounded 13% the next day.

Another grant, on Oct. 22, 2001, caught the second-lowest closing price of 2001. Others also correspo[nded to] price dips. The odds of such a pattern occurring by chance are around 1 in six billion, according to the Journal's analysis.

Before Comverse announced its internal probe, John Friedman, a member of the board's compensation committee, said directors had noticed the scattered nature of the grants -- eight between 1994 and 200[1 in] six different months -- but management assured them there were valid reasons. Mr. Alexander, the CE[O,] didn't return phone calls.

This week, Comverse said that, as a result of the board's review of its options grants, it expects it will restate past financial results.

Propitious option timing can help build fortunes even at companies where the stock doesn't steadily ri[se.] Shares of **Vitesse Semiconductor** Corp., although they zoomed in the late 1990s, now rest at about th[e level] of a decade ago. But Louis R. Tomasetta, chief executive of the Camarillo, Calif., chip maker, reaped millions of dollars from stock options.

Mr. Tomasetta got a grant in March 1997 that, adjusted for later stock splits, gave him the right to buy 600,000 shares at $5.625 each. The date they were priced coincided with a steep fall in Vitesse's stock [to] what turned out to be its low for the year. He pocketed $23.1 million in profit when he exercised most [of] these options between 1998 and 2001. Had the grant come 10 days earlier, when the stock price was n[ot] stronger, he would have made $1.4 million less.

In eight of Mr. Tomasetta's nine option grants from 1994 to 2001, the grants were dated just before do[uble-] digit price surges in the next 20 trading days. The odds of such a pattern occurring by chance are abou[t 1 in] 26 billion.

Alex Daly, a member of the Vitesse board's compensation committee, said a review of the grants foun[d] "nothing extraordinary" about their timing, and "absolutely no grants have been made to anyone, least [of all] the CEO, that are out of sequence with our normal grant policy." Vitesse's finance chief, Yatin Mody, [said] the grants were "reviewed and approved" by the compensation committee, "and the exercise price set [at] the date of the approval, as documented by the related minutes." He declined to provide a copy of tho[se] minutes. Mr. Tomasetta said the grants were "approved by the board and the price set at the close of t[he day] of approval."

At ACS in Dallas, Mr. Rich helped turn a small technology firm into one with more than $4.4 billion i[n]

annual revenue and about 55,000 employees. ACS handles paperwork, accounting and data for busine and government agencies. It is a major outsourcer, relying on global labor. "It is a pretty boring busine Mr. Rich told the University of Michigan business school in 2004, "but there is a lot of money in borii

While most of Mr. Rich's stock-option gains were due to rises in ACS stock, the exceptional timing of enhanced his take. If his grants from 1995 through 2002 had come at each year's average share price, i than the favorable dates, he'd have made about 15% less.

An especially well-timed grant, in which Mr. Rich received 500,000 options at $11.53, adjusted for st splits, was dated Oct. 8, 1998. This happened to be the bottom of a steep plunge in the price. The shar 28% in the 20 trading days prior to Oct. 8, and rose 60% in the succeeding 20 trading days.

ACS's Ms. Pool said the grant was for Mr. Rich's promotion to CEO. He wasn't promoted until Februa 1999. Ms. Pool said there was a "six-month transition plan," and the Oct. 8 option grant was "in antici of his promotion.

Mr. Rich would have fared far worse had his grant come on the day ACS announced his promotion. T stock by then was more than twice as high. The grant wasn't reported to the SEC until 10 months after stated grant date. Ms. Pool said that was proper under regulations in place at the time.

A special board committee oversaw Mr. Rich's grants. Most years, its sole members were directors Fr Rossi and Joseph O'Neill. Mr. Rossi declined to comment. Mr. O'Neill said, "We had ups and downs i stock price like any publicly traded stock. If there were perceived low points, would we grant options point? Yes."

Mr. Rich said grants were made on the day the compensation committee authorized them, or within a so of that. He said he or Chairman Darwin Deason made recommendations to the special board comm about option dates.

Mr. Rich, who is 45 years old, resigned abruptly as ACS's chief executive on a Thursday in Septembe "pursue other business interests." Again, his timing was advantageous. In an unusual separation agreei the company agreed to make a special payment of $18.4 million, which was equal to the difference be the exercise price of 610,000 of his outstanding stock options and the closing ACS stock price on the his resignation.

But the company didn't announce the resignation that day. On the news the next Monday that its CEO departing suddenly, the stock fell 6%. Mr. Rich netted an extra $2 million by cashing in the options be the announcement, rather than on the day of it.

Mr. Rich said ACS signed his separation agreement on Friday, using Thursday's price for the options He said it waited till Monday to release the news because it didn't want to seem "evasive" by putting t news out late Friday.

—George Anders contributed to tl

**Write to** Charles Forelle at charles.forelle@wsj.com[5] and James Bandler at james.bandler@wsj.com[6]

# Buy Low

Certain executives have repeatedly received stock options on favorable dates just ahead of sharp gains in the price of the company stock. Below, the number of option grants six executives received between roughly 1995 and 2002 and the odds—by a Wall Street Journal analysis—that such a favorable pattern of grants would occur by chance. Charts show three especially propitious grants to each executive, and what the stock did 2 months before the grant and what it did 2 months after.



**Examples of options granted**
Stock prices adjusted for splits

○ Date of grant

**Company's response**

**Jeffrey Rich**
Affiliated Computer Services, former chief executive

Total grants:
6

Odds:
About 1 in 300 billion

 

Mr. Rich said no grants were backdated, called his favorable dates "blind luck." Company spokeswoman said, "We did grant options when there's a natural dip in the stock price." Mr. Rich stepped down as executive last fall.

**Louis Tomasetta**
Vitesse Semiconductor, president and chief executive

Total grants:
9

Odds:
About 1 in 26 billion

  

Mr. Tomasetta said the grants were "approved by the board and the price set at the close the day of approval." A member of the board compensation committee, said there was "nothing extraordinary about grant timing."

**Kobi Alexander**
Comverse Technology, chairman and chief executive

Total grants:
8

Odds:
About 1 in 6 billion

  

Company said its board has begun a review of past option practices, including "the accuracy of the stated dates options granted." As a result expects to have to restate financial results.

**William McGuire**
UnitedHealth Group, chairman and chief executive

Total grants:
12

Odds:
At least 1 in 200 million

 

William Spears, a director, the Oct. 13, 1999 grant was concurrent with signing of multiyear employment contract. "The price of the stock being at a depressed level gave us incentive to get options to management," wrapping up negotiations briskly.

**Robert Therrien**
Brooks Automation, former chief executive

Total grants:
7

Odds:
About 1 in 9 million

  

Company declined to explain grant timing. Finance chief Robert Woodbury said company is revamping policy to give options at same time each year. Mr. Therrien stepped down CEO in 2004 and as chair this month.

**Timothy Main**[2]

Company said it did not

**URL for this article:**
http://online.wsj.com/article/SB114265075068802118.html

**Hyperlinks in this Article:**
(1) window.open('http://online.wsj.com/documents/info-backdate06-0603.html','backdate','toolbar=no,scrollbars=no,location=no,width=780,height=640,left=20,top=30');void('');;return false;
(2) window.open('http://online.wsj.com/documents/info-backdate06-0603.html','backdate','toolbar=no,scrollbars=no,location=no,width=780,height=640,left=20,top=30');void('');;return false;
(3) http://online.wsj.com/article/SB114265125895502125.html
(4) http://online.wsj.com/article/SB114265125895502125.html
(5) mailto:charles.forelle@wsj.com
(6) mailto:james.bandler@wsj.com

Copyright 2006 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.