

## GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

200 Park Avenue  New York, New York 10166-0193
(212) 351-4000
www.gibsondunn.com

rsenor@gibsondunn.com

May 29, 2007

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: _____

## MEMO ENDORSED

Direct Dial                                                            Client No.
(212) 351-3917                                                         T 94625-00001
Fax No.
(212) 351-5246

*5/30/07*

*NO — I will simply deny + send you to trial — so don't waste your time*

BY FACSIMILE & HAND DELIVERY

Honorable Colleen McMahon
United States District Judge
United States Courthouse
300 Quarropas Street, Room 533
White Plains, New York 10601-4150

    Re:    *In re Veeco Instruments Inc. Sec. Litig.*, No. 7:05-MD-01695 (CM)(GAY)

Dear Judge McMahon:

    I am counsel for Defendants in the above-referenced action. I write to respectfully inform Your Honor that fact discovery (much of which occurred since mid-February) has now concluded, and has yielded essentially no support for any of the allegations relied upon by Plaintiffs[1] in order to withstand Defendants' motion to dismiss, particularly as it related to scienter. For this reason, I also respectfully request Your Honor's guidance regarding whether this Court will consider, prior to trial, a motion for summary judgment by Defendants based on insufficient proof of scienter, based on Rule 56 precedents in this Circuit.

    What has emerged in discovery is a pattern of efforts by Veeco's management, plus the company's Audit Committee, to intensify scrutiny of its newly acquired TurboDisc division, resulting in the uncovering of the accounting errors in that division for the first three quarters of 2004 that necessitated a restatement in early 2005. While in hindsight, the errors, as is always the case, might have been uncovered earlier, that is not a basis for finding either intentional or

---

[1] "Plaintiffs" refers to Lead Plaintiff, Steelworkers Pension Trust, individually and on behalf of a class of purchasers of common stock of Veeco Instruments Inc. ("Veeco") between April 26, 2004 and February 10, 2005.

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 2

reckless conduct by the people at Veeco who – without outside prodding, – successfully acted to correct the errors.

Defendants moved to dismiss Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") on December 2, 2005, on the grounds that Plaintiffs had failed to state their claims – including the necessary element of scienter – with the particularity required by Fed. R. Civ. P. 9(b). Your Honor denied that motion on March 21, 2006. See In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220 (S.D.N.Y. 2006) ("MTD Order"). With respect to Defendants' scienter argument, this Court agreed with Defendants that "the complaint fail[ed] to allege adequate motive and opportunity" to commit the alleged fraud. Id. at 230. Your Honor also found that "[t]aking plaintiffs' allegations as true – as the court must do on a motion to dismiss" Plaintiffs had pleaded Defendants' "recklessness" with sufficient particularity to withstand Rule 9(b) dismissal. Id. at 231.

In doing so, this Court acknowledged that Plaintiffs' Complaint, "to a large extent, is based on information obtained from three former Veeco employees, referred to as CW1, CW2, CW3." MTD Order, at 229. Indeed, save for the allegations concerning defective filaments (which are demonstrably false, and upon which Your Honor did not rely), CW3 is the exclusive confidential source for the allegations in Plaintiffs' Complaint. Plaintiffs have themselves conceded that "CW3" is "the source on which they primarily rely." Id. Through discovery, it has come to light that "CW3" is Bruce Huff, former controller of Veeco's TurboDisc division. Mr. Huff's deposition testimony directly contradicts each of Plaintiffs' allegations for which Mr. Huff was supposedly their confidential source. And through extensive discovery, Plaintiffs have failed to adduce any other evidence of scienter. As a result, summary judgment based on lack of scienter is appropriate.

## A.    Mr. Huff's Deposition

At his deposition, conducted December 20, 2006, Mr. Huff testified that he had talked "eight to ten" times with Plaintiffs' private investigator, Don Richards, prior to the filing of Plaintiffs' Complaint (as well as with "other people . . . in the phone conversations" he had with Mr. Richards). See Huff Dep. Tr., dated Dec. 20, 2006, at 151-52. Notably, when Mr. Huff "look[ed] through" a copy of the Complaint that had been sent to him by Plaintiffs, he "saw some inaccuracies in it, contacted [Mr. Richards], at which point [Mr. Richards] said it was too late to change anything." Id.

Indeed, Mr. Huff gave testimony contrary to nearly every allegation in Plaintiffs' complaint attributed to confidential source "CW3," including all of the scienter-related allegations upon which this Court relied (and whose truth this Court was required to assume) in denying Defendants' motion to dismiss. These scienter allegations were:

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 3

> **(1)** "that defendants had knowledge or recklessly ignored Veeco's premature recognition of $10 million in revenues from the Sanan Group during the first three quarters of 2004." MTD Order at 231 (citing Complaint, ¶¶ 58-60, 88);

> **(2)** "that defendants had knowledge or recklessly ignored the dramatic increase in TurboDisc's warranty costs under Veeco ownership" by refusing to increase Veeco's warranty accruals, and that Defendant Kiernan instructed Mr. Huff to reverse a proposed $250,000 warranty accrual. Id. (citing Complaint, ¶¶ 71, 133).

> **(3)** that "Defendants had knowledge of or recklessly ignored Veeco's accumulation of stockpiles of nonsaleable inventory" by "fail[ing] to write down more than $5 million" in such inventory as required by both GAAP and Veeco's own accounting policies. Id. (citing Complaint, ¶¶ 76-77, 88); and

> **(4)** that "Defendants had knowledge of or recklessly ignored Veeco's improper recognition of revenues" in connection with agreements entered into between Veeco and Emcore at the time of the TurboDisc acquisition (the "Veeco-Emcore Agreements," and that Defendant Kiernan directed Mr. Huff to "bur[y]" adjustments relating to the Veeco-Emcore Agreements into TurboDisc's fourth quarter financial results. Id. (citing Complaint, ¶¶ 55-56, 135)

Through both Mr. Huff's testimony and the balance of the discovery, each of these allegations has been demonstrated to be without any basis. Taking each in turn:

### 1.    Sanan

Plaintiffs' allegation regarding improper revenue recognition from Sanan Group transactions is essentially that "according to CW3 [Mr. Huff]," Veeco paid its Chinese employees "increased incentive bonuses in order to obtain fictitious customer sign-offs" which were required for revenue recognition under both GAAP and Veeco's own accounting policies. MTD Order, at 231 (citing Complaint, ¶ 59). At his deposition, however, Mr. Huff testified that he was not aware of, and *never* made any representation to Plaintiffs about, Veeco soliciting fictitious customer sign-offs. See Huff Dep. Tr., dated Dec. 20, 2006, at 117:4 - 118:7 (stating that paragraph 59 of the Complaint is inaccurate, and that "I know of no inducement to employees for increased bonuses. I know of no fictitious sign-offs that were received to allow for revenue recognition," nor was he aware "of any attempts by anyone at Veeco to improperly accelerate the recordation of revenue"). Moreover, none of the documents produced by Defendants support these allegations. Veeco delivered the first two tools in an eight-tool Sanan Group order during the third quarter of 2004, and it properly recognized $3.2 million in revenue based on delivery and unconditional acceptance. See VECO 0103797-98; VECO 0512477 Veeco specifically *refused* to recognize revenue on the tools on September 9, 2004, when

MAY-29-2007 TUE 07:28 PM

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 4

Veeco's Chinese sales representative executed a "side agreement" with Sanan Group delaying the actual acceptance date. See VECO 0018537. Instead, Veeco wanted to recognize revenue until September 29, 2004, when it received confirmation that an unconditional sign-off had been obtained. See VECO 0103797-98, VECO 0512477. Finally, as Veeco's internal work papers supporting the restatement make clear, *no part* of the ultimate restatement of Veeco's first, second, and third quarter 2004 financials related to premature revenue recognition of revenue on Sanan Group transactions. See VECO 0097788.

## 2.    Warranty Accruals

Plaintiffs' allegation regarding refusal to increase TurboDisc warranty accruals is that "according to CW3 [Mr. Huff], upon his preparation of a $250,000 journal entry to increase the accrual for warranty costs, defendant Kiernan, at the direction of Rein, instructed CW3 to reverse the accrual." MTD Order, at 231 (citing Complaint, ¶ 133). Again, none of the evidence adduced by Plaintiffs through discovery supports these allegations. Indeed all of it is to the contrary. Mr. Huff testified at his deposition that Plaintiffs' allegations were not accurate, and that he had never told Plaintiffs that Mr. Kiernan had instructed him to reverse the warranty accrual at Mr. Rein's direction. See Huff Dep. Tr., dated Feb. 9, 2007, at 334:9 - 335:23, see also id. at 331:24 - 332:9, Huff Dep. Tr., dated Dec. 20, 2006, at 105:10 - 107:9. Plaintiffs, after Mr. Huff's deposition, refused to ask Mr. Kiernan about the incident when he was deposed on February 27, 2007.

## 3.    Nonsaleable Inventory

Plaintiffs' allegation regarding the failure to write down $5 million in "nonsaleable inventory" is that "[a]ccording to CW3 [Mr. Huff], defendants Braun, Rein, and Kiernan knew of the inventory build-up throughout 2004." MTD Order, at 231. However, Mr. Huff testified at his deposition that, while Veeco senior management was periodically informed of the inventory levels at the TurboDisc division, he had no reason to believe that they knew of anything *inaccurate* about these inventory levels. See Huff Dep. Tr., dated Dec. 20, 2006, at 101:9-11, 102:14-19 (stating his view that inventory on hand at the end of the third quarter 2004 was "accurately valued as of that time," and that he did not "have any reason to believe that a material portion of the inventory that TurboDisc had on-hand at the end of the third quarter would have to be scrapped or sold for low cost"); see generally id. at 100-102.[2] More

---

[2] Indeed, the fact that Veeco and its management did not automatically equate increasing inventory levels at TurboDisc with misconduct at TurboDisc is hardly evidence of recklessness. Fraud cannot be inferred simply because Veeco "might have been more curious or concerned" about the reasons for the build-up. See, e.g., Chill v. General Electric Co., 101 F.3d 263, 270 (2d Cir. 1996) ("The plaintiffs do not demonstrate how the increased

[Footnote continued on next page]

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 5

importantly, examination of the specific inventory errors corrected in the restatement reveal that they had nothing to do with the write-off of what Plaintiffs alleged to be unsaleable generic reactors or defective components. See 3/14/05 Report to Audit Committee (VECO 0512074-84) To the contrary, the bulk of the adjustments (approximately 85%) resulted from Mr. Huff's failure to accurately relieve the appropriate inventory costs associated with systems that had already been sold, and to record costs associated with inventory in process, among other things. Id.[3] Thus, these inventory adjustments, which Ernst & Young approved, were not the result of unsaleable inventory. See VECO 0512074-84.

### 4. Errors Relating to the Veeco-Emcore Agreements

Plaintiffs' allegation regarding Defendants "ignoring" improper recognition of revenue relating to agreements between Veeco and Emcore is that "CW3 asserts that he was specifically instructed by defendant Kiernan, at the direction of Rein, to 'book the [Veeco-Emcore] adjustments in October [2004],' so as to push them into the fourth quarter and 'bury' them with other adjustments." MTD Order, at 231 (citing Complaint, ¶¶ 55-56, 135). This allegation is contrary to Mr. Huff's own testimony. Mr. Huff testified that the adjustments relating to the Veeco-Emcore Agreements were not recorded in the third quarter of 2004 based on the conclusion of "the Veeco corporate folks and Ernst & Young that the aggregate didn't impact Veeco's financial statements for quarter 3," and that he "had no reason to think the[n] conclusion was wrong," nor did he have any reason to think that it was anything other than a "legitimate accounting determination." See Huff Dep. Tr., dated Dec. 20, 2006, at 79, 85-86; see also id. at 82 (the Veeco-Emcore Agreements were "not set up for Veeco to improperly recognize revenue").[4] The evidence produced via discovery demonstrates that these errors were discovered by Veeco's internal auditor prior to the release of Veeco's third quarter financials, at which point they were brought to the attention of Veeco's senior management and audit committee — as well as the company's outside auditor, Ernst & Young – all of whom determined the errors not to be

[Footnote continued from previous page]

> level of activity at Kidder, as reflected in GE's consolidated financial records, would necessarily have indicated to GE that there was misconduct. The fact that GE did not automatically equate record profits with misconduct cannot be said to be reckless.").

[3] The remaining inventory errors of $0.8 million related to the improper valuation of service parts returned by a Taiwanese subsidiary, failure to write off a training tool that was not intended for sale, and other miscellaneous errors. See 3/14/05 Report to Audit Committee (VECO 0512074-84).

[4] In fact, the adjustments relating to the Veeco-Emcore Agreements were reported at the segment level in Veeco's third quarter 10-Q.

## GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 6

material in light of offsetting corporate level adjustments.  See VECO 0137104-08; EY-FF-AAFRE 002214-16.

### B.    Plaintiffs' Remaining Scienter Allegations

The remainder of Plaintiffs' allegations relied upon by this Court in denying Defendants' motion to dismiss (insofar as it related to scienter) have similarly been shown, through discovery, to be without basis.  For instance, this Court accepted as true Plaintiffs' allegation that Defendants "recklessly ignored red flags regarding Veeco's internal accounting controls" because "the size of TurboDisc's accounting department was dramatically reduced after Veeco acquired the division."  MTD Order, at 23.2 (citing Complaint ¶ 136 ("TurboDisc's accounting department had been reduced from a standing staff of six to eight people under Emcore, to two under Veeco")).  This allegation has now been shown to be false.[5]  At Mr. Huff's deposition, he testified that "[t]here were seven people in the accounting department" for *all of Emcore*, and

---

[5]    Indeed, having tacitly recognized their own failure to prove any of the scienter allegations in the Complaint, Plaintiffs have shifted their focus – both in their recent depositions of Veeco personnel, and the report of their proposed accounting expert, Robert W. Berliner – to the alleged inaccuracy of Veeco's quarterly certifications as to internal controls over financial reporting, made pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.  See Complaint, ¶¶ 90, 98, 115.  The weight of authority holds that even if these certifications were false, this would be insufficient to prove Defendants' scienter.  See Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (rejecting argument that SOX certifications are indicia of scienter because otherwise, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA"); Ley v. Visteon, Civ. No. 05-CV-70737, 2006 WL 2559795, at *9 (E.D. Mich. Aug. 31, 2006) (refusing "to interpret the signed [SOX] certifications as evidence of scienter, as doing so would be to hold company executives strictly liable for innocent accounting mistakes"); In re Hypercom Corp. Sec. Litig., Civ. No. 05-0455 (PHX) (NVW), 2006 WL 1836181, *11 (D. Ariz. July 5, 2006) ("an incorrect Sarbanes-Oxley certification does not, by itself, create a strong inference of scienter"); Limantour v. Cray Inc., 432 F. Supp.2d 1129, 1160 (W.D. Wash. 2006) (holding that a Section 10(b) plaintiff must show "not only that the Forms 10Q and SOX 302 certifications were false or misleading, but also that Defendants had actual knowledge of their false or misleading nature or were deliberately reckless in issuing such statements at the time"); cf. In re American Express Co. Shareholder Litig., 840 F. Supp. 260, 268 (S.D.N.Y. 1993) (holding that allegations of "failure to disclose information 'regarding the Company's . . . lack of internal controls'" is "[p]lainly . . . the type of nondisclosure concerning 'garden variety mismanagement' that [does] not give rise to a claim under" the securities laws), aff'd, 39 F.3d 395 (2d Cir. 1994).

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 7

that TurboDisc was just "one of three [Emcore] business units" See Huff Dep. Tr., dated Feb. 9, 2007, at 54:8-19.[6]  Mr. Huff further testified that at Emcore, he was the *only* accounting employee that was "solely" dedicated to TurboDisc. *Id.* at 54:15-19  Two of Emcore's accounting employees (including Mr. Huff) were kept on following Veeco's acquisition of the TurboDisc division, performing their duties under the oversight of a sizable corporate finance department at Veeco. See Kiernan Dep. Tr., dated Feb. 27, 2007, at 33:24 - 37:23.  Thus, the number of dedicated TurboDisc accounting employees was not decreased upon acquisition  And indeed, this number *increased* throughout 2004 to account for, *inter alia*, a ramping up of the division's business and the new requirements of the Sarbanes-Oxley Act of 2002  See Kiernan Dep. Tr., dated Feb. 27, 2007, at 90:8 - 91:8, 109:22 - 113:18, Huff Dep. Tr., dated Dec. 20, 2006, at 47:4 - 52:23, 56:12 - 61:20; VECO 0075583-600; VECO 0076546-50, VECO 0075709-10.

The only other scienter allegations relied upon by this Court in denying Defendants' motion to dismiss for lack of scienter are allegations which necessarily rise and fall with the aforementioned allegations. Take, for example, Plaintiffs' allegation that Defendants "falsely attributed the need for a restatement to the actions of a 'single individual at TurboDisc whose employment had been terminated.'" See MTD Order, at 232 (citing Complaint, at ¶ 4)  Veeco unquestionably did state, in its 10-K filed March 16, 2005, that the restatement was due to one person at TurboDisc. But this statement is only false if any of Plaintiffs' other scienter allegations regarding Defendants are proven to be true. As shown above, *none* of them are

Similarly, Plaintiffs' allegation that "defendants repeatedly assured investors that TurboDisc was increasingly profitable and was yielding cost-saving synergies" (see MTD Order, at 232) is in some respects true, as there is evidence that Defendants made optimistic statements regarding TurboDisc's financial results during 2004.[7]  However, given the lack of evidentiary support for Plaintiffs' other scienter allegations, there is no proof that Defendants believed that the positive statements regarding TurboDisc's financial performance were incorrect when they were made. As with the underlying financial misstatements themselves, only in hindsight did

---

[6]  For the purposes of their Complaint, Plaintiffs apparently included Emcore's CFO, its Vice President of Finance, and other finance employees at Emcore with only partial (or no) responsibility for TurboDisc as part of TurboDisc's accounting staff  See Huff Dep. Tr., dated Feb. 9, 2007, at 54:8-59:5.

[7]  Defendants' statement regarding potential "synergies" would only appear to have been made at the time of the initial acquisition, *see* Complaint ¶ 80, as Plaintiffs have adduced no further proof of such statements. Thus, Plaintiffs' allegation that "Defendants continued to tout the purported 'synergies' throughout the Class Period" (see Complaint ¶ 32) finds no support in the evidence.

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 8

these statements prove to be false. See, e.g., Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud.").

## C.    Summary Judgment Is Appropriate

Indeed, stripped of the now-disproved scienter allegations, Plaintiffs' Complaint now alleges only "fraud by hindsight," accounting restatements made by Veeco management following its discovery of GAAP violations by a single mid-level accounting employee, a discovery which resulted from an internal investigation undertaken on the company's own initiative once indications of the problem were brought to its attention. It is axiomatic that proof of "a violation of GAAP provisions," without proof of "corresponding fraudulent intent," is insufficient to prove "recklessness" as a matter of law. See Chill v. Gen. Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996); In re Carter Wallace Sec. Litig., 220 F.3d 36, 42 (2d Cir. 2000); In re Citigroup, Inc. Sec. Litig., 330 F.Supp.2d 367, 378 (S.D.N.Y. 2004); In re Federated Department Stores, Inc. Sec. Litig., 2004 WL 444559, at *8 (S.D.N.Y. Mar. 1, 2004). As the Second Circuit has explained, Section 10(b) does not require defendants to be "clairvoyant." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2001).

Your Honor found that Plaintiffs had made sufficient allegations of "recklessness" to withstand a motion to dismiss. However, this Court's decision was based on Plaintiffs' having alleged that Defendants ignored various "red flags." See, e.g., MTD Order at 23 (citing Complaint, ¶ 136). Now that discovery is complete, the mere existence of "red flags" – absent proof of Defendants' knowledge of or deliberate indifference to them – is not enough. See In re Ikon Office Solutions, Inc., 277 F.3d 658, 668 n.9 (3d Cir. 2002) ("As this litigation is well beyond the pleading stage, appellants overstate the significance of caselaw suggesting that allegations of violations of GAAP or GAAS, coupled with allegations of ignoring 'red flags,' can be sufficient to withstand a motion to dismiss in a securities fraud action."). Rather, "when testing the sufficiency of [Plaintiffs'] evidence" with respect to Defendants' recklessness "rather than the adequacy of [the scienter] allegations in [their] complaint," this Court's inquiry becomes simply "whether the evidence, taken as a whole, could support a finding by a reasonable juror that [D]efendants acted with the intent to deceive, manipulate, or defraud investors." In re Northern Telecom Ltd. Sec. Litig., 116 F.Supp.2d 446, 462 (S.D.N.Y. 2000).[8] The evidence, taken as a whole, establishes that Defendants did not

---

[8] See generally Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Chill, 101 F.3d at 269 ("recklessness 'must, in fact, approximate an actual intent to aid in the fraud being perpetrated'") (citation omitted); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) ("Reckless conduct is, at the least, conduct which is 'highly unreasonable,' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent

[Footnote continued on next page]

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 9

    The precedents in this Circuit indicate that summary judgment would be appropriate in this sort of corporate disclosure case. Several decisions have recognized that a court should not hesitate to grant summary judgment based on insufficient proof of scienter where, as here, a plaintiff's proof utterly fails to live up to the promises of its complaint. See, e.g., In re Symbol Tech. Class Action Litig., 950 F. Supp. 1237, 1240-41 (E.D.N.Y. 1997); Robbins v. Moore Medical Corp., 894 F. Supp. 661, 669 (S.D.N.Y. 1995) ("The failure to offer any evidence of scienter is proper grounds for granting summary judgment"); S.E.C. v. Lowy, 396 F. Supp.2d 225, 243 (E.D.N.Y. 2003).

    The court in Symbol Tech granted summary judgment to defendants, officers of a corporation who issued optimistic press releases shortly before receiving formal internal reports circulated by management which indicated problems at the company. The court rejected the plaintiffs' argument that these internal reports must have been preceded by other red flags that defendants knowingly or recklessly ignored, holding that "[m]ere generalized allegations that defendants knew at the time of the statements that the[ir] predictions" were false are insufficient. Symbol Tech, 950 F. Supp. at 1246 (noting that "all of the internal documents support the assessments and projections in the three statements at issue," and "Plaintiffs have not pointed to any evidence, let alone 'strong evidence,' that defendants had or relied on information to the contrary"). Here, Plaintiffs cannot point to any evidence that Veeco senior management had or relied on any information at the time of the release of the first, second and third quarter 2004 financials which was contrary to those financials.[9] Indeed, it was through the efforts of Veeco's management — particularly its internal audit unit — that accounting errors at TurboDisc were uncovered.

    In Robbins, the court granted summary judgment for the defendant officers of a corporation who, plaintiff alleged, had publicly claimed to be "optimistic" that their company's

---

[Footnote continued from previous page]

    that the danger was either known to the defendant or so obvious that the defendant must have been aware of it ") (emphasis added).

[9]  That contrary information might have existed and been obtained by Defendants upon their investigation is of no moment. It is not enough for Plaintiffs to prove that Defendants had access to particular information. To prove recklessness, Plaintiffs must prove that Defendants had actual knowledge of that information. See Kinsey v. Cendant Corp., 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005); In re Health Mgmt. Sys., Inc. Sec. Litig., No. 97 Civ. 1865(HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998); Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594(LAP), 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996); Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1036 (9th Cir. 2002)

GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 10

new subsidiary would "become profitable during the year." Robbins, 894 F.Supp. at 666. [10] This statement was made despite the existence of a more pessimistic internal memorandum which opined:

> The [subsidiary's] budget is a real stretch. The sales budget is extremely aggressive. The gross profit depends on not reducing sales prices to get the sales growth and also on more than double the 1989 production without much increase in manufacturing expenses. . . . While I believe progress can be made at [the subsidiary], I do not believe the budget is achievable.

Id. at 672. Yet Robbins rejected the argument that the defendants were reckless in making their statements in light of the memorandum, because "[t]he memo d[id] not question the existence of a reasonable basis for the budget," and did not indicate that the writer "believed [the subsidiary] could not turn a profit." Id. Accordingly, the plaintiff had failed to establish scienter. Id. ("'misguided optimism is not a cause of action, and does not support an inference of fraud'") (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994)). The same result should obtain here, as Plaintiffs have failed to produce any evidence that Veeco management was in possession of information prior to the issuance of its first, second and third quarter 2004 financials which indicated that those financials were materially misstated.

Finally, the Lowy decision, while not a ruling on a motion for summary judgment (but rather a judgment for defendant following a bench trial of a Section 10(b) claim), is particularly instructive. In Lowy, the SEC alleged that the defendant was reckless in representing to a corporation that acquired his own corporation that his corporation owned certain assets, and that they were worth a certain amount based on a particular appraisal. Lowy, 396 F.Supp.2d at 228. The SEC presented evidence that the defendant had received faxes and letters which raised doubts as to the validity of both the corporation's title and the appraisal (doubts which were ultimately substantiated). Id. at 232-33. While the court acknowledged that the faxes and letters "could qualify as . . . red flag[s]," it found that the "evidence presented established that [the defendant] did in fact respond" to them, and "proceed[ed] in a reasonable fashion, particularly considering that he did not have the benefit of hindsight that the Court and the SEC have now." Id. at 244-45, see also id. at 243 (finding the defendant "in fact responded reasonably to and investigated each of the supposed 'red flags'" cited by the SEC, "that he did not 'ignore obvious signs of fraud' and that the SEC has not shown that his conduct amounted to 'an extreme departure from the standards of ordinary care'") (citations omitted).

----

[10] This allegation is almost identical to Plaintiffs' allegations in this case regarding Veeco's public statements "that TurboDisc was increasingly profitable and was yielding cost-saving synergies." See MTD Order, at 232, see also Complaint ¶ 32.

## GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 11


The facts of the case at bar are similar to those in Lowy. That is, it is clear now that the
scienter allegations of Plaintiffs' Complaint consisted primarily of allegations of intentional
misconduct of Defendants resulting in financial misstatements, allegations whose only support –
the expected testimony of a confidential witness – has proved illusory. All that remains are
Plaintiffs' allegations that Defendants deliberately failed to respond to warnings of problems with
TurboDisc's internal controls over financial reporting, and turned a blind eye to potential
accounting errors. However, the evidence shows that Defendants – like the defendant in Lowy –
did respond reasonably to the issues which arose at TurboDisc. In particular, the evidence
shows, inter alia:

- that Veeco management was appropriately responsive to the reports of its internal
  auditor regarding issues with respect to TurboDisc's compliance with Sarbanes-Oxley
  documentation requirements, and the division's staffing needs as the volume of the
  TurboDisc business increased. See October 20, 2004 Audit Committee Presentation
  (VECO 0129171-208), November 29, 2004 Audit Committee Presentation (VECO
  0144310-69);

- that Veeco's internal auditor, Gary Reifert, spent extensive time on location at the
  TurboDisc division in Somerset, NJ, from the time of initial Sarbanes-Oxley testing
  for 2004 (beginning in July 2004) to the time of the restatement. See, e.g., Reifert
  Dep. Tr., dated Feb. 13, 2007, at 30-31 (noting that the suggestion by Veeco's audit
  committee to do "a financial and operations audit of TurboDisc . . . as part of the
  internal audit plan for 2004" was "appropriate, given the fact that [the] compan[y]
  was] recently acquired," and "showed that the committee was being responsive"); id.
  at 94 ("I spent a good portion . . . of the second half of [2004] in New Jersey doing
  Sarbanes-Oxley testing for TurboDisc, as well as balance sheet audits");

- that Veeco appropriately expanded the scope of its internal audit procedures with
  respect to TurboDisc as information came to light which suggested that such
  additional audit scrutiny would be prudent. See, e.g., 3/14/05 Report to Audit
  Committee (VECO 0512074-84); Reifert Dep. Tr., dated Feb. 13, 2007, at 174-75
  ("given the number of items that I had found that required remediation in my SOX 404
  testing [completed in October 2004], I believed it was prudent as the internal auditor to
  notify management and the committee[, a]nd we ultimately went to [Ernst & Young]
  shortly thereafter, explaining that we thought it was most appropriate for internal audit
  to conduct a balance sheet audit to get comfortable"); and

- that Veeco, after discovering potentially serious accounting errors, appropriately
  initiated an internal investigation (with the help of outside counsel and forensic
  accountants) to determine the scope of the misstatements. See Internal Audit Update,
  dated Dec. 22, 2004 (VECO 0156932-36); Audit Committee Minutes, dated January
  17, 2005 (VECO 0507388-89).

# GIBSON, DUNN & CRUTCHER LLP

Honorable Colleen McMahon
May 29, 2007
Page 12


Thus, just as in Lowy, Defendants "responded reasonably to and investigated" the supposed "red flags." Lowy, 396 F.Supp.2d at 243. As such, Plaintiffs cannot show recklessness, i.e., that the misstatements at issue were "either known to [Defendants] or so obvious that [Defendants] must have been aware" of them. Rolf, 570 F.2d at 47.

For all these reasons, we would respectfully request guidance from Your Honor, whose time we do not wish to waste,[11] as to whether Your Honor would be willing to consider a summary judgment motion.

Respectfully submitted,

Robert F. Serio
John A. Herfort

RFS/dph
Enclosure(s)

cc:   Sherrie R. Savett, Esq.
      Carole Broderick, Esq.
      Arthur Stock, Esq.
      Phyllis Parker, Esq.
      Jeff Osterwise, Esq.
      Robert I. Harwood, Esq.
      Shane Rowley, Esq.
      Paul Scarlato, Esq.


---

[11]  We are cognizant of Your Honor's comments at the February 23, 2007 hearing that "[y]ou'll be wasting your time and you'll be wasting your client's money" with a summary judgment motion. Transcript of February 23, 2007 Hearing, at 6.