UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————— —— —— —— —— ——x
IN RE: VEECO INSTRUMENTS, INC.            05-MD-01695 (CM)(GAY)
SECURITIES LITIGATION

—————————————————————x
THIS DOCUMENT RELATES TO ALL ACTIONS
—————————————————————x


MEMORANDUM AND DECISION ON MOTIONS *IN LIMINE*

McMahon, J.:

The court, for its rulings on motions *in limine*:


I. Defendants' Motion *In Limine* to Bifurcate the Trial

Defendants have filed a motion *in limine* requesting the Court to bifurcate the trial of

plaintiffs' securities fraud claims into a liability phase and a damages phase. Under Fed. R. Civ.

P. 42(b), this court may conduct a separate trial of "any separate issue" where it would: (1)

promote judicial economy; (2) further the convenience of the Court, parties, and jurors; (3) avoid

prejudice to the party requesting the bifurcation; and (4) not result in prejudice to the opposing

party. Though the decision on whether to bifurcate a trial into liability and damages phases is a

matter committed to the sound discretion of the trial court, bifurcation is the exception, not the

rule, and efficient judicial administration favors a single trial whenever possible. Getty Petroleum

Corp. v. Island Transp. Corp., 862 F.2d 10, 15 (2d Cir. 1988); L-3 Communs. Corp. v. OSI

Systems, Inc, 418 F. Supp. 2d 380, 382 (S.D.N.Y. 2005); see also Monaghan v. SZS 33 Assocs.,

L.P., 827 F.Supp 233, 245-46 (S.D.N.Y. 1993)(highlighting "the fundamental presumption

which favors the trial of all issues to a single jury and underlies the assumption of Rule 42(b) that

1

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

bifurcation . . . is reserved for truly extraordinary situations of undue prejudice.") The party

seeking bifurcation bears the burden of establishing that bifurcation is warranted. Dallas v.

Goldberg, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001).

In support of their motion to bifurcate, defendants offer nothing but stock assertions about

the general differences in proof required at the liability and damages phases of a securities fraud

class action; the potential for confusion given the complexity of the issues involved; the boon to

judicial economy that would flow from a verdict for defendants that eliminates the need for a

damages phase altogether; and the amorphous possibility of prejudice to defendants if jurors are

moved by sympathy when presented with evidence of the plaintiffs' losses. Far from presenting

the sort of exceptional circumstances that would overcome the presumption in favor of a single

trial, these considerations are so routine that they would seem to require bifurcation in every

securities class action. That is surely not the practice of the courts. See In re WorldCom, Inc. Sec.

Litig., 2005 U.S. Dist. LEXIS 2214, at *5-6 (S.D.N.Y. Feb 18, 2005)(ruling that all class-wide

issues will be tried together in a plenary trial, including reliance, knowledge and damages); see

also In re: Blech Sec. Litig., 2003 U.S. Dist. LEXIS 4650, at *41-43 (S.D.N.Y. Mar. 27, 2003).

Defendants' argument that a bifurcated trial would conserve judicial resources if the jury

found for defendants at the liability phase is equally applicable to almost any case, both in and

out of the securities class action context. By definition, it cannot represent an exceptional

circumstance. Moreover, the plaintiffs argue convincingly that intertwined issues of liability and

damages undermine defendants' claim of judicial economy. Id. To provide a proper factual

backdrop for the jury in a separate damages phase would require the redundant introduction of

evidence from the liability phase – a duplication of effort that benefits neither this court, nor the

2

litigants. Even if the two phases could be tried to the same jury *seriatim*, the court is not

persuaded that defendants' generalized claims of prejudice justify the delay and administrative

inconvenience of a bifurcated trial. Relying on data from personal injury cases, defendants

speculate that the jury may find liability based on sympathy rather than the merits of the claim,

unless the damages issues are tried separately. Where, as here, the loss is purely financial in

nature, such concerns about juror sympathy are greatly attenuated, and do not come close to a

showing of undue prejudice. Finally, as this court recognized in DeMarco v. National Collector's

Mint, Inc, 229 F.R.D. 73 (S.D.N.Y 2005), where damages can be calculated using a class-wide

formula, the trial need not be bifurcated. Although this trial is admittedly more complex than the

one contemplated in DeMarco, bifurcation remains unnecessary since plaintiffs plan to present

their damages evidence using a class-wide formula, and there will be no issues of individual

reliance.

For the foregoing reasons, defendants' motion to bifurcate the trial into separate liability

and damages phases under Rule 42(b) is DENIED.

II. Defendants' Motion *In Limine* to Preclude Evidence of Liability Insurance

Defendants have filed a motion *in limine* to preclude the plaintiffs from presenting

evidence at trial with respect to the fact or amount of defendants' Directors & Officers (or D &

O) liability insurance. Defendants argue that such evidence is generally precluded pursuant to

Fed. R. Evid. 411, that it is irrelevant to the disputed issues in the case, and that any possible

probative value is far outweighed by the substantial prejudice that would result to defendants

from the introduction of such evidence. Defendants are correct.

Federal Rule of Evidence 411 provides as follows: "Evidence that a person was or was

3

not insured against liability is not admissible upon the issue [of] whether the person acted

negligently or otherwise wrongfully." Pursuant to this rule, evidence concerning a party's

liability insurance is generally excluded "as being an invitation to the jury to share the resources

of the insurer with the plaintiff, regardless of the merits of the case." See 1 Handbook of Fed.

Evid. 411.1 (6th ed.). However, the Rule does not require the exclusion of evidence of liability

insurance when offered for another purpose, such as proof of agency, ownership of control, or

bias or prejudice of a witness. This list is illustrative, but not exclusive. See Weiss v. La Suisse,

Societe D'Assurances sur la Vie, 293 F.Supp. 2d 397, 413 (S.D.N.Y. 2003).

Plaintiffs contend that they are seeking to introduce evidence relating to the defendants'

liability insurance for a permissible purpose, namely to establish defendants' scienter. To the

extent that defendants notified their insurance carriers, during the Class Period, of the possibility

of claims against them related to defendants' public statements, the plaintiffs' argument goes,

such notification would be evidence of defendants' scienter with respect to those statements.

Unfortunately for the plaintiffs, their argument runs straight into the prohibition of Rule

411. Evidence of liability insurance is generally not admissible when a party is accused of acting

wrongfully "because of the likelihood of spillover between insurance and inference of fault."

Posttape Associates v. Eastman Kodak Co., 537 F.2d 751, 758 (3d Cir. 1976). Yet that is

precisely the inference plaintiffs would ask the jury to draw here. Plaintiffs' attempt to

distinguish between the use of evidence of liability insurance to establish that a defendant *acted*

wrongfully and the use of such evidence to establish the requisite state of mind that makes the act

wrongful is unpersuasive.

The plaintiffs' argument assumes, rather quaintly, that defendant directors and officers

have only legitimate claims to fear. To the contrary, defendants are entitled not only to have liability insurance coverage but also to rely upon that coverage when the specter of litigation arises, without giving rise to any implication of wrongdoing. To find that defendants' concern about the prospect and implications of litigation – evinced by any communications with their liability insurance carrier -- constitutes subjective awareness of the wrongfulness of their conduct would cross the line established by Rule 411.

The plaintiffs have notably failed to point to a single case where a court has admitted evidence of D & O liability insurance for the reason proffered here. despite the fact that similar scenarios abound in the securities fraud class action context. Instead, plaintiffs recite cases that deal with readily distinguishable sets of circumstances for the proposition that evidence of liability insurance can be used to establish "knowledge." In Posttape Associates, for instance, the plaintiff documentary film producers sued the defendant film manufacturers for consequential damages caused by defective film. At trial, the *defendant* sought to introduce evidence that *plaintiff* carried liability insurance covering losses due to defective film in order to show that the plaintiff had knowledge of the custom of film manufacturers limiting their liability to the replacement of defective film. The Third Circuit held that the trial court erred by excluding relevant, probative evidence that was clearly submitted for a purpose other than to establish the wrongfulness of the defendant's conduct. Id. at 758. That rationale does not apply to the present case.

The Second Circuit has long recognized that statements disclosing defendants' liability insurance coverage are highly prejudicial to defendants. See Cuccarese v. Solomon, 405 F.2d 866 (2d Cir. 1969). The court finds that even if defendants' communications with their liability

5

insurance carrier are considered relevant to the question of scienter, their limited probative value is substantially outweighed by the danger of unfair prejudice and misleading the jury. Fed. R. Evid. 403. Since the danger to defendants flows not only from the implication that defendants have unlimited resources, but also from the possibility that jurors would accord substantial weight to evidence that has very limited probative value, the use of the evidence is not susceptible of any reasonable limiting instruction.

The plaintiffs also claim that they should be permitted to introduce evidence of defendants' liability insurance coverage should the defendants seek to introduce evidence that tends to give the impression that they would suffer financial hardship from a judgment against them. See Weiss, 293 F.Supp.2d at 413 (evidence of liablity insurance may properly be introduced "where the insured opens the door to the issue by 'poor mouthing' or where the party's ability to pay damages has been put into issue.") If any defendant intends to make an argument or offer evidence to permit an argument that an award of damages will be borne by their shareholders or employees, or intends to offer evidence in order to permit an argument that the jury should consider their financial circumstances in awarding damages, they shall notify the Lead Plaintiff of such an intention. In the absence of such notice, all such references and arguments are barred. See e.g., In re WorldCom, Inc. Securities Litigation, 2005 WL 375314, *2 (S.D.N.Y. Feb 17, 2005)

With the above exception, defendants' motion *in limine* to preclude evidence of liability insurance is GRANTED.

Defendants also request that the court preclude the introduction of evidence with respect to any conduct or statements of the parties in any settlement negotiations pursuant to Fed. R.

Evid. 408. Defendants' request appears to be unopposed and is granted as a matter of course.

III. Defendants' Motion *in Limine* to Preclude Evidence Regarding Veeco's Use of Non-Calendar Quarters

Defendants have filed a motion *in limine*, seeking to preclude the plaintiffs from presenting any argument or evidence at trial with respect to Veeco's practice of using thirteen-week fiscal quarters that do not correspond to the calendar quarters indicated in its SEC filings, without making any disclosure of the discrepancy.

The key question is whether plaintiffs are seeking to introduce the evidence on a "bad person" theory, as defendants contend, or whether the evidence is admissible under Fed. R. Evid. 404(b) to prove the plaintiffs' existing claims. (Def. Br. at 3).

Rule 404(b) of the Federal Rules of Evidence proscribes the use of evidence of "other crimes, wrongs, or acts" committed by the defendant "to prove the character of a person in order to show action in conformity therewith." Prior "bad-acts" evidence is admissible, however, to prove, *inter alia,* knowledge, intent, and absence of mistake. Id. In Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the Supreme Court articulated a four-part test to guide judicial discretion under Rule 404(b). Evidence of prior bad acts must be (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. In addition, (4) at the defendant's request, the district court should give the jury an appropriate limiting instruction. Id. at 691-92, 108 S.Ct. 1496; see also United States v. Ramirez, 894 F.2d 565, 568-69 (2d Cir. 1990)(discussing the Huddleston test).

The Second Circuit "follows the 'inclusionary' approach to 'other crimes, wrongs or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of

showing the defendant's bad character or unless it is overly prejudicial . . . or not relevant."
United States v. Pascarella, 84 F.3d 61, 69 (2d. Cir. 1996); United States v. Oskowitz, 294
F.Supp. 2d 379, 382 (E.D.N.Y. 2003)(other crimes or bad acts evidence is admissible "for any
purpose except to show criminal propensity" and the list of reasons found in Rule 404(b) is not
exhaustive)(citations omitted).

In the pre-trial order (which supercedes the complaint), the plaintiffs assert that the
defendants' admitted "off-quarter" misrepresentations are one aspect of their claim of securities
fraud. In respect of the motion *in limine*, however, plaintiffs deny that the "off-quarter"
misrepresentations are the basis of any claim. Instead, the plaintiffs argue that evidence of
Veeco's "knowingly false representations in [its] quarterly press releases, conference calls and
Forms 10-Q filed with the SEC that those disclosures presented data for calendar quarters when
they actually included data for periods after the end of the calendar quarters" is probative of
defendants' scienter. (Plaintiff's Opp. Br. at 2).

Rule 404(b) explicitly provides, and the courts have long held, that evidence of prior bad
acts may properly be introduced to help establish a defendant's state of mind. See Huddleston,
485 U.S. at 685; Downing, 297 F.3d at 59. Evidence of "another" act should not be admitted to
show knowledge, however, unless the other act is "sufficiently similar to the conduct at issue to
permit the jury reasonably to draw from that act the knowledge inference advocated by the
proponent of the evidence." United States v. Peterson, 808 F.2d 969, 974 (2d Cir.1987).
"Similarity, being a matter of relevancy, is judged by the degree in which the prior act
approaches near identity with the elements of the offense charged. There is no necessity for
synonymity but there must be *substantial* relevancy . . . " United States v. Kasouris, 474 F.2d

8

689, 692 (5th Cir.1973) (emphasis in original) . . . If the other-act evidence does not provide a reasonable basis for inferring knowledge, its offer for that purpose should be rejected on the grounds of relevance. United States v. Afjehei, 869 F.2d 670, 674 (2d Cir. 1989).

My problem with the defendants' objection to the use of this evidence is that the "off-quarter" misrepresentations are not prior bad acts. They are contemporaneous with and a part of the very filings that plaintiffs claim to be false and fraudulent. They are not "another" act and are part and parcel of the challenged filings. Indeed, evidence of the defendants' false statements with respect to their fiscal quarter system must be admitted in order to complete the story, see e.g. Carofino v. Forester, 450 F.Supp. 2d 257, 272 (S.D.N.Y. 2006), because the financial statements containing these misrepresentations are going to be entered into evidence. The jury cannot be precluded from learning that the very public filings alleged to contain the material misstatements at issue in this litigation contain a knowingly false depiction of the defendants' fiscal quarter accounting system. Nor can the jury meaningfully assess such issues as the influence of the alleged accounting improprieties on Veeco's stated financial results or the relationship between Veeco's accounting system and the system used at TurboDisc without being apprised of the way in which the quarterly results were being computed. I will admit the evidence and permit the plaintiffs to make whatever arguments they wish.

That said, it appears from the defendants' submissions that it has been Veeco's consistent practice for over a decade to certify to the SEC that the company's fiscal periods are calendar quarters when they are, in fact, equal 13-week quarters. Only in its most recently filed 10-Q did Veeco disclose the discrepancy. Oddly enough, Veeco's longstanding practice of making these false representations could persuade a jury that they are not probative of the defendants' scienter

with respect to accounting improprieties at TurboDisc, and I would expect the defendants to so

argue. But they must make that argument to a jury.

Defendants' motion *in limine* to preclude evidence regarding Veeco's use of fiscal

quarters is DENIED.

IV. Defendants' Motion *in Limine* to Preclude Lead Plaintiff's Damages Expert from Offering
Certain Calculations as to Potential Damages

Defendants have filed a motion *in limine*, seeking to cabin the testimony of Lead

Plaintiff's damages expert, Professor Steven P. Feinstein, in two respects. First, they ask this

court to prevent Professor Feinstein from characterizing the damages provisions of the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. 78u-4(e)(1),(2) as a means of

measuring actual damages, rather than as a cap on those damages. Second, they seek to prevent

Professor Feinstein from including in his damages calculations (1) shares sold after the corrective

disclosure at a price higher than or equal to the initial purchase price, and (2) shares purchased

prior to the corrective disclosure and not yet sold.

With respect to the first of defendants' challenges, there is no question that Section 21(D)

of the PSLRA does not provide a measure of damages, but rather imposes a cap on the damages

available to a plaintiff. Although the court is unpersuaded that Professor Feinstein stated

otherwise in his Expert Report, it need not resolve the parties' debate surrounding the language

he used in order to decide this motion. The Second Circuit has consistently held . . . that expert

testimony that 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable

law or the role of the jury in applying that law to the facts before it, by definition does not "aid

the jury in making a decision;" rather, it "undertakes to tell the jury what result to reach," and

thus "attempts to substitute the expert's judgment for the jury's." Nimely v. City of New York,
414 F.3d 381, 397 (2d Cir.2005) (citations omitted). The parties agree, and the court concurs,
that it is not Professor Feinstein's place to explain the PSLRA's damages provisions to the jury.
The court adopts the plaintiffs' sensible suggestion that the jury be instructed to calculate actual
damages, and that the damages cap be imposed, if and where necessary, by the court itself.

Second, defendant argues that the plaintiffs' expert must be precluded from including in
his calculations any shares sold after the corrective disclosure at a price higher than or equal to
the initial purchase price. The defendant argues that this case does not present the rare set of
circumstances in which courts of this Circuit will award a plaintiff the benefit of his bargain even
if he has sustained no out-of-pocket loss. See Barrows v. Forest Labs. Inc., 742 F.2d 54, 56 (2d
Cir. 1984); Carlisle Ventures, Inc., v. Banco Espanol de Credito, 176 F.3d 601, 606 (2d Cir.
1999). The court agrees. Surprisingly enough, so does Professor Feinstein, who clearly states in
the section entitled "Per Share Damages" that "If either the inflation or price increased over the
holding period for any particular share, that share was not damaged, so the damage for that share
is zero." (Expert Report on Damages and Loss Causation Prepared By Steven P. Feinstein, Ph.D.,
CFA March 23, 2007, at 90). It is unclear what contrary evidence the defendants are seeking to
exclude or why the plaintiffs defend calculations their own expert has not proffered. In any case,
this part of defendants' motion appears to be moot.

Finally, the defendants seek to preclude Professor Feinstein from including in his
calculations damages for any shares that were purchased prior to the corrective disclosure but
that have not yet been sold. Neither the PSLRA nor the Supreme Court's decision in Dura
Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627 (2005) imposes such a "sell-to-sue"

11

requirement. Indeed, Section 21(D)(e) of the PSLRA recognizes that purchasers who retain

shares past the 90 day look-back period can suffer cognizable damages by explicitly providing

for an exception "*if* the plaintiff sells . . . prior to the expiration of the 90-day period." 15. U.S.C.

78u-4(e)(2)(emphasis added).

Not all holding plaintiffs, however, find themselves on equal footing. Under the

reasoning of Dura, a plaintiff who continues to hold shares that were purchased during the class

period must still prove that he has suffered an economic loss. In Malin v. XL Capital LTD, et al.,

2005 WL 2146089 (D.Conn. Sept. 1, 2005), the court took judicial notice of defendants'

proffered evidence that stock prices returned to the pre-disclosure trading price on January 12,

2004, shortly after the end of the class period. The court proceeded to find that a holding plaintiff

could not recover if the current value of his stock was commensurate to the purchase price,

regardless of whether the price was artificially inflated at the time he purchased it.

The same result should obtain here. Plaintiffs who chose to retain their shares past the

point when the stock price first recovered to the value at which the shares were purchased, can

prove no economic loss that is attributable to any of the defendants' alleged misrepresentations.

Once again, this ruling seems to comport with Professor Feinstein's conclusion that if a share's

price increased over the holding period, the plaintiff suffered no damages. The only remaining

question is when the relevant "holding period" ends for a plaintiff who has not yet sold his

shares. Since actual economic loss is required for a plaintiff to state a viable cause of action, the

court finds that it may continue to consider evidence of price recovery up until the point when the

plaintiffs' damages are finally computed.

12

V. Lead Plaintiff's First, Second, and Third Motions *in Limine*

Plaintiffs have brought three species of essentially the same motion, all of which seek to preclude defendants (and defendants' witnesses) from claiming or testifying at trial with respect to any subject matters which also may have been the subject of defendants' legal advice. If this motion is granted, the jury would be deprived of testimony on purely factual matters, which do not involve attorney-client communications, legal advice, or actual work product. Nothing in Bilzerian, or its progeny, warrants this outcome.

Plaintiffs seek to preclude (i) "defendants and any witnesses from claiming to the jury" that "they did not conclude that the identified 'potential' errors [in TurboDisc's accounting] were actual errors until after they had obtained the results" of the "Kaye Scholer/Jefferson Wells investigation;" (ii) "defendants" and "any defense witness who had access to, or was otherwise informed of the contents of the [KS/JW Investigation] materials, including the investigation's findings" from "making affirmative claims at trial about a belief regarding *any issue that was addressed during the investigation*;"and (iii) defendants from "asserting at trial . . . that defendants Braun and Rein believed in good faith that they were not violating the requirements of the Sarbanes-Oxley Act in issuing [their] Section 302 and 906 certifications." *Id.*

Relying principally on United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991), plaintiffs' stated basis for each of these three motions is that "it would be grossly unfair and prejudicial" for defendants to introduce such factual testimony after denying plaintiffs access to the information from their communications with counsel, which may have dealt with the same subjects.

Plaintiffs' position is untenable. In Bilzerian, the Second Circuit held that where a

defendant puts at issue his understanding of the law based on the advice of counsel, the defendant has waived any applicable privilege relating to those communications. 926 F.2d at 1292. The advice of counsel defense was the proverbial sword a defendant was not allowed to wield after having invoked the attorney-client privilege as a shield. In the present case, defendants have not asserted, and apparently do not intend to assert, an advice of counsel defense. Nor have they put at issue their understanding of the law.

The plaintiffs' contentions in their first and second motions *in limine* are misguided for two additional reasons. First, plaintiffs' contention that defendants' have "cloak[ed] in privilege all information about the purported investigations of accounting entries at the TurboDisc division" has already been rejected both by Magistrate Judge Yanthis and this court. As a result, plaintiffs' claim that they would be unable effectively to cross-examine defense witnesses without the withheld documents is without basis.

Second, nowhere in <u>Bilzerian</u> or its progeny does the Second Circuit suggest that a plaintiff has any right to preclude a defendant from simply denying the allegations set forth in the plaintiff's complaint, or explaining why it believed its factual certifications were made in good faith. For instance, under plaintiffs' view, defendants are to be precluded from offering any evidence with respect to the purely factual issue of Bruce Huff's state of mind at the time he engaged in the improper accounting practices unless they disclose any privileged communications defendants may have had on the subject with counsel months later. To so hold would vitiate the attorney-client privilege altogether. See e.g. <u>Discover Financial Services, Inc. v. Visa U.S.A., Inc.</u>, 2006 WL 2807187, at *6 (S.D.N.Y. Sept. 27, 2006)("To waive the attorney-client privilege . . . a defendant must do more than merely deny a plaintiff's allegations."); <u>see</u>

14

generally Oxyn Telecomm v. Onse Telecom, 2003 WL 660848, at *6 (S.D.N.Y. Feb. 27,
2003)("A party cannot, through its allegations of fraud or bad faith, waive its adversary's
privilege . . . That would give an adversary who is a skillful pleader the ability to render the
privilege a nullity.") The reverse principle is equally true: the defendants cannot be forced at trial
to choose between admitting plaintiffs' allegations of fraudulent conduct and waiving their
privileges.

The plaintiffs' third motion *in limine* seeks to preclude Defendants Braun and Rein "from
making any affirmative assertions to the jury that they believed in good faith that their Sarbanes-
Oxley disclosures were lawful." Plaintiffs argue that the defendants have "waived" their right to
argue good faith because they have "shielded from discovery from plaintiffs the advice and
information defendants Braun and Rein received from counsel in assessing whether their
Sarbanes-Oxley certifications were true and accurate." Plaintiffs have cited no case for the
proposition that asserting a general Section 20(a) "good faith" defense – or indeed, any "good
faith" defense – necessarily puts a defendants' privileged communications with its counsel at
issue. Indeed, existing case law provides no support for the plaintiffs' position.

In Bank Brussels Lambert v. Chase Manhattan Bank, N.A., 1996 WL 173138, at *3
(S.D.N.Y. Apr. 12, 1996) the court rejected the argument that the defendant's good faith defense
waived attorney-client privilege. As the court explained, while "a party does not have to use the
phrase 'reliance on counsel' to put in issue attorney-client communications[, n]either, however,
does every claim of good faith open up inquiries into privileged communications." The reason is
that "not every assertion of good faith implicates the legal understanding of the party making the
claim." Id.; accord In re MetLife Demutualization Litig., 2007 WL 1017603, at *9 (a party may

be found to have waived attorney-client privilege with respect to certain materials "where a party asserts his reliance upon advice of counsel or otherwise puts his understanding of the law at issue."). In Bank Brussels Lambert, attorney-client communications were not put "at issue" because the case revolved around "what [the defendant] knew, not what the law requires." 1996 WL 173138, at *4; see also Arkwright Mutual Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 1994 WL 510043, at *12 (S.D.N.Y. Sept. 16, 1994)("Even where a party's state of knowledge is particularly at issue . . . waiver of the privilege should not be implied because the relevant question is not what legal advice was given or what information was conveyed to counsel, but what facts the party knew and when.") The plaintiffs' attempt to preclude argument at trial with respect to defendants' "good faith" in signing their SOX certifications without any showing that the certifications were even discussed with counsel, let alone that defendants have affirmatively placed any such discussions "at issue," must be rejected.

For the foregoing reasons, Lead Plaintiff's first, second, and third motions *in limine* are DENIED.

## CONCLUSION

This constitutes the decision and order of the Court.

Dated: June 28, 2007:

U.S.D.J.

16